## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| YASIN MUHAMMED BASARDH,<br>              Petitioner,<br>     v.<br><br>GEORGE W. BUSH, et al.,<br>              Respondents. | Civil Action No. 05-0889 (ESH) |
| ABDULRAHIM ABDUL RAZAK AL<br>  GINCO,<br>              Petitioner,<br>     v.<br><br>GEORGE W. BUSH, et al.,<br>              Respondents. | Civil Action No. 05- 1310 (RJL) |

**RESPONDENTS' OPPOSITION TO PETITIONERS' MOTIONS
FOR PRELIMINARY INJUNCTIONS SEEKING TO PREVENT
THEIR TRANSFER OR RELEASE WITHOUT THE COURT'S
PRIOR APPROVAL OR, ALTERNATIVELY, TO REQUIRE
ADVANCE NOTICE OF THEIR TRANSFER OR RELEASE**

Petitioners in the above-captioned cases, represented by the same counsel, have filed

virtually identical motions for preliminary injunctions seeking application of Federal Rule of

Appellate Procedure 23 to prevent their transfer or release from Guantanamo Bay, Cuba

("Guantanamo"), without the Court's prior approval or, alternatively, to require advance notice

of their transfer or release from Guantanamo. In the interest of efficiency, respondents oppose

these motions on a consolidated basis.

On December 30, 2005, the Detainee Treatment Act of 2005, Pub. L. No. 109-148, Tit.

X, 119 Stat. 2680 ("the Act"), became law. The Act, among other things, amends 28 U.S.C.

§ 2241 to remove court jurisdiction to hear or consider applications for writs of habeas corpus

and other actions brought in this Court by or on behalf of aliens detained at Guantanamo and

creates an exclusive review mechanism in the D.C. Circuit, applicable to pending cases, to

address the validity of the detention of such aliens held as enemy combatants.  Id. § 1005(e)(1),

(h)(2).  Consequently, under the Act the Court lacks jurisdiction to order the relief requested by

petitioners.  The effect of the Act was addressed in supplemental briefing in the Guantanamo

detainee appeals pending before the D.C. Circuit,[1] and our understanding is that it is the sense of

the Court that it wishes to await anticipated guidance from the D.C. Circuit regarding the effect

of the Act before deciding any pending motions.[2]  In light of this and given the new, statutory

withdrawal of the Court's jurisdiction, at a minimum a stay of all proceedings in these cases,

including with respect to petitioners' requests for relief, is appropriate pending the resolution of

the effect of the Act.  Indeed, because the Act vests "exclusive" jurisdiction in the D.C. Circuit

"to determine the validity of any final decision of a Combatant Status Review Tribunal that an

alien is properly detained as an enemy combatant," id. § 1005(e)(1), it would be inappropriate for

the Court to order relief in the interim that might infringe upon the Court of Appeals' exclusive

jurisdiction.  See Telecomm. Research and Action Ctr. v. FCC, 750 F.2d 70, 75, 78-79 (D.C. Cir.

1984) (request for relief in district court that might affect Court of Appeals' future, exclusive

jurisdiction is subject to the exclusive review of the Court of Appeals).  For these reasons,

respondents oppose petitioners' requests for relief.

        Accordingly, absent further direction from the Court, respondents should not be required

---

[1] Oral argument before the D.C. Circuit was held on March 22, 2006.

[2] In this vein, several Judges of the Court have recently entered orders in Guantanamo detainee habeas cases pending before them that deny without prejudice, or hold in abeyance, all pending motions and stay "all action" in the cases pending resolution of the effect of the Act. See Order, Gherebi v. Bush, Civ. A. No. 04-1164 (RBW) (D.D.C. Jan. 11, 2006); Order, Begg v. Bush, Civ. A. No. 04-1137 (RMC) (D.D.C. Jan. 27, 2006); Order, Anam v. Bush, Civ. A. No. 04-1194  (HHK) (D.D.C. Mar. 16, 2006); Order, Ahmed Doe v. Bush, Civ. A. No. 05-1458 (ESH) (D.D.C. Mar. 31, 2006).

to submit additional substantive responses to the present requests for relief.  Nonetheless, in an abundance of caution regarding this understanding, respondents also oppose petitioners' requests for relief for the reasons discussed below.[3]

## **BACKGROUND**

### A.    **Detention of Enemy Combatants at Guantanamo**

Following the terrorist attacks of September 11, 2001, pursuant to his powers as Commander in Chief and with congressional authorization, see Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), the President dispatched the United States Armed Forces to seek out and subdue the al Qaeda terrorist network and the Taliban regime and others that had supported it.  In the course of those hostilities, the United States has captured or taken custody of a number of foreign nationals as enemy combatants, some of whom are being held at Guantanamo.

