Steven T. Wax
Federal Public Defender
steve_wax@fd.org
Stephen R. Sady
Chief Deputy Federal Public Defender
steve_sady@fd.org
Patrick J. Ehlers
Assistant Federal Public Defender
patrick_ehlers@fd.org
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204
503-326-2123 Telephone
503-326-5524 Facsimile

Attorneys for Petitioner

## UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDULRAHIM ABDUL RAZAK AL GINCO, | CV 05-1310 RJL |
| Petitioner, | PETITIONER'S RESPONSE TO MOTION FOR PROCEDURES RELATED TO REVIEW OF CERTAIN DETAINEE MATERIALS |
| v. | |
| GEORGE W. BUSH, et al., | |
| Respondents. | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    THE SEIZURE OF ATTORNEY-CLIENT MATERIALS REQUIRES A
      SHOWING OF INDIVIDUALIZED CAUSE, WHICH IS NOT PRESENT
      HERE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.    The Respondents May Not Seize or Inspect Attorney-Client Materials
            Based Simply On General Allegations Pertaining To The Detainees As
            A Group; Rather, The Respondents Must Show That A Specific Detainee
            Has Abused The Attorney-Client Privilege. . . . . . . . . . . . . . . . . . . . . . . . 6

      B.    The Respondents Have Made No Showing To Justify The Seizure Or
            Review Of Any Of The Detainees' Legal Documents. . . . . . . . . . . . . . . 13

      C.    The Respondents' Motion Does Not Explain Why Seizure And Search
            Of Documents Is Necessary To Stop Detainees From Communicating In
            Those Camps Where Detainees Already Have The Ability To
            Communicate In Other Ways. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

II.   THE RESPONDENTS' EFFORTS TO PREVENT DETAINEES FROM
      BEING ABLE TO COMMUNICATE WITH EACH OTHER IS AN
      ILLEGITIMATE PURPOSE TO BEGIN WITH BECAUSE THE GENEVA
      CONVENTIONS REQUIRE THAT DETAINEES BE ABLE TO
      INTERMINGLE AND COMMUNICATE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      B.    The Geneva Convention Applies To Guantanamo Detainees. . . . . . . . . 29

            1.    The Full Geneva Convention Applies To All Detainees Who Are
                  Deemed To Be Enemy Combatants. . . . . . . . . . . . . . . . . . . . . . . 30

            2.    Article 3's Prohibition On Inhumane Treatment Prohibits Close
                  Confinement And Requires That Detainees Be Able To
                  Communicate And Associate. . . . . . . . . . . . . . . . . . . . . . . . . . . 32

i

C.      Interference With The Attorney-Client Relation Violates International
        Law Because Petitioner Is Not An Enemy Combatant. . . . . . . . . . . . . . . 33

D.      The Respondents' Attempts To Prevent Any Communication, And Its
        Attempts To Detect And Prevent Communication By Seizing And
        Reading The Detainees' Papers,  Are Unnecessary, Improper, And Serve
        No Legitimate Purpose. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

III.    EVEN IF THE PRIVILEGE MUST YIELD, REVIEW SHOULD BE BY A
        NEUTRAL PARTY RATHER THAN A GOVERNMENT FILTER TEAM. . . 35

IV.     THE RESPONDENTS HAVE SHOWN NO CAUSE FOR CREATING A
        FILTER TEAM TO POLICE THE ACTIONS OF HABEAS COUNSEL. . . . . . 37

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adem v. Bush*, 425 F. Supp. 2d 7 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . 3, 4, 11, 12, 20, 21

*Al Odah v. Bush*, 346 F. Supp. 2d 1 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9, 12

*Bach v. Illinois*, 504 F.2d 1100 (7th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Black v. United States*, 172 F.R.D. 511 (S.D. Fla. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 36

*Carter v. Hutto*, 781 F.2d 1028 (4th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Doe v. United States*, 2003 WL. 22879314 (2d Cir. Dec. 4, 2003) . . . . . . . . . . . . . . . . . 10

*Goff v. Nix*, 113 F.3d 887 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32 (2d Cir. 1986) . . . . . . . . 10, 37

*Hamdan v. Rumsfeld*, 2006 WL. 1764793 (2006) . . . . . . . . . . 3, 23, 29, 30, 31, 32, 33, 34

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Hiney v. Wilson*, 520 F.2d 589 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Johnson-El v. Schoemehl*, 878 F.2d 1043 (8th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 7

*Lanza v. State of New York*, 370 U.S. 139 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Procunier v. Martinez*, 416 U.S. 396 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Richard Roe, Inc.*, 68 F.3d 38 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Sealed Case*, 107 F.3d 46 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Search of the Scranton Housing Authority*, 2006 WL. 1722565
(M.D. Pa. Jun. 22, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Simmons v. Dickhaut*, 804 F.2d 182 (1st Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Swidler & Berlin v. United States*, 524 U.S. 399 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Abbell*, 914 F. Supp. 519 (S.D. Fla. 1995) . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Skeddle*, 989 F. Supp. 890 (N.D. Ohio 1997) . . . . . . . . . . . . . . . . . . . . 10

*United States v. Stewart*, 2002 WL. 1300059 (S.D.N.Y. June 11, 2002) . . . . . . . . . 10, 36

*United States v. Zolin*, 491 U.S. 554 (1989)        11

*Upjohn Co. v. United States*, 449 U.S. 383 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Wright v. Newsome*, 795 F.2d 964 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## OTHER AUTHORITIES

Congressional Research Service Report for Congress: Lawfulness
of Interrogation Techniques Under the Geneva Conventions (September 8, 2004) . . . . 30

Geneva Convention (III) Relative to the Treatment of Prisoners
Of War, August 12, 1949, [1955] U.S.T. 3316, T.I.A.S. No. 3364 . . . . . . . 2, 5, 17, 19-33

ICRC, 3 Commentary on the Geneva Conventions of 12 August 1949
 (Jean Pichtet, ed. 1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

International Covenant on Civil and Political Rights ("ICCPR") . . . . . . . . . . . . . . 27, 29

United Nations Universal Declaration of Human Rights . . . . . . . . . . . . . . . . . . . . . . . 29

**Steven T. Wax**
**Federal Public Defender**
**steve_wax@fd.org**
**Stephen R. Sady**
**Chief Deputy Federal Public Defender**
**steve_sady@fd.org**
**Patrick J. Ehlers**
**Assistant Federal Public Defender**
**patrick_ehlers@fd.org**
**101 S.W. Main Street, Suite 1700**
**Portland, Oregon 97204**
**503-326-2123 Telephone**
**503-326-5524 Facsimile**

**Attorneys for Petitioner**

# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | |
|---|---|
| **ABDULRAHIM ABDUL RAZAK AL GINCO,** | **CV 05-1310 RJL** |
| **Petitioner,** | **PETITIONER'S RESPONSE TO MOTION FOR PROCEDURES RELATED TO REVIEW OF CERTAIN DETAINEE MATERIALS** |
| **v.** | |
| **GEORGE W. BUSH, et al.,** | |
| **Respondents.** | |

Petitioner AbdulRahim Abdul Razak Al Ginco hereby urges that the Court deny

Respondents' Motion For Procedures Related To Review Of Certain Detainee Materials,

and that the Court order the immediate return to the detainee of all his personal written materials, including but not limited to, any and all attorney-client materials.

