PRECEDENTIAL


IN THE UNITED STATES COURT
OF APPEALS FOR THE THIRD CIRCUIT

_____

NO.  03-3823

_____


RONALD C. JONES,
Appellant

v.

M. BROWN, Internal Affairs Ofc.;
S. SOOTKOOS, Associate Warden;
ROY L. HENDRICKS, Warden

_____

On Appeal From the United States
District Court
For the District of New Jersey
(D.C. Civil Action No. 02-cv-03045)
District Judge:  Hon. Garrett E. Brown, Jr.

_____

---

NOS. 04-4426 and 04-4493

---

JAMAAL W. ALLAH; KEVIN JACKSON;
LENNIE KIRKLAND

v.

*RICHARD J. CODEY, Acting Governor, N.J. (Official
Capacity); JAMES MCGREEVEY (Personal/Individual
Capacity); DEVON BROWN,Commissioner, Dept. of Corr.,
N.J. (Official/Personal/ & Individual Capacity); TERRANCE
MOORE, Administrator, East Jersey State Prison, Rahway, N.J.
(Official/Personal & Individual Capacity); JOHN/JANE DOES
(Official/Personal & Individual Capacity); ROY L.
HENDRICKS;  ROBERT  SHABBICK;  WAYNE
SANDERSON

*(Pursuant to F.R.A.P. 43(c))

Devon Brown, Terrance Moore, Roy L. Hendricks,
Robert Shabbick, Wayne Sanderson
Appellants in No. 04-4426

Jamaal W. Allah; Kevin Jackson; Lennie Kirklan,
Appellants in No. 04-4493

2

———————

On Appeal From the United States
District Court For the District of New Jersey
(D.C. Civil Action No. 02-cv-05298)
District Judge: Hon. William H. Walls

———————

Argued April 25, 2006

BEFORE: FUENTES, STAPLETON and
ALARCON,* Circuit Judges

(Filed: August 24, 2006 )

———————

Ronald C. Jones (Argued)
Northern State Prison
168 Frontage Road
P.O. Box 2300
Newark, NJ 07114-2300
 Appellant Pro Se in No. 03-3823

Peter C. Harvey
Patrick DeAlmeida
Christopher C. Josephson (Argued)

———————————

* Hon. Arthur L. Alarcon, Senior United States Circuit Judge
for the Ninth Circuit, sitting by designation.

Office of New Jersey Attorney General
P.O. Box 112
Richard J. Hughes Justice Complex
Trenton, NJ 08625
  Attorneys for Appellants in No. 04-4426 and Appellees in
  Nos. 03-3823 and 04-4493

Shavar D. Jeffries (Argued)
Seton Hall Law School
833 McCarter Highway
Newark, NJ 07102
  Attorney for Appellants in No. 04-4493 and Appellees in
  No. 04-4426

Gerald J. Pappert
Calvin R. Koons
John O.J. Shellenberger
John G. Knorr, III
Office of Attorney General of Pennsylvania
15th Floor - Strawberry Square
Harrisburg, PA 17120
  Attorneys for Amicus Curiae
  Commonwealth of Pennsylvania
  Amicus Appellant in No. 04-4426 and Amicus Appellee in
  Nos. 03-3823 and 04-4493

Aaron Christopher Wheeler
James S. Pavlichko
Derrick Dale Fontroy
Theodore B. Savage
Graterford SCI

4

P.O. Box 244
Graterford, PA  19426
  Pro Se Amici Appellees in Nos. 03-3823 and 04-4426

Edward L. Barocas
American Civil Liberties Union of New Jersey Foundation
P.O. Box 750
Newark, NJ  07101
  Attorney for ACLU NJ and Association of Criminal Defense
  Lawyers
  Amici Appellants in No. 04-4426 and Amici Appellees in
  Nos. 03-3823 and 04-4493

---

## OPINION OF THE COURT

---

STAPLETON, Circuit Judge:

   We have before us two cases that have been consolidated
on appeal.[1]   While the District Courts in these cases both
addressed the constitutionality of a New Jersey regulation

---

[1]A third appeal that was originally consolidated, *Taylor
v. Oney,* No. 04-2062, has been severed and is being resolved
in a not precedential opinion.

