Steven T. Wax, OSB #85012
Federal Public Defender
steve_wax@fd.org
Stephen R. Sady
Chief Deputy Federal Public Defender
steve_sady@fd.org
Patrick J. Ehlers
Assistant Federal Public Defender
patrick_ehlers@fd.org
101 SW Main Street, Suite 1700
Portland, Oregon  97204
Tel:   503-326-2123
Fax:   503-326-5524

Attorneys for Petitioner

**PREVIOUSLY FILED WITH CSO
AND CLEARED FOR PUBLIC FILING**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDULRAHIM ABDUL RAZAK AL GINCO,<br><br>                                    Petitioner,<br><br>     v.<br><br>GEORGE W. BUSH, et al.,<br><br>                                  Respondents. | CV 05-1310-RJL<br><br>**MOTION TO LIFT OR MODIFY STAY FOR CONSIDERATION OF MOTION FOR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, AN ORDER TO SHOW CAUSE**<br><br>**(ORAL ARGUMENT REQUESTED)** |

# TABLE OF CONTENTS

Page

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.   The Department Of Defense Has No Authority To Detain Abdul
     Rahim Because He Was A Prisoner Of the Taliban From January
     2000 Until The Americans Liberated The Prison Where He Was
     Held. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B.   The Stay Of Almost A Year Runs Counter To The Statutory And
     Constitutional  Policies Favoring Swift Resolution Of Habeas
     Corpus Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

C.   Even Under The Demanding Standard Of *Khalid*, This Court Has
     Jurisdiction To Determine The Department of Defense's Authority
     To Detain. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

D.   *Hamdan* Resolved The Question Of This Court's Jurisdiction To
     Hear This Petition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

E.   A Contrary Reading Of The Statutes Would Raise Serious
     Constitutional Questions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     1.   As Construed By The Respondents, The DTA Would Violate
          The Constitution's Prohibition Against Bills Of Attainder. . . . . . . 12

     2.   As Construed By The Respondents, The DTA Works An
          Unconstitutional Suspension Of The Writ Of Habeas Corpus. . . . 17

     3.   As Construed By The Respondents, The DTA Violates The
          Due Process Clause Of The Fifth Amendment. . . . . . . . . . . . . . . . 19

          a.   Legislation Based On Alienage Would Violate The
               Detainees' Right To Equal Protection Of The Laws. . . . . . 19

          b.   Indefinite Detention And Unredressable Torture
               Violate Substantive Due Process. . . . . . . . . . . . . . . . . . . . 22

i

        c.     The DTA's Limitations On Judicial Review Violate
Procedural Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    4.     As Construed By The Respondents, Congress's Effort To
Overturn Supreme Court Action In <u>Rasul</u> Violates The
Separation Of Powers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Application of Yamashita*, 327 U.S. 1 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 8

*In re Blodgett*, 502 U.S. 236 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Bolling v. Sharpe*, 347 U.S. 497 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Booker v. United States*, 543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Carafas v. LaVallee*, 391 U.S. 234 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993) . . . . . . . . . 22

*Clark v. Martinez*, 543 U.S. 371 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 23

*Colorado v. Connelly*, 479 U.S. 157 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Crowell v. Benson*, 285 U.S. 22 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Cummings v. Missouri*, 71 U.S. 277 (1866) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 15

*Davis v. Adult Parole Authority*, 610 F.2d 410 (6th Cir. 1979) . . . . . . . . . . . . . . . . . . . . 5

*Dellinger v. Mitchell*, 442 F.2d 782 (D.C. Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Fay v. Noia*, 372 U.S. 391 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Fletcher v. Peck*, 10 U.S. (6 Cranch) 87 (1810) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Foretich v. United States*, 351 F.3d 1198 (D.C. Cir. 2003) . . . . . . . . . . . . . 12, 13, 14, 17

*Ex parte Garland*, 71 U.S. 333 (1866) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Graham v. Richardson*, 403 U.S. 365 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005) . . . . . . . . . 23, 24

*Hamdan v. Rumsfield*, 126 S. Ct. 2749 (2006) . . . . . . . . . . 1, 2, 7, 8, 9, 10, 17, 18, 23, 24

*Hamdi v. Rumsfield*, 542 U.S. 507 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 23

*INS v. St. Cyr*, 533 U.S. 289 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 18, 19

*Johnson v. Eisentrager*, 339 U.S. 763 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 18

*Johnson v. Rogers*, 917 F.2d 1283 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . 1, 7, 8, 23

*Landis v. North American Co.*, 299 U.S. 248 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Lego v. Twomey*, 404 U.S. 477 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Lisenba v. California*, 314 U.S. 219 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Lynce v. Mathis*, 519 U.S. 433 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Lynumn v. Illinois*, 372 U.S. 528 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*McClellan v. Young*, 421 F.2d 690 (6th Cir.1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Moses H. Cone Mem. Hospital v. Mercury Construction Corp.*, 460 U.S. 1 (1983) . . . . . 6

*Nixon v. Administrator of General Services*, 433 U.S. 425 (1977) . . . . . . . . . . . . . . . . . 14

*Plyler v. Doe*, 457 U.S. 202 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ex parte Quirin*, 317 U.S. 1 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Rasul v. Bush*, 215 F. Supp. 2d 55 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . 10, 18, 20, 25, 26

*Rhines v. Weber*, 544 U.S. 269 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Rochin v. California*, 342 U.S. 165 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Romer v. Evans*, 517 U.S. 620 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ruby v. United States*, 341 F.2d 585 (9th Cir.1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993) . . . . . . . . . . . . . . . . . . . . . . 26

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Selective Service System v. Minnesota Public Interest Group*, 468 U.S. 841 (1984) . . . 14

