EXHIBIT A



U.S. DEPARTMENT *of* STATE

# United States' Response to the Questions Asked by the Committee Against Torture

**U. S. DELEGATION ORAL RESPONSES TO CAT COMMITTEE QUESTIONS**
Geneva, Switzerland
May 5, 2006

[LEGAL ADVISER BELLINGER]

I will now provide summaries of our answers to the many questions posed by the Committee. In all cases, I would encourage you to consult those written responses as they provide more detail than I and my colleagues will be able to provide today.

**Questions 1 and 2** concern the memoranda drafted by the Department of Justice's Office of Legal Counsel in August 2002 and December 2004 that provided legal advice on the meaning of the term "torture" under the extraterritorial criminal torture statute that implements portions of the Convention. Nothing in these memos changes the definition of torture governing U.S. obligations under the Convention from what the United States accepted upon ratification of the Convention.

The Department of Justice's Office of Legal Counsel, which provides opinions on questions of law to the Executive Branch of the United States Government, produced the August 2002 and December 2004 memoranda. The August 2002 memorandum provided legal advice on the meaning of the term "torture" under the extraterritorial criminal torture statute and addressed issues concerning the separation of powers under the United States Constitution. That opinion was requested to provide operational guidance with respect to the implementation of the criminal statute at the level of detail needed to guide U.S. government officials

The Office of Legal Counsel later withdrew that opinion and issued another opinion dated December 30, 2004, which is confined to an interpretation of the extraterritorial criminal torture statute. The December 2004 opinion supersedes the August 2002 opinion in its entirety and thus provides the Executive Branch's authoritative interpretation of the extraterritorial criminal torture statute.

The August 2002 opinion was withdrawn not because it purported to change the definition of torture but rather because it addressed questions that were not necessary to address. In this regard, the December 2004 Memorandum clarified that "[b]ecause the discussion in that [August 2002] memorandum concerning the President's Commander-in-Chief power and the potential defenses to liability was—and remains—unnecessary, it has been eliminated from the analysis that follows. Consideration of the bounds of any such authority would be inconsistent with the President's unequivocal directive that United States personnel not engage in torture."

The purpose of both opinions was to provide legal advice related to a domestic criminal statute. Neither opinion purported to change the definition of torture set out in Article 1 as understood by the United States. The question that the OLC addressed was simply what the terms of that definition, as now reflected in the United States Code, mean.

**Question 3** asks whether the references to "torture" as involving "extreme" acts in the December 2004 memorandum are compatible with the Convention. The fact that the Convention defines torture in Article 1 and then subsequently refers in Article 16 to "other acts of cruel, inhuman or degrading treatment or punishment" reflects the recognition of the negotiators that torture applied to more severe acts of cruelty and abuse than did cruel, inhuman or degrading treatment or punishment. This basic distinction between the severity of the conduct constituting torture, on the one hand, and cruel, inhuman and degrading treatment or punishment, on the other, is reflected in the underlying regime set forth in the treaty text to combat and prevent each form of conduct. Specifically because of the aggravated nature of torture, States Parties agreed to comprehensive measures to prohibit it under their criminal law, to prosecute perpetrators found in territory under their jurisdiction, and not to return individuals to other States where there are substantial grounds for believing that such persons would be in danger of being subjected to torture. In contrast, the obligations regarding cruel, inhuman or degrading treatment or punishment are far more limited.

The December 2004 memorandum, recognizing what is clear from the text and structure of the Convention, distinguishes "torture" from "other acts of cruel, inhuman or degrading treatment or punishment" as expressed in Article 16, by explaining that torture is a more severe, or extreme, form of mistreatment than that described by Article 16. The use of the word "extreme" in these contexts clarifies the meaning of the word "severe" contained in the definition of torture set forth in Article 1.

The fact that the term "torture" is reserved for those acts involving more severe pain and suffering, as distinguished from cruel, inhuman or degrading treatment or punishment, is also confirmed by the Convention's negotiating history and is consistent with other international law sources, cited in our written submission.

**Question 4** suggests that both OLC memoranda on the extraterritorial criminal torture statute are more restrictive than previous U.N. standards, including the 1975 Declaration. We respectfully disagree. The interpretation of the term "severe" in the December 2004 memorandum reflects the understanding that torture constitutes a more aggravated form of abuse than that covered by the "cruel, inhuman or degrading treatment or punishment" described in Article 16. As I have just explained, this distinction is not only express in the text of the Convention, but also is apparent from the negotiating history, the U.S. ratification record, and other international law sources. This distinction is also consistent with, and is not more restrictive than, the 1975 Declaration, which distinguishes torture from other lesser forms of abuse in part on the basis of the severity of the underlying acts.

Regarding **Question 5** and how the United States ensures implementation of its Convention obligations, I would note that, before ratifying the Convention, the United States carefully reviewed U.S. federal and state laws for compliance with the treaty's terms. The United States concluded that, with the sole exception of prohibiting certain acts of torture committed outside the territory of the United States, U.S. state and federal law covered all of the offenses stated in the Convention. The United States filled this lone shortcoming by enacting the afore-mentioned extraterritorial criminal torture statute.

In other words, the United States ensures compliance with its Convention obligations through operation and enforcement of its existing laws. As a result, there is no specific federal crime styled as "torture" for acts occurring within U.S. territory. The reason is simply that any act of torture falling within the Convention definition, as ratified by the United States, is already criminalized under U.S. federal and state laws. These laws, which meet the requirements of the Convention, are binding on government officials and are enforced through a variety of administrative procedures, criminal prosecutions. Additionally, civil suits provide available remedies in many cases. Our written response to this question provides a comprehensive list of such mechanisms.

There are various mechanisms that allow the United States to ensure its Convention obligations. Of these, the Civil Rights of Institutionalized Persons Act of 1980 ("CRIPA"), is particularly relevant to the Committee's question about monitoring of prisons as it enables the Department of Justice to eliminate a pattern or practice of abuse in any state prison, jail or detention facility. It is perhaps the most direct source of the federal government's authority to enforce the federal constitutional rights of persons in jails and prisons, including juvenile justice facilities, at the state and local level. Our written response provides more detailed information on the activities of the Department of Justice under this statute.

**Question 6** requests extensive information, including statistics relating to detained persons both within and outside United States territory. In the interests of conserving time for our presentation this morning, I would direct you to our written answer, which includes detailed statistical data.