---

[3] Similar motions have been filed throughout the past year in numerous other Guantanamo detainee habeas cases, with varying results.  Compare, e.g., Al-Joudi v. Bush, Civ. A. No. 05-0301 (GK), 2005 WL 774847 (D.D.C. Apr. 4, 2005) (granting preliminary injunction), with Kurnaz v. Bush, Civ. A. No. 04-1135 (ESH), 2005 WL 839542 (D.D.C. Apr. 12, 2005) (granting preliminary injunction only as to transfers other than for release), with Al-Oshan v. Bush, Civ. A. No. 05-0520 (RMU) (D.D.C. Mar. 31, 2005) (ordering advance notice as part of stay), with Deghayes v. Bush, Civ. A. No. 04-2215 (RMC) (D.D.C. June 15, 2005) (denying preliminary injunction but requiring notice to the Court of any decision to transfer a particular individual to a particular country), with Almurbati v. Bush, 366 F. Supp. 2d 72 (D.D.C. 2005) (denying preliminary injunction); Al-Anazi v. Bush, 370 F. Supp. 2d 188 (D.D.C. 2005) (same); Mammar v. Bush, Civ. A. No. 05-0573 (RJL) (D.D.C. May 2, 2005) (same); Attash v. Bush, Civ. A. No. 05-1592 (RCL) (D.D.C. Sept. 1, 2005) (same).  Respondents have taken interlocutory appeals of the orders requiring advance notice.  No orders denying motions seeking advance notice of a transfer have been appealed.

**B.      Repatriation and Transfer of Enemy Combatant Detainees at Guantanamo**

Although the laws of war permit the United States to hold enemy combatants in detention

for the duration of hostilities, the United States has no interest in detaining any individuals longer

than necessary.  See Decl. of then Deputy Assistant Secretary of Defense for Detainee Affairs

Matthew C. Waxman dated June 2, 2005 ("Waxman Decl.") ¶ 3; Decl. of then Ambassador

Pierre-Richard Prosper dated March 8, 2005 ("Prosper Decl.") ¶ 2.[4]  The Department of Defense

("DoD") conducts at least annual reviews of each Guantanamo detainee to determine whether

continued detention is warranted based on factors such as whether the detainee continues to pose

a threat to the United States and its allies.  Waxman Decl. ¶¶ 3, 7; Prosper Decl. ¶ 2.  Those

annual reviews include those currently being conducted through Administrative Review Boards.

See Waxman Decl. ¶¶ 3, 7.[5]  As part of the Administrative Review Board process, counsel who

represent detainees have been invited to make written submissions concerning whether further

detention is appropriate; in these submissions, counsel are free to raise, and in fact have raised,

any concerns about transfer or repatriation, and have in fact made such submissions.

---

[4] The June 2, 2005 Waxman Declaration submitted herewith replaces and supersedes two
prior declarations by Deputy Assistant Secretary Waxman submitted in connection with similar
motions in other Guantanamo detainee cases.  See Waxman Decl. ¶ 1.  The Prosper Declaration
submitted herewith was originally submitted in connection with a similar motion in Abdah v.
Bush, Civ. A. No. 04-1254 (HHK), 2005 WL 711814 (D.D.C. Mar. 29, 2005).  While Mr.
Waxman and Mr. Prosper have both recently left office, the policies and practices set forth in
their prior declarations remain in effect and are applicable to the instant case.  Certain numerical
information in the declarations is subject to updating.  See infra note 6.

[5] See generally Memorandum of the Deputy Secretary of Defense dated May 11, 2004,
re: Admin. Review Procedures for Enemy Combatants in the Control of the DoD at Guantanamo
Bay Naval Base, Cuba, available at <<http://www.defenselink.mil/news/May2004/d20040518
gtmoreview.pdf>>; Memorandum dated Sept. 14, 2004, re: Implementation of Admin. Review
Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba,
available at <<http://www.defenselink.mil/news/Sep2004/ d20040914adminreview.pdf>>.

Following consultation with various agencies, a senior Department of Defense official grants the ultimate approval for the transfer of any Guantanamo detainee to the control of another government. Waxman Decl. ¶¶ 6-7; Prosper Decl. ¶¶ 2-3, 7. Approximately 270 Guantanamo detainees have been so transferred, over a period spanning several years. Waxman Decl. ¶ 4; Prosper Decl. ¶ 2.[6]

Where continued detention by the United States is not warranted, a detainee may be transferred to the control of another government, typically the government of his country of citizenship, for release. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3. The United States also transfers Guantanamo detainees, under appropriate circumstances, to the control of other governments for continued detention, investigation, and/or possible prosecution when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3. Such governments can include the government of a detainee's country of citizenship, or another country that may have law enforcement, prosecution, or other interest in the detainee. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.

Such transfers to the control of other governments for continued detention, investigation, and/or prosecution occur after a dialogue between the United States and the receiving government, which may have been initiated by either the United States or the receiving government. Waxman Decl. ¶ 5. The purpose of such dialogue is to ascertain or establish what

_____

[6] As an update to certain information provided in the attached declarations approximately 270 detainees have been transferred by the DoD from Guantanamo, of which approximately 190 were transferred for release. See, e.g., DoD News Release, "Detainee Release Announced," Feb. 9, 2006, available at <<http://www.defenselink.mil/news/nrdgb.html>>.

measures the receiving government intends to take, pursuant to its own domestic laws and

independent determinations, that will ensure that the detainee will not pose a continuing threat to

the United States and its allies.  Id.  In all cases where a transfer is consummated, the detainee is

transferred entirely to the custody and control of the other government; once transferred, the

individual is no longer in the custody or control of the United States.  Id.  Any future detention of

that individual is by the foreign government pursuant to its own laws and not on behalf of the

United States.  Id.  In fact, most of the Guantanamo detainees who have been transferred by the

DoD to the control of their home countries for continued detention, investigation, and/or

prosecution have been released from detention some time after the transfer.  Id.