Respondents' motion should be denied for the following reasons: (1) the Respondents' scant factual recitation provides inadequate cause for a wholesale seizure of attorney-client materials from the detainee, without any individualized justification, given the chilling effect such seizure has on the attorney-client relationship and given the importance of that relationship to the system of justice that the Supreme Court has applied to Guantanamo detainees; (2) the seizure and reading of attorney-client material has no legitimate penological justification because its purpose is to detect whether detainees have been communicating with each other, yet detainees are permitted to communicate with each other by other methods; and (3) the seizure of any detainee paperwork, including both attorney-client material and general personal documents, for the purpose of stopping detainees from communicating with each other, serves no legitimate penological interest because detainees must be able to have interpersonal communication, and not be kept in full-time close confinement, under the Geneva Conventions and other fundamental principles of international law.  Thus, preventing detainees from communicating, or investigating whether they have communicated in the past, is not a legitimate purpose.

## SUMMARY OF ARGUMENT

The Respondents seized all of the personal papers, including attorney-client material as well as all other papers, from every detainee at Guantanamo, in every Camp,

who has been designated an enemy combatant.  The Respondents recite that this seizure

occurred between June 14 and June 18, 2006, following three purported suicides in Camp

One on June 10.  Resp. Ex. B, pp. 2-3. The Respondents gave no advance notice to

counsel or the court of its intentions, and gave no notice for almost three weeks after the

fact, until filing its Motion For Procedures on July 7.

 For a host of reasons, it has proven exceptionally difficult to build trusting

attorney-client relationships with many detainees at Guantanamo.  Trusting relationships

are often difficult to build with persons in custody, and the usual reasons apply here.  In

addition, the detainees are from multiple foreign cultures that are already in difficult

relationships with the United States, do not understand our legal system or its many

nuances, have been detained in harsh conditions, many of them in near total isolation, for

a lengthy period of time (*Adem v. Bush*, 425 F. Supp. 2d 7, 10-11 (D.D.C. 2006)), and

have been unable during that time even to see much of the evidence against them or

receive a fair tribunal (*Hamdan v. Rumsfeld*, 2006 WL 176479337, at *30-31 (2006)).

They have suffered long delays in getting to meet counsel even after learning that lawyers

would be appointed (*Adem*, 425 F.Supp. 2d at 17, 18 n. 20) (as of March 2006, nearly a

year after submitting requests for assistance, not a single detainee had been visited by

appointed counsel).[1]  Many detainees were also apparently told a variety of lies about

---

[1]  The undersigned counsel, and others from the Federal Public Defender for the District of Oregon, were part of the first group of assigned counsel to travel to Guantanamo, in early March 2006.  These meetings were referred to in *Adem*, 425 F.Supp. 2d at 17 n. 20. The appearance of counsel in the present case did not occur until April 2006, with an initial

their counsel by Department of Defense employees in a deliberate effort by those employees to undermine the attorney-client relationship (*Adem*, 425 F.Supp. 2d at 16).

The Respondents' seizure of the legal paperwork from all the detainees a month ago, for which it gave no notice to anyone outside of Guantanamo for nearly three weeks, threatens to undermine the delicate attorney-client relations that the attorneys have worked, at considerable time and expense, to foster.  The Respondents' proposal to have Department of Defense employees now read the papers threatens even greater destruction of that delicate relationship.  Having worked to gain trust, counsel are now potentially in the position of having to advise their clients that their communications are not, in fact, sacrosanct, and that all of the writings that have previously passed between them are now open for review by their captors. The nuances of a "filter team" will be lost on detainees whose trust in their attorneys is conditional to begin with and whose trust in the Department of Defense is nonexistent.  *See Adem*, 425 F.Supp. 2d at 15-18 (confusion about legal procedures; distrust of Department of Defense).

The Respondents argue that this seizure is justified in order to  "investigate fully the circumstances surrounding the deaths of the three detainees and to determine whether other suicides were planned or likely to be planned" Resp. Mot., p. 6.  The Respondents additionally contend that review of all the detainee paperwork, including attorney-client

---

visit in late May 2006.

materials, is necessary to determine whether there is any "planning or coordination" of possible future suicide attempts.  Resp. Mot., p. 20.

Yet the Respondents offer only a small handful of documents that show any kind of communication between detainees, only one of which apparently contains a direct reference to the apparent suicides.  Even that reference is vaguely described in the Respondents' Motion and attachments.  Aside from that single vague reference,  the Respondents offer no evidence to show that detainees may have communicated about the suicides.  *See below* at pp. 13-18.  The Respondents' papers make no individual reference at all to Petitioner.

Violation of the attorney-client relationship, that is, allowing the Respondents to penetrate it and be privy to privileged communications, requires a specific, individualized showing of need adequate to demonstrate a sufficient degree of cause.  All of that is lacking here.  There is no individualized showing sufficient to justify intrusion into the attorney-client paperwork of even a single detainee, much less all of them.

Any intrusion on the attorney-client privilege must not only be satisfied by a showing of individualized cause, but also must be shown to be necessary for a legitimate penological interest.  Here, the sole purpose of the Respondents' desire to read attorney-client paperwork is to be able to determine whether detainees are "coordinating" or "planning."  But, to the extent that detainees already have the ability to communicate with each other freely in other respects, they could coordinate and plan, if at all, without having to resort to illicit notes on attorney-client documents. This is at least true of Camp

Four, where detainees live communally.  But in any Camp where detainees have at least a limited right and ability to interrelate and communicate, there is no justification for allowing the Respondents to read privileged paperwork as a way of investigating whether detainees have been communicating, because they are already permitted to.

Finally, allowing the Respondents to read any of the detainees' paperwork, not just the attorney-client material, as a way of investigating whether they have been communicating, is an illegitimate objective because the Geneva Convention and other principles of international law require that detainees be permitted to interrelate and communicate.  Indeed, with the possible exception of Camp Four, the entire Guantanamo facility, in terms of its restrictions on the ability of detainees to interrelate, and in terms of the close custody in which the detainees are held, violates the Geneva Conventions and is an inhumane form of custody under other principles of international law.  Thus, the Respondents' efforts to prevent detainees from communicating with each other, and to investigate whether they have been doing so, are illegitimate to begin with.

I.    **THE SEIZURE OF ATTORNEY-CLIENT MATERIALS REQUIRES A SHOWING OF INDIVIDUALIZED CAUSE, WHICH IS NOT PRESENT HERE.**

A.    **The Respondents May Not Seize or Inspect Attorney-Client Materials Based Simply On General Allegations Pertaining To The Detainees As A Group; Rather, The Respondents Must Show That A Specific Detainee Has Abused The Attorney-Client Privilege.**

Prison officials may not read or review attorney-client materials, even those in the hands of detainees, absent a showing of individualized cause.  The attorney-client

privilege is "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Its purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998); *see also Lanza v. State of New York*, 370 U.S. 139, 143-44 (1962) ("[I]t may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection"). As this Court has recognized in the context of the Guantanamo litigation, "[t]he privilege that attaches to communications between counsel and client has long held an exceptional place in the legal system of the United States." *Al Odah v. Bush*, 346 F. Supp. 2d 1, 10 (D.D.C. 2004).

Nowhere is the effectuation of the privilege more important than in the context of pre-trial detention. "An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to redress his grievances is particularly important." *Bach v. Illinois*, 504 F.2d 1100, 1102 (7th Cir. 1974); *see also Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pretrial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials. When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised"). For such prisoners, "contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts." *Bach*, 504 F.2d

at 1102. Even for prisoners convicted of crimes, the Supreme Court has held,

"[r]egulations and practices that unjustifiably obstruct the availability of professional

representation or other aspects of the right to access to the courts are invalid." *Procunier*

*v. Martinez*, 416 U.S. 396, 419 (1974).