5

governing the processing of incoming inmate legal mail, they reached conflicting conclusions. These consolidated appeals present two principal issues. First, do state prisoners have an interest protected by the First Amendment in being present when their incoming legal mail is opened? We conclude that our prior case law establishes that they do. Second, may New Jersey open prisoners' legal mail outside of the prisoners' presence pursuant to a state policy intended to protect the safety and security of its prisons by reducing the risk of anthrax contamination? We conclude that New Jersey has not shown that its legal mail policy is reasonably related to its interest in protecting the safety and security of its prisons. Accordingly, New Jersey's legal mail policy does not withstand constitutional scrutiny. We will affirm the grant of injunctive relief in *Allah* and reverse the District Court's summary judgment for the defendants in *Jones*.[2]

I.

A.

Prior to October 19, 2001, New Jersey regulations governing the Department of Corrections required that "[i]ncoming legal correspondence be opened and inspected in front of the inmate to whom it is addressed." *See* 33 N.J. Reg. 4033(a) (Oct. 23, 2001).

––––––––––––––––

[2]Plaintiff Jones appeals from the District Court's resolution of a number of other issues. We agree with its resolution of those issues and will affirm its judgment with respect to them for essentially the reasons articulated in the opinion of the District Court.

6

On September 11, 2001, in response to the terrorist attacks on the World Trade Center and Pentagon and associated disruptions, the Acting Governor of New Jersey, Donald DiFrancesco, declared a state of emergency in New Jersey. In that declaration, Executive Order No. 131-2001, Governor DiFrancesco directed

> that the heads of any agency or instrumentality of the State government with authority to promulgate rules may, for the duration of the Executive Order, subject to my prior approval and in consultation with the State director of Emergency Management, *waive, suspend or modify any existing rule the enforcement of which would be detrimental to the public welfare during this emergency*, notwithstanding the provisions of the Administrative Procedure Act or any law to the contrary.

Executive Order No. 131-2001 (Sept. 11, 2001) (emphasis added).

In September and October 2001, one or more individuals mailed a string of letters containing anthrax through the postal system. At least four letters containing anthrax were processed in the Hamilton, N.J. mail processing center. In all, five people died and thirteen others were sickened by the mailings. In New Jersey, there were no fatalities, but there were five confirmed and two suspected infections.

In response to these anthrax mailings, the Acting

7

Commissioner of the New Jersey Department of Corrections, acting under the authority provided by the statewide declaration of emergency, issued an amendment to New Jersey's legal mail policy that suspended the regulatory requirement that legal mail be opened in the addressee prisoner's presence. The statement accompanying the amendment reads, in pertinent part:

> N.J.A.C. 10A:18-3.4(b) requires that incoming legal correspondence be opened and inspected in front of the inmate to whom it is addressed. Suspension of N.J.A.C. 10A:18-3.4(b) is necessary to protect the health, safety and welfare of the people and to aid in the prevention of loss to and destruction of property . . . .
>
> This special adopted amendment is necessary in order to inhibit the possible spread of contamination should a toxic biological substance be introduced by way of incoming legal correspondence addressed to an inmate who is incarcerated at a facility of the Department of Corrections. The Department is establishing remote areas at each facility for the processing of all incoming correspondence by trained staff members. Inmates shall not be present or involved in the processing or opening of any incoming correspondence.

33 N.J. Reg. 4033(a) (Oct. 23, 2001). The regulation now reads, in pertinent part:

8

Inspection of incoming legal correspondence

(a) Incoming legal correspondence shall be opened and inspected for contraband only.

(b) Incoming legal correspondence shall not be read or copied. The content of the envelope may be removed and shaken loose to ensure that no contraband is included. After the envelope has been inspected the correspondence shall be given to the inmate.

N.J. Admin. Code § 10A:18-3.4.