*Tennessee v. Lane*, 541 U.S. 509 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States Department of Agriculture v. Moreno*, 413 U.S. 528 (1973) . . . . . . . . . . 22

*United States v. Brown*, 381 U.S. 437 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 16

*United States v. Dorcely*, 454 F.3d 336 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Karake*, 2006 WL 2374463 (D.D.C. Aug. 17, 2006) . . . . . . . . . . . . . . 3

*United States v. Lovett*, 328 U.S. 303 (1946)      12

*Weinberger v. Rossi*, 456 U.S. 25 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Ex parte Yerger*, 75 U.S. (8 Wall.) 85 (1868) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Yong v. INS*, 208 F.3d 1116 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Zadvydas v. Davis*, 533 U.S. 678 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 16, 22, 23

## FEDERAL STATUTES

8 U.S.C. § 1231(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

8 U.S.C. §1531 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

28 U.S.C. § 2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18, 20, 21

28 U.S.C. § 2243 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

**Introduction**

Because military authorities do not have jurisdiction to detain the petitioner, this Court has jurisdiction to enter a writ for habeas corpus. Abdul Rahim was a political prisoner of the Taliban, tortured and held in custody for almost two years prior to the American liberation of Kandahar in December 2001. Under *Hamdan v. Rumsfield*, 126 S. Ct. 2749 (2006), the respondent's jurisdiction is limited to the time of war and to persons engaged in belligerent acts. Prominently, the relevant acts must have been committed "*during*, not before, the relevant conflict." *Hamdan*, 126 S. Ct. at 2779 (emphasis in original). Not only is the temporal requirement for jurisdiction absent, as set out in the briefing in support of partial summary judgment, Abdul Rahim meets no definition of enemy combatant, and his detention appears to be based, at least in part, on the products of horrific Taliban torture.

The stay, which has been in effect since October 24, 2005, runs contrary to the strong statutory and constitutional policies favoring swift consideration of habeas corpus petitions. The Court should reach the merits of the petition forthwith on several grounds, from narrowest to broadest: 1) in this Court's decision in *Khalid v. Bush*, 355 F.Supp.2d. 311, 329 (D.D.C. 2005), the Court recognized jurisdiction to determine "the legality of the 'authority of those detaining the petitioner'" (quoting *Application of Yamashita*, 327 U.S. 1, 6 (1946)); 2) the Supreme Court decision in *Hamdan* provides intervening authority recognizing this Court's jurisdiction to reach the merits because the Detainee Treatment Act of 2005 does not retrospectively apply to Abdul Rahim's pre-DTA petition; and 3) failure to consider the merits of the petition would constitute a bill of attainder, an unconstitutional suspension of

the writ of habeas corpus, a violation of the separation of powers, and a violation of due process and equal protection.  The respondents oppose this motion.

A. **The Department Of Defense Has No Authority To Detain Abdul Rahim Because He Was A Prisoner Of the Taliban From January 2000 Until The Americans Liberated The Prison Where He Was Held.**

The summary judgment motion papers establish that the Department of Defense has no jurisdiction to hold Abdul Rahim.  The Taliban held Abdul Rahim as a political prisoner for almost two years before he was freed when American bombing drove the Taliban out of Kandahar.  For the next month, he and four similarly situated freed political prisoners attempted to go home with the assistance of the Red Cross and the United Nations.  The Americans seized him and eventually, apparently based on the products of Taliban torture, transported him to Guantanamo Bay in May 2000.  The Department of Defense has no jurisdiction to hold Abdul Rahim because he engaged in no belligerent activity during the time covered by the Authorization for the Use of Military Force (AUMF), and because he is not an enemy combatant under any definition.

*Hamdan* limited the Department of Defense's jurisdiction to acts committed after 9/11 and the promulgation of the Authorization for the Use of Military Force. 126 S. Ct. at 2777-79.  Abdul Rahim was in Taliban custody during this time.  Furthermore, as a political prisoner of the Taliban, Abdul Rahim could not be an enemy combatant as defined by *Hamdi v. Rumsfield*, 542 U.S. 507, 518 (2004).  Finally, jurisdiction to detain cannot be based on

the products of torture.  Under the Convention Against Torture,[1] the products of torture

cannot be used to confer jurisdiction for Guantánamo proceedings.[2]  Nor, under the CAT, can

the products of torture be used before this Court.[3]

### B.    The Stay Of Almost A Year Runs Counter To The Statutory And Constitutional  Policies Favoring Swift Resolution Of Habeas Corpus Claims.

The norm for federal habeas litigation is a rapid adjudication of the issues: "A court,

justice or judge entertaining an application for a writ of habeas corpus shall *forthwith* award

the writ or issue an order directing the respondent to show cause why the writ should not be

granted ...." 28 U.S.C. § 2243 (emphasis added).  Swift resolution is entirely warranted in the

present case, in which the face of the petition demonstrates lack of Department of Defense

---

[1] United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 15, Apr. 18, 1988, 112 Stat. 2681, 2681-821, 1465 U.N.T.S. 85 (hereinafter CAT).

[2] "Article 15 of the Convention is a treaty obligation of the United States, and the United States is obligated to abide by that obligation in Combatant Status Review Boards and Administrative Review Boards."  U.S. Dep't. of State, Legal Advisor John B. Bellinger III, U.S. Delegation Oral Responses to CAT Committee Questions, Geneva, Switzerland (May 5, 2006) (Question 42) (available at http://www.state.gov/g/drl/rlsl) (Exhibit A).  *See also* Dept. of Defense, Military Commission Instruction No. 10 (March 24, 2006) (applying Article 15 to bar products of torture in commission proceedings) (available at http://www.defenselink.mil/NEWS/Mar2006/d20060327MCI10.pdf).