**Question 7** concerns alleged "secret detention facilities" under the "*de facto* effective control" of the United States. While it is the policy of the United States not to comment on allegations of intelligence activities, it is important to underscore that all components of the United States Government are obligated to act in compliance with the law, including all U.S. constitutional, statutory, and treaty obligations relating to torture and cruel, inhuman or degrading treatment or punishment. The U.S. Government does not permit, tolerate, or condone unlawful practices by its personnel or employees (including contractors) under any circumstances. The extraterritorial criminal torture statute makes it a crime for a person acting under the color of law to commit, attempt to commit, or conspire to commit torture outside the United States. In addition, pursuant to the Detainee Treatment Act of 2005, which I mentioned in my opening remarks, the United States voluntarily has undertaken a prohibition on cruel, inhuman, and degrading treatment or punishment that applies as a matter of statute to protect any persons "in the custody or under the physical control of the United States Government, regardless of nationality or physical location."

I will now turn to Mr. Cully Stimson, Deputy Assistant Secretary of Defense for Detainee Affairs at the Department of Defense to address Question 8.

**[STIMSON]**

**Question 8** concerns the Committee's interest in measures to remedy command and operational issues at DoD detention

facilities in light of what the Committee describes as "numerous allegations of torture and ill-treatment of persons in detention under the jurisdiction of the State party and the case of the Abu Ghraib prison." The United States would like first of all to address an underlying misconception that is the basis for the Committee's question. While the United States is aware of allegations of torture and ill-treatment, and takes them very seriously, it disagrees strongly with the assertion that such are widespread or systemic. As Mr. Bellinger stated in his opening remarks, these allegations must be placed in context: they relate to a minute percentage of the overall number of persons who have been detained. Moreover, not everything that is alleged is in fact truth. For example, it is well-known that al Qaida are trained to lie. The "Manchester Manual" instructs all al Qaeda members, when captured, to allege torture, even if they are not subjected to abuse. The Department of Defense investigates all allegations of abuse or maltreatment, and if found credible, takes appropriate actions to hold accountable those who violate the law or our policies. The United States provided numerous examples of specific measures taken in response to incidents of maltreatment or misconduct at Department of Defense ("DoD") detention facilities at Guantanamo Bay, Cuba and in Afghanistan and Iraq in our written response to the Committee's questions and in the Annex to the *Second Periodic Report.*

With respect to access and information provided to the International Committee of the Red Cross (ICRC), the ICRC has access to DoD theatre internment detention facilities, including Guantanamo, Iraq, and Afghanistan, and meets privately with detainees. DoD accounts for detainees under its control fully and provides notice of detention to the ICRC as soon as possible, normally within 14 days of capture.

The ICRC transmits its confidential communications to senior officials in the U.S. Government, including those in DoD, and military commanders in Afghanistan, Iraq, and Guantanamo. DoD has established procedures to ensure that ICRC communications are appropriately routed to senior leadership and acted upon in a timely manner. While our dialogue with the ICRC is confidential, we take seriously the matters the ICRC raises and greatly value the historic and ongoing relationship between the U.S. Government and the ICRC.

I will now return the floor to Mr. Bellinger.

**[LEGAL ADVISER BELLINGER]**

Thank you, Cully. **Question 9** asks about derogations. I would like to state unequivocally that under U.S. law, there is no derogation from the express prohibition on torture. The legal and administrative measures undertaken by the United States to implement this prohibition are described in detail in both our *Initial Report* and *Second Periodic Report.*

In response to **Questions 10 and 11,** which ask whether there are exceptions to the prohibition on torture, I would like to reiterate that the United States stands by its obligations under Article 2, that "[a]n order from a superior officer or a public authority may not be invoked as a justification of torture" and that "[n]o exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture." These are longstanding commitments of the United States, repeatedly reaffirmed at the highest levels of the U.S. Government.

With regard to the Committee's concern about investigations, the United States described in great detail in the Annex to the *Second Periodic Report* that the Department of Defense has conducted 12 major investigations into all aspects of its detention operations following the events of Abu Ghraib.

As these major investigations reflect, the U.S. government is committed to investigating and holding accountable those who engage in acts of torture or other unlawful treatment of detainees. If it appears that criminal laws have been violated, then those violations are investigated and prosecuted as appropriate by the relevant authorities.

Let me now turn to the Committee's questions about interrogation rules in **Question 12.** The Detainee Treatment Act of 2005, as I mentioned, prohibits cruel, inhuman, and degrading treatment or punishment, as that term is defined by U.S. obligations under Article 16, and applies as a matter of statute to protect any persons "in the custody or under the physical control of the United States Government, regardless of nationality or physical location." The Act also provides for uniform interrogation standards that "[n]o person in the custody or under the effective control of the Department of Defense or under detention in a Department of Defense facility shall be subject to any treatment or technique of interrogation not authorized by and listed in the United States Army Field Manual on Intelligence Interrogation." These standards apply to military, DoD civilians, and contract interrogators.

The question also asks about any interrogation rules, instructions, and methods that may have been adopted by the CIA. As already noted, the United States does not comment publicly on alleged intelligence activities. But, like any other U.S. government agency, any activities of the CIA would be subject to the extraterritorial criminal torture statute and the Detainee Treatment Act's prohibition on cruel, inhuman, or degrading treatment or punishment.

The United States provided a detailed answer to the Committee's questions in **Question 13** about the process under which Article 3 is implemented in its written answers to the Committee. Rather than oversimplifying the various intricacies of procedure that may apply, I refer you to that discussion as well as the relevant discussion contained in the *Second Periodic Report*. To summarize briefly, however, let me make several points. Regulations in the immigration removal and extradition contexts permit aliens to assert Article 3 claims as a defense to either removal or extradition. Consistent with its obligations under Article 3, the United States does not transfer persons to countries where it determines that it is "more likely than not" that they would be tortured. Additionally, the United States' implementing laws and regulations do not exclude categories of persons from protection from refoulement under Article 3. The United States may not revoke or terminate an individual's protection under Article 3 from involuntary removal to a particular country so long as it continues to be shown that the protected individual would "more likely than not" be tortured in that country.

Our policy is clear. The United States does not transfer persons to countries where it believes it is more likely than not that they will be tortured. This policy applies to all components of the U.S. Government and to individuals in U.S. custody or control, regardless of where they may be detained. Nevertheless, on this point, I would like to refer you to our detailed analysis in our written response to this question. It explains that, despite this firm policy, as a legal matter, the view of the United States is that Article 3 does not impose obligations on the United States with respect to an individual who is outside the territory of the United States. Neither the text of the Convention, its negotiating history, nor the U.S. record of ratification supports a view that Article 3 applies to persons outside of U.S. territory.