In any transfer, a key concern is whether the foreign government will treat the detainee

humanely and in a manner consistent with its international obligations.  Prosper Decl. ¶ 4;

Waxman Decl. ¶ 6-7.  It is the policy of the United States not to repatriate or transfer a detainee

to a country where the United States believes it is more likely than not that the individual will be

tortured.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.  If a transfer is deemed appropriate, a process is

undertaken, typically involving the Department of State, in which appropriate assurances

regarding the detainee's treatment are sought from the country to whom the transfer of the

detainee is proposed.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 5.  Once the DoD approves a transfer

and requests the assistance of the Department of State, the Department of State initiates transfer

discussions with the foreign government concerned.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 6.  Such

discussions include an effort to seek assurances that the United States Government considers

necessary and appropriate for the country in question, including assurances of humane treatment

and treatment in accordance with the international obligations of the foreign government

accepting transfer.  Id.  Among other things, the Department of State considers whether the

nation in question is a party to relevant treaties such as the Convention Against Torture and

Other Cruel, Inhuman or Degrading Treatment or Punishment, and pursues more specific

assurances if the nation concerned is not a party or other circumstances warrant.  Id.

The determination whether it is more likely than not an individual would be tortured by a

receiving foreign government, including, where applicable, evaluation of foreign government

assurances, involves senior level officials and takes into account a number of considerations,

including whether the nation concerned is a party to certain treaties; the expressed commitments

of officials of the foreign government accepting transfer; the particular circumstances of the

transfer, the country, and the individual concerned; and any concerns regarding torture that may

arise.  Prosper Decl. ¶¶ 6-8; Waxman Decl. ¶ 7.  Recommendations by the State Department are

developed through a process involving the Bureau of Democracy, Human Rights, and Labor

(which drafts the State Department's annual Country Reports on Human Rights Practices) and

the relevant State Department regional bureau, country desk, or U.S. Embassy.  Prosper Decl.

¶ 7.  When evaluating the adequacy of assurances, State Department officials consider the

identity, position, or other information concerning the official relaying the assurances; political or

legal developments in the foreign country concerned that provide context for the assurances; and

the foreign government's incentives and capacity to fulfill its assurances to the United States.

Prosper Decl. ¶ 8.  In an appropriate case, the State Department may consider various monitoring

mechanisms for verifying that assurances are being honored.  Id.  If a case were to arise in which

the assurances obtained from the receiving government were not sufficient when balanced

against treatment concerns, the United States would not transfer a detainee to the control of that

government unless the concerns were satisfactorily resolved. Waxman Decl. ¶ 7; Prosper Decl.

¶ 8. Indeed, circumstances have arisen in the past where the DoD decided not to transfer

detainees to their country of origin because of mistreatment concerns. Waxman Decl. ¶ 7;

Prosper Decl. ¶ 8.

The United States' ability to seek and obtain assurances from a foreign government

depends on its ability to treat its dealings with the foreign government with discretion. Prosper

Decl. ¶ 9; Waxman Decl. ¶ 8. Obviously, diplomatic sensitivities surround the Department of

State's communications with foreign governments concerning allegations relating to torture.

Prosper Decl. ¶ 9; Waxman Decl. ¶ 8. The United States Government typically does not

unilaterally make public any specific assurances or other precautionary measures obtained,

because such disclosure would have a chilling effect on and cause damage to our ability to

conduct foreign relations. Prosper Decl. ¶ 9. If the United States Government were required to

disclose its communications with a foreign government relating to particular mistreatment or

torture concerns outside appropriate Executive Branch channels, that government and potentially

other governments would likely be reluctant to communicate frankly with the United States

concerning such issues in the future.[7] Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8. As a result,

disclosure could impede our country's ability to obtain vital cooperation from concerned

governments with respect to military, law enforcement, and intelligence efforts related to the war

---

[7] Another reason such disclosure would be harmful is that the State Department's recommendation concerning transfer relies heavily on facts and analyses provided by Embassies and other State Department offices, and confidentiality is necessary to ensure that the advice and analysis provided by those offices are useful and informative for the decision-maker. Prosper Decl. ¶ 11. Disclosure of their assessments could chill important sources of information and interfere with the ability of our foreign relations personnel to interact effectively with foreign state officials. Id.

on terrorism.  Waxman Decl. ¶ 8; Prosper Decl. ¶ 12.

## ARGUMENT

### I.    PRELIMINARY INJUNCTION STANDARD

It is well-established that a request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  See Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004).  To prevail in a request for a preliminary injunction, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'"  See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

In particular, the irreparable harm that must be shown to justify a preliminary injunction "must be both certain and great; it must be actual and not theoretical."  Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).  "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."  Id. (citations and internal quotation marks omitted; emphasis in original).[8]

---

[8] Some Judges of this Court have entered the functional equivalent of preliminary injunctive relief as a component of a stay of proceedings related appeals.  However, as one Judge of this Court has concluded, "if the petitioners cannot meet the prerequisites of a motion for preliminary injunction . . . it is unlikely that they should receive that same relief through the

(continued...)