Seizure of legal papers is particularly egregious because it strikes at the heart of

the attorney-client relationship and interferes with the inmate's access to the courts. "The

taking of legal papers will often (though perhaps not always) interfere with an inmate's

right of access to the courts.... [T]he destruction or withholding of inmates' legal papers

burdens a constitutional right, and can only be justified if it is reasonably related to a

legitimate penological interest."*Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997) (internal

citations omitted); *see also Simmons v. Dickhaut*, 804 F.2d 182, 183–84 (1st Cir. 1986);

*Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986); *Carter v. Hutto*, 781 F.2d 1028,

1031–32 (4th Cir. 1986); *Hiney v. Wilson*, 520 F.2d 589, 591 (2d Cir. 1975).

This Court has recognized that Petitioners – who have not been tried and who seek

the opportunity through their counsel to challenge the basis of their detention – have a

right to counsel and are entitled to a confidential relationship with their counsel. *Al Odah*,

346F.Supp.2d at 5. This Court found "that Petitioners are entitled to be represented by

counsel." *Al Odah*, 346 F. Supp. 2d at 5. Thus, "the Court determine[d] that the

government is not entitled to unilaterally impose procedures that abrogate the attorney-

client relationship and its concomitant attorney-client privilege covering communications

between them." *Al Odah*, 346 F. Supp. 2d at 5. Yet the Respondents have decided, in the

teeth of this decision, to do exactly what *Al Odah* prohibited – "to unilaterally impose

procedures that abrogate the attorney-client relationship and its concomitant attorney-

client privilege covering communication between them." *Al Odah*, 346 F. Supp. 2d at 5.

To give meaning to the attorney-client privilege in this context, the Court

implemented Access Procedures that created avenues of confidential communication

between detainees and their attorneys by laying the ground rules for in-person meetings,

and for written communication between these parties. The Respondents sought the ability

to monitor these communications, but that request was squarely rejected by the Court.

The Respondents' actions here are a plain violation of the terms of the Protective

Order and accompanying Access Procedures. The Respondents do not attempt to justify

their actions under the Protective Order, but rather admits that the seized materials "will

likely include some number of attorney-client communications potentially subject to

attorney-client privilege." Resp. Mot., p. 9. The Respondents made no pre-seizure

request – e ither *ex parte* or with notice – requesting leave to violate the Protective Order,

and did not even notify the Court or counsel until nearly three weeks after the seizure.

But the Respondents' unilateral abrogation of the privilege would have been

unlawful even if it had not directly violated a Court order. Abrogation of the attorney-

client privilege in any context requires the government to make a specific, *individualized*

showing that there is sufficiently compelling justification for invading the privilege. For

example, the Respondents' attempts here to invoke the crime-fraud exception to the

attorney-client privilege as a justification for seizing and reviewing the attorney-client

paperwork.  Resp. Mot., pp. 15-16.  But the Respondents ignore the fact that, under the crime-fraud exception, it bears the burden of making an adequate showing that the exception applies – *i.e.*, that *that* particular client "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," and actually carried out that act.  *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997); *see also Doe v. United States*, 2003 WL 22879314 (2d Cir. Dec. 4, 2003) (reversing contempt order where government failed to meet burden of showing that crime-fraud exception applied); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (requiring a showing of probable cause to believe that a crime or fraud has been attempted or committed and that attorney-client communications were used to further that crime or fraud); *In re Grand Jury Subpoenas Duces Tecum*,  798 F.2d 32, 34 (2d Cir. 1986) (reversing civil contempt order because the government did not satisfy its burden of showing that the crime-fraud exception applied to the documents the corporation failed to produce).  Similarly, when the government seizes materials from a location that likely contains privileged papers, that seizure must be supported by probable cause and a warrant, and it still must employ appropriate means of screening out privileged materials. *See, e.g., United States v. Stewart*, 2002 WL 1300059 (S.D.N.Y. June 11, 2002).

The Respondents have not cited any cases that suggest the privilege may be invaded without an *individualized*, sufficiently rigorous showing that the materials of a particular client or particular attorney are likely to have been abused in furtherance of a crime.  *See, e.g.*, *United States v. Skeddle*, 989 F. Supp. 890, 894 (N.D. Ohio 1997)

(permitting review of attorney-client materials "[i]n light of the finding of probable cause that had preceded the issuance and execution of the warrant"); *United States v. Grant*, No. 04 CR 207, 2004 WL 1171258, at *2 (S.D.N.Y. May 25, 2004) (documents "seized pursuant to a valid warrant, which was based upon a [judicial] finding of probable cause").  Even when such documents will be reviewed *in camera* by the court – and not by the government – "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *United States v. Zolin*, 491 U.S. 554, 572 (1989) (quotations and citations omitted).

        The seizure of the Guantanamo detainees' papers, and the prospect of their being reviewed by the Respondents, chills the attorney-client relationship perhaps to an even greater extent than in a more traditional prison context.  The reason is that there is a well-documented mistrust by many Guantanamo detainees of the actions of the United States government, presenting even greater than usual problems for attorneys to gain a trusting relationship.  In *Adem*, this Court described the observations of one detainee who was quoted as saying "the authorities at Guantanamo have deceived the prisoners so consistently and so often" that the detainees do not trust anything they are told by their captors.  *Adem*, 425 F.Supp.2d at 16. There have also been other public accusations of direct interference by Guantanamo officials with the attorney-client relationship.  For instance, one reported incident involved interrogators asking prisoners "did you know your lawyers are Jews?" and warning prisoners that they would never be released if they

retained counsel.  *See* Davies, *U.S, Interrogators Accused Of Trying to Divide Detainees, Attorneys*, http://www.commondreams.org/headlines05/0513-04.htm.  Other reported incidents include telling detainees that detainees with lawyers would not be released, that their lawyers were liars, or that the military knows everything they say to their lawyers. *See* Savage, *Guantánamo Detainees Find Fault with Lawyers*, Boston Globe, Aug. 10, 2005, http://www/boston.com/news/nation/washington/articles/2005/08/ guantanamo_detainees_find_fault_with_lawyers/.

Not only is the attorney-client relationship made more difficult by dishonesty toward the detainees by the Respondents, and deliberate attempts by the Respondents to interfere with the attorney-client relationship, but also the relationship between counsel and the detainees is made more difficult by the passage of time without apparent result. In March 2006, this Court noted the deleterious effect on the attorney-client relationship by the passage of time.  *Adem*, 425 F.Supp. 2d at 17; *see also Al Odah*, 346 F. Supp. 2d at 12 (before counsel met petitioners, they had "been detained virtually incommunicado for nearly three years without being charged with any crime").

The attorneys having painstakingly struggled to overcome these hurdles to build a trusting relationship, explain the complexities of the litigation, and engage in meaningful interchange with their clients.  The Respondents have now unilaterally seized all the detainees' paperwork, including their legal documents, and proposes to advise the detainees that the Respondents will read them, based on a minimal set of generalized allegations.  The chilling effect on the attorney-client relationship caused by the seizure

alone cannot yet be measured, much less the effect that allowing the Respondents to keep

and read the documents.  No legal authority allows the Respondents to engage in

wholesale inspection of the content of legal papers in the possession of inmates, and it

should particularly not be allowed here, given the incalculable adverse impact it would

have on counsel's ability to represent these detainees.

**B.    The Respondents Have Made No Showing To Justify The Seizure Or Review Of Any Of The Detainees' Legal Documents.**

Not only must the Respondents make an individualized showing in order to be able

to inspect any given detainee's paperwork, but the Respondents' Motion fails to show any

adequate reason why any detainee's legal papers should be read, or any justification for

seizing any of them in the first place.