The Assistant Commissioner of the Department of Corrections issued a memo to all Corrections administrators providing guidelines for the handling of legal mail. That memo specifies:

1.  A Correctional Officer shall open all incoming legal correspondences in the mailroom.

2.  The officer shall log the information in accordance with current practices.

3.  The incoming legal correspondence shall be opened and inspected for contraband . . . . The contents shall not be read or censored by the officer.

9

    4.       After the envelope has been inspected, the officer shall seal the envelope with tamper proof evidence tape. . . .

***

    5.       After the inspection has been completed the correspondence shall be delivered to the inmate.

Memorandum from Jeffrey J. Burns, Assistant Comm'r, N.J. Dep't of Corrections, to All Administrators (Oct. 19, 2001); App. Brown at Ra92-93.

The amendment indicates that the suspension of former § 10A:18-3.4(b) will remain in effect until the end of the state of emergency declared on September 11, 2001 in Executive Order No. 131-2001. To date, the state of emergency remains in force and the suspension of former § 10A:18-3.4(b) remains in effect.

B.

The plaintiffs in *Allah*[3] and the plaintiff in *Jones* are inmates in the New Jersey correctional system whose legal mail has been opened outside their presence pursuant to New Jersey's revised legal mail policy. Both sets of plaintiffs filed suit in

---

    [3] Jamaal W. Allah, Kevin Jackson, and Lennie Kirkland ("the *Allah* plaintiffs").

10

New Jersey District Courts against state correctional officials[4] asserting, *inter alia*, that the legal mail policy violates their First Amendment right of free speech. They sought injunctive and monetary relief.

In *Allah*, on cross-motions for judgment on the pleadings, the District Court ruled that the legal mail policy violated the prisoners' constitutional right to be present when their legal mail is opened.[5] It accordingly enjoined the state officials from enforcing the challenged policy. However, citing the uncertainty necessarily involved in assessing the risk of anthrax

---

[4] The defendants in *Allah* are Devon Brown, the Commissioner of the New Jersey Department of Corrections, Terrance Moore, the now former Administrator of East Jersey State Prison ("EJSP"), Roy Hendricks, the now former Administrator of New Jersey State Prison ("NJSP"), Robert Shabbick, a corrections sergeant at EJSP, and Wayne Sanderson, a corrections sergeant at NJSP. The defendants in *Jones* are Roy Hendricks, Steven Sootkoos, Associate Administrator of NJSP, and Matthew Brown, an Investigator with the Special Investigations Division at NJSP.

[5] The District Court in *Allah* appears to have effectively converted the cross-motions for judgment on the pleadings into cross-motions for summary judgment. Neither party objects to this treatment on appeal and we assume it not to have been an abuse of discretion. *See Rubert-Torres v. Hospital San Pablo, Inc.*, 205 F.3d 472, 475-76 (1st Cir. 2000); 5C Wright & Miller, *Federal Practice & Procedure* § 1371 at 275.

11

contamination at the time of the policy's adoption, the Court granted the defendants' motion to dismiss the plaintiffs' claims for monetary damages on the basis of qualified immunity.

In *Jones*, by contrast, the District Court granted summary judgment to the Defendants on all of Jones' claims. In particular, the District Court concluded that New Jersey's legal mail policy is a valid exercise of administrative discretion.

Before us now are the *Allah* defendants' appeal of the District Court's grant of injunctive relief, the *Allah* plaintiffs' cross-appeal of the dismissal on qualified immunity grounds of their claim for monetary damages, and plaintiff Jones' appeal of the District Court's grant of summary judgment to the defendants. We have jurisdiction over the grant of injunctive relief in *Allah* pursuant to 28 U.S.C. § 1292(a) and pendent appellate jurisdiction over the plaintiffs' cross-appeal because the facts regarding the merits of the injunction order are inextricably intertwined with those concerning qualified immunity. *See E.I. DuPont de Nemours & Co. v. Rhone Paulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 203 (3d Cir. 2001). The District Court's grant of summary judgment in *Jones* is a final order over which we exercise jurisdiction pursuant to 28 U.S.C. § 1291.

II.