[3] *See also Lisenba v. California*, 314 U.S. 219, 237 (1941) ("To extort testimony from a defendant by physical torture in the very presence of the trial tribunal is not due process. The case stands no better if torture induces an extrajudicial confession which is used as evidence in the courtroom."); *United States v. Karake*, No. 02-0256 (ESH), 2006 WL 2374463 (D.D.C. Aug. 17, 2006) (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973); *Lego v. Twomey*, 404 U.S. 477, 489 (1972); and *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)).

jurisdiction, because writs of habeas corpus are intended to afford a "'swift and imperative remedy in all cases of illegal restraint or confinement.'"  *Fay v. Noia*, 372 U.S. 391, 400 (1963) (quoting *Sec'y of State for Home Affairs v. O'Brien,* (1923) A.C. 603, 609 (H.L.)); *see Carafas v. LaVallee,* 391 U.S. 234, 238 (1968) (the purpose of the habeas corpus statute is to provide an effective and speedy instrument by which judicial inquiry may be had into the legality of detention).  An indefinite stay, in effect, constitutes a de facto denial of the claim without a hearing – also known as a suspension of the writ of habeas corpus.

The express statutory language compels prompt disposition of habeas corpus petitions. The statute explicitly directs district courts to "summarily hear and determine the facts, and dispose of [a habeas corpus petition] as law and justice require."  28 U.S.C. § 2243.  Section 2243 requires the court to hold a hearing within five days of the return of the writ, which must itself be within three days, absent good cause.  *Ruby v. United States*, 341 F.2d 585, 587 (9th Cir. 1965) ("The application for the writ usurps the attention and displaces the calendar of the judge or justice who entertains it and receives prompt action from him within the four corners of the application.").[4]  Further delay would also indirectly suspend the writ in violation of Article I, section 9, clause 2, of the Constitution.  *Davis v. Adult Parole Authority,* 610 F.2d 410, 414 (6th Cir. 1979) ("[A] rule which would permit a court to dismiss an action for habeas relief without any consideration of the equities presented renders

---

[4] *See also McClellan v. Young,* 421 F.2d 690, 691 (6th Cir.1970) ("Habeas corpus is a speedy remedy entitled to preferential consideration to insure expeditious hearing and determination.").

the habeas corpus process inadequate to test the legality of a person's conviction and, thereby, constitutes a prohibited suspension of the writ.").

In *Yong v. INS*, 208 F.3d 1116 (9th Cir. 2000), the Ninth Circuit was confronted with a similar situation involving indefinite detention of aliens subject to deportation orders that could not be effectuated. Hundreds of habeas corpus petitions had been filed in multiple jurisdictions with rapidly evolving law and conflicting district court decisions. The Court of Appeals vacated an indefinite stay that had been entered by the district court to await a decision from the Circuit in another case, stating:

> We acknowledge that the district court was in an unenviable position. It was faced with a number of petitions in an evolving area of law and knew that, however it ruled, it might be required to revisit its decision if its reasoning did not comport with our ruling in *Ma*. The stay it crafted, however, placed a significant burden on Yong by delaying, potentially for years, any progress on his petition. Consequently, although considerations of judicial economy are appropriate, they cannot justify the indefinite, and potentially lengthy, stay imposed here.

*Yong*, 208 F.3d at 1120-21 (citing *Johnson v. Rogers*, 917 F.2d 1283, 1285 (10th Cir. 1990) (holding that a crowded docket, without more, is insufficient to justify lengthy delay)); *see also McClellan*, 421 F.2d at 691 (the district court "was without authority to defer action in petitioner's habeas corpus case and in twenty-five other habeas corpus actions pending before him, to await a ruling by the Supreme Court in another case"). The district court lacked authority to issue an indefinite stay of habeas proceedings to await a circuit court decision. *Yong*, 208 F.3d at 1120.

Once a petitioner satisfies the procedural requirements of the habeas corpus statutes, federal district courts have a duty to rule on the issues presented. *See Rhines v. Weber,* 544 U.S. 269, 277 (2005) (district courts do not have the discretion to stay habeas proceedings indefinitely to await resolution of claims in other judicial proceedings).[5] This duty is especially pressing here when no legitimate countervailing interests exist to support continuation of the stay. "Any protracted halting or limitation of plaintiffs' right to maintain their case would require not only a showing of 'need' in terms of protecting the other litigation involved but would also require a balanced finding that such need overrides the injury to the parties being stayed." *Dellinger v. Mitchell*, 442 F.2d 782, 787 (D.C. Cir. 1971).

The harm inflicted on Abdul Rahim's interest in obtaining a prompt determination of the legality of his current detention outweighs any burden on the respondents in answering the motion now. The Court should, therefore, either vacate the stay or modify it to allow litigation of the pending motions.

---

[5] *See also In re Blodgett*, 502 U.S. 236, 239-240 (1992) (Court of Appeals was duty-bound to consider habeas corpus petitioner's claim for relief without delay, given potential for prejudice, and could not stay proceedings indefinitely to await recommendations from death penalty task force); *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 16-19 (1983) (vacating stay and holding that the district court must exercise its jurisdiction over a claim unless there are "exceptional circumstances" for not doing so); *Landis v. North American C*o., 299 U.S. 248, 255 (1936) (discretion was abused by a stay of indefinite duration in the absence of a pressing need).

### C.    Even Under The Demanding Standard Of *Khalid*, This Court Has Jurisdiction To Determine The Department of Defense's Authority To Detain.