In **Question 14** the Committee asks whether the United States' understanding to Article 3 interpreting "substantial grounds for believing" is in fact a reservation that restricts or changes the scope of the provision. At the time the United States became a State Party to the Convention, it considered that the standard enunciated in its understanding was merely a clarification of the definitional scope of Article 3, rather than a statement that would exclude or modify the legal effect of Article 3 as it applied to the United States. This view has not changed. With respect to the question of who is the competent authority to make Article 3 determinations, this turns on the context in which the determination is made. For example, as I mentioned in the previous question, the decisionmaker will differ in immigration removal and extradition proceedings. To provide a thorough answer to this complex question, I would refer you to our more detailed description of the procedures governing these various contexts that is contained in our written submissions.

On **Question 15**, let me briefly describe the appeal rights of individuals asserting Article 3 claims in the immigration removal context. Generally speaking, in immigration removal proceedings (with the narrow exception of certain expedited proceedings described in our written response), an individual seeking protection from removal from the United States under Article 3 may appeal an adverse decision of the immigration judge to the Board of Immigration Appeals (BIA). If the BIA dismisses the individual's administrative appeal or denies his or her motion to reopen, the individual may file a petition for review of the BIA's decision with the appropriate federal court of appeals. I refer you to our written submissions for a more detailed description of these appeal procedures.

With respect to **Question 16**, as an initial matter, I would like to reiterate that the United States does not comment on information or reports relating to alleged intelligence operations. That being said, Secretary Rice recently explained that the United States and other countries have long used renditions to transport terrorist suspects from the country where they were captured to their home country or to other countries where they can be questioned, held, or brought to justice. Rendition is a vital tool in combating international terrorism, which takes terrorists out of action and saves lives. I would like to emphasize that the United States does not transport, and has not transported, detainees from one country to another for the purpose of interrogation using torture. The United States has not transported anyone, and will not transport anyone, to a country if the United States believes he or she will be tortured. Where appropriate, the United States seeks assurances it considers to be credible that transferred persons will not be tortured.

Concerning **Question 17**, U.S. federal and state law prohibits unlawful acts that would constitute an enforced or involuntary disappearance, for example, by prohibiting assault, abduction, kidnapping, false imprisonment, and by regulating the release or detention of defendants.

With respect to transfers or removals of persons to another country, I would like to reiterate that the United States does not transfer persons to countries when it determines that it is more likely than not that they would be tortured.

Regarding the Committee's questions about diplomatic assurances in **Question 18**, I would like to emphasize, as the United States did in paragraph 33 of the *Second Periodic Report*, that diplomatic assurances are used sparingly. As an example, I would refer you to the over 2500 cases where Article 3 protection was granted to individuals in removal proceedings between 2000 and 2004. Procedures are in place that permit the United States, as appropriate, to seek assurances in order to be satisfied that it is not "more likely than not" that the individual in question would be tortured upon return. These procedures are described at length in our written submissions. Diplomatic assurances are not a substitute for a case-by-case determination of whether that standard is met.

If, taking into account all relevant information, including any assurances received, the United States believes that it is

"more likely than not" that a person would be tortured if returned to a foreign country, the United States would not approve the return of the person to that country. There have been cases where the United States has considered the use of diplomatic assurances, but declined to return individuals because the United States was not satisfied such an assurance would satisfy its obligations under Article 3.

In response to the Committee's question about the "rule of non-inquiry," this is a judicial doctrine under which courts of the United States refrain from examining the penal systems of nations requesting extradition of fugitives when considering whether to permit extradition. Instead, such issues are considered by the Secretary of State in making the final extradition decision. The rule of non-inquiry recognizes that, in the U.S. constitutional system, the Executive branch is best equipped to evaluate and deal with such issues. The rule of non-inquiry is regularly cited and relied upon in U.S. judicial opinions involving extradition.

In **Question 19**, the Committee refers to cases in which the United States has allegedly returned individuals to countries that the United States considers "not to respect human rights." In response, I would like to emphasize that Article 3 does not prohibit the return or transfer of individuals to countries with a poor human rights record *per se*, nor does it apply with respect to returns that might involve "ill treatment" that does not amount to torture. Rather, the United States implements its obligations under Article 3 through making an individualized determination as to whether a **particular individual** would "more likely than not" face torture in a **particular country**.

To the extent that the Committee's question is directed to returns or transfers of individuals that are effected outside of U.S. territory, the U.S. reiterates its view that Article 3, by its terms, does not apply to individuals outside of U.S. territory. That said, as we have noted previously, the United States does not transfer persons to countries where it believes it is "more likely than not" that they will be tortured.

Finally, a note on what the Committee and others have called "extraordinary renditions." If that term is meant to refer to moving persons across borders outside normal extradition procedures, the United States has acknowledged, as I just stated, that it, like other countries, has long used procedures in addition to extraditions or other judicial mechanisms to transport terrorist suspects from the country where they were captured to their home country or to other countries where they can be questioned, held, or brought to justice. If, however, the term is meant to refer to a practice of rendering a person to a place where he or she will be tortured, I cannot be more emphatic: we do not engage in that practice. This applies to all components of the United States government and with respect to individuals in U.S. custody, regardless of whether they are inside or outside of U.S. territory.

In **Question 20**, the Committee asks whether torture constitutes a specific federal offense if it is committed within the United States. As I explained previously, while there is no specific federal crime styled as "torture" for acts occurring within U.S. territory, any act of torture falling within the Convention's definition, as ratified by the United States, is criminally prosecutable. There is a long list of criminal violations that could be charged depending on the facts of the case: for example, aggravated assault or battery or mayhem in cases of physical injury; homicide, murder or manslaughter, when a killing results; kidnapping, false imprisonment or abduction where an unlawful detention is concerned; rape, sodomy, or molestation if those acts occur; an attempt or a conspiracy to commit any of the above acts; or a criminal violation of an individual's civil rights. Thus, there is no "lacuna" in U.S. law, as all acts that would constitute torture under the Convention are crimes in the United States.

Additionally, in our written response to Question 5, we described a range of mechanisms by which U.S. compliance with its Convention obligations is implemented. The availability of these mechanisms ensure that individuals are protected from torture and other serious forms of abuse, and that when violations arise, prosecution at the federal and state level, and appropriate remedies are available.