## II.    PETITIONERS FAIL TO SHOW IRREPARABLE INJURY

### A.    The Mooting of a Habeas Claim that Naturally Flows From Relinquishment of United States Custody Does Not Constitute Irreparable Injury Justifying a Preliminary Injunction

Petitioners argue that a preliminary injunction requiring advance notice is necessary in order to "protect" the Court's jurisdiction, reasoning that a transfer would or could extinguish the transferred detainee's habeas claims and curtail the Court's review of the legality of his detention.  See Pet'rs' Br. at 5, 7-8.  Petitioners' argument, however, rests on faulty logic.  The ultimate relief sought by petitioners in these habeas cases is obviously release from custody.  Any right to challenge the legality of one's detention through a habeas proceeding cannot reasonably extend so far as to require that detention be continued, after the Executive determines that the military rationales for enemy combatant detention no longer warrant such custody, for no reason other than to be able to test the legitimacy of detention the Executive no longer is interested in maintaining.[9]  "The ultimate objective of a habeas petition is release from custody."  Almurbati,

_____

[8](...continued)
backdoor of a stay."  Al-Anazi, 370 F. Supp. 2d at 199 n.11 (citing Laborers' Int'l Union of N. Am. v. Nat'l Post Office Mail Handlers, Civ. A. No. 8801731-OG, 1988 WL 142384, at *1 (D.D.C. Dec. 23, 1988)).  Thus, in whatever form of order the inherently-injunctive-in-nature relief petitioners seek might be embodied, petitioners should be required to satisfy the preliminary injunction standard in order to justify that relief.

[9] Transfers of Guantanamo detainees are not undertaken in order to thwart the jurisdiction of the Court.  Waxman Decl. ¶ 3.  Indeed, such transfers have been occurring since October 2002, long before the Supreme Court's decision in Rasul v. Bush, 524 U.S. 466 (2004), and the proliferation of detainee habeas petitions that it spawned in this Court.  Waxman Decl. ¶ 4.  It has been noted that 131 transfers (i.e., more than half of the transfers to date) had occurred three months or longer before Rasul was decided, "thus casting doubt on petitioners' suggestion that DOD is undertaking a policy of transfer in order to thwart the jurisdiction of the courts."  Al-Anazi, 370 F. Supp. 2d at 196 n.7 (citing DoD, Transfer of Afghani and Pakistani Detainees Complete (Mar. 15, 2004); see also supra note 5 (citing documents showing that administrative
(continued...)

366 F. Supp. 2d at 78.  As one Judge of this Court stated, "once the respondents release the petitioners from United States custody . . . they will have obtained the result requested and at that point there will be no further need for this Court to maintain jurisdiction."  Id. at 80; see also Al-Anazi, 370 F. Supp. 2d at 198 ("Every habeas petition, including this one, is ultimately about obtaining release from detention, and where, as here, the United States will relinquish custody of the detainee to the home government there is nothing more the Court could provide to petitioners.") (citation omitted).

That release from United States custody will give petitioners all the relief they can seek through habeas is not altered by the fact that, upon being released from the custody of the United States, a former detainee may be taken into custody and detained in the receiving country based on that country's independent interests and determinations.  As respondents' declarations make clear, when the DoD transfers detainees to the control of other governments, the detainees are no longer subject to the custody or control of the United States, and any subsequent confinement in the receiving country is based on the receiving government's independent decision, based on its domestic laws, that the individual should be detained.  Waxman Decl. ¶ 5.  Indeed, even if the United States transfers a detainee to his home government with the understanding that, from the United States' perspective, he can be released, the home government may well subsequently take any law enforcement or investigatory action against the former detainee that it may deem appropriate under its laws.  The Court should therefore reject petitioners' suggestion that the possibility of future detention in an individual's home or another country based on that country's

_____

[9](...continued)
review process for considering transfers and repatriations predates the filing of this and most other detainee habeas petitions).

independent interests and determinations constitutes irreparable injury warranting an injunction.

**B.    Speculation that the United States Will Defy its Own Policy by Transferring Detainees to Countries in Circumstances Where it is Believed They Will be Tortured Does Not Warrant a Preliminary Injunction**

Nor can petitioners carry their burden to show irreparable injury that is "certain and great . . . actual and not theoretical," Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985), by rife speculation that, contrary to the policies and processes attested to in the sworn declarations of high-level Executive Branch officials, the United States has designs to send petitioners to a foreign country in circumstances where they will be tortured. Those declarations, after all, make clear that it is the policy of the United States not to repatriate or transfer a detainee to a country when the United States believes, based on a number of factors and considerations, it is more likely than not that the individual will be tortured there. Prosper Decl. ¶ 4; Waxman Decl. ¶ 6. This policy is implemented through a process that contains several levels of precautions and safeguards. To conclude that an injunction is nevertheless necessary would require the Court to assume, without any evidence, that the United States' policy and practice is somehow a sham or pretext. There is no valid basis for such an assumption.