As noted above, the Respondents' Motion rests almost completely on its stated

desire to "investigate fully the circumstances surrounding the deaths of the three detainees

and to determine whether other suicides were planned or likely to be planned."  Resp.

Mot., p. 6. The Respondents additionally contend that review of all the detainee

paperwork, including attorney-client materials, is necessary to uncover any "planning or

coordination" of possible future suicide attempts.  Resp. Mot., p. 20.

But only one item in the Respondents' factual recitation relates in any way to the

apparent suicides, and even that reference is so vague that it provides no justification to

seize and read anything.  No other document or item, based on the Respondents' showing,

shows any attempt by any detainee to coordinate anything.  Several of the documents

found in a detainee's cell, which the Respondents put forward as evidence of some kind of wrongdoing, may be perfectly legal for the detainees to have in their possession.

Taking the documents in order, the Respondents' first assertion is that, in the mesh wall of one deceased detainee's cell, the Respondents found a note which the Respondents claim was written by someone other than the detainee.  Resp. Mot., p. 5.  This note was on a piece of paper which was stamped on the back as an attorney-client document.  The Respondents' Motion and accompanying affidavit do not describe the contents of the note, except to state that it was "related to the suicides."  Resp. Mot., p. 5; Resp. Ex. B., p. 1.  The Respondents' Motion papers do not have the note or the translation attached, do not quote from it, and do not state whether the writer of the note was encouraging, discouraging, or taking any other position about the suicides.  The Respondents' papers do not say whether the note was a simple expression of regret or farewell.

The Respondents do not say whether the writer of the note showed any knowledge that more than one suicide was being contemplated: Indeed, although the Motion and supporting materials state that the note was found "in the mesh wall of the deceased detainee's cell," they do not say whether this was a mesh wall common with any other detainees and, if so, do not say whether the note was written by the neighbor in the next cell.  From this scant information, the Respondents seek to justify seizing and reading all the paperwork in the possession of every enemy-combatant detainee in every Camp in

order to investigate the circumstances of the suicides in Camp One and the possibility of

any future suicides.

Yet this note, scant as it was in reference to the suicides, was the only article found

by the Respondents in its seizure and review of the documents that apparently had any

reference to the suicides.   Taking the next assertion about documents, the Respondents

claim to have found, in a cell in the same block as at least one of the apparent suicides,

documents containing handwritten notes by two of the deceased detainees, also on paper

stamped as attorney-client material. Resp. Mot., p. 6; Resp. Ex. B, p. 2.  The Respondents

vaguely assert that these papers "were considered to be relevant to the investigation," but

does not say what the relevancy supposedly is.  Resp. Ex. B, p. 2.  Neither these notes nor

any translation of them is included with the Motion papers, and the contents, or even a

summary of the contents, are not mentioned.  Presumably, if these notes had any reference

to the suicides, the Respondents' Motion would have stated as much; thus the assumption

which this court should make is that they did not.  They then cannot in any way provide a

basis on which to seize and read the paperwork of every detainee in every Camp as part of

an investigation into the suicides.

In the cell of another detainee in an unspecified camp, the Respondents found a

document purportedly describing how to tie knots, an internal JTF-Guantanamo generated

e-mail, and, in an attorney-client envelope, a typed document with an "FOUO"

designation and another document which had previously been stamped "Secret" on which

that word had been lined through and the word "Unclassified" added.  The Motion does

not say what Camp these things were found in, nor does it explain what relevance these materials have to an effort to "investigate fully the circumstance surrounding the deaths of the three detainees and to determine whether other suicides were being planned or were likely to be planned." Resp. Mot., p. 6.

Several things in particular need to be said about these last documents. First, detainees may legitimately be in possession of documents bearing the designation "FOUO," and the Respondents' Motion does not explain why this document provides any basis whatever for a search or seizure. "FOUO" or "For Official Use Only" stamps are *not* classification designations; documents so-labeled are not necessarily sensitive in any manner. "FOUO" is nothing but an internal Department of Defense designation whose purpose is to determine whether a particular document may be released to the public under the Freedom of Information Act. "The abbreviation 'FOUO' is used to designate *unclassified* portions that contain information that may be exempt from mandatory release to the public under [FOIA] … ." DoD Regulation 5200.1: C5.2.7.1.1.3 (emphasis added). The designation is specifically "not authorized as an anemic form of classification to protect national security interests" (*Id.* 5400.7-R: C4.1.1) and in fact "is, by definition, unclassified." *Id.* AP3.2.2.3.2. The Protective Order does not prevent prisoners from being in possession of FOUO documents; such documents by definition represent no security risks, and there is therefore no reason why a prisoner should not legitimately be in possession of such documents, whether in an attorney-client envelope or anywhere else.

Second, Respondents' Motion does not describe what is illicit about the document marked with a crossed-out "SECRET."  As with all the other documents on which the Respondents base their Motion, the Motion does not include a copy of the document with the "SECRET" designation crossed out, so it is impossible to respond with certainty about what it is.  But Petitioner's Exhibit A, attached hereto includes a page from the unclassified factual return in *Chaman v. Bush*, CV 05-887-RWR, in which someone has lined out the word "Secret" at the bottom of the page, and several more pages where someone has handwritten the word "Unclassified."  Based on counsel's experience and observation in these cases, seeing such pages is not unusual.  The Protective Order does not prevent prisoners at Guantánamo from possessing unclassified documents, and there is therefore no reason why a prisoner should not legitimately be in possession of a document in which the word "Secret" is crossed out and the word "Unclassified" added.  The Respondents' Motion simply does not explain why this document should not be legitimately in the hands of the detainee in whose cell it was found.

Third, the so-called "knot-tying" document found by the Respondents is similarly not attached to the Motion, and is only generally characterized.  It was not purported to have been labeled "attorney-client material" and is not alleged to have been discovered in a prisoner's privileged legal folder.  Petitioner does not accept the Respondents' characterization of it as illicit, or as containing "instructions on tying knots," in the absence of production of the actual document.

Finally, the Respondents do identify a single document that – from the description

of it – likely should not have been in the possession of a prisoner.  This document is an

email from JTF-Guantánamo itself.  Resp. Mot., p. 5.  The Respondents do not allege that

this document was given to this detainee by another detainee or that it demonstrates any

kind of communication among detainees.  It was also not found amongst the detainee's

legal materials. While it may be that JTF-Guantánamo had some form of security

breakdown of its own, this apparent security breakdown provides no justification for

seizing and searching the legal paperwork every enemy-combatant detainee in the prison.

      **C.**     **The Respondents' Motion Does Not Explain Why Seizure And Search Of Documents Is Necessary To Stop Detainees From Communicating In Those Camps Where Detainees Already Have The Ability To Communicate In Other Ways.**

Although the Respondents' Motion asserts that the seizure and review of all

attorney-client paperwork is necessitated by legitimate security concerns (Resp. Mot., pp.

13-15), or more precisely, by "legitimate penological interests," the final failure in the

Respondents' showing is based on the underlying premise of the Motion – that seizure

and review of all these documents, including both the attorney-client and general

documents in each detainee's possession, is necessary in order to assure that detainees are

not passing papers between themselves in order to communicate.  The stated purpose of

the seizure and reading of the documents is the need to investigate "whether a coordinated

plan existed for the suicides involving the encouragement, assistance or direction of other

detainees or individuals, as well as the existence of any other plots or plans for additional

detainee suicides" (Resp. Mot., pp. 8, 13, 15), but what this amounts to is nothing more and nothing less than an investigation to determine whether inmates have been communicating with each other by passing papers.  Indeed, as noted above, the Respondents have identified only one paper that even makes reference to the suicides.