The Supreme Court's decision in *Turner v. Safley*, 482 U.S. 78, 84 (1987), governs our review of New Jersey's legal mail policy. *See Beard v. Banks*, 126 S.Ct. 2572, 2577 (2006). The *Turner* Court emphasized that "federal courts must take

12

cognizance of the valid constitutional claims of prison inmates."
482 U.S. at 84. However, the Court also recognized that prison
administration is "an inordinately difficult undertaking," aspects
of which are "peculiarly within the province of the legislative
and executive branches of government." *Id.* at 85. In light of
these principles, the Court held that a prison regulation that
impinges on the constitutional rights of prisoners is nonetheless
valid, so long as the regulation "is reasonably related to
legitimate penological interests." *Id.* at 89. The *Turner* analysis
presupposes "that the plaintiff inmate has demonstrated that a
constitutionally protected interest is at stake." *Dehart v. Horn*,
227 F.3d 47, 51 (3d Cir. 2000) (en banc). Accordingly, in the
instant case, our threshold task is to determine whether the New
Jersey legal mail policy impinges on inmates' constitutional
rights at all. If it does, we must then consider the policy's
relationship to legitimate penological interests.

A.

The First Amendment, as incorporated in the Fourteenth,
prohibits states from "abridging the freedom of speech." U.S.
Const. Amend. I. We held in *Bieregu* that state prisoners, by
virtue of their incarceration, "do not forfeit their First
Amendment right to use of the mails," 59 F.3d at 1452, and that
a "pattern and practice of opening properly marked incoming
[legal] mail outside an inmate's presence infringes
communication protected by the right to free speech." 59 F.3d
at 1452. We stressed that a pattern and practice of opening
properly marked court mail is particularly troubling because it
"chills protected expression and may inhibit the inmate's ability
to speak, protest, and complain openly, directly, and without

13

reservation with the court." *Id.*

We reaffirm that holding of *Bieregu* today.[6] A state pattern and practice, or, as is the case here, explicit policy, of opening legal mail outside the presence of the addressee inmate interferes with protected communications, strips those protected communications of their confidentiality, and accordingly impinges upon the inmate's right to freedom of speech. The practice deprives the expression of confidentiality and chills the inmates' protected expression, regardless of the state's good-faith protestations that it does not, and will not, read the content of the communications. This is so because "the only way to ensure that mail is not read when opened . . . is to require that it be done in the presence of the inmate to whom it is addressed." *Id.* at 1456 (citing *Wolff v. McDonnell*, 418 U.S. 539, 576-77 (1974)).

We reject the argument of *amicus curiae*, the Commonwealth of Pennsylvania, that the Supreme Court's

---

[6]In *Bieregu*, we also ruled that a pattern and practice of opening legal mail outside the addressee prisoner's presence impinges on the inmate's right to court access under the First Amendment right to petition clause and the Fourteenth Amendment due process clause, independent of whether the prisoner can show "actual injury" to his or her access to the courts. 59 F.3d at 1455. However, as we later recognized in *Oliver*, this alternative holding of *Bieregu* was subsequently abrogated by the Supreme Court's decision in *Lewis v. Casey*, 518 U.S. 343 (1996). *Oliver*, 118 F.3d at 178.

14

decision in *Lewis v. Casey*, 518 U.S. 343 (1996), and our subsequent decision in *Oliver v. Fauver*, 118 F.3d 175 (3d Cir. 1997), require that the plaintiffs prove some injury-in-fact beyond the infringement of constitutionally protected speech. The Supreme Court in *Casey* ruled that in order to press a claim for interference with the right to court access, a prisoner plaintiff must allege that he or she has been actually injured in his or her access to the courts, *i.e.,* that he or she has been hindered in an effort to pursue a nonfrivolous legal claim. 518 U.S. at 349-53. Allegations that the state has not provided adequate preconditions to effectuate the right of access to the court, such as law libraries or legal services, are insufficient. Rather, the inmate must show that his or her exercise of the right at issue, the right of accessing the courts to secure judicial relief, has been infringed in some consequential way. *Id.*