In *Khalid*, this Court cited to three Supreme Court cases to find clear authority for the following proposition: "[J]udicial review is limited to the question of whether Congress has given the military the authority to detain or charge the individual as an enemy combatant, rather than whether the military's decision was correct or otherwise supported by the facts." 355 F. Supp.2d at 328 (citing *Ex parte Quirin*, 317 U.S. 1, 25 (1942)); *Application of Yamashita*, 327 U.S. 1 (1946); *Johnson v. Eisentrager*, 339 U.S. 763, 786 (1950)).  The Court cited, with emphasis, to the passage in *Yamashita* where the Supreme Court stated, "The courts may inquire whether the detention complained of is within the authority of those detaining the petitioner."  *Khalid*, 355 F. Supp. 2d at 329 (quoting *Yamashita*,  327 U.S. at 6).  This is the precise question Abdul Rahim now raises.

In *Khalid*, the petitioners conceded that they were detained pursuant to lawful military orders.  355 F. Supp.2d at 329.[6]  In contrast, Abdul Rahim asserts that, under the standards of *Hamdan*, the Department of Defense lacks jurisdiction over him.  Not only is this established by the evidence in support of summary judgment, Abdul Rahim's pro se submissions  establish the Department of Defense's lack of jurisdiction by asserting that for

---

[6] This Court's opinion states, "In this case, the petitioners have conceded, as they must, that the military orders given to capture and initially detain them were lawful orders." *Khalid*, Docket No. 70, at 31.  The published opinion erroneously substitutes "unlawful" for "lawful."  *Khalid*, 335 F. Supp.2d at 329.

two years he had been a prisoner of Al-Qaida and the Taliban, accused of being an American spy (CR 1, 3). Thus, under this Court's prior opinion in *Khalid*, jurisdiction is appropriate.

The petitioner recognizes that the *Khalid* opinion is presently pending before the Circuit Court for the District of Columbia. Since this Court filed its opinion in *Khalid*, the Supreme Court has addressed many related issues in the *Hamdan* opinion. The intervening authority from the Supreme Court has undermined much of the reasoning of *Khalid*.[7] However, even given the great deference to Executive Branch authority in *Khalid*, this Court's pre-*Hamdan* opinion strongly supports vacation of the stay and immediate exercise of jurisdiction over the basic question of the military's authority to detain Abdul Rahim. The Court explicitly recognized jurisdiction to determine whether the detention is within the lawful authority of the Department of Defense and, as in *Yamashita*, that the Court would have authority to grant the writ upon a determination that the military lacked jurisdiction to hold the prisoner.

---

[7] The *Hamdan* Court addressed each of the World War II era cases upon which this Court relied, distinguishing or otherwise marginalizing each. For example, Abdul Rahim, unlike the *Eisenberger* defendants, is not a citizen of an "enemy nation", was not tried by a military tribunal, has been imprisoned by the United States for over four years, and has denied committing any aggression against the United States. *Compare Hamdan*, 126 S. Ct. at 2793-94. Further, after an extended discussion of *Yamashita*, the Court concluded that the case had been "stripped of its precedential value." *Hamdan*, 126 S. Ct. at 2790. *Quirin* was also distinguished as "the high water mark of military power to try enemy combatants for war crimes." *Hamdan*, 126 S. Ct. at 2777. Further, the Court's ultimate decision in *Khalid* – that no cognizable rights existed for detainees – is contrary to the direct holding of *Hamdan* that Geneva Conventions Common Article III and other rights conferred by the Code of Military Justice apply to Guantanamo detainees. 126 S. Ct. at 2786, 2795-97.

### D. *Hamdan* Resolved The Question Of This Court's Jurisdiction To Hear This Petition.

*Hamdan* conclusively determined that Section 1005(e)(1) of the Detainee Treatment Act of 2005 "does not strip federal court's jurisdiction over cases pending on the date of DTA's enactment."  126 S. Ct. at 2769 n.15.  The Court also recognized that Sections 1005(e)(2) and (3) are not jurisdiction-stripping provisions.  *Hamdan*, 126 S. Ct. at 2768. The Court viewed with favor the legislative history indicating that "the amendment will not strip the courts of jurisdiction over [pending] cases."  *Hamdan*, 126 S. Ct. at 2766 n.10 (bracketed word in original).  This intervening authority establishes this Court's full jurisdiction over Abdul Rahim's habeas petition.

Despite these strong statements from the Supreme Court, the respondents have argued that subsections 2 and 3 should be deemed as jurisdiction-stripping.  Most simply, this position is directly contrary to the controlling authority of *Hamdan*.  Even if the statements in *Hamdan* regarding pre-DTA petitions were dicta, which they are not because they are essential to the reasoning, "'carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.'" *United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006) (citations omitted).  Further, as in *Dorcely*, where the court cited to the dissenting Justices' assessment of the scope of review after *Booker v. United States*, 543 U.S. 220 (2005), the dissent in *Hamdan* assumed that the breadth of reasoning would result in a rule applicable to habeas petitioners who filed before the DTA.  *Compare Dorcely*, 454 F.3d at 374, *with Hamdan*, 126 S. Ct. at 2817-18 (Scalia, J., dissenting).  *See*

*also Clark v. Martinez*, 543 U.S. 371, 379-80 (2005) (Justice Scalia noting for the majority that the breadth of *Zadvydas v. Davis*, 533 U.S. 678 (2001), had been anticipated in the *Zadvydas* dissent, in which he had joined).

The respondent's argument under subsections 2 and 3 is untenable for three additional reasons. The present case does not challenge the Combatant Status Review Tribunal, but addresses the Department of Defense's underlying jurisdiction and the basic legality of the detention. Further, there has been no final decision of the CSRT, as required by Section 1005(e)(2)(A), because the Department of Defense has not implemented the procedures required by Section 1005(e)(2)(B)(ii). Lastly, the *Hamdan* court found nothing absurd about dual jurisdiction under subsections 2 and 3. 126 S. Ct. at 2768-69.

Under *Hamdan*'s controlling authority, this Court has full jurisdiction to consider the matters raised in the motion for summary judgment.