To give one example that I think highlights just how broad the available tools for criminal prosecution under our system are: many acts which would qualify as "torture" could, provided the offender was acting under color of law, be prosecuted under Section 242 of Title 18 of the United States Code as criminal deprivations of Constitutional rights. As the examples in paragraphs 20 and 21 of the *Second Periodic Report* make clear, Section 242 also reaches, and the Department of Justice prosecutes as criminal deprivations of Constitutional rights, many violations that would constitute torture but also many that do not rise to that level.

The same is true of the military justice system, which is the focus of **Question 21**. As described in the Annex to the *Second Periodic Report*, it is a violation of our Uniform Code of Military Justice or "UCMJ," which applies world-wide, to engage in cruelty and maltreatment. Further, under the UCMJ, acts of assault, maiming, rape and carnal knowledge, manslaughter, murder, and unlawful detention, among other violations, can be prosecuted.

Under the UCMJ, individuals may also be charged for violations of U.S. federal criminal statutes, including the extraterritorial criminal torture statute and the other federal crimes I listed in response to Question 20.

Concerning **Question 22**, there is no "penal immunity" for any person for the crime of torture under U.S. law. Additionally, although there have been no criminal prosecutions initiated under the extraterritorial criminal torture statute to date, there have been prosecutions for offenses occurring outside the United States under other statutory provisions, including the Uniform Code of Military Justice.

I will now turn to Cully Stimson to respond to Questions 23 through 27 as they concern detention operations by the Department of Defense, including relating to training of military personnel and applicable interrogation rules.

[STIMSON]

Regarding **Questions 23 and 24**, which concern education and training of military and DoD civilian personnel, including contractor employees, I would like to reiterate that DoD conducts comprehensive training programs on treatment and interrogation of detainees. Of course, the United States recognizes that no training program, however extensive, will be able to prevent every case of abuse. Education programs and information for personnel, including contractors, involved in the custody, interrogation, or treatment of individuals in detention include training on the law of war. Law of War training is provided at least annually (and more frequently as appropriate) for all DoD personnel involved in conducting or supporting detention operations, including contractors. This extensive training on the law of war also includes instruction on the prohibition against acts of torture and the requirement of humane treatment. DoD has provided the Committee a more comprehensive and detailed answer in Annex 3 to our written response to the Committee's questions. Our written answer includes information on law of war training in the military academies.

Rules and instructions regarding the custody, interrogation, and treatment of detainees are described in the Annex to the *Second Periodic Report* and will also be addressed in response to Question 26. Mechanisms for systematic review of military, DoD civilians, and contractor employees involved in detention operations include inspector general visits, command visits and inspections, Congressional and intelligence oversight committees and visits, as well as reviews conducted pursuant to unit procedures and by the chain of command. They also include case-specific investigations and overall reviews, including the 12 major Department of Defense reviews of detainee policy described in detail in the Annex to the *Second Periodic Report.*

The U.S. written response to **Question 25** concerns the recruitment, use, and training of contractors involved in detention facilities by the Department of Justice or Department of Homeland Security. Please consult our written response for that information. Please also refer to our written response for more detailed information on the use of contractors in Department of Defense detainee operations; however, let me provide a brief overview here. The Department of Defense requires all contractors to comply fully with its rules, regulations, and standards regarding the humane treatment of detainees and has explicitly required contractors to agree to adhere to these requirements. On April 11, 2005, the Secretary of Defense established a policy that all federal employees and civilian contractors engaged in the custody or interrogation of individuals detained by the Department of Defense shall complete annual training on the law of war, including the obligations of the United States under domestic and international law. In addition, all personnel deploying to the Iraq and Afghanistan theaters receive Geneva Conventions training before they leave for their deployment. Personnel also receive periodic training with their units while deployed. This is applicable to all the military services.

Regarding **Question 26**, which asks about whether the December 2004 memorandum created unnecessary confusion for trainers and personnel, the answer is no. As the United States explained in the Annex to the *Second Periodic Report,* the main finding of the investigation conducted by General Kern, Lieutenant General Jones, and Major General Fay (commonly referred to as the Jones-Fay report) was that a small group of individuals, acting in contravention of U.S. law and DoD policy, were responsible for perpetrating the acts of abuse at Abu Ghraib. Specifically, in an interview after the report's release, General Kern told reporters, "We found that the pictures you have seen, as revolting as they are, were not the result of any doctrine, training or policy failures, but violations of the law and misconduct." This finding has been supported in 12 other major reviews conducted by the Department of Defense.

The issues arising in **Question 27** concern interrogation rules and has largely been addressed by John Bellinger in his reply to Question 12. As he stated, the Detainee Treatment Act of 2005 prohibits cruel, inhuman, or degrading treatment or punishment, as that term is defined by U.S. obligations under Article 16 of the Convention, and provides for uniform interrogation rules for persons in the custody of DoD or under its effective control or under detention in a DoD facility. Only the interrogation techniques listed in the Army Field Manual on Intelligence Interrogation may be used.

Other U.S. government agencies may also have their own interrogation policies. As already noted, any activities of such other agencies would be subject to the federal anti-torture statute and the prohibition on cruel, inhuman, or degrading treatment or punishment in the Detainee Treatment Act of 2005.

I would now like to return the floor to John Bellinger.

[LEGAL ADVISER BELLINGER]

Let me now introduce Mr. Tom Monheim, an Associate Deputy Attorney General at the Department of Justice, to respond to **Questions 28 and 29** concerning the programs of the Department of Justice's Civil Rights Division.

[MONHEIM]

In the limited time we have for oral reply, it is difficult to both succinctly describe the functions of the Civil Rights Division and adequately pay tribute to its many accomplishments. For that reason, please refer to the more detailed information contained in our written responses to the Committee's questions and our *Initial* and *Second Periodic Reports*. In the limited time available, however, I will briefly explain the Division's role.

The Division was established in 1957 and is responsible for enforcing federal statutes prohibiting discrimination on the basis of race, sex, handicap, religion, and national origin, and numerous other federal civil rights statutes and additional civil rights provisions contained in other laws and regulations. These laws prohibit discrimination in education, employment, credit, housing, public accommodations and facilities, voting, and certain federally funded and conducted programs. The Division also enforces the Civil Rights of Institutional Persons Act of 1980, which I will refer to by its acronym "CRIPA," which Mr. Bellinger mentioned previously in response to Question 5 and which is also the subject of the next question.