Rather, as one Judge of this Court has found, respondents' sworn declarations "directly refute the petitioners' allegations of their potential torture, mistreatment and indefinite detention to which the United States will in some way be complicit." Almurbati, 366 F. Supp. 2d at 78. Moreover, another Judge found that the assortment of magazine and newspaper stories relied upon by many detainee-petitioners in these cases failed to form a factual predicate justifying an injunction, noting that, among other problems with relying on such materials, "[p]etitioners [in

12

that case] concede that none of these incidents involve the transfer of detainees out of Guantanamo." Al-Anazi, 370 F. Supp. 2d at 190-91; see also id. at 196. Thus, petitioners have failed to show that either the prospect of relinquishment from United States custody or unfounded speculation about possible torture in a foreign country constitute irreparable harm that must be remedied by a preliminary injunction.

**III.   PETITIONERS CANNOT SHOW A LIKELIHOOD OF SUCCESS
        IN OBTAINING A COURT ORDER PREVENTING A TRANSFER
        OR RELEASE IN ACCORDANCE WITH THE POLICIES
        EXPRESSED IN RESPONDENTS' DECLARATIONS**

Petitioners fare no better on the second prong of the preliminary injunction analysis, which requires them to show that they are likely to succeed in preventing a transfer from Guantanamo.

To be clear, aside from the withdrawal of district court habeas jurisdiction in these cases under the Detainee Treatment Act, see supra, whatever the merits of petitioners' substantive claims that they are being wrongfully detained, see Pet'rs' Br. at 9, it is not the likelihood of success on those issues or claims that matters for purposes of the instant motions for preliminary injunctions. Rather, as two Judges of this Court (who reached opposite outcomes on the bottom line of whether to require advance notice) have agreed, the likelihood of success analysis must focus on the legal basis for petitioners to obtain an order preventing termination of detention by the United States in the manner described in the declarations submitted herewith. See Al-Anazi, 370 F. Supp. 2d at 194 ("[T]he presence of a sound basis to challenge the legality of one's detention does not at all imply that there exists a sound basis to challenge the legality of one's transfer. Put differently, the 'merits,' if you will, to be assessed for purposes of the present claim

for preliminary injunctive relief, is petitioners' challenge to their <u>transfer</u> from Guantanamo, not

to their <u>detention</u> at Guantanamo) (emphasis in original); <u>Abdah</u>, 2005 WL 711814, at *4 ("<u>if</u>

there are no circumstances under which Petitioners could obtain a court order preventing a

contemplated transfer, a preliminary injunction should not be granted") (emphasis in original).

     As we show below, no valid source of legal authority supports petitioners' request for an

order prohibiting transfer or requiring advance notice of transfer.  Moreover, even if a valid

source of legal authority existed for such an order, the Rule of Non-Inquiry, which bars judicial

inquiry into the fairness of a foreign nation's justice system and the procedures or treatment that

an individual may experience in a foreign nation, weighs heavily against petitioners' likelihood

of success in contesting a transfer or repatriation.

     **A.**    **Federal Rule of Appellate Procedure 23 Does Not Apply**

     Petitioners' primary argument is that Rule 23(a) of the Federal Rules of Appellate

Procedure requires authorization by the Court (or at a minimum notice to the Court and

petitioners' counsel) before a detainee may be released, repatriated, or transferred.  <u>See</u> Pet'rs'

Mem. at 3.  However, petitioners never confront a threshold problem with this argument: the

Federal Rules of Appellate Procedure, by their terms, plainly do not apply to these cases, in

which there has not been any decision undergoing appellate review.  <u>See</u> Fed. R. App. P. 23(a)

(applying "[p]ending review of a decision in a habeas corpus proceeding" and only to "the

prisoner" in whose proceeding that decision was made); <u>see also</u> Fed. R. App. P. 1(a)(1) ("These

rules govern procedure in the United States courts of appeals."); Order, <u>Tohirjanovich v. Bush</u>,

Civ. A. No. 05-994 (JDB) (D.D.C. Dec. 22, 2005), at 1-2 (rejecting Fed. R. App. P. 23(a)

argument where, like the instant cases, there had not been any decision undergoing appellate

14

review, because the case was "not 'pending review' in any way"); Order, <u>Battayav v. Bush</u>, Civ.

A. No. 05-714 (RBW) (D.D.C. May 3, 2005), at 1 n.1 (rejecting Fed. R. App. P. 23(a) argument

where case, like these, did not have a pending appeal); <u>Al-Anazi</u>, 370 F. Supp. 2d at 199 n.11

("The Court notes that petitioners did not even attempt to argue in their papers that Federal Rule

of Appellate Procedure 23 requires a stay of a transfer decision, because petitioners' habeas

petition is not presently on appeal.").

In any event, even in a case in which there <u>is</u> a decision undergoing appellate review,

Federal Rule of Appellate Procedure 23(a) does not have the effect that petitioners ascribe to it.

As Judge Bates has held, "[n]othing in the Rule indicates a desire to extend it to situations where

the United States (or a state) is transferring an individual out of federal or state custody entirely."