As part of this concern with the illicit passing of papers, the Respondents additionally argue that detainees have used attorney-client documents for the communication of such plots to shield the improper communication from Camp officials who do not review attorney-client documents.  Resp. Mot., pp. 8, 13.

But the Respondents do not explain how seizure and review of the paperwork would  prevent coordinated detainee activity or communication among detainees who, because of the Camp they are confined in, have the ability to communicate with each other without any need to resort to surreptitious means.  The website of the organization GlobalSecurity.org describes the basic conditions existent at each of the Camps making up the Guantanamo Bay detention facility.  Camp Four is described as having communal living rooms housing up to ten detainees each, with a common shower that serves the whole Camp. *See* http://www.globalsecurity.org/military/guantanamo-bay_dela.htm, p. 4. Each living area has common recreational areas for detainees to play team sports, board games and cards, to which they have access seven to nine hours per day.  *Id.*  Detainees in Camp Four also have access to a soccer field and a volleyball court.  The detainees eat together in their cell block.  They also receive visits from a librarian who provides reading materials.  *Id.*

The Respondents' Motion does not discuss what possible justification there can be for reading the legal paperwork of detainees in Camp Four in order to determine whether they are "coordinating" or "planning" through surreptitious use of their legal paperwork. These detainees live together in a communal setting where they have virtually unlimited interaction with each other. No "legitimate penological interest" could possibly exist to justify the Respondents reading their legal paperwork to determine whether they are communicating with each other given that they have unfettered communication 24 hours per day.

Notably, the Respondents' Motion references an incident at Camp Four in May 2006, when the ten detainees in one of the bunkhouses engaged in a "melee" with prison guards. Resp. Mot., pp. 4, 6 n. 6. But the Respondents do not explain how reading these detainees attorney-client documents would help prevent such incidents, given that these detainees live communally and hardly needed to utilize paperwork to communicate about such activities.

Other Camps have the same issues to the extent they allow detainees to exercise together, attend common worship gatherings, or otherwise interact. As will be discussed at the next section, the Geneva Conventions require that detainees be permitted to interact in these ways, meaning that the Respondents cannot have any legitimate interest in preventing them from intermingling and communicating. But to the extent any of these Camps already allow intermingling and communication, then any legitimacy to the

Respondents' assertion that it must read legal paperwork to investigate possible

communication disappears.

There are also documented, legitimate instances when detainees have been in

possession of paperwork written by other detainees, undercutting any claim by the

Respondents that the discovery of such items gives cause to seize and search the

detainees' paperwork.  Indeed, many of the detainees would never have filed habeas

corpus petitions had it not been for their ability to help each other prepare their petitions.

In *Adem*, this Court described how some of the detainees apparently only filed for habeas

corpus because of advice and assistance from other detainees:

> However, Al-Rawi believed that the only reason the Afghani detainees were
> able to send letters to the Court is because one of the Afghani detainees
> spoke some English and because these particular detainees were held in a
> group setting. ... According to Al-Rawi, the Afghani detainees discussed the
> DoD notice and wrote their letters to the Court as a group ... . However, this
> kind of collective action "cannot happen in other blocks because the
> prisoners cannot easily speak as a group to discuss their options for
> challenging their detention."

*Adem*, 425 F.Supp. 2d at 16.  The Court also described how Mr. Al-Rawi himself was

instrumental in helping other detainees file petitions or communicate the desire for

counsel:

> Al-Rawi, who speaks English, and who is himself represented by counsel,
> offered to help other detainees file a *habeas* petition because the DoD
> notice "specifically said that he could."  Al-Rawi claims that he knows
> Adem personally because they lived together for some period of time in
> Camp Delta.  Adem specifically asked Al-Rawi to help him get a lawyer.
> Several other detainees did the same.  Al-Rawi sent a letter to Mr. Mickum,
> his own lawyer, listing the names of the detainees who had come to him
> asking for help in getting a lawyer.  Al-Rawi listed Adem's name, his ISDN

number and his home country (Sudan).  He also noted that Adem had
attempted to write directly to Mr. Mickum, but the letter apparently never
arrived.

According to Al-Rawi, when he "gave his attorney authorizations from
other detainees, he was conveying 'their words, their wishes.' "  Adem and
other detainees sought help from Al-Rawi because he had a lawyer whom
he trusted and also because he spoke English and could help translate
detainees' requests for a lawyer.

*Adem*, 425 F.Supp.2d at 17-18 (citations to the case record and footnote omitted).

Mr. Al-Rawi and others like him, who provided this service to other detainees,

necessarily found themselves in possession of papers with other detainees' handwriting,

just as other detainees almost certainly had possession of papers containing his.[2]  This

was perceived by the *Adem* Court as not merely legal, but desirable in vindicating the

rights of these detainees.  The fact that the detainees have legal means of communicating

with each other undercuts – indeed, shatters – the Respondents' claim that it has some

"legitimate penal objective" in seizing and reading inmate papers, including legal papers,

in order to prevent them from communicating.

Far from making an individualized showing of need to justify seizing and reading

legal paperwork, the Respondents' Motion ignores the simple fact that the measure it

wants to take would put an extraordinary chill on the already delicate, but essential, trust

between the detainees and their counsel, while accomplishing nothing whatsoever to stop

---

[2]  It is also apparent, and tragic, to contemplate how many detainees were deprived
of the ability to file habeas corpus petitions because they were held in Camps where they
could not communicate with people like Mr. Al-Rawi.

them from communicating in most of the Camps. All of the Respondents' justification

for such a step is, as noted above, supported by assertions of fact that do not even

remotely show any connection between the seizure of the legal papers and the

investigation or prevention of suicide.

## II.    THE RESPONDENTS' EFFORTS TO PREVENT DETAINEES FROM BEING ABLE TO COMMUNICATE WITH EACH OTHER IS AN ILLEGITIMATE PURPOSE TO BEGIN WITH BECAUSE THE GENEVA CONVENTIONS REQUIRE THAT DETAINEES BE ABLE TO INTERMINGLE AND COMMUNICATE.

The predominant purpose of the Respondents' seizure of the detainee paperwork,

and the predominant purpose of reading the papers, is to prevent detainees from being

able to communicate with each other and to discover whether communication has

occurred in the past. Indeed, the repeated theme of the Respondents' efforts to seize and

read detainee paperwork is to determine whether the detainees are, or have been,

engaging in "some level of planning or coordination." Resp. Mot., pp. 5, 8, 13, 15, 16-17,

20.

The problem with this premise is that, under the Geneva Conventions, prisoners

are allowed to communicate with each other in ways far exceeding the passing of notes.[3]

Indeed, the manner in which the Respondents are detaining the prisoners at Guantánamo

Bay, including the extreme measures to limit or preclude communication among them,

---

[3]    While Petitioner believes his detention should be considered under the Fourth Geneva Conventions, with its more favorable treatment of persons not in combat, he relies on the Third based on *Hamdan* and the Respondents' recognition of applicability of Common Article 3.

violates multiple provisions of the Geneva Convention, with the possible exception of

Camp Four. The Respondents' seizure of all the paperwork, including personal as well as

legal documents, should be disallowed because its very premise – that the Respondents

have the right to stop detainees from communicating – violates  the Geneva Conventions

and other established principles of international law.