Following *Casey*, we ruled in *Oliver v. Fauver*, 118 F.3d 175 (3d Cir. 1997), that a prisoner could not support a claim for denial of court access stemming from interference with legal mail without producing evidence of actual injury to his access to the courts. In so doing, we made clear that to the extent we had ruled otherwise in *Bieregu*, that holding of *Bieregu* was "effectively overruled." *Id.* at 178. While we did not expressly limit our statement that *Bieregu* was "effectively overruled" to exclude its First Amendment holding, nothing in the reasoning of *Casey* or *Oliver* suggests that a prisoner alleging that officials have opened his legal mail outside of his presence and thereby violated his First Amendment rights need allege any consequential injury stemming from that violation, aside from the violation itself. Unlike the provision of legal libraries or legal services, which are not constitutional "ends in themselves,

15

but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts,'" *Casey*, 518 U.S. at 351, protection of an inmate's freedom to engage in protected communications is a constitutional end in itself.

B.

The fact that the legal mail policy burdens prisoners' First Amendment rights does not, however, tell us whether the policy is constitutional. Prisoners necessarily sacrifice many of the constitutional rights available to non-incarcerated citizens. *See Banks*, 126 S.Ct. at 2577-78. ("[I]mprisonment does not automatically deprive a prisoner of certain constitutional protections, including those of the First Amendment. But at the same time the Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere.") (citations omitted); *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) ("Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner."). The relevant question, as articulated by the Supreme Court in *Turner*, is whether the legal mail policy is "reasonably related to legitimate penological interests." 482 U.S. at 89.

Under the teachings of *Turner*, there are two steps to take in determining whether a prison regulation is "reasonably related to legitimate penological interests." *Id.* "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it. Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so

16

remote as to render the policy arbitrary or irrational" or to demonstrate that it "represents an exaggerated response to [the asserted] objectives." *Turner*, 482 U.S. at 89-90 (citation omitted), 97-98. Thus, "a rational nexus between a regulation and a legitimate penological interest is essential to its validity." *Dehart v. Horn*, 227 F.3d 47, 53 (3d Cir. 2000) (en banc).

On the other hand, "not all prison regulations that are rationally related to [a legitimate state] interest pass *Turner*'s 'overall reasonableness' standard." *Id.* If such a rational relationship is found to exist, that "determination commences rather than concludes our inquiry." *Id.* The other three *Turner* factors to be considered are (1) "whether inmates retain alternative means of exercising the circumscribed right," (2) the burden on prison resources that would be imposed by accommodating the right, and (3) "whether there are alternatives to the regulation that 'fully accommodate[] the prisoners' rights at de minimis cost to valid penological interests." *Id.* at 51 (quoting from *Waterman v. Farmer*, 183 F.3d 208, 213 (3d Cir. 1999)).

"Of course, the *Turner* analysis is appropriate only in cases where a prison policy is impinging on inmates' constitutional rights" and *Turner*'s two-step assessment of reasonableness must be made in light of "the inmate's interest in engaging in constitutionally protected activity." *Dehart*, 227 F.3d at 51.

While the ultimate burden of persuasion with regard to the reasonableness of a regulation resides with those challenging it, *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003),

17

the defendant administrators must "put forward" the legitimate
governmental interest alleged to justify the regulation, *Turner*,
482 U.S. at 89, and "'demonstrate' that the policy drafters
'could rationally have seen a connection' between the policy and
[that interest]." *Wolf v. Ashcroft*, 297 F.3d 305, 308 (3d Cir.
2002). "[T]his burden, though slight, must 'amount [] to more
than a conclusory assertion.'" *Id.* (quoting *Waterman*, 183 F.3d
at 218 n.9). As we explained in *Wolf*, satisfying this burden may
or may not require evidence; where the connection is obvious,
common sense may suffice:

> [W]hile the connection may be a matter of
> common sense in certain instances, such that a
> ruling on this issue based only on the pleadings
> may be appropriate, there may be situations in
> which the connection is not so apparent and does
> require factual development.    Whether the
> requisite connection may be found solely on the
> basis of "common sense" will depend on the
> nature of the right, the nature of the interest
> asserted, the nature of the prohibition, and the
> obviousness of its connection to the proffered
> interest.    The showing required will vary
> depending on how close the court perceives the
> connection to be.