### E.     A Contrary Reading Of The Statutes Would Raise Serious Constitutional Questions.

The direct reading of the statutes compelled by *Hamdan* requires that this Court consider the merits of the motions. Even if there were ambiguity, the Doctrine of Constitutional Avoidance would require that any ambiguity be construed in favor of the petitioner. The Doctrine of Constitutional Avoidance provides that, "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' [courts] are obligated to

construe the statute to avoid such problems." *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001)

(quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

> The canon [of constitutional avoidance] is not a method of adjudicating
> constitutional questions by other means . . . . Indeed, one of the canon's chief
> justifications is that it allows courts to *avoid* the decision of constitutional
> questions. It is a tool for choosing between competing plausible interpretations
> of a statutory text, resting on the reasonable presumption that Congress did not
> intend the alternative which raises serious constitutional doubts.

*Martinez*, 543 U.S. at 381 (emphasis in original).  If the Court does not conclude that the

DTA is unambiguously prospective, the Doctrine of Constitutional Avoidance applies, under

which the Court must determine if the statute is amenable to a "plausible" construction that

would avoid the necessity for deciding the constitutional questions.  *Martinez*, 543 U.S. at

380-81.

The arguments regarding prospective application of the DTA are, at the very least,

"plausible" competing interpretations of the statutory text.  This is especially true because,

under *Martinez*, the Doctrine of Constitutional Avoidance is assessed based on "the lowest

common denominator," which in this case would mean the Court should assume the

petitioner is absolutely innocent and the respondents wholly lack a jurisdictional basis to hold

him.  *Martinez*, 543 U.S. at 380 ("The lowest common denominator, as it were, must

govern.").  If the Court concludes that the statute is ambiguous regarding retroactivity, the

Court must give Congress credit for not intending to enact legislation that would raise serious

questions regarding the constitutional protections for an innocent detainee related to bills of

attainder, due process, equal protection, habeas corpus, and separation of powers.

    1.     *As Construed By The Respondents, The DTA Would Violate The Constitution's Prohibition Against Bills Of Attainder.*

The DTA's amendment to § 2241, customized to deny habeas and other court access to a small, distinct, and unpopular group, is a classic Bill of Attainder prohibited by Article I, § 9, clause 3, of the Constitution ("No Bill of Attainder . . . shall be passed."). It is precisely this type of "deprivation of any rights, civil or political," including "the privilege of appearing in the courts," especially when imposed on a disfavored minority, that has been condemned by the Supreme Court. *Cummings v. Missouri*, 71 U.S. 277, 320 (1866); *accord United States v. Brown*, 381 U.S. 437, 445-47 (1965).

To qualify as a Bill of Attainder, a legislative enactment must (1) apply with specificity to an identified individual or group, and (2) impose punishment. *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003). The element of specificity is satisfied if a statute singles out a person or class by name or applies to "easily ascertainable members of a group." *United States v. Lovett*, 328 U.S. 303, 315 (1946).

The target group of the DTA is any "alien detained by the Department of Defense at Guantánamo Bay, Cuba." § 1005(e)(1). These individuals could not be more discretely identified: the only persons detained at the detention camp are those whom the Executive Branch puts there. The individuals to whom the DTA would retroactively apply are the named persons who have petitioned for habeas relief. The DTA easily meets the specificity criterion for classification as a Bill of Attainder.

The DTA also easily meets the punishment requirement for a Bill of Attainder. From the time of Chief Justice Marshall, the scope of forbidden punishment falling within the attainder prohibition has included banishment, deprivation of the right to vote, corruption of blood, and confiscation of property. *Foretich,* 351 F.3d at 1217. Following the Civil War, Congress and the States enacted legislation aimed at persons who had rebelled against the United States, barring practice of certain professions without an expurgatory oath of loyalty. In *Cummings*, the Court freed a priest who ministered without swearing the oath, stating:

> *The deprivation of any rights, civil or political, previously enjoyed, may be punishment, the circumstances attending and the causes of the deprivation determining this fact.* Disqualification from office may be punishment, as in cases of conviction upon impeachment. Disqualification from the pursuits of a lawful avocation, or from positions of trust, *or from the privilege of appearing in the courts*, or acting as an executor, administrator, or guardian, may also, and often has been, imposed as punishment.

71 U.S. at 320 (emphasis added). Similarly, in *Ex parte Garland*, 71 U.S. 333 (1866), loyalty oath legislation that barred an attorney from the courtroom was held to constitute a Bill of Attainder:

> As the oath prescribed cannot be taken by these parties, the act, as against them, operates as a legislative decree of perpetual exclusion. And exclusion from any of the professions or any of the ordinary avocations of life for past conduct can be regarded in no other light than as punishment for such conduct.

71 U.S. at 377. The Civil War cases make clear that Congress cannot legislate to the detriment of a group – irrespective of size – that is defined by the status of its members so

as to permanently exclude them, on the basis of that status, from civil liberties ordinarily available to all.[8]

Determination of the punitive aspect of legislation barred by the Bill of Attainder Clause analysis has included consideration of three factors:  "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'" *Foretich,* 351 F.3d at 1218 (quoting  *Selective Service System v. Minnesota Public Interest Group*, 468 U.S. 841, 852 (1984)).  A statute need not satisfy all three factors to be a Bill of Attainder; they are merely factors to be considered. *Selective Service System*, 468 U.S. at 852.  "Our treatment of the scope of the Clause has never precluded the possibility that new burdens and deprivations might be legislatively fashioned that are inconsistent with the bill of attainder guarantee." *Nixon v. Administrator of General Services*, 433 U.S. 425, 475 (1977).  The test is functional rather than dependent

---

[8] In *Brown*, the Court found that the Bill of Attainder prohibition stemmed from separation of powers concerns:

> [T]he Bill of Attainder Clause not only was intended as one implementation of the general principle of fractionalized power, but also reflected the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness, of, and levying appropriate punishments on, specific persons.