In addition, the Division prosecutes actions under several federal criminal civil rights statutes, mentioned previously, including those prohibiting conspiracy to interfere with Constitutional rights and deprivation of rights under color of law – both of which are key mechanisms to ensure U.S. compliance with its Convention obligations.

Finally, the Civil Rights Division is responsible for coordinating civil rights enforcement efforts of other federal agencies in certain areas. Since October 1999, the Division has achieved an impressive record protecting and enforcing the civil rights of all persons and enforcing U.S. civil rights laws, filing 537 criminal civil rights cases against 971 defendants and obtaining 766 convictions to date. This includes 254 cases filed charging 436 law enforcement officers with official misconduct, which have resulted in 359 convictions to date. While I should note that not all of these cases involve matters within the scope of the Convention, this is a noteworthy record.

Regarding **Question 29**, the Department of Justice has continued its vigorous enforcement of CRIPA.

- Since October 1999, the Department of Justice has opened 65 investigations covering 79 facilities.
- The Department of Justice has also entered into 39 settlement agreements, including seven consent decrees.
- Over the past 5 years, the Department of Justice has initiated 25 percent more new investigations than in the preceding 5-year period.
- In fiscal year 2005 alone, the Department of Justice opened 11 CRIPA investigations; sent 9 findings letters; obtained 9 agreements involving 12 facilities; entered 4 consent decrees involving 6 facilities; and conducted approximately 120 investigatory and compliance tours of facilities.
- In addition, the Department of Justice is monitoring compliance with court orders that cover persons who previously resided in institutions but who currently reside in community-based residential settings in the District of Columbia, Hawaii, Pennsylvania, Indiana, Puerto Rico, Wisconsin, and Tennessee.
- As of April 2006, there are currently 41 active investigations covering 44 facilities.

**Question 29** also asks about investigations that ended in prosecution for torture or cruel, inhuman, degrading treatment or punishment. As noted in the *Second Periodic Report*, complaints about abuse, including physical injury by individual law enforcement officers, continue to be made and are investigated by the Department of Justice and, if the facts so warrant, prosecuted. The Department remains committed to investigating all incidents of willful use of excessive force by law enforcement officers and to prosecuting federal law violations where action by state or local authorities fails to vindicate the federal interest. Since October 1, 1999, 432 law enforcement officers have been convicted of violating federal civil rights statutes. Most of these officers were charged with using excessive force.

The Civil Rights Division also investigates conditions in state prisons and local jail facilities pursuant to CRIPA, and investigates conditions in state and local juvenile detention facilities pursuant to either CRIPA or the "pattern or practice" provision of the Violent Crime Control and Law Enforcement Act of 1994. These statutes allow the Department to bring legal actions for declaratory or equitable relief for a pattern or practice of unconstitutional conditions of confinement.

The Committee's question also concerned what measures have been taken to improve conditions of detention. In response, when the investigations of the Civil Rights Division uncover unconstitutional conditions at prisons, jails, or juvenile detention facilities, it takes measures -- including working with local and state authorities -- to remedy these conditions. The remedies, often memorialized in negotiated settlement agreements, represent constitutional solutions and

recognized best national practices. Once the reforms are agreed upon with the facility, DOJ will often work cooperatively with the jurisdiction to jointly select a monitor to ensure implementation. The monitor will then work with the jurisdiction to promptly identify issues of non-compliance and provide status assessments regarding compliance to both the jurisdiction and DOJ.

In addition, in this regard, I would also like to emphasize the importance of the Civil Right's Division's impressive record of prosecuting officers who engaged in unlawful use of force. Prosecution enhances conditions of confinement by providing general and specific deterrence to law enforcement officers, and ensuring persons in custody that laws prohibiting use of excessive force or other constitutional violations will be vigorously enforced.

**I will now return the floor to Mr. Bellinger.**

**[LEGAL ADVISER BELLINGER]**

Thank you, Tom. Turning to **Question 30**, which asks for detailed statistical data regarding deaths in custody according to detention, due to the very large amount of data requested by the Committee and provided by the U.S. in response to this question, I would like to refer you to our written response to this question. Please refer to the annexes to those answers, in which we provided statistical information, broken down by various categories as the Committee requested. However, let me just emphasize that any death of an individual in United States Government custody is reported, and if the facts suggest that there may be criminal implications resulting from such deaths, the incident will be investigated. If the facts so warrant, the responsible individuals will be held accountable.

Mr. Chairman, until this point our presentation has addressed the Committee's questions in numerical order. For the next few questions, however, in order to avoid having to pass the floor back and forth among my colleagues excessively, I would like to group some of the questions together. I will first ask Mr. Stimson to respond to Questions 31 through 34, Question 36 and Question 39. I will then ask Mr. Monheim to address Questions 35, 37, and 38. I will then resume the presentation from Question 40.

**[STIMSON]**

**Questions 31 and 32** concern the number of individuals who have died in DoD control and cases involving assaults on detainees in Afghanistan, Iraq and Guantanamo Bay.

There have been a total of 120 deaths of detainees in Department of Defense control in Afghanistan and Iraq. There have been no deaths at Guantanamo. The vast majority of the deaths in Afghanistan and Iraq were caused by factors such as natural causes, injuries sustained on the battlefield, or detainee-on-detainee violence. In only 29 cases was abuse or other violations of law or policy suspected. In these cases, these alleged violations were properly investigated, and appropriate action was taken. Our written answers to the Committee's questions provide extensive information about the investigations and, where appropriate, prosecutions that have been undertaken to date in specific cases of detainee deaths or alleged detainee abuse. These investigations have numbered in the hundreds. I would invite the Committee to review that very detailed information, which includes information about punishment.

I should note that the process of holding violators accountable is ongoing. For example, in the time between our submitting of the answers to the Committee's questions last Friday and today, the Army has charged a senior officer, the former head of the interrogation center at Abu Ghraib prison, for his alleged involvement in the abuse of detainees and for allegedly interfering with the abuse investigation.