<u>O.K. v. Bush</u>, 377 F. Supp. 2d 102, 116 (D.D.C. 2005); <u>see also</u> Order, <u>Tohirjanovich v. Bush</u>,

Civ. A. No. 05-994 (JDB) (D.D.C. Dec. 22, 2005), at 3-5 (reaffirming holding of <u>O.K.</u>).  Rule

23(a) is designed to ensure that, in situations where a prisoner is transferred from one custodian

subject to federal habeas jurisdiction to another custodian subject to federal habeas jurisdiction,

but remains in the custody of the United States (or relevant state thereof), the court is able to

appropriately substitute the successor custodian as the respondent.  <u>See</u> Fed. R. App. P. 23(a)

("the court, justice, or judge rendering the decision under review may authorize the transfer and

substitute the successor custodian as a party"); <u>Wood v. United States</u>, 873 F. Supp. 56, 57 (W.D.

Mich. 1995) (declining to adopt expansive construction of Rule 23(a) where "the purposes of

Rule 23(a) would not be furthered," which purposes are "reflected in the provisions of the rule

for substituting the successor custodian as a party").  Critically, nothing in Rule 23(a), nor any

other provision of law, operates to restrict the United States from relinquishing custody of an

individual, which, after all, is the ultimate object of a habeas corpus case.  See O.K., 377 F.

Supp. 2d at 116-17; cf. Brady v. United States Parole Comm'n, 600 F.2d 234, 236 (9th Cir.

1979) (Rule "does not touch upon release" by government).

        In light of its focus on "substitut[ing] the successor custodian as a party," the Rule should

not be read to cover situations that involve a relinquishment of United States custody altogether

in connection with a transfer or repatriation to a foreign nation, as opposed to scenarios that

involve a transfer from one United States custodian to another United States custodian.  See Fed.

R. App. Proc. 23(a).  In the former situation, there is no "successor custodian" subject to federal

habeas jurisdiction who could be substituted as a party.[10]  See O.K., 377 F. Supp. 2d at 116

(noting that petitioners' interpretation of the word "another" to include a foreign government

"immediately runs into difficulty in the next sentence of the Rule").  Moreover, upon

relinquishment of United States custody, the relief available in habeas would have been received

and the habeas case therefore would be moot, making substitution of a successor custodian

unnecessary.

        Historically, Rule 23(a) cases have involved transfers from one United States (or state)

custodian to another United States (or state) custodian where the prisoner remained in the

custody of the United States (or state authorities).  See, e.g., Goodman v. Keohane, 663 F.2d

1044, 1047 (11th Cir. 1981) (involving transfer from federal correctional facility in Miami,

Florida to a federal penitentiary in Terre Haute, Indiana); see also Brady, 600 F.2d at 236 (Rule

_____

        [10] This is so regardless of whether the foreign nation to which the former Guantanamo
detainee is repatriated or transferred may itself detain the individual as a function of its own law
enforcement, criminal justice, or other interests, as would be its prerogative.  Neither
respondents, nor this Court, are in a position to confer upon ex-detainees some kind of
worldwide immunity from law enforcement by other sovereign governments.

23 "was promulgated to alleviate jurisdictional problems sometimes created by geographical limits on habeas corpus jurisdiction").  As Judge Bates held, in light of the "well-settled canon of statutory interpretation providing that a court should not construe a statute to interfere with the province of the Executive over military affairs in the absence of a clear manifestation of Congressional intent to do so," the unique situation of detainees captured in the course of ongoing military hostilities does not present an appropriate occasion for indulging a creative interpretation that "would transform a technical and procedural rule that addresses the identity of the parties in a habeas proceeding into a sweeping prohibition on the transfer and release of military detainees while a case is on appeal."  O.K., 377 F. Supp. 2d at 117 (citing Dep't of Navy v. Egan, 484 U.S. 518, 527 (1988)).  Petitioners do not even acknowledge the O.K. decision, let alone attempt to distinguish or refute it.

**B.    Principles Underlying the Rule of Non-Inquiry Militate Heavily Against Petitioners' Likelihood of Success**

Further, even if some valid claim or other legal basis existed for judicial involvement in transfer or repatriation decisions with respect to enemy combatants held abroad, or for an advance notice requirement to support and facilitate such involvement, the separation of powers would bar such relief.  "[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch."  People's Mojahedin Org. v. Dep't of State, 182 F.3d 17, 23 (D.C. Cir. 1999) (citing Chicago & S. Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103 (1948)); see also Holmes v. Laird, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations such as this, '[t]he controlling considerations are the interacting interests of the United States and of foreign countries, and in assessing them [the courts] must move with the circumspection

17

appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our international relations.'") (quoting <u>Romero v. Int'l Terminal Operating Co.</u>, 358 U.S. 354, 383 (1959)).[11]  If the Court were to entertain petitioners' claims to a right to contest repatriation or removal from Guantanamo, it would insert itself into the most sensitive of diplomatic matters. Judicial review of a transfer or repatriation decision could involve scrutiny of United States officials' judgments and assessments on the likelihood of torture in a foreign country, including judgments on the reliability of information and representations or the adequacy of assurances provided, and confidential communications with the foreign government and/or sources therein. Prosper Decl. ¶¶ 9-12.  Disclosure and/or judicial review of such matters could chill important sources of information and interfere with our ability to interact effectively with foreign governments.  Prosper Decl. ¶¶ 9-12; Waxman Decl. ¶ 8.  In particular, the foreign government in question, as well as other governments, would likely be reluctant to communicate frankly with the United States in the future concerning torture and mistreatment concerns.  Prosper Decl. ¶¶ 10, 12.  This chilling effect would jeopardize the cooperation of other nations in the war on terrorism.  Prosper Decl. ¶¶ 10, 12; Waxman Decl. ¶ 8.