> **A.    To The Extent Association Among Detainees Is Severely Limited Or Prohibited, The Conditions Violate Multiple Articles Of The Geneva Conventions Prohibiting Restrictions On Detainees' Ability To Associate.**

Looking first to the description of the various camps at Guantanamo, as described

on the GlobalSecurity.org web page, the maximum security exists at Camp Three,

described as follows:

> Cells are 6 ft. 8 in. by 8 ft., with a squat-style toilet, a metal sink and a sleeping berth affixed to green steel-mesh walls.  Detainees are allowed to exercise for about 30 minutes, three times a week, in a small exercise area. They are not allowed to exercise with others.  They are also not allowed to have a roll of toilet paper.  They have to ask a guard to give them an appropriate size piece when they need it.  Camp 3 hold (sic) about 10% of the total detainees at Camp Delta.[4]

*See* http://www.globalsecurity.org/military/facility/guantanamo-bay_delta.htm, p. 3.

Camp Two is the next most secure, with the same cells, the same exercise limitations

(including that the exercise must be alone), and the same limitations on toilet paper.  *Id.*

Detainees at Camp Two may have comfort items not allowed at Camp Three such as anti-

---

[4] Camp Delta is the name for the detention facility and includes Camps 1, 2, 3, 4, and 5.

dandruff shampoo and soft-plastic pens.  Camp 2 holds about 9% of the total detainees.
*Id.*

Camp One, the next level down in security, includes 10 cell blocks with 48 cells
each.  Detainees have more personal items than in Camps Two and Three, but still no
toilet paper except for an appropriate sized piece when they ask for it.  *Id.*, p. 4.  If they
behave well they are allowed to have a paper cup to drink from.  *Id.*  They are allowed
exercise three times a week, including being permitted to kick a soccer ball with one other
detainee.  *Id.*  They eat alone in their cells. *Id.* Camp One houses 31% of the detainees.
*Id.*

Camp Five is a newer building with four wings of 12-14 individual cells each.
Camp Five houses the detainees who are considered the most dangerous or who are
believed to possess "the most valuable intelligence."  *Id.*  All cells are monitored by
camera 24 hours per day. *Id.*  Detainees are allowed about one hour of exercise per day.
*Id.*

Even under the Third Geneva Convention, interaction among detainees is
permitted.  Article 21 states in relevant part:

> Subject to the provisions of the present Convention relative to penal and
> disciplinary sanctions, prisoners of war may not be held in close
> confinement except where necessary to safeguard their health and then only
> during the continuation of the circumstances which make such confinement
> necessary.

Article 22 similarly requires in relevant part:

The Detaining Power shall assemble prisoners of wars in camps or camp compounds according to their nationality, language and customs, provided that such prisoners shall not be separated from prisoners of war belonging to the armed forces with which they were serving at the time of their capture, except with their consent.

These two Articles together require that prisoners may not be kept in solitary confinement, but rather must be kept in camps or compounds with others of their nationality, language and culture.  Similarly, Article 25 refers to "dormitories of prisoners of war" and states that they must be as favorable in terms of size and general installations as those used for forces of the Detaining Power.  Geneva Convention, Article 25.

Every Camp at Guantánamo, with the arguable exception of Camp 4, violates these Articles of the Geneva Convention.  Most importantly for purposes of the present Motion, these  Articles, prohibiting close confinement and requiring that detainees be kept in camps or compounds with others of their language and culture, contradict entirely the Respondents' contention that it can isolate detainees, prevent them from even passing notes to each other, and house them as it does in these Camps.  The entire premise of these portions of Articles 21 and 22 is that prisoners/detainees must be kept in camps or compounds where they have the ability to associate with others.

Other Articles of the Geneva Convention similarly require that detainees/prisoners be able to associate with each other.  Article 28 provides in relevant part:

Canteens shall be installed in all camps, where prisoners of war may procure food stuffs, soap and tobacco and ordinary articles in daily use. The tariff shall never be in excess of local market prices.  The profits made by camp canteens shall be used for the benefit of the prisoners; a special fund shall be created for this purpose.  The prisoners' representative shall

have the right to collaborate in the management of the canteen and of this fund.

The "prisoners' representative" referenced in this Article refers to the elected representative which the prisoners have designated under Article 79.  Article 79 requires, in relevant part:

> in all places where there are prisoners of war, except in those where there are officers, the prisoners shall freely elect by secret ballot, every six months, and also in the case of vacancies, prisoners' representatives entrusted with representing them before the military authorities, the Protecting Powers, the International Committee of the Red Cross and any other organization which may assist them.  These prisoners' representatives shall be eligible for re-election.

> * * *

> In all cases the prisoners' representative must have the same nationality, language and customs as the prisoners of war whom he represents.  Thus, prisoners of war distributed in different sections of the camp, according to their nationality, language or customs, shall have for each section their own prisoners' representative, in accordance with the foregoing paragraphs.

Article 80 anticipates that prisoners may decide to organize among themselves a system of mutual assistance, which should be within the province of the prisoners' representative.  Once again, this stands in direct contradiction to the Respondents' attempts to prevent prisoners from being able to communicate with each other.  Contrary to the entire premise of the Respondents' Motion, prisoners under the Geneva Convention are required to be allowed to communicate their mutual needs and provide for their mutual assistance.

Article 38 requires that prisoners be permitted to engage in sports and intellectual

pursuits together:

> While respecting the individual preferences of every prisoner, the Detaining
> Power shall encourage the practice of intellectual, educational, and
> recreational pursuits, sports and games amongst prisoners, and shall take the
> measures necessary to ensure the exercise thereof by providing them with
> adequate premises and necessary equipment.

> Prisoners shall have opportunities for taking physical exercise, including
> sports and games, and for being out of doors.  Sufficient open spaces shall
> be provided for this purpose in all camps.

Geneva Convention, Article 38.  Detainees who are clerics must have the liberty to

"minister freely to the members of their community."  Geneva Convention, Article 36.

Moreover, each Camp is required to have premises for holding of religious services, and

detainees must be permitted "complete latitude" to attend services at those premises.

Geneva Convention, Article 34.

The mail seizures and inspections described in the Respondents' Motion, which

the Respondents want this Court to ratify, violate the Geneva Convention.  Article 72, for

instance, states in relevant part:

> Prisoners of war shall be allowed to receive by post or by any other means
> individual parcels or collective shipments containing, in particular, food
> stuffs, clothing, medical supplies and articles of a religious, educational or
> recreational character which may meet their needs, including books,
> devotional articles, scientific equipment, examination papers, musical
> instruments, sports outfits and materials allowing prisoners of war to pursue
> their studies or their cultural activities.

* * *

> The only limits which may be placed on these shipments shall be those
> proposed by the Protecting Power in the interest of the prisoners
> themselves, or by the International Committee of the Red Cross or any other
> organization giving assistance to the prisoners, in respect of their own
> shipments only, on account of exceptional strain on transport or
> communications.

Article 73 continues, in relevant part, that in the absence of special agreements between

the powers concerned (that is, the detaining power and the power from which the

prisoners come), certain rules regarding collective shipments shall be applied.  But the

special agreements:

> shall in no case restrict the right of prisoners' representatives to take
> possession of collective relief shipments intended for prisoners of war, to
> proceed to their distribution or to dispose of them in the interest of the
> prisoners.

Geneva Convention, Article 73.

The Convention permits the censorship, or the reading, of detainees' mail for

security purposes.  Indeed, the Convention contemplates that such will occur.  Article76

states that:

> The censoring of correspondence addressed to prisoners of war or
> despatched by them shall be done as quickly as possible.  Mail shall be
> censored only by the despatching State and the receiving State, and once
> only by each.

Geneva Convention, Article 76.