*Wolf*, 297 F.3d at 308-09.

When neither common sense nor evidence demonstrates
a reasonable causal nexus – "where the logical connection
between the regulation and the asserted goal is so remote as to

18

render the policy arbitrary or irrational" or to demonstrate that the regulation "represents an exaggerate[d] response" – summary judgment for the defendant administrator is inappropriate and the plaintiff inmate may be entitled to injunctive relief. *See, e.g., Ramirez v. Pugh*, 379 F.3d 122, 130 (3d Cir. 2004) ("In the absence of a factual record, . . . we cannot ignore the possibility that the proscription rationally applies to such a small percentage of the . . . inmate population that its connection to the government's rehabilitative interest 'is so remote as to render [it] arbitrary or irrational.'") (quoting *Turner*, 482 U.S. at 89-90); *Wolf v. Ashcroft*, 297 F.3d 305, 309 (3d Cir. 2002); *Bieregu v. Reno*, 59 F.3d 1445, 1458 (3d Cir. 1995); *Mann v. Reynolds*, 46 F.3d 1055, 1060-61 (10th Cir. 1995).

Our decision in *Bieregu* is instructive on this point. While the defendant administrators in *Bieregu* argued only that their opening of legal mail in the absence of the inmate addressee did not violate the Constitution, the Court, in the course of reversing summary judgment in favor of those defendants, necessarily addressed whether the legal mail policy was enforceable under *Turner*. *Bieregu*, 59 F.3d at 1456-58. The Court found that no reasonable connection had been demonstrated between their conduct and institutional security "on the supposition that correspondence may contain plans for escape or incite violence." *Id.* at 1457. We recognized that the state had a "substantial interest" in institutional security but concluded that, on the state of the record, "to suggest that repeatedly opening incoming court mail outside the presence of an inmate advances a legitimate interest in institutional security . . . would overreach." *Id.* In other words, while it was true that

19

legal mail conceivably might contain such plans and the opening
of it might conceivably thwart those plans, the risk allegedly
addressed was too insubstantial to justify incursion on First
Amendment interests.

There is no dispute here about the existence of the
regulation and the defendants' conduct implementing it. As we
have explained, based upon that regulation and conduct,
plaintiffs have established that the defendants have infringed
upon their First Amendment protected interest in being present
when legal mail addressed to them is opened. It follows that
defendants' practice cannot pass constitutional muster unless it
can satisfy the *Turner* tests.

In order to satisfy their burden at the first *Turner* step, the
defendant administrators have identified as the relevant
penological interest their interest in protecting the safety and
security of New Jersey's prisons. The defendants put forth only
one means by which the policy might serve that interest:
through a reduction in the risk of anthrax contamination in
prisons. In order to establish that there is a non-negligible risk
of anthrax contamination that the policy could be thought to
reduce, the defendants rely solely on the generally known facts
regarding the events of September 11, 2001, and the letters
posted in October of 2001 containing anthrax spores.[7] They

------

[7]Both sides in both cases agree upon the facts here earlier
reported concerning the anthrax letters. *See* page ___, *infra*. A
series of such letters was posted in October of 2001, four of
which were processed by the mail processing center in

20

have tendered no other evidence for the purpose of establishing
the existence of a significant risk of anthrax contamination and
thus a reasonable connection between these practices and the
safety and security of their prisons.

The District Court in *Allah*, viewing the question
presented under *Turner*'s first step from the perspective of the
date of its decision in October of 2004, found "that there is no
reasonable connection between the Legal Mail Policy and the
Defendants' asserted interest." App. Brown at Ra123. It
explained:

> Defendants have offered no evidence that there is
> an elevated risk of anthrax contamination in
> prisons resulting from the events of September
> 11, 2001, which prompted DiFrancesco's
> executive order. Nor have Defendants cited any
> evidence of attempts to expose prisoners to
> anthrax in the three years since the incident in the
> Hamilton postal facility. Since that time,
> investigations conducted by the Center for
> Disease Control and Prevention (the "CDC") have
> found that the actual risk of anthrax
> contamination in this country is quite small, and

---

Hamilton, NJ. Five people died. There were five confirmed
infections in New Jersey. No evidence has been tendered,
however, regarding the addressees of those letters, the results of
the ensuing investigation, or any other information regarding
them.