*Brown*, 381 U.S. at 445.

upon legislative labeling. *Cummings*, 71 U.S. at 325 ("The Constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name.").

Denial of equal access to the courts meets the historic definition of punishment. If exclusion from vocations constitutes punishment – including "appearing in the courts" as in *Cummings* – then barring a prisoner from bringing a claim for habeas relief before the district court can only be an even more punitive measure. This is especially true because the DTA's exclusion cripples the ability of Guantánamo detainees to attack the constitutional legitimacy of their confinement and destroys any opportunity they might otherwise have had in habeas litigation to develop facts to counter the one-sided record created in the Combatant Status Review Tribunals (CSRT). Consequently, as construed by the government, the DTA ensures that the petitioners' detention will be prolonged and indefinite; a state of affairs which the *Cummings* court – citing to Blackstone – listed as an historically-recognized form of punishment. 71 U.S. at 321 (quoting William Blackstone, 4 Commentaries *377). *See also Lynce v. Mathis*, 519 U.S. 433, 442 (1997) (discussing constitutional bases for the prohibitions on retroactive legislative action and removal of eligibility for a benefit as punishment).[9]

The punitive aspects of the DTA, as a practical matter, are extreme. Imprisonment itself is punitive – whether brief or prolonged and regardless of the conditions. *Brown*, 381 U.S. at 458 (imprisonment regardless of its purpose is punishment). Here, Abdul Rahim has

---

[9] The discussion in *Lynce* suggests that the punitive aspect of the DTA also implicates the Ex Post Facto Clause of Article I, Section 9. 519 U.S. at 440 n.12.

been in onerous custody, virtually incommunicado, for almost five years after being liberated from a Taliban prison, where he had been tortured and subjected to hellish conditions. Given the length of custody and suffering Abdul Rahim has endured, the continued indefinite detention is at the apex of punitive treatment. *Zadvydas*, 533 U.S. at 690.

The punitive reality of the DTA accords with the animus toward the detainees that has been expressed by some members of both the Legislative and Executive branches. The detainees have been repeatedly prejudged and characterized as terrorists. This animus is especially anomalous in light of indications from the declassified CSRT proceedings that only a minority are alleged to have taken up arms against the United States and very few belong to al Qaeda. Mark Denbeaux, *Report on Guantánamo Detainees: A Profile of 517 Detainees Through Analysis of Dept. of Defense Data,* Seton Hall University of Law, Feb. 2006, *available at* http://law.shu.edu/news/guantanamo_report_final_2_08_06.pdf.

Historically, members of political groups believed to present a threat to national security have been the "targets of the overwhelming majority of English and early American bills of attainder." *Brown*, 381 U.S. at 453; *see Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 137-38 (1810) ("[I]t is not to be disguised that the framers of the constitution viewed, with some apprehension, the violent acts which might grow out of the feelings of the moment; and that the people of the United States, in adopting that instrument, have manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed."). Politically-suspect groups are most likely to draw the fire of legislative censure and condemnation. For a statute to be declared a Bill of Attainder, all that

is necessary "is that the legislative process and the law it produces indicate a congressional purpose to behave like a court and to censure and condemn." *Foretich*, 351 F.3d at 1226. That is what has happened with the DTA.

The nonpunitive purposes of the DTA are negligible compared to the punitive consequences. The statutory text lacks any formal statement of purpose or findings regarding § 1005. The Guantánamo Bay detainee litigation raises critical questions which address the very heart of our Constitution's meaning in the real world. The protective order and its enforcement mechanisms have addressed the needs of national security sufficiently for this Court to hear the claims of an innocent petitioner, who is not within the jurisdiction of the military.

2.    As Construed By The Respondents, The DTA Works An Unconstitutional Suspension Of The Writ Of Habeas Corpus.

The *Hamdan* opinion directly addressed concerns that the DTA works an unconstitutional suspension of the writ of habeas corpus. 126 S. Ct. at 2769. The writ of habeas corpus, "[a]t its historical core, . . . has served as a means of reviewing the legality of Executive detention, and it is in that context that the protections have been strongest." *St. Cyr*, 533 U.S. at 301. Permanent denial of access to the writ of habeas corpus for the Guantánamo Bay detainees is unprecedented and would constitute a suspension of the writ.

Even if the DTA were construed to abrogate jurisdiction under 28 U.S.C. § 2241, review would remain available in the district courts under the common law writ of habeas corpus. In *Rasul* and *Hamdan,* the Court discussed at length *Eisentrager*, 339 U.S. 763.

*Rasul*, 542 U.S. at 475-480. In *Eisentrager,* the six factors that militated against a right to the writ related "only to the question of the prisoners' *constitutional* entitlement to habeas corpus." *Rasul*, 542 U.S. at 476. The Court observed that the Court of Appeals in *Eisentrager* had found a constitutional right to the writ protected by the Suspension Clause. 542 U.S. at 477. "In essence, the Court of Appeals concluded that the habeas statute, as construed in *Ahrens*, had created an unconstitutional gap that had to be filled by reference to 'fundamentals.'" 542 U.S. at 478.

Nowhere in the Court's discussion is there any indication that a "fundamental" non-statutory (*i.e*., constitutional) right to petition for habeas relief does not exist. The Supreme Court noted the constitutional basis for seeking habeas relief in *St. Cyr*:

> In sum, even assuming that the Suspension Clause protects only the writ as it existed in 1789, there is substantial evidence to support the proposition that pure questions of law like the one raised by the respondent in this case could have been answered in 1789 by a common-law judge with power to issue the writ of habeas corpus.