Concerning the Committee's question about overall reviews of policy in **Question 33**, as mentioned before, the Department of Defense has conducted 12 major reviews of its detention operations. Let me make a few points about the allegations mentioned by the Committee that these investigations have not been not fully independent. In all 12 of these reviews, panels were allowed access to all materials and individuals they requested. They were provided any resources for which they asked, including the assignment of more senior personnel when investigations required it. In no way did DoD officials direct the conclusions drawn. As the Secretary of Defense, Donald H. Rumsfeld, has said on numerous occasions and in numerous venues with respect to the investigations, DoD policy was "to let the chips fall where they may." The recommendations generated by these investigations have been taken seriously, as described in further detail in the Annex to the *Second Periodic Report*.

As the Department of Defense has conducted an honest, open and impartial set of investigations since the events of Abu Ghraib into all aspects of detention operations, other investigations are not foreseen at this time. They would not add value to the 12 investigations already conducted. Should information come to light that would suggest additional investigation is warranted, the Department of Defense will, as it has before, investigate such allegations fully.

The question also asks about access to detention facilities, a topic that I already addressed under Question 8.

**Question 34** asks whether the Combatant Status Review Tribunals and the Administrative Review Boards have any jurisdiction regarding complaints of torture and cruel, inhuman or degrading treatment or punishment. The Annex to the *Second Periodic Report* describes the scope, jurisdiction, and impartiality of these processes. Our answers to the Committee's questions provide an update on the judicial review applicable to the CSRTs under the Detainee Treatment Act of 2005. These are processes with specific purposes, namely to review the initial enemy combatant determination in the case of the CSRTs and to determine on an annual basis whether there is a continued need to detain an enemy combatant in the ARBs. Of course, if credible allegations of torture or cruel, inhuman, or degrading treatment or punishment were raised during such proceedings (or in any other context), they would be investigated and acted upon based upon the information that is uncovered.

**Question 36** asks about remedies, including compensation, available to detainees who have alleged abuse while under U.S. control. The Department of Defense has administrative procedures in place under various domestic statutes that enable it to pay compensation in such cases. Thirty-three (33) detainees, including some detainees from Abu Ghraib have filed claims for compensation, and the claims process is ongoing. Our written answer provides more detail on these procedures, as well as a table with a breakdown of the statistical data regarding allegations of torture or ill-treatment according to gender, age, location of the complaint and result of the investigation.

**Question 39** requests an update on *habeas corpus* litigation in U.S. courts. Currently, there are approximately 195 *habeas corpus* cases on behalf of more than 350 detainees presently pending before 15 district court judges. Proceedings in almost all of these cases are stayed awaiting either a decision of the U.S. Supreme Court in the case of **Hamdan v. Rumsfeld** or a U.S. Circuit Court of Appeals decision on one of the various decisions appealed to the Circuit Court level.

As discussed in our written answer to Question 39, the Detainee Treatment Act of 2005 eliminates district court jurisdiction in favor of review by the United States Court of Appeals under certain circumstances delineated within the statute.

As Mr. Bellinger requested, I will now pass the floor to Mr. Monheim to answer Questions 35, 37 and 38.

[MONHEIM]

**Question 35** asks for further information on the Justice for All Act. This Act provides for a range of rights of victims of federal crimes described in greater detail in our written response. The protections contained in the Act improve the ability of victims of abuse to monitor and assist in efforts to prosecute the perpetrators of such abuse. The Act includes rights to protection from the accused, notice of public court proceedings involving the crime or of any release or escape of the accused, full and timely restitution as provided in law, as well as the rights to appear and be heard at public proceedings, confer with the government in the case, and to be treated with fairness and with respect for dignity and privacy owed to victims of abuse.

If a victim believes that he has been denied these rights by an employee of the Department, he may file a complaint with DOJ's Victims' Rights Ombudsman. As far as the DOJ is aware, no alleged victims of torture by U.S. government personnel have asserted any of these rights, filed for writs of mandamus, or filed complaints with the Ombudsman.

Regarding **Question 37**, while the Prison Litigation Reform Act of 1995 contains several provisions designed to curtail frivolous lawsuits by prison inmates, it does so in a manner consistent with Article 13 of the Convention. By no means does it "increase the possibility of impunity for perpetrators," as the Committee's question suggests. Those who violate the rights of prisoners are subject to both civil and criminal liability for their actions.

The Act does not limit a prisoner's ability to "complain and to have his case promptly and impartially examined by competent authorities regarding allegations of torture," which is the language used in Article 13 of the Convention. The Act does not prevent a prisoner from bringing a federal civil action to redress allegations of torture. A prisoner alleging actual physical injury may seek compensatory, nominal, and punitive damages, and injunctive and declaratory relief. In addition, courts of appeals have held that this provision permits prisoners alleging a non-physical constitutional injury to seek nominal and punitive damages, and injunctive and declaratory relief.

Moreover, nothing in the Act prevents access to the wide range of other administrative and other avenues by which prisoners may present complaints and grievances, including administrative remedies at the federal and state level as well as judicial remedies before state courts.

Regarding **Question 38**, the United States is not aware of any allegations of torture by U.S. government personnel that have been brought to the attention of the Center for Victims of Torture.

I now return the floor to Mr. Bellinger.

[LEGAL ADVISER BELLINGER]

**Question 40** seeks an explanation of the exact legal status of "enemy combatants" and asks whether the United States is considering reviewing its decision not to apply the Geneva Conventions to them. As an initial matter, I note that the applicability of and compliance with the Geneva Conventions is a matter unrelated to the scope of U.S. obligations under the Convention.

While the question seems to conflate the discussion relating to persons detained in Iraq, in Afghanistan, and at Guantanamo, it is important to be precise and recognize the different legal status of each of these categories of detainees.

The United States has not made any "decision not to apply" the Geneva Convention where it would, by its terms, apply. For example, the United States recognized that the Geneva Conventions apply to the war in Iraq and made it clear that our armed forces would treat captured Iraqi armed forces in accordance with the Geneva Conventions.

The United States is aware that questions are often raised about the concept of "unlawful combatants," which certain academics and others have asserted is not a concept found in the Geneva Conventions. The United States strongly disagrees: the concept of "unlawful combatants" is well-recognized in international law by courts, in military manuals, and by international legal scholars, some of whom are cited in our written response.

With regard to Taliban detainees, the President determined that the Third Geneva Convention does apply to the Taliban detainees, but that the Taliban fail to meet the requirements of Article 4 of that Convention and so are not entitled to the status of prisoners of war. With regard to the al-Qaeda detainees, the President determined that the Geneva Convention did not apply because al-Qaeda is not a party to the Convention. Article 2 of the Convention makes it clear that the Convention only applies as between High Contracting Parties. Because these decisions are grounded in the Geneva Conventions themselves, the United States does not consider it necessary to review them.