Because of these foreign relations implications, as developed most extensively in the analogous context of extradition, courts have uniformly eschewed inquiry into "'the fairness of a

---

[11] In <u>Holmes</u>, U.S. citizen servicemembers sued to prevent the United States government from surrendering them to West German authorities to serve sentences for convictions by West German courts on criminal charges relating to their conduct while stationed in West Germany. Even in this situation involving U.S. <u>citizens</u>, the District Court and D.C. Circuit rejected the plaintiffs' invitation to examine the fairness of their treatment by the West German courts and declined to enjoin the transfer, the latter court holding that "the contemplated surrender of appellants to the Federal Republic of Germany is a matter beyond the purview of this court."  459 F.2d at 1225.

requesting nation's justice system'" and "'the procedures or treatment which await a surrendered

fugitive in the requesting country.'" United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir.

1997) (quoting Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1983));

see Al-Anazi, 370 F. Supp. 2d at 194 (holding that this "well-established line of cases in the

extradition context" "counsel[s] even further against judicial interference").  This principle is

sometimes called the Rule of Non-Inquiry.  For example, in Ahmad v. Wigen, 910 F.2d 1063 (2d

Cir. 1990), a United States citizen was extradited from the United States to Israel to stand trial

for an alleged terrorist attack.  While the district court upheld the extradition only after receiving

testimony and extensive documentation concerning Israel's law enforcement system and

treatment of prisoners, the Second Circuit held that such inquiry was wholly improper.  "The

interests of international comity are ill-served," the Second Circuit explained, "by requiring a

foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its

laws and the manner in which they are enforced."  Id. at 1067.  "It is the function of the Secretary

of State to determine whether extradition should be denied on humanitarian grounds."  Id.

Accord Escobedo v. United States, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar

extradition based on allegations that appellant "may be tortured or killed if surrendered to

Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that

properly falls within the exclusive purview of the executive branch" (internal quotation marks

omitted)); Peroff v. Hylton, 563 F.2d 1099, 1102 (4th Cir. 1977); Matter of Extradition of

Sandhu, 886 F. Supp. 318, 321-23 (S.D.N.Y. 1993); Hoxha v. Levi, 371 F. Supp. 2d 651, 659-61

(E.D. Pa. 2005) (holding that allegations that individual would be tortured after extradition to

Albania were solely for the Secretary of State to weigh, and not an appropriate subject for

judicial inquiry), on appeal, No. 05-3149 (3d Cir.).  See generally Jacques Semmelman, Federal

Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings,

76 Cornell L. Rev. 1198 (1991).

The force of these principles is not diminished by the fact that petitioners seek judicial

review of any kind of transfer, repatriation or removal from Guantanamo, rather than merely

trying to block an extradition.  The considerations that underlie the Rule of Non-Inquiry are not

endemic to the specific context of extradition, but instead rest on the constitutional separation of

powers.[12]  See Matter of Requested Extradition of Smyth, 61 F.3d 711, 714 (9th Cir. 1995)

("Undergirding this principle is the notion that courts are ill-equipped as institutions and

ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into

and pronouncements about the workings of foreign countries' justice systems."); Sandhu, 886 F.

---

[12] Some petitioners in Guantanamo detainee habeas cases have argued that the Rule of Non-Inquiry is contingent on the existence of an extradition treaty, citing In re Extradition of Howard, 996 F.2d 1320, 1329 (1st Cir. 1993).  However, the applicable language from Howard was characterized as dicta by the First Circuit in a subsequent decision.  Kin-Hong, 110 F.3d at 111 n.12.  In that later case, while pretermitting the question "[w]hether the doctrine is constitutionally mandated" as "immaterial here," the First Circuit cited an analogy to the act-of-state doctrine and described the doctrine using language imbued with constitutional significance. See id. at 110-11 ("The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers.  It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed.") (citation omitted).

Moreover, to the extent that petitioners may contend that the only possible way to repatriate them would be pursuant to an extradition treaty or statute, such a contention would be wholly without merit.  See United States v. Alvarez-Machain, 504 U.S. 655 (1992); Ker v. Illinois, 119 U.S. 436 (1886); Coumou v. United States, 107 F.3d 290, 295 (5th Cir. 1997) (reversing lower court's holding, Civ. A. No. 93-1465, 1995 WL 2292, *11 (E.D. La. Jan. 3, 1995), that "[n]or did the United States, or its officers or agents, have the discretion to deliver an arrested person to the government of Haiti, unless the extradition laws of the United States were followed").