In short, the entire premise of the Respondents' Motion, that the Respondents have

the power or right to prevent detainees from communicating with each other, is

inconsistent with the Geneva Convention.  The Geneva Convention anticipates free and

ready exchange between prisoners within the confines of their camps, including requiring that they be kept in camps or compounds rather than close confinement, requiring that they have canteens from which they can purchase articles, requiring that they be allowed to engage in intellectual and physical pursuits together, that they be allowed to attend worship services, elect representatives, be able to receive and distribute collective shipments, which include musical instruments and sports outfits, and generally anticipates that, within the area of confinement, the prisoners shall have latitude in association with others of their language, culture and nationality.  The notion that their paperwork needs to be seized to discover whether they have been secretly communicating by passing notes through their individual cells is in direct conflict with the provisions of the Geneva Convention that prohibit individual cells except in cases of medical necessity and other provisions of the Geneva Convention which anticipate relatively free association of the prisoners within the confines of the prison facility.     **B.     The Geneva Convention Applies To Guantanamo Detainees.**

All articles of the Geneva Convention apply to all the detainees at Guantanamo. This argument was made on behalf of the petitioners in *Hamdan*.  *Hamdan* held two things with respect to the Geneva Convention.  First, *Hamdan* made clear that the war against the Taliban is covered by the entire Geneva Convention because Afghanistan is a contracting party to the Convention.  *Hamdan*, 2006 WL 1764793*37.  Indeed, the

Supreme Court cited a memorandum from the President agreeing that the war against the

Taliban is subject to the Geneva Convention.  *Hamdan*, 2006 WL 1764793*37 n. 60.

Second, *Hamdan* held that it was unnecessary to decide whether the entire Geneva

Convention applies to the war against al Qaeda because the Court held that, at a

minimum, Article 3 of the Convention applies, which was sufficient to decide Mr.

Hamdan's case.  *Hamdan*, 2006 WL 1764793*37.  Article 3 includes the requirement

that:

> 1.    Persons taking no active part in the hostilities, including members of
>       armed forces who have laid down their arms and those placed hors
>       de combat by sickness, wounds, detention, or any other cause, shall
>       in all circumstances be treated humanely... .

Geneva Convention, Article 3.  Finally, *Hamdan* rejected the lower court's ruling that the

Geneva Conventions are not judicially enforceable.  *Hamdan*, 2006 WL 1764793, at *36.

### 1.    The Full Geneva Convention Applies To All Detainees Who Are Deemed To Be Enemy Combatants.

Even though the Respondents, in pleadings before the *Hamdan* Court, among other

places, takes the position that al Qaeda members are not protected by the Geneva

Convention to the same extent as supposed Taliban members, nothing about the enemy

combatant determination process, or the conditions of confinement at Guantanamo, draws

any distinction between the two.  Thus, any detainee who has been classified as an enemy

combatant necessarily has been so classified under a definition that includes classification

as a Taliban associate. All detainees are therefore entitled to the full protection of the

Geneva Convention.

The Department of Defense has defined "enemy combatant" as

an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners.

*Hamdan*, 2006 WL 1764793, at *10 n. 1 (quoting memorandum from Deputy Secretary of Defense Paul Wolfowitz Re: Order Establishing Combatant Status Review Tribunals (July 7, 2004)).  Thus the determination of enemy combatant status for every single detainee includes an allegation that includes association with the Taliban.

The Geneva Convention requires that such people be treated as being covered by the Convention until a judicial determination that they are not.  The various categories of prisoners of war, to whom the Convention applies, are set out in Article 4.  Article 5, in turn, provides in relevant part:

Should any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy, belong in any of the categories enumerated in Article 4, such person shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.

Geneva Convention, Article 5.  Although the term "competent tribunal" is not defined in the Article, other international covenants use similar terms to refer to regularly constituted, independent courts with regular procedures including procedural protections for the detainee.

For example, *Hamdan* referred to the International Covenant on Civil and Political Rights ("ICCPR") as an "international instrument" that sets out basic procedural protections.  *Hamdan*, 2006 WL 1764793, at *39 n. 66.  That Covenant states that anyone

who has been deprived of liberty "by arrest or detention shall be entitled to proceedings

before a court, in order that court may decide without delay on the lawfulness of his

detention." ICCPR, Part III, Article 9. Similarly, Article 14(1) of the ICCPR describes

"competent, independent and impartial tribunals established by law." The Basic Principles

on the Independence of the Judiciary, adopted by the Seventh United Nations Congress in

1985, refers to "ordinary courts or tribunals using established legal procedures."

All detainees held as enemy combatants under this definition must be entitled to

protection of the full Geneva Convention, at least until some "competent tribunal" decides

otherwise.

> 2.      **Article 3's Prohibition On Inhumane Treatment Prohibits Close Confinement And Requires That Detainees Be Able To Communicate And Associate.**

Article 3 of the Geneva Convention requires that all persons to whom that Article

applies "be treated humanely." *Hamdan* held that, at a minimum, Article 3 of the

Convention applies to Guantanamo detainees, regardless of whether the full Convention

does. *Hamdan*, 2006 WL 1764793, at *37.

Holding prisoners in solitary confinement for years on end as a routine matter,

denying them the ability to have regular association and conversation with other human

beings, defies even the most basic standards of human decency. Although the Geneva

Convention itself does not define the term "treated humanely," it should be noted that

similar terms appear throughout the body of international law. The ICCPR states that "No

one shall be subjected to torture or to cruel, inhuman or degrading treatment or

punishment." ICCPR, Part III, Article 7. The United Nations Universal Declaration of

Human Rights contains identical language at its Article 5.

The International Committee of the Red Cross ("ICRC"), commenting on Article 3

of the Geneva Convention, has noted that holding a detainee incommunicado all by itself

qualifies as inhumane treatment:

> It could not mean, it seems, solely treatment constituting an attack on
> physical integrity or health; the aim of the Convention is certainly to grant
> prisoners of war in enemy hands a protection which will preserve their
> human dignity and prevent their being brought down to the level of animals.
> Certain measures, for example, *which might cut prisoners of war off
> completely from the outside world* and in particular from their families, or
> which would cause great injury to their human dignity, should be considered
> as inhumane treatment.

ICRC, 3 Commentary on the Geneva Conventions of 12 August 1949 (Jean Pichtet, ed.

1960), p. 627 (emphasis added); *see also* Congressional Research Service Report for

Congress: Lawfulness of Interrogation Techniques Under the Geneva Conventions

(September 8, 2004), pp. CRS-18, 19.

### C.    Interference With The Attorney-Client Relation Violates International Law Because Petitioner Is Not An Enemy Combatant.

For 18 months before Petitioner's seizure by the United States, Petitioner had been

a political prisoner of the Taliban who had endured terrible torture and deprivation at the

hands of his captors. As stated in *Hamdi v. Rumsfeld,* 542 U.S. 507 (2004), an enemy

combatant would need to be "part of or supporting forces hostile to the United States or

coalition partners" and "engaged in an armed conflict against the United States" to justify

detention. 542 U.S. at 526-57; *accord Hamdan v. Rumsfeld*, 2006 WL 1764793, at *10

n.1 (2006).  The *Hamdi* court noted that "[t]he permissible bounds of the [enemy combatant] category will be defined by the lower courts as subsequent cases are presented to them."  542 U.S. at 522 n.1.  No conceivable definition of enemy combatant would include a freed political prisoner who had been subjected to brutal torture and confinement prior to the declaration of war.