21

guidelines set forth by the CDC and the State of New Jersey provide a sensible approach to dealing with suspicious packages.

*Id.*

The District Court in *Jones*, viewing the question presented under *Turner*'s first step from the time perspective of the adoption of the regulation, found "that the revised mail policy has a rational relation to its stated and legitimate purpose of maintaining prison safety and security." *Id.* at Ra111. It explained:

After September 11, 2001, prison officials were faced with the very real and dangerous prospect of receiving prisoner mail containing Anthrax. In such a close-quartered environment as a prison, the potential danger to inmates and staff alike is obvious.    If a prisoner were to open a contaminated envelope in his cell, not only would the prisoner and mail carrier likely be exposed to the contaminant, the prisoner's cell mate and neighbors, as well as his entire prison wing, would be at risk of exposure.   The revised mail policy seeks to lessen the risk of Anthrax exposure to prisoners and prison staff by opening incoming mail in a secure environment in which any contamination would be immediately contained.

*Id.*

22

We believe that a prison administrator compelled to act immediately after September 11th and October of 2001 might reasonably have concluded that the risk of an anthrax terrorism attack on a prison was sufficiently unquantifiable to justify a temporary, emergency measure involving the opening of a prisoner's legal mail in his absence. We conclude, however, that we should review the injunction entered by the District Court in *Allah* based on the state of the record in that case at the time it was entered more than three years after September 11th. *See United States v. Carolene Products Co.*, 304 U.S. 144, 153 (1938) ("[T]he constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist."); *Schumacher v. Nix*, 965 F.2d 1262, 1271 (3d Cir. 1992). Reviewing it from that perspective we, too, find that there is "no reasonable connection between the Legal Mail Policy and the defendants' asserted interest."[8]  App. Brown at RA123.

---

[8]While they have played no role in our decision, extra-record materials to which plaintiffs and *amici* refer us, some of which are dated after the *Allah* Court's October 2004 injunction, support its soundness today. Since October of 2004, the Postal Service has implemented a series of measures to reduce the risk of anthrax contamination through the mail. These measures have included the installation of biohazard detection systems in all nine processing centers in New Jersey. The Centers for Disease Control and Prevention estimates an individual's current risk of contracting anthrax to be roughly 1 in 300 million in an average year. *See* Ctrs. for Disease Control & Prevention, *Anthrax  Q  &  A:  Risk,*

23

At every step in the suggested logical progression from the events of September and October 2001 to the need for protection of prisons against anthrax contamination in October 2004, common sense would not assist the responsible administrator. He or she, without additional information, could not reasonably take each logical step in deciding whether to continue to tread upon inmates' First Amendment rights. For example, it is conceivable, we suppose, that there may have been a connection between the events of September 11th and the anthrax letters of October 2001, but common sense does not alone afford a reasonable basis for believing that there was, and a prison administrator in the absence of substantial evidence to so suggest could not three years later reasonably rely upon such a connection in deciding whether to continue the amended legal mail policy until the end of the state of emergency. The same can be said for the alleged connection between a limited but undisclosed number of anthrax letters posted in October of 2001 by an unknown person or persons to undisclosed places and the existence three years later of a person motivated and with the means to attack a prison with anthrax. Finally, even if an administrator could reasonably conclude in October of 2004 that

──────────────

http://www.bt.cdc.gov/agent/anthrax/faq/risk.asp (last visited July 31, 2006). By way of comparison, one is two times less likely to contract anthrax in a given year than to win the grand prize in the Multi-State Lottery Association's Powerball game. *See* The Multi-State Lottery Association, *Powerball–Prizes and Odds*, http://www.powerball.com/powerball/pb_prizes.asp (reporting odds of grand prize to be roughly 1 in 146 million) (last visited July 31, 2006).