533 U.S. at 304-05. The Court expressly rejected the government's position that habeas can be eliminated by statute: "[A] serious Suspension Clause issue would be presented if we were to accept the INS' submission that the 1996 statutes have withdrawn that power from federal judges and provided no adequate substitute for its exercise." *St. Cyr*, 533 U.S. at 305; *see also Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 96 (1868) ("It would have been, indeed, a remarkable anomaly if this court, ordained by the Constitution for the exercise, in the United States, of the most important powers in civil cases of all the highest courts of England, had been denied, under a constitution which absolutely prohibits the suspension of the writ,

except under extraordinary exigencies, that power in cases of alleged unlawful restraint, which the Habeas Corpus Act of Charles II expressly declares those courts to possess.").

The inherent power of the judiciary under Article III, the common law history of the writ imported into the Constitution in the Suspension Clause, and the checks on judiciary power given to Congress in Article I, provide a sound basis for recognition of a right to habeas review that cannot be nullified by the legislature. *See* Chrisman, *Article III Goes to War: A Case for a Separate Federal Circuit for Enemy Combatant Cases*, 21 JOURNAL OF LAW AND POLITICS 31 (Winter 2005).

3.    *As Construed By The Respondents, The DTA Violates The Due Process Clause Of The Fifth Amendment.*

The Due Process Clause of the Fifth Amendment provides that "no person shall be . . . deprived of life, liberty, or property, without due process of law." This clause includes both procedural and substantive protections and requires equal protection of the laws. The government's interpretation of the DTA runs afoul of these concepts.

a.    Legislation Based On Alienage Would Violate The Detainees' Right To Equal Protection Of The Laws.

The Fifth Amendment's guarantee of due process incorporates the Fourteenth Amendment's equal protection clause. *Bolling v. Sharpe*, 347 U.S. 497, 498-500 (1954). Although the government retains the power to classify, particularly in the area of economics and social welfare, classifications "based on alienage . . . are . . . subject to close judicial scrutiny." *Graham v. Richardson*, 403 U.S. 365, 372 (1971). In *Rasul v. Bush*, the Court found that § 2241 applied equally to United States citizens and to aliens held at Guantánamo

Bay: "Considering that the statute draws no distinction between Americans and aliens held in federal custody, there is little reason to think that Congress intended the geographical coverage of the statute to vary depending on the detainee's citizenship." 542 U.S. 466 at 481 (2004).

The DTA, by its express terms, strips aliens detained in Guantánamo of access to the courts, while maintaining the rights of United States citizens to such access (". . . an application for a writ of habeas corpus filed by or on behalf of an *alien* . . . or . . . any other action . . . relating to any aspect of the detention of an *alien* . . ."). § 1005(e)(1) (emphasis added). The DTA's new statutory distinction based on alienage, regardless of legal status, violates the guarantee of equal protection under law.

The restriction on access to the courts based on national origin requires strict scrutiny for two reasons. First, discrimination based on alienage is inherently suspect. Disparate treatment of persons based on their alienage, without respect to legal status, is generally prohibited as a classification based on national origin. *Plyler v. Doe,* 457 U.S. 202, 214 (1982) (Fourteenth Amendment's phrase "person within its jurisdiction" "sought expressly to ensure that the equal protection of the laws was provided to the alien population."); *Yick Wo v. Hopkins,* 118 U.S. 356, 369 (1886) ("The fourteenth amendment to the constitution is not confined to the protection of citizens. . . . [Its] provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws."). By limiting the habeas-stripping provisions to aliens, the DTA

recognized the court's continued § 2241 jurisdiction over United States citizens at Guantánamo Bay.

Second, discrimination regarding a fundamental right, such as access to the courts, triggers heightened protections. *Tennessee v. Lane,* 541 U.S. 509, 529 (2004) (right of access to the courts "call[s] for a standard of judicial review at least as searching, and in some cases more searching, than the standard that applies to sex-based classifications"); *Romer v. Evans*, 517 U.S. 620, 633 (1996) ("Central both to the idea of the rule of law and to our own Constitution's guarantee of equal protection is the principle that government and each of its parts remain open on impartial terms to all who seek its assistance.").  Strict scrutiny is also required because the target group of aliens is de facto Muslim, which implicates equal protection as well as First Amendment concerns.  *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542 (1993).  Constitutional and statutory prohibitions on arbitrary detention and torture mean little without a judicial remedy, especially where a suspect class is the target.

Congressional hostility to the Guantánamo Bay detainees and prejudgment of the merits of their claims does not provide a rational basis for discrimination against them. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 534 (1973).

    b. Indefinite Detention And Unredressable Torture Violate Substantive Due Process.

In considering the constitutionality of the authorization for detention contained in 8 U.S.C. § 1231(a)(6) (1994), the Supreme Court stated in *Zadvydas*:

> A statute permitting indefinite detention of an alien would raise a serious constitutional problem. The Fifth Amendment's Due Process Clause forbids the Government to 'depriv[e]' any 'person . . . of . . . liberty . . . without due process of law.' Freedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the liberty that Clause protects.

533 U.S. at 690. The Court ultimately resolved the case by interpreting the statute to forbid indefinite detention. Identical concerns arising out of the substantive liberty component of the Due Process Clause apply here. Should the Court accept the government's interpretation of the statute, it would be required to address the due process question raised but avoided in *Zadvydas* and *Martinez*.

The substantive due process issues are even more acute because of the detainees' claims of torture and mistreatment. The respondents make the claim that the DTA bars torture while at the same time depriving torture victims of meaningful access to the courts. The moral identity of our Republic, as well as its prestige abroad, is compromised by this position, which implicates substantive due process (*Rochin v. California*, 342 U.S. 165, 167-73 (1952)), as well as the CAT and the parallel precepts of international humanitarian law.

    c. The DTA's Limitations On Judicial Review Violate Procedural Due Process.