At the same time, I should note that in making these determinations, President Bush ordered that "the United States Armed Forces shall continue to treat detainees humanely. . . in a manner consistent with the principles of Geneva." Moreover, let me reiterate that the United States Government complies with its Constitution, its laws, and its treaty obligations with respect to all detainees.

**Question 41** requests examples of cases where statements have been found inadmissible in court on the grounds that they were obtained coercively. As the United States explained in its *Initial Report*, and in its *Second Periodic Report*, U.S. law provides strict rules regarding the inadmissibility of coerced statements. U.S. courts take these rules seriously, as evidenced by the numerous cases cited in our written response and prior reports. We direct the Committee to those reports for further details.

**Question 42** asks how Article 15 of the Convention is implemented in the Combatant Status Review Tribunal and Administrative Review Boards proceedings. Article 15 of the Convention is a treaty obligation of the United States, and the United States is obligated to abide by that obligation in Combatant Status Review Tribunals and Administrative Review Boards.

On Article 15, the United States would like to draw the Committee's attention to an important recent development with regard to the implementation of that article in military commission proceedings. On March 24, 2006, an instruction was adopted that provides that "the commission shall not admit statements established to have been made as a result of torture as evidence against an accused, except as evidence against a person accused of torture as evidence the statement was made."

Regarding the Committee's question about the U.S. reservation to Article 16 in **Question 43**, let me begin first by explaining why the United States felt it necessary to take this reservation. Pursuant to the U.S. reservation, the United States agreed under Article 16 to "undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture," "insofar as the term 'cruel, inhuman or degrading treatment or punishment' means the cruel, unusual and inhumane treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution." As we have explained, this reservation was adopted because of concern over the uncertain meaning of the phrase "cruel, inhuman or degrading treatment or punishment" and was intended to ensure that existing U.S. constitutional standards would satisfy U.S. obligations under Article 16. Moreover, I would like to emphasize that while the United States recognizes that other courts in other countries, often dealing with different instruments than the Convention, have held that certain types of conduct satisfy standards similar to that in Article 16, the relevant test for the United States is the obligation it assumed as set forth in the U.S. reservation.

Because the meaning of Article 16's "cruel, inhuman or degrading treatment or punishment" standard is uncertain, it is difficult to state with certainty and precision what treatment or punishment (if any) would be prohibited by Article 16 with no reservation, but permitted under Article 16 as reserved by the United States. It is this very uncertainty that prompted the reservation in the first place.

In response to **Question 44**, and the Committee's question about the geographic scope of Article 16, as ratified by the United States, I would like to emphasize that by its terms, Article 16 of the Convention obliges States Parties "to prevent **in any territory under its jurisdiction**other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture. . . ." (emphasis added). Clearly this legal obligation does not apply to activities undertaken outside of the "territory under [the] jurisdiction" of the United States. The United States does not accept the concept that "de facto control" equates to territory under its jurisdiction. There is nothing in the text or the travaux of the Convention indicating that the two are equivalent.

Notwithstanding debates over the territorial scope of Article 16, it is important to bear in mind that, as a matter of U.S. law, the Detainee Treatment Act of 2005 now provides that "[n]o individual in the custody or under the physical control of the U.S. government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment," as that term is defined by U.S. obligations under Article 16. Cruel, inhuman and degrading treatment or punishment is also prohibited under the Uniform Code of Military Justice, which governs U.S. military personnel wherever they may be located and prohibits abusive conduct.

Regarding the special maritime and territorial jurisdiction of the United States, I would direct you to our more detailed explanation contained in our written response to this question.

However, let me briefly make a few points. The territorial restriction in Article 16 of the Convention, which also appears in other provisions of the Convention, uses different terms to describe its coverage and serves a purpose entirely different from the technical term "special maritime and territorial jurisdiction," which Congress used to define the jurisdiction of certain U.S. criminal statutes. Article 16 is limited, by its own terms, to "territory under [the State Party's] jurisdiction." Moreover, "special maritime and territorial jurisdiction" includes concepts obviously inapposite to Article 16's reach, such as offenses committed on certain spacecraft and in "places outside the jurisdiction of any nation."

I now turn to Mr. Monheim to address Questions 45 through 50.

**[MONHEIM]**

**Question 45** asks for information about the Department of Homeland Security's National Detention Standards, which serve as a framework for selection of contract detention facilities. The American Bar Association has applauded the standards as a "significant achievement" and "good first step towards providing uniform treatment and access to counsel for immigrants and asylum seekers."

One practical example of these standards at work can be seen in the recently opened South Texas Detention Complex, a facility comprised of several secure "pods" that allow for separation of detainees based on gender and degree of risk posed. Other examples are discussed in our written responses, which also address under Question 49 measures to prevent sexual violence.

**Question 46** concerns the use of Tasers. The U.S. government and others are conducting extensive research into the safety and effectiveness of electro-muscular disruption devices, including Tasers. In addition, the Department of Justice works with local police agencies to assist them in their development of policies regarding the use of these devices. This policy guidance includes consideration of community acceptance, use-of-force protocols, continuous monitoring of all uses of these devices, medical response, and training.

The use of Tasers to control arrestees and inmates is consistent with the law. Courts have reviewed the application of such devices for consistency with the Eighth Amendment's "prohibition of cruel and unusual punishment," and have upheld their legality.

Furthermore, use of Tasers often obviates the need to use other forms of more severe, or even deadly, force. Nevertheless, the Department of Justice remains committed to investigating and, where appropriate, prosecuting use of Tasers where the circumstances indicate a willful use of excessive force in violation of Constitutional standards. In addition, the Departments of Justice and Defense continue to develop less-lethal options, including novel electro-muscular devices that may provide improved safety and effectiveness to law enforcement and military personnel.

**Question 47** concerns the detention of juveniles with adults. As an initial matter, it should be noted that that the detention

of juveniles with adults would not *per se* constitute cruel, inhuman or degrading treatment or punishment.

That being said, Federal law prohibits juvenile offenders held in custody of federal authorities from being housed in correctional institutions or detention facilities in which they could have regular contact with adult offenders. When a juvenile must be temporarily detained in an adult facility, as, for example, immediately following arrest, it is for a minimal period of time and "sight and sound" separation from the adult offenders is ensured within the institution. Similarly, under the Juvenile Justice and Delinquency Act, **accused juvenile delinquents in custody of state authorities may be detained in adult jails for only 6 hours after arrest and only for the purposes of identification, processing, and awaiting pickup by a parent or guardian. Juvenile delinquents also may be detained in adult jails 6 hours before and 6 hours after a court appearance. In both instances, juveniles must be "sight and sound" separated from adult inmates.**

Regarding the Committee's request for statistics, please see our written response to this question.