Supp. at 321 ("The rule of non-inquiry arises from recognition that the executive branch has

exclusive jurisdiction over the country's foreign affairs."); cf. Holmes, 459 F.2d at 1219-23

(holding, in a non-extradition context, that considerations similar to those embodied in the Rule

of Non-Inquiry made it improper for the Judiciary to examine allegations of unfairness in a

foreign nation's trial of a U.S. citizen).  Thus, petitioners cannot turn to the courts to second-

guess Executive judgments about matters such as custodial conditions and/or the adequacy of

legal procedures in a foreign country, as well as the credibility and adequacy of a foreign

government's assurances.  Cf. People's Mojahedin, 182 F.3d at 23 (expressing reluctance of

courts to interfere in matters "'for which the Judiciary has neither aptitude, facilities nor

responsibility and have long been held to belong in the domain of political power not subject to

judicial intrusion or inquiry'") (quoting Chicago & S. Air Lines, 333 U.S. at 111)).

***

Thus, there is no basis in law for an injunction blocking petitioners' transfer or release

without the Court's prior authorization, or requiring petitioners' counsel and this Court be given

advance notice of any upcoming transfer or release.  Neither the Court's habeas corpus

jurisdiction nor any other legal authority supports the notion of ordering custody that the United

States wishes to relinquish to nevertheless be artificially and indeterminately prolonged purely to

preserve a live case for the Court.  And, apart from the absence of affirmative legal authority,

separation of powers considerations and foreign relations sensitivities preclude a judicial inquiry

in which this Court would substitute its judgment regarding the appropriateness of repatriation

for that of the appropriate Executive Branch officials.

21

## IV.    AN INJUNCTION REQUIRING ADVANCE NOTICE WOULD TRAMPLE ON THE SEPARATION OF POWERS

It is undisputed that the sole reason petitioners seek advance notice is to enable them to seek an order blocking a transfer or repatriation decision that the Executive would already have made after consultation and coordination with the foreign government in question.  Such an advance notice requirement foreshadows judicial review and intervention that would be accompanied by the attendant harms discussed in the declarations of then Deputy Assistant Secretary Waxman and then Ambassador Prosper submitted herewith.  See Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12.  Even if such judicial review did not ultimately result in an injunction against transfer, the mere inquiry into the United States' dialogue with foreign nations and into the terms of a transfer and any assurances that may have been obtained would cause grave harm.  See supra Section III.B (describing interests that underlie the Rule of Non-Inquiry); Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12.  Moreover, the very prospect of judicial review, as exemplified by an advance notice requirement, causes separation-of-powers harm by undermining the ability of the Executive Branch to speak with one voice in its dealings with foreign nations.  See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with other governments").  An advance notice requirement, after all, would make the results of diplomatic dialogue between the Executive Branch and a foreign government regarding repatriations or transfers inherently contingent because the effective acquiescence of another Branch (i.e., the Judiciary) would be required for a transfer or repatriation to go forward, and such a requirement would also inject delays into future transfers.

These harms weigh heavily against entry of a preliminary injunction.

## V.    AN INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST

The public interest favors allowing the Executive Branch, which is constitutionally vested with the authority both to conduct military functions, such as detention of enemy combatants for the duration of hostilities, and to engage in foreign relations, to act without undue intrusion within its constitutional sphere of responsibility.[13]  As one Judge of this Court has held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon the foreign policy and war powers of the Executive on a deficient factual record. Where the conduct of the Executive conforms to law, there is simply no benefit – and quite a bit of detriment – to the public interest from the Court nonetheless assuming for itself the role of a guardian ad litem for the disposition of these detainees.  See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch.").

Al-Anazi, 370 F. Supp. 2d at 199.  Here, as well, the public interest disfavors an injunction.

## CONCLUSION

For the reasons stated above, respondents respectfully request that petitioners' motions for preliminary injunctions be denied.

---

[13] While two Judges, in granting preliminary injunctions, have relied on the general statement that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights," G & V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994), cited in Al-Joudi, 2005 WL 774847, at *6; Abdah, 2005 WL 711814, at *6, that formulation leaves the question what violations of constitutional rights (assuming arguendo that enemy aliens detained at Guantanamo possess rights under the United States Constitution, but see Khalid, 355 F. Supp. 2d at 320-23) are present or imminent here and stand to be prevented by an injunction.  As discussed above, respondents' policy and practices governing transfer and repatriation of Guantanamo detainees plainly do not violate any rights petitioners may have, constitutional or otherwise.  The public interest surely does not support assuming without any foundation that Executive Branch officials are wont to engage in constitutional violations unless supervised by the courts.

Dated: May 4, 2006                    Respectfully submitted,

                                      PETER D. KEISLER
                                      Assistant Attorney General

                                      DOUGLAS N. LETTER
                                      Terrorism Litigation Counsel

                                      ___/s/ Marc A. Perez_____
                                      JOSEPH H. HUNT (D.C. Bar No. 431134)
                                      VINCENT M. GARVEY (D.C. Bar No. 127191)
                                      TERRY M. HENRY
                                      JAMES J. SCHWARTZ
                                      PREEYA M. NORONHA
                                      ROBERT J. KATERBERG
                                      ANDREW I. WARDEN
                                      NICHOLAS J. PATTERSON
                                      EDWARD H. WHITE
                                      MARC A. PEREZ
                                      Attorneys
                                      United States Department of Justice
                                      Civil Division, Federal Programs Branch
                                      20 Massachusetts Ave., N.W.
                                      Washington, DC  20530
                                      Tel:  (202) 514-2000
                                      Fax:  (202) 616-8470

                                      Attorneys for Respondents