Persons not engaged in armed conflict, such as a prisoner and torture victim of the Taliban, are entitled to be free of restraint in the absence of a violation of the laws of war. William Winthrop, *Military Law And Precedents*, at 816 (2d ed. 1920).[5]  The norm of liberty is also part of the Fourth Geneva Convention on the treatment of civilians.  The Respondents cannot establish an exception to the norm of liberty based on the *Hamdan* opinion's outline of four general prerequisites for detention for violation of the laws of war:  the offense must occur within the field of command; the offense must occur during the time of war; the offense must be committed by an individual of the enemy's army who is guilty of illegitimate warfare or other violations of the law of war; and the offense must

---

[5]    In the treatise on the laws of war most cited by the *Hamdan* court, the author recognized the general rule of liberty with exceptions for charged and adjudicated violations of the law of war:

> While the peaceable citizens of a country under Military Government are in general exempt from military arrest or restraint of the person, the governing commander is authorized to apprehend and restrain all persons guilty of violation of the laws of war, hostile demonstrations, or public disorders, and in extreme cases to inflict upon them summary punishment.

Mr. Abdul Rahim has not done anything remotely qualifying as a violation of the laws of war.

not be cognizable in other courts. *Hamdan* at 2006 WL 1764796 at *23. As will be

developed in the merits submissions, none of the prerequisites for detention are established

in Petitioner's case.

D.    **The Respondents' Attempts To Prevent Any Communication, And Its Attempts To Detect And Prevent Communication By Seizing And Reading The Detainees' Papers, Are Unnecessary, Improper, And Serve No Legitimate Purpose.**

Because the entire purpose of the Respondents' seizure and efforts to read detainee paperwork is to detect and stop detainees from communicating with each other, and because that purpose is illegal, illegitimate, and contrary to every fundamental standard of basic decency, the Respondents' proposal to read all of the detainees' paperwork, including but not limited to their legal materials, serves no legitimate security, or any other, function. Reading of inmate papers by prison officials serves no legitimate security concern if those inmates are able to communicate freely in other unmonitored ways. Because the Respondents here cannot, consistent with the Geneva Convention or any other statement of international law, keep these detainees in full-time close custody, preventing them from associating or communicating with their fellows, then it is inappropriate to allow the Respondents to read their paperwork, especially their legal paperwork, under some false claim that such reading will enhance security. Stated differently, because the Respondents have no interest in stopping detainees from communicating, it has similarly no justification for trying to detect whether they are doing it.

III.    **EVEN IF THE PRIVILEGE MUST YIELD, REVIEW SHOULD BE BY A NEUTRAL PARTY RATHER THAN A GOVERNMENT FILTER TEAM.**

Even if the Respondents have shown sufficient basis to abrogate the attorney-client privilege, the use of a Department of Defense Filter Team is inappropriate here. As confirmed by the Respondents' lack of case citations, courts have shown great reluctance

to entrust attorney-client privileged materials to such governmental teams.  Indeed, "the use of government taint teams has often been questioned or outright rejected by the courts."  *In re Search of the Scranton Hous. Auth.*, 2006 WL 1722565, at *5 (M.D. Pa. Jun. 22, 2006).  *See, e.g.*, *Black v. United States*, 172 F.R.D. 511, 516 (S.D. Fla. 1997) (even though government needed documents to pursue escaped fugitive, court rejected proposed "taint team" and ordered that "a United States district judge or his designee" would review documents for privilege); *United States v. Abbell*, 914 F. Supp. 519, 520–21 (S.D. Fla. 1995) (appointing special master rather than filter team to review potentially privileged documents obtained by search warrant).  The Sixth Circuit recently overruled a district court's decision to permit review of potentially privileged documents by an independent government "taint team" because the review posed unacceptable risks to the attorney-client privilege.  *See In re Grand Jury Subpoenas 04-124-03 and 04-124-05*, Nos. 05-2274/2275, slip op. at 6 (6th Cir. July 13, 2006).  Even when such teams have been authorized, "at least three courts that have allowed for review by a government privilege team have opined, in retrospect, that the use of other methods of review would have been better."  *United States v. Stewart*, No. 02 CR 396, 2002 WL 1300059, at *6 (S.D.N.Y. June 11, 2002).

To the extent that the Respondents can make a specific, individualized showing that a particular detainee is using his attorney-client materials for improper ends, the Court at most should order that those documents be reviewed *in camera* by a judge, in the presence of habeas counsel, and without government lawyers.  This procedure is necessary given

the fragile nature of the attorney-client relations that exist between many Guantanamo counsel and their clients, and given the extreme distrust that many, perhaps nearly all, detainees have toward the Department of Defense.  The prospect of having to advise these clients that, not only has their legal paperwork been seized, but that Department of Defense employees have been authorized by the Court to read it, threatens the attorney-client relationship for many detainees in ways that may already be irreparable.

## IV.    THE RESPONDENTS HAVE SHOWN NO CAUSE FOR CREATING A FILTER TEAM TO POLICE THE ACTIONS OF HABEAS COUNSEL.

A final unacceptable aspect of the Respondents' proposal is their suggestion that the filter team should be allowed to conduct its own review of the confiscated documents to determine whether they were properly "privileged" in nature, whether or not the documents are relevant to the NCIS suicide-plot investigation.  Resp. Mot., p. 11  If the filter team determines that the documents are not privileged, the Respondents propose, then they will be "returned … to JTF-Guantánamo for appropriate action."  Resp. Mot., p. 11.  Such a review for privilege leaves "the government's fox . . . in charge of the [clients'] henhouse," with no check against the possibility that the filter team would draw "false negative conclusions" overriding legitimate claims of privilege.  *In re Grand Jury Subpoenas*, slip op. at 10. The Respondents' Motion in this respect is a patent attempt to chill attorney-client communications.  In it, the Respondents suggest that "possibly others" – *i.e.*, non-prisoners – may have participated in a "manifest abuse of the legal mail system."  Resp. Mot., p. 10.

This unfounded assertion is a veiled threat to habeas counsel, designed to deter them from communicating effectively with their clients.  Indeed, buried in a footnote is the Respondents' conclusion that because counsel is prohibited "from sharing … certain types of materials with detainees … [if] prohibited materials are discovered in the course of review, the Filter Team would not be constrained from bringing the matter to the Court's attention for appropriate action."  Resp. Mot., p. 11 n. 10 .

Habeas counsel with access to classified information are aware that they work under the shadow of possible contempt and criminal actions, they have all been deemed not to be a security risk by the FBI, and they are all officers of the Court.  There is no warrant for a new team of Department of Defense lawyers to begin scouring their privileged communications in order to uncover an imagined, nefarious plot to assist their clients in committing suicide.

**Conclusion**

The Respondents have shown no justification for the seizure of all the detainees' papers, or for the Respondents' request that government employees, even through the lens of a filter team, be permitted to review the contents of the attorney-client paperwork.  The goal of detecting whether detainees have been in communication with each other is an illegitimate one to begin with, given the clear mandates of the Geneva Conventions and the inhumanity of holding detainees in solitary confinement without the ability to interact and engage in normal human communication.  Yet if the detainees are permitted such communication, as they must be and as many of them already are, then there is no

legitimate justification for allowing the Respondents access to their attorney-client paperwork.  This is especially true given that the Respondents have shown no individualized basis directed toward any detainee.

Moreover, the harm that Respondents' actions have already caused to the attorney-client relations of many Guantanamo detainees and their counsel cannot be calculated.  More, and perhaps even greater irreparable harm would ensue if the court were to allow, and if the detainees were to learn, that employees of the Department of Defense may review their confidential paperwork.

The only remedy which has any hope of restoring attorney-client relations would be for the court to order the immediate return of the paperwork to the detainees, and for the detainees to be made aware that it was their attorneys who made the Respondents return it.

RESPECTFULLY SUBMITTED this 21st day of July, 2006.

/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender


/s/ Stephen R. Sady
Stephen R. Sady
Chief Deputy Federal Public Defender


/s/ Patrick J. Ehlers
Patrick J. Ehlers
Assistant Federal Public Defender