24

there was a non-*de minimis* risk of an anthrax attack on New Jersey prisons, common sense, without more, would not afford a reasonable basis for believing that that risk would be materially reduced by opening letters from lawyers and courts.

In ruling that the state had failed to demonstrate a "valid, rational connection" between the legal mail policy and a legitimate governmental interest, the *Allah* Court did not second guess New Jersey prison administrators' judgment with respect to administrative burdens or inmate behavior, or any other matter within their special expertise. The problem it addressed was one involving the assessment of the risk of a terrorist anthrax attack on New Jersey's prisons in the Fall of 2004. Yes, such an attack is conceivable, but that Court would have been neglectful of its responsibility if it had sanctioned the elimination of the constitutional right we recognized in *Bieregu* in the absence of some rational basis for believing there was a non-negligible risk of such an attack. Stated otherwise, while the health and safety of inmates and staff are legitimate penological interests, if there is no information suggesting a significant risk of an anthrax attack, there is no reasonable connection between those interests and the policy of opening legal mail in the absence of the inmate addressee. Accordingly, we hold that the defendants have not met their burden under the first step of *Turner* and proceed no further in our review of the injunction in the *Allah* Court.

Although only two, rather than three, materially uneventful years had passed at the time of the *Jones* Court's decision to refuse injunctive relief, our analysis of the issues presented by Jones' appeal parallels the analysis we have just

25

conducted in *Allah* and reaches the same conclusion. The defendants in *Jones*, like those in *Allah*, have failed to meet their burden under the first step of *Turner*. Accordingly, we will reverse the judgment of the *Jones* Court on Jones' claim for injunctive relief and will remand with instructions to enter an injunction consistent with the *Allah* injunction.

III.

State officials are entitled to qualified immunity from damage liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "This inquiry . . . must be undertaken in light of the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

*Bieregu* established as a general matter that prisoners have a First Amendment protected interest in being present when their legal mail is opened. 59 F.3d at 1458. But as the Supreme Court emphasized in *Saucier*, "that is not enough." 533 U.S. at 202. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). For two reasons, we believe it cannot be said with confidence that reasonable prison administrators in the defendants' position would have realized that they were violating the teachings of *Bieregu*.

First, as we have explained, prison administrators in defendants' position would not have been violating inmates'

26

rights if they reasonably believed they were acting in the interest
of inmate and staff health and safety. As we have further
explained, the *Turner* test is highly fact sensitive and, at the time
the challenged regulation was adopted, there was no guidance in
our case law regarding the application of *Bieregu* and *Turner* in
the context of the special circumstances encountered in the Fall
of 2001. Without being able to determine whether the October
2001 series of anthrax letters had ended or was on-going, a
reasonable administrator might well have understood the legal
mail policy to be consistent with those cases.

Second, even at a later point in time when it became
apparent that there was no significant, on-going risk from
anthrax attack, we believe a reasonable prison administrator
evaluating whether the legal mail policy should be continued
might well have concluded that *Bieregu* was no longer sound
law. As previously noted, at that point we had declared without
reservation in *Oliver v. Fauver*, 118 F.3d 175, 178 (3d Cir.
1997), that the Supreme Court had "effectively overruled
*Bieregu*." While we here hold that this was not true with respect
to the First Amendment aspects of *Bieregu*, in the absence of
authority suggesting otherwise, we cannot find a prison
administrator to have been unreasonable in taking our statement
in *Oliver* at face value.

Accordingly, we will affirm the ruling of both the *Allah*
Court and the *Jones* Court that the defendants are entitled to
qualified immunity with respect to plaintiffs' damage claims.

IV.

27

The judgment of the District Court in *Allah* will be affirmed. The judgment of the District Court in *Jones* will be affirmed in all respects other than the denial of relief on plaintiffs' claim for an injunction. Its denial of injunctive relief will be reversed and this matter will be remanded with instructions to enter an injunction consistent with that entered in *Allah*.