The DTA offers no other substantive procedural protections than those found to be constitutionally inadequate by the district court in *In re Guantánamo Detainee Cases,* 355 F. Supp.2d 443, 468 (D.D.C. 2005).  Given the Supreme Court's rationale in *Hamdan*, the *Khalid* opinion, to the extent it is inconsistent, is not longer valid precedent because intervening authority from a superior court has undermined its reasoning.[10]

In reliance on *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), the district court found that the failure of the CSRT process to provide detainees access to the material evidence upon which the CSRT affirmed "enemy combatant" status and the failure to permit the assistance of counsel were general procedural defects rendering the proceedings unconstitutional.  *In re Guantánamo Detainee Cases*, 355 F. Supp.2d at 465-72.  In *Hamdan*, the Court emphasized the need for procedural regularity in military proceedings involving loss of liberty.  126 S. Ct. at 2786-2798.  The recently published transcripts of 360 CSRT and ARB proceedings illustrate the systemic inadequacies of the process.

The district court also found that reliance on coerced statements and a vague and overly broad definition of "enemy combatant" were specific defects of the process.  *In re Guantánamo Detainee Cases*, 355 F. Supp.2d at 473.  With the exception for use of coerced evidence, the DTA does not address, much less overcome these deficiencies.  The only "improvement" in the CSRT process purportedly provided by the DTA requires consideration of the "probative value" of coerced statement.  §1005(b)(1).  Even that

---

[10] Under the Doctrine of Constitutional Avoidance, the conflict at least demonstrates serious constitutional doubt regarding the requisite procedural protections.

provision is inconsistent with the Convention Against Torture, which the State Department has expressly admitted applies to CSRT and ARB proceedings. *Supra* at 4 n.2. And the DTA prohibits reconsideration of any past determination of "enemy combatant" status derived from coerced statements. §1005(b)(2).[11]   Consequently, the "improvement" purportedly provided by Section 1005 is illusory. Where, as here, the established procedures are unconstitutional, judicial oversight through habeas corpus is even more critically important. The DTA's limitation on judicial review fails to satisfy due process.

    4.    *As Construed By The Respondents, Congress's Effort To Overturn Supreme Court Action In <u>Rasul</u> Violates The Separation Of Powers.*

In *Rasul*, the Court addressed the lease agreements and treaty with Cuba and concluded that Guantánamo Bay is "a territory over which the United States exercises plenary and exclusive jurisdiction, but not 'ultimate sovereignty.'" *Rasul*, 542 U.S. at 475. "By the express terms of its agreements with Cuba, the United States exercises 'complete jurisdiction and control' over the Guantánamo Bay Naval Base, and may continue to exercise such control permanently if it so chooses." *Rasul*, 542 U.S. at 480. The Court concluded that, for aliens detained at Guantánamo Bay, the courts had jurisdiction to review the actions

---

[11]  The due process inadequacies of the DTA are in stark contrast to the rules of procedure established in the Alien Terrorist Removal Court of the United States. There, suspected terrorists are afforded a myriad of procedural due process rights before they may be removed from the United States, including neutral judicial involvement, access through appointed counsel to classified evidence, discovery, proof by a preponderance of terrorist status, and significantly, appeal rights. 8 U.S.C. §1531 *et seq.* Alleged terrorists facing removal are further entitled to consideration for release pending removal, and review of detention at least every six months.

of custodians over whom "no party question[ed] the District Court's jurisdiction." *Rasul*, 542 U.S. at 483.

In the absence of any change in the relevant agreements and treaty, Congress purported to overrule *Rasul's* jurisdictional ruling by redefining the geography of the United States: "For purposes of this section, the term 'United States', when used in a geographic sense, is as defined in section 101(a)(38) of the Immigration and Nationality Act and, in particular, does not include the United States Naval Station, Guantánamo Bay, Cuba." § 1005(g). This section of the DTA creates separation of powers problems because it seeks to reverse *Rasul* by adopting the *Rasul* district court analysis.

The *Rasul* district court denied relief based on its conclusion that the military base at Guantánamo Bay, Cuba, is outside the sovereign territory of the United States. *Rasul v. Bush*, 215 F. Supp.2d 55, 68-70 (D.D.C. 2002). The Supreme Court's reversal, however, was premised on the effect of our Nation's agreements and treaties with Cuba, not on whether Guantánamo Bay is geographically part of the United States. *Rasul*, 542 U.S. at 480-81. Because the *Rasul* decision is based on the Supreme Court's interpretation of a treaty, and the DTA does not contain an "affirmative expression of congressional intent to abrogate the United States' international obligations," the congressional enactment does not overturn this aspect of *Rasul*. *See Weinberger v. Rossi,* 456 U.S. 25, 32 (1982).

The DTA abrogates other treaties without an affirmative expression of congressional intent. For example, in 1992, the Senate ratified the International Covenant on Civil and Political Rights (ICCPR). 138 CONG. REC. S4781-84 (April 2, 1992). Article 9 of the

ICCPR provides that "[n]o one shall be subjected to arbitrary arrest or detention." G.A. Res. 2200A (XXI), 21 U.N. GOAR Supp. (no. 16) at 52, U.N. Doc. A/6316 (1966). The result of the DTA is to abrogate these treaty obligations. *See Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155, 178 (1993).

**Conclusion**

For the foregoing reasons, the Court should lift or modify the stay in order to hear the petitioner's motion for partial summary judgment or, in the alternative, to issue an order to show cause.

Respectfully submitted September 20, 2006.

/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

/s/ Stephen R. Sady
Stephen R. Sady
Chief Deputy Federal Public Defender

/s/ Patrick J. Ehlers
Patrick J. Ehlers
Assistant Federal Public Defender