Additionally, with respect to juveniles in Department of Homeland Security custody, as discussed in greater detail in our written response, generally speaking, juveniles are not detained with adults in DHS adult or juvenile detention facilities. One limited exception allows for the detention of a juvenile with an unrelated adult for a temporary period of time (not to exceed 24 hours) only to the extent necessary for processing or for transport from a remote area.

**Question 48** concerns a range of restraints used on detainees, and also concerns supermaximum prisons. First, let me emphasize that it is not the general policy or practice of the United States government to shackle female prisoners during childbirth. Although the use of restraints is not prohibited, the Bureau of Prisons does not generally restrain inmates in any manner during labor and delivery because they are not considered a flight risk. An inmate would be restrained only in the unlikely case that she posed a threat to herself, her baby, or others around her.

Allegations of the misuse of shackles or other restraints in both federal and state prisons are investigated by the Department of Justice. However, it should be noted that the use of shackles on prisoners is not per se unconstitutional, and there are circumstances in which the use of shackles is permissible.

The Department of Justice has been vigilant in its monitoring of unconstitutional practices by prisons, including use of chain gangs and the hitching post. While the use of chain gangs is not *per se* unconstitutional, the Department's investigations examine whether the practice is conducted in conformity with the Constitution (such as, providing inmates on chain gangs with adequate water, access to toilets, medical care, etc.). If the practice were conducted in violation of constitutional principles, the Department would seek immediate prohibition of such practices.

Regarding the Committee's question about supermaximum prisons, the Department of Justice has reviewed allegations involving several supermaximum facilities in the last several years, applying the same constitutional standards as in other penal facility investigations. For example, the Department investigated a supermaximum facility in Baltimore, Maryland, and worked with the State of Maryland to address the identified deficiencies. The Department intends to continue to fully investigate all credible allegations pertaining to super maximum facilities.

**Question 49** concerns measures to prevent sexual violence against detainees. First, I should note that the Prison Rape Elimination Act of 2000 mandates that all correctional facilities have standards that identify and report sexual assaults and rapes. Our written materials provide detailed information regarding Department of Justice and Department of Homeland Security policies and practices design to prevent sexual violence, including information on allegations of sexual abuse and misconduct by staff and on inmate-on-inmate sexual abuse, as well as the availability of compensation for victims.

While the Department of Justice and Department of Homeland Security have their own policies, in general terms, I can say that staff and inmates alike are encouraged to report incidents of misconduct or otherwise inappropriate behavior. When allegations of serious abuse are accompanied by credible evidence, appropriate administrative measures are taken. For example, in the Bureau of Prisons, the staff member is removed from contact with inmates or placed on administrative leave. Cases are also referred for criminal prosecution when warranted. Finally, staff working with female inmates receive appropriate training, including training on policies prohibiting sexual abuse, assault, and intimidation.

**Question 50** concerns the use of solitary confinement and monitoring of the mental health of detainees. The Bureau of Prisons does not use solitary confinement in its facilities. Procedures and safeguards applicable in the limited cases where it is necessary to separate inmates temporarily from the general population, including mental health monitoring, are described in our written answer.

Regarding the question relating to "prolonged isolation and indefinite detention," the United States takes exception to the assumption contained therein that prolonged isolation and indefinite detention *per se* constitutes cruel, inhuman, and

degrading treatment or punishment. Under U.S. criminal law, the United States does not detain individuals convicted of criminal charges indefinitely. Rather, their sentences are imposed for a term of years, or for life, as the case may be, by judges, and if elected by the defendant, by juries of his or her peers.

Finally, inasmuch as this question is meant to relate to the detention of enemy combatants, there is no question that a State is authorized under the law of war to detain combatants – whether lawful or unlawful combatants – for the duration of the armed conflict without charges.

**Question 51** concerns executions by lethal injection. The United States included an understanding in its instrument of ratification of the Convention that the treaty does not "restrict or prohibit the United States from applying the death penalty consistent with the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States." The Supreme Court of the United States has found lethal injection to be consistent with the U.S. Constitution.

I now return the floor to Mr. Bellinger.

[LEGAL ADVISER BELLINGER]

**Question 52** deals with alleged interrogation techniques. Although we have submitted a lengthy written response, for purposes of our meeting today, our answer to Question 27 provides our views on the topic.

**Question 53** concerns implementation of the Convention in light of the federal structure of the United States. Under the U.S. Constitution, the federal government is a government of limited authority and responsibility. The resulting division of authority means that state and local governments retain significant responsibility in many areas, including in areas relevant to certain aspects of the implementation of the Convention. Nonetheless, as a practical matter, this has not detracted from or limited our substantive obligations under the treaty because the U.S. Constitution prohibits such conduct by state and local government officials.

**Question 54** concerns the individual complaints procedure under Article 22 of the Convention. The United States is not considering making a declaration under Article 22.

On **Question 55**, while the United States has considered its existing reservations, understandings and declarations in light of the Committee's recommendation to withdraw them, there have been no developments in the interim that have caused the United States to revise its view.

**Question 56** concerns the Optional Protocol to the Convention Against Torture. The United States is not considering ratification of this instrument. **Question 57** concerns restrictions on equipment specifically designed to inflict torture. The United States recognizes that trade and export of certain items should be controlled to prevent their misuse. Under the Export Administration Regulations, the export of such items requires a special license. Human rights vetting is a prerequisite for the issuance of such licenses. Items specifically designed for the use of torture would never receive such a license.

**Question 58** concerns measures to respond to terrorism and **Question 59** asks for information on measures to prevent domestic violence. Both questions are extremely broad, raising many issues outside the scope of the Convention. In the interest of time, I would refer you to our written answers, our *Second Periodic Report*, as well as the latest U.S. Periodic Report to the Human Rights Committee.

Mr. Chairman, that concludes our oral responses to the Committee's extensive list of questions. As I mentioned before, our written submissions as well as the information submitted in the *Initial Report* and the *Second Periodic Report* are much more detailed, and I would once again refer the Committee to those materials.

Thank you very much. My delegation looks forward to your questions.