Steven T. Wax, OSB #85012
Federal Public Defender
steve_wax@fd.org
Stephen R. Sady
Chief Deputy Federal Public Defender
steve_sady@fd.org
Patrick J. Ehlers
Assistant Federal Public Defender
patrick_ehlers@fd.org
101 SW Main Street, Suite 1700
Portland, Oregon 97204
Tel:   503-326-2123
Fax:   503-326-5524

Attorneys for Petitioner

PREVIOUSLY FILED WITH CSO
AND CLEARED FOR PUBLIC FILING

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDULRAHIM ABDUL RAZAK AL GINCO, <br><br> Petitioner, <br><br> v. <br><br> GEORGE W. BUSH, et al., <br><br> Respondents. | CV 05-1310-RJL <br><br> MOTION FOR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, AND ORDER TO SHOW CAUSE <br><br> EXPEDITED HEARING REQUESTED |

The petitioner, Abdul Rahim Abdul Razak Al Ginco, through attorneys, Steven T.

Wax, Stephen R. Sady, and Patrick J. Ehlers, respectfully moves this Court pursuant to Fed.

R. Civ. P. 56 for partial summary judgment granting his petition for writ of habeas corpus

on the grounds the respondents lack jurisdiction to hold him in indefinite detention or, in the

alternation ordering the respondents to show cause why the petitioner's detention does not

violate the laws and Constitution of the United States.  The respondents oppose this motion.

Respectfully submitted September 20, 2006.

/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

/s/ Stephen R. Sady
Stephen R. Sady
Chief Deputy Federal Public Defender

/s/ Patrick J. Ehlers
Patrick J. Ehlers
Assistant Federal Public Defender

Steven T. Wax
Assistant Federal Public Defender
steve_wax@fd.org
Stephen R. Sady
Chief Deputy Federal Public Defender
steve_sady@fd.org
Patrick J. Ehlers
Assistant Federal Public Defender
patrick_ehlers@fd.org
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204
503-326-2123 Telephone
503-326-5524 Facsimile

Attorneys for Petitioner

PREVIOUSLY FILED WITH CSO
AND CLEARED FOR PUBLIC FILING

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDULRAHIM ABDUL RAZAK AL GINCO,<br><br>                                        Petitioner,<br><br>v.<br><br><br>GEORGE W. BUSH, et al.,<br><br>                                        Respondents. | CV 05-1310-RJL<br><br>STATEMENT OF MATERIAL FACTS |

A.   **When Abdul Rahim Arrived In Afghanistan, He Was A 22-Year-Old Syrian Kurd Student, With No History Of Political Or Religious Extremism, Who Had Left Home Over A Family Squabble.**

1.   Abdul Rahim is a Syrian Kurd born on June 24, 1978, in northwest Syria.  Pet.

Ex. 101; Pet. Ex. 108 at 9.

2.     Abdul Rahim's father is a teacher of Islamic education, and Abdul Rahim has ten brothers and sisters.  Pet. Ex. 103 at 1-2 ¶ 1-2.

3.     Abdul Rahim lived in Syria attending public school until the age of 13, when the family moved to the United Arab Emirates. Pet. Ex. 103 at 2 ¶ 2; Pet. Ex. 108 at 8

4.     Abdul Rahim's adult brothers are teachers and businessmen.  Pet. Ex. 104 at 2 ¶ 2; Pet. Ex. 105 at 2 ¶ 2; Pet. Ex. 106 at 2 ¶ 1, 2.

5.     In the United Arab Emirates, Abdul Rahim continued attending school up to over two years of post-high school education.  Pet. Ex. 103 at 2 ¶ 4; Pet. Ex. 107 at 5; Pet. Ex. 108 at 8.

6.     From childhood, Abdul Rahim had medical issues regarding a seizure disorder and, as a consequence, took medications prescribed by physicians and received special care from his family.  Pet. Ex. 103 at 2 ¶ 4; Pet. Ex. 107 at 5; Pet. Ex. 108 at 8.

7.     Abdul Rahim attended school and lived with his two brothers, Adnan and Abdul Haleem, in the emirate of Ras El Khaimah, which is north of Dubai and Ajman, where the rest of the family was living.  Pet. Ex. 103 at 2 ¶ 4; Pet .Ex. 104 at 3 ¶ 5; Pet. Ex. 105 at 3 ¶ 5; Pet. Ex. 106 at 2 ¶ 5; Pet. Ex. 108 at 8.

8.     Abdul Rahim maintained close contact with his family and engaged in no misbehavior beyond the normal.  Pet .Ex. 103 at 2-3 ¶ 5; Pet. Ex. 104 at 2 ¶ 3, 4; Pet. Ex. 105 at 2, ¶ 3, 4; Pet. Ex. 106 at 2 ¶ 3, 4; Pet. Ex. 108 at 9.

9.     Abdul Rahim had no affiliation or beliefs regarding extreme politics or religion. Pet. Ex. 103 at 2-3 ¶ 5; Pet. Ex. 104 at 2 ¶ 4; Pet. Ex. 105 at 2 ¶ 3, 4; Pet. Ex. 106 at 2 ¶ 3, 4; Pet. Ex. 108 at 6, 14, 15.

10.     Abdul Rahim had friends and associates of all backgrounds, as is not uncommon in the blended society of the United Arab Emirates. Pet. Ex. 103 at 2-3 ¶ 5;[1] Pet. Ex. 107 at 3-4; Pet. Ex. 108 at 6, 15.

11.     A family argument led to his sudden departure from the United Arab Emirates in either December 1999 or January 2000. Pet. Ex. 103 at 3 ¶ 6; Pet. Ex. Pet. Ex. 105 at 3¶ 6; Pet. Ex. 106 at 3 ¶ 5; Pet. Ex. 107 at 5.

12.     Abdul Rahim borrowed money – 400 to 500 dirhams – from outside the family for expenses related to a school trip. Pet. Ex. 103 at 3 ¶ 6; Pet. Ex. 104 at 3 ¶ 5; Pet. Ex. 105 at 3 ¶ 5; Pet. Ex. 106 at 2-3 ¶ 5; Pet. Ex. 107 at 9; Pet. Ex. 108 at 8, 12, 13.

13.     When his brother Haleem insisted that his strict father be told that Abdul Rahim borrowed money outside the family, Abdul Rahim ran away from home. Pet. Ex. 103 at 3 ¶ 6; Pet. Ex. 104 at 3 ¶ 5; Pet. Ex. 106 at 2-3 ¶ 5; Pet. Ex. 107 at 5; Pet. Ex. 108 at 5, 12.

14.     The issue was not the relatively small amount of money involved but the honor of the family, which was sullied by the suggestion that the family would not or could not take

---

[1] "Abdul Rahim socialized with people of all backgrounds and showed a kind heart to all the communities in the United Arab Emirates, which includes a blend of different religious sects such as Hindus, Christians, Muslims, non-Muslims, and the like. Abdul Rahim dealt with all as his brothers."

care of Abdul Rahim's financial needs.  Pet. Ex. 103 at 3 ¶ 6; Pet. Ex. 104 at 3 ¶ 6; Pet. Ex. 105 at 3 ¶ 5; Pet. Ex. 106 at 3 ¶ 6; Pet. Ex. 107 at 5, 8, 9; Pet. Ex. 108 at 12, 13.

    15.    Abdul Rahim decided to leave the United Arab Emirates in the aftermath of the quarrel regarding money that he feared would anger his father.  Pet. Ex. 105 at 3¶ 6; Pet. Ex. 106 at 2-3 ¶ 5; Pet. Ex. 107 at 8; Pet. Ex. 108 at 3.

    16.    All of the family was aware of the incident leading to Abdul Rahim's sudden departure and confirm the details.  Pet. Ex. 103 at 3 ¶ 6; Pet. Ex. 104 at 3 ¶ 5; Pet. Ex. 105 at 3-4 ¶ 6, 7; Pet. Ex. 106 at 2-3 ¶ 5.

    17.    Abdul Rahim's father had control of Abdul Rahim's passport, as he had for all his sons, so Abdul Rahim did not have travel documents.  Pet. Ex. 103 at 3 ¶ 7; Pet. Ex. 104 at 3 ¶ 7; Pet. Ex. 105 at 4 ¶ 7; Pet. Ex. 107 at 9-10.

    18.    After a time looking for Abdul Rahim and hoping he would return, Abdul Rahim's father contacted the Ajman police on February 6, 2000, and filed the equivalent of a missing person report, a copy of which he retained, and turned Abdul Rahim's passport in to the Ajman police at the same time.  Pet. Ex. 103 at 3 ¶ 7;[2] Pet. Ex. 104 at 4 ¶ 8; Pet. Ex. 107 at 9-10; Pet. Ex. 108 at 7.

---

    [2] The police report is attached to Abdul Razzak Mustafa Al Janko's declaration.  Pet. Ex. 103.

19.    Abdul Rahim's brother, Abdul Salam, obtained a copy of the original passport on September 6, 2006; the passport itself remains in the possession of the Ajman police. Pet. Ex. 104 at 4 ¶ 8.[3]

20.    Because Abdul Rahim wanted to go Europe or Canada, he contacted several embassies and a United Nations office in Abu Dhabi seeking assistance. Pet. Ex. 107 at 5, 9, 10; Pet. Ex. 108 at 3, 8, 10.

21.    After his efforts failed to produce a way out of the country, Abdul Rahim heard from a college friend connected to the Afghan embassy that, without a passport, he could be deported to Afghanistan and, as a refugee there, travel to Europe through humanitarian organizations. Pet. Ex. 107 at 5, 9; Pet. Ex. 108 at 7.

**B.    Abdul Rahim Was In Afghanistan For Less Than A Month When He Was Taken Into Custody And Accused Of Being An American And Israeli Spy.**

22.    Upon arriving in Afghanistan in January 2000, Abdul Rahim's plan to seek passage to Europe was thwarted when he was impressed by the Taliban militia. Pet. Ex. 107 at 5-6; Pet. Ex. 108 at 7.

23.    When Abdul Rahim explained his situation through an interpreter, the Taliban did not accept his plan and instead insisted he go to training camp. Pet. Ex. 107 at 5-6; Pet. Ex. 108 at 10.[4]

---

[3]The copy of the passport is attached to Abdul Salam's declaration. Pet. Ex. 104.

[4] "I explained to them that I ran away from home and I wanted to live there for six months to a year in a simple life and to gain asylum from the United Nations. The mujahidden said I did not speak the language so I needed an interpreter. The interpreter asked me who sent me. I tried to explain to them that no one sent me I just ran away from

24.     Abdul Rahim repeatedly told the Taliban he did not want to go and would not go to the camp; the Taliban insisted he go the camp near Kabul, and "they took me to the camp by force."  Pet. Ex. 107 at 6;[5] Pet. Ex. 108 at 10.

25.     While Abdul Rahim was at the training facility, he was treated with suspicion and given low level jobs such as hauling water, cutting wood, and cleaning small arms.  Pet. Ex. 108 at 4, 11.

26.     After eighteen days, Abdul Rahim attempted to leave the camp, advising the Taliban that he wanted to return home.  Pet. Ex. 107 at 2; Pet. Ex. 108 at 3, 4, 10.

27.     When Abdul Rahim stated he wanted to leave, the Taliban took him into custody and accused him of spying for the United States and Israel.  Pet. Ex. 108 at 4, 7, 10.

28.     The spy accusation stemmed from Abdul Rahim's desire to go home, his ability to speak some English, and the arrest of another person as a spy three months earlier.  Pet. Ex. 107 at 10; Pet. Ex. 117 at 8.

---

my parents.  They told me someone sent me because any Arab who comes to Afghanistan should be under supervision."

[5] "If I don't go to that camp, they can do whatever they want to me, kill me; I'm already scared that they are going to kill me.

C.  **The Taliban And Al Qaeda Subjected Abdul Rahim To Brutal Torture And Threats Of Death, Forced Him To Make False Videotaped Statements, And Incarcerated Him In Political Prisons For Almost Two Years.**

29.  First in Kabul, and later in Kandahar, the Taliban, as well as Al Qaeda officials, subjected Abdul Rahim to torture and threats of death during vicious interrogation sessions. Pet. Ex. 107 at 6; Pet. Ex. 108 at 4, 10.

30.  As a result of the torture and threats starting in January 2000, Abdul Rahim falsely confessed to being a spy for the United States and Israel, which were videotaped by his captors.  Pet. Ex. 108 at 10; Pet. Ex. 117 at 13.

31.  In May 2000, the Taliban, through the Taliban Minister of Foreign Affairs and Minister of Information, announced Abdul Rahim's arrest for spying for the United States and Israel, and that he had confessed under interrogation, implicating others.  Pet. Ex. 109; Pet. Ex. 110; Pet. Ex. 111; Pet. Ex. 112; Pet. Ex. 114 at 11-12; Pet. Ex. 117.

32.  At around the same time, Abu Dhabi television broadcasted an interview of Abdul Rahim in which he confessed to being an American and Israeli spy.  Pet. Ex. 103 at 4 ¶ 9; Pet. Ex. 104 at 4 ¶ 9; Pet. Ex. 105 at 4 ¶ 8; Pet. Ex. 106 at 3 ¶ 6; Pet. Ex. 107 at 10, 11; Pet. Ex. 130.

33.  In July 2000, the Taliban published a print version of the Abu Dhabi television interview in the Taliban's magazine, Islamic Caliphate.  Pet. Ex. 113.

34.     Abdul Rahim's statements that he was an American and Israeli spy were false and the result of torture and threats of death.  Pet. Ex. 104 at 4-5 ¶ 10, 11; Pet. Ex. 105 at 4-5 ¶ 8, 10; Pet. Ex. 106 at 3 ¶ 6; Pet. Ex. 107 at 3; Pet. Ex. 108 at 4, 10.

35.     Most of the other statements in the videotape were the false results of torture and threats of death: Abdul Rahim did not live the decadent life described; the names of most individuals were simply made up on the spot; he did not attend Hanifa but had been at the training camp; and phrases Abdul Rahim mouthed were foreign to his own background.  Pet. Ex. 103 at 4 ¶ 8; Pet. Ex. 104 at 4 ¶ 9; Pet .Ex. 105 at 8 ¶ 8; Pet. Ex. 106 at 3 ¶ 6; Pet. Ex. 108 at 10; Pet. Ex. 130.[6]

36.     Abdul Rahim appears in the videotape to be extremely pale, underweight, and under extreme stress.  Pet. Ex. 104 at 4 ¶ 9; Pet. Ex. 105 at 8 ¶ 8; Pet. Ex. 106 at 3 ¶ 6; Pet. Ex. 130.

37.     Al-Qaeda members tortured Abdul Rahim until he admitted he was a spy and subjected him to severe torture for three months.  Pet. Ex. 107 at 3;[7] Pet. Ex. 108 at 10.[8]

38.     The torture inflicted upon Abdul Rahim included severe beatings, electric shock, being hung from the ceiling, water torture, striking the bottom of his feet with clubs,

---

[6] Abu Dhabi television asserted in a post-interview notation that the names appeared to be fictitious.

[7] "They forced me, tortured me to say I am an American spy, or spy for any intelligence service."

[8] "They told me to just say yes, so I told them I would if they would not touch me again.  I had no choice but to say yes, they turned my life to hell and tortured me for three months."

striking his hand with the butt of a gun, and sleep deprivation. Pet. Ex. 102 at 3; Pet. Ex. 107 at 3, 6;[9] Pet. Ex. 108 at 4.

39.    Abdul Rahim's torture took place under the supervision and participation of Al Qaeda officials, including Mohammed Atef and Sayf Al-Adl. Pet. Ex. 102 at 3 ¶ 7; Pet. Ex. 123.

40.    Abdul Rahim's account of being tortured while in Taliban custody is similar to the accounts of torture by Saadiq Turkestani, Ayrat Vhakitov, Abdul Hakeem Bukhary, and Arkan Mohammed Ghafil Al Karim while they were in Taliban custody. Pet. Ex. 102 at 2¶ 2, 3 ¶ 6; Pet. Ex. 115 at 2-3, 7; Pet. Ex. 116 at 2; Pet. Ex. 117 at 2-3, 5, 6, 14; Pet. Ex. 123.

41.    After three months of torture, the Taliban transferred Abdul Rahim to a political prison called Sarpusa in Kandahar. Pet. Ex. 107 at 3, 6, 7; Pet. Ex. 8 at 14.

42.    Abdul Rahim believed he was serving a 25-year prison sentence on the false accusation of being a spy. Pet. Ex. 107 at 6; Pet. Ex. 108 at 5, 7.

43.    The political prison where Abdul Rahim confined also housed between 1,400 and 2,500 political prisoners, mostly Afghans from the Northern Alliance. Pet. Ex. 115 at 5; Pet. Ex. 118; Pet. Ex. 120; Pet. Ex. 122.

44.    The conditions in the Taliban prison were terrible: one piece of bread to eat all day; overcrowding; filthy living conditions; an abundance of rats and insects; poor medical

---

[9] "They took me to Kabul again and then to Kandahar. There they started beating and torturing me. They used electric shock on me to get information from me. They started to torture me a lot. I lost the use of my right hand because of that."

care; and rampant disease.  Pet. Ex. 104 at 5 ¶ 10; Pet. Ex. 105 at 4 ¶ 9; Pet. Ex. 108 at 6; Pet. Ex. 115 at 5; Pet. Ex. 118 at 2.

45.    The International Committe of the Red Cross visited Abdul Rahim while he was in the Taliban prison.  Pet. Ex. 102 at 3 ¶ 8; Pet. Ex. 126.

46.    Abdul Rahim remained in the prison, after the initial three months of torture, between approximately May 2000 to January 2002.  Pet. Ex. 107 at 4; Pet. Ex. 120; Pet. Ex. 121 at 2.

    **D.**    **American Bombing In Kandahar Led To The Liberation Of The Taliban Prison, After Which Abdul Rahim And Other Former Prisoners Sought Aid From The Red Cross And The United Nations In Returning To Their Home Countries.**

47.    On or about December 18, 2001, the Taliban abandoned the prison in Kandahar due to American bombing, and the new Afghan government took over.  Pet. Ex. 102 at 3 ¶ 9; Pet. Ex. 108 at 14; Pet. Ex. 115 at 5; Pet. Ex. 118; Pet. Ex. 119; Pet. Ex. 120.

48.    Almost all the political prisoners left the prison, eventually leaving behind Abdul Rahim; Jamal Al-Harith from Great Britain, Sadeeq Turkestani, a Uighur from Saudi Arabia; Abdul Hakeem Al-Bukhary from Saudi Arabia; and Ayrat Vakhitov from Russia (the Kandahar 5).  Pet. Ex. 102 at 3 ¶ 9; Pet. Ex. 107 at 7, 13; Pet. Ex. 108 at 14; Pet. Ex. 115 at 7; Pet. Ex. 117 at 5-6; Pet. Ex. 120; Pet. Ex. 121; Pet. Ex. 122 at 1; Pet. Ex. 124 at 2.

49.    The Kandahar 5 remained as guests in the juvenile wing of the prison because the new warden warned them that local Afghans might be hostile to foreigners or might sell

them to the United States for a $5,000.00 bounty. Pet. Ex. 102 at 4 ¶ 9; Pet. Ex. 119; Pet. Ex. 120 at 3; Pet. Ex. 124.

50.    Between mid-December 2001, and January 24, 2002, Abdul Rahim and others of the Kandahar 5 visited offices of the Red Cross and the United Nations, seeking assistance in returning to their home countries. Pet. Ex. 102 at 4 ¶ 10; Pet. Ex. 104 at 5 ¶ 11; Pet. Ex. 119; Pet. Ex. 120 at 2; Pet. Ex. 124 at 2.

51.    Between mid-December 2001, and January 24, 2002, Abdul Rahim and others of the Kandahar 5 spoke to numerous journalists regarding their treatment as prisoners of the Taliban. Pet. Ex. 102 at 4 ¶ 10; Pet. Ex. 118; Pet. Ex. 119; Pet. Ex. 120; Pet. Ex. 121 at 2-3;[10] Pet. Ex. 122 at 8;[11] Pet. Ex. 123; Pet. Ex. 124.

52.    Abdul Rahim stated that he had been tortured by Mohammed Atef and other Al Qaeda officials and expressed his willingness to testify regarding the human rights violations committed against him. Pet. Ex. 107 at 6;[12] Pet. Ex. 108 at 14;[13] Pet. Ex. 123.[14]

---

[10] "The marks of maltreatment are visible."

[11] "All say they were captured and accused of spying by the Taliban and tortured to make them confess."

[12] "We said we would be witnesses against the Taliban and al Qaida."

[13] Abdul Rahim and his Russian friend told journalists, "we wanted to be witnesses against the Taliban in court."

[14] "The men – a Russian, a Syrian, a Saudi, and a Saudi-born stateless man – said al-Adl and Muhammed Atef, a close aid of bin Laden's, killed in U.S. bombings in November, had interrogated them and authorized their torture."

53.    The Kandahar 5, as well as the new warden of the Kandahar prison, told journalists they had been the victims of Taliban torture while in custody in the Taliban prison.  Pet. Ex. 102 at 4 ¶ 10; Pet. Ex. 115 at 7; Pet. Ex. 120 at 3; Pet. Ex. 122.

54.    On January 22, 2002, two Americans, one in uniform and the other in civilian clothes, visited the Kandahar at the prison, advised they were from military intelligence, took photographs of the former prisoners, and advised they wanted information and would be transferred home in about two weeks.  Pet. Ex. 102 at 4 ¶ 11; Pet. Ex. 108 at 14.

**E.    The American Military Took Abdul Rahim And Other Political Prisoners Of The Taliban Into Custody, First At The Kandahar Air Base, Then At Guantanamo Bay, Cuba.**

55.    On January 24, 2002, the two Americans and a heavily armed detachment of American soldiers took Abdul Rahim and the others of the Kandahar into custody and transported them to Kandahar for what was supposed to be a few days.  Pet. Ex. 101;[15] Pet. Ex. 102 at 4-5 ¶ 12; Pet. Ex. 115 at 7.

56.    On January 24, 2002, Attorney General John Ashcroft held a press conference announcing that videotape had been found in the wreckage of Mohammed Atef's dwelling in Kandahar, where Mohammed Atef had been killed by American bombing, and that five persons including "Abd Al-Rahim" were being sought as potential terrorists.  Pet. Ex. 107 at 8; Pet. Ex. 108 at 10; Pet. Ex. 127; Pet. Ex. 128.

---

[15] The proximity of ISN numbers corroborates the seizure of Ayrat, Bukhary, Turkestani, Jamal, and Abdul Rahim (ISN 489) at the same time.  Jamal, Ayrat, and Turkestani have been released from Guantanamo.

57.    In the January 28, 2002, issue of Time magazine, an article included a photograph of "Abd Al-Rahim" with four others on different tapes and reported the request of the government for public assistance to help "identify, locate and incapacitate" the individuals depicted.  Pet. Ex. 108 at 4, 8; Pet. Ex. 129.

58.    For the first month at the Kandahar air base, the Kandahar 5 were treated relatively well, being kept apart from other prisoners and receiving extra blankets and chocolate.  Pet. Ex. 102 at 5 ¶ 13.

59.    After about a month, the interrogators suddenly began treating Abdul Rahim very badly after showing him a magazine article claiming he was a terrorist.  Pet. Ex. 102 at 5 ¶ 14; Pet. Ex. 108 at 5.[16]

60.    Abdul Rahim's bad treatment by the Kandahar air base interrogators, after they confronted Abdul Rahim with the magazine article, included sleep deprivation, exercise to exhaustion, stress positions for hours at a time, use of police dogs, and rough treatment to take him to interrogation, although Abdul Rahim did not resist or use violence.  Pet. Ex. 102 at 5-6 ¶ 15; Pet. Ex. 107 at 13.

61.    At the end of April or early May 2002, the American military transferred Abdul Rahim to Guantanamo Bay, Cuba, where he remains to this day.  Pet. Ex. 102 at 6 ¶ 17.

---

[16] "When the Americans came, I told them about the videotape the Taliban made of me.  By me telling them about the video it created confusion to the point that the Americans believed I was working for al Qaida.  Here I am now I don't know if I am a spy for America or I work for al Qaida."

62.    Abdul Rahim was and is being treated with psychotropic medications for mental conditions including post-traumatic stress disorder. Pet. Ex. 102 at 6-7 ¶ 18-19; Pet. Ex. 107 at 7-8.

63.    The United States has released from Guantanamo three of the Kandahar 5: Jamal Al-Harith; Sadeeq Turkestani, and Ayrat Vakhitov. Pet. Ex. 102; Pet. Ex. 107 at 13.

Respectfully submitted on September 20, 2006.

/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender


/s/ Stephen R. Sady
Stephen R. Sady
Chief Deputy Federal Public Defender

/s/ Patrick J. Ehlers Jr.
Patrick J. Ehlers Jr.
Assistant Federal Public Defender

Steven T. Wax
Federal Public Defender
steve_wax@fd.org
Stephen R. Sady
Chief Deputy Federal Public Defender
steve_sady@fd.org
Patrick J. Ehlers
Assistant Federal Public Defender
patrick_ehlers@fd.org
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204
503-326-2123 Telephone
503-326-5524 Facsimile

Attorneys for Petitioner

**PREVIOUSLY FILED WITH CSO
AND CLEARED FOR PUBLIC FILING**

# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDULRAHIM ABDUL RAZAK AL GINCO,<br><br>                    Petitioner,<br><br>     v.<br><br>GEORGE W. BUSH, et al.,<br><br>                 Respondents. | CV 05-1310-RJL<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, AN ORDER TO SHOW CAUSE** |

# TABLE OF CONTENTS

Page

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of Material Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Procedural Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.      Abdul Rahim Is Not An Enemy Combatant Because He Committed No
        Belligerent Act Within The Time Of War, Committed No Belligerent Act
        Against The United States Or Its Allies, And Suffered Torture And Coercion
        That Induced His Pre-War Involuntary And False Statements. . . . . . . . . . . . . . . . 5

        A.      The Temporal Basis For Department Of Defense Jurisdiction Is
                Lacking Because The Petitioner Was A Non-Combatant Prisoner Of
                The Taliban Well Before And After 9/11 And After He Was Liberated,
                Only Tried To Go Home With Help From The Red Cross And The
                United Nations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.      The Department Of Defense Lacks Jurisdiction To Hold The Petitioner
                Because He Was Not A Part Of Forces Hostile To, Nor Did He Engage
                In Armed Conflict Against, The United States And Its Allies. . . . . . . . . . . 9

        C.      The Department Of Defense Lacks Jurisdiction To Detain Based On
                Statements Obtained By Torture And Threat Of Death. . . . . . . . . . . . . . . 11

II.     Partial Summary Judgment Is The Appropriate Procedure For Granting Relief
        Or, In The Alternative, An Order To Show Cause. . . . . . . . . . . . . . . . . . . . . . . . . 16

III.    The Court Should Order Abdul Rahim Released With Protections Against
        Rendition To Countries Where He Faces Torture Or Death. . . . . . . . . . . . . . . . . 18

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................... 16, 17

*Banks v. Chesapeake and Potomac Telegraph Co.*, 802 F.2d 1416 (D.C. Cir. 1986) ..... 17

*Blackledge v. Allison*, 431 U.S. 63 (1977) ...................................................... 16

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................ 17

*Clark v. Martinez*, 543 U.S. 371 (2005) ..................................................... 18, 19

*Greene v. Dalton*, 164 F.3d 671 (D.C. Cir. 1999) ............................................. 17

*Hamdi v. Rumsfield*, 542 U.S. 507 (2004) ........................................... 5, 6, 7, 8, 9

*Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006) ....................................... 1, 6, 7, 8

*Harding v. Gray*, 9 F.3d 150 (D.C. Cir. 1993) ................................................ 17

*Kingman Park Civic Association v. Williams*, 348 F.3d 1033 (D.C. Cir. 2003) ............. 17

*Laningham v. United States Navy*, 813 F.2d 1236 (D.C. Cir. 1987) .............................. 17

*Rasul v. Bush*, 542 U.S. 466 (2004) ......................................................... 5, 19

*Sanders v. United States*, 373 U.S. 1 (1963) ................................................. 18

*Siderman de Blake v. Republic of Argentina*, 965 F.2d 699 (9th Cir. 1992) .................. 12

*United States v. Handa*, 122 F.3d 690 (9th Cir. 1997) ....................................... 18

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ..................................................... 18

## FEDERAL STATUTES

8 U.S.C. § 1231(a)(6) ........................................................................ 18

28 U.S.C. § 2243 ........................................................................... 2, 17

Fed. R. Civ. P. 56(c) ................................................................................................. 16, 17

Fed. R. Civ. P. 81(a)(2) .................................................................................................... 16

United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading
    Treatment or Punishment, art. 15, Apr. 18, 1988, 112 Stat. 2681,
    2681-821, 1465 U.N.T.S. 85 ................................................................................. 11

Introduction

This case implicates the core functions of the writ of habeas corpus: Abdul Rahim is not an enemy combatant and is being held at least in part based on the results of Taliban torture. Not only was he not an enemy combatant, he was a prisoner of the Taliban for over 18 months prior to the Authorization for the Use of Military Force on September 18, 2001. While a prisoner, he was brutally tortured and subjected to cruel and degrading treatment by the Taliban. Under torture and threat of death, he falsely confessed to being a spy for the United States and Israel and made statements about jihad to placate his tormentors. Upon the liberation of Kandahar in December 2001, he did not flee but sought the aid of non-governmental organizations to secure his return to his home country. Then, on or about January 24, 2002, he was taken into the custody of the United States, where he has remained for four and a half years, first at the Kandahar air base, then in Guantánamo Bay, Cuba.

Based on facts that the government cannot reasonably controvert, the Department of Defense has no jurisdiction to hold Abdul Rahim, who has committed no act conceivably considered hostile to this country or its allies. He was a prisoner of the Taliban long before and well after September 11th. Jurisdiction to confine an enemy combatant requires acts that "must have been committed . . . *during*, not before, the relevant conflict." *Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2779 (2006). There is not even an allegation that Abdul Rahim took any hostile action during the period of war. Further, there is no allegation that Abdul Rahim acted as a combatant against the United States and its allies. The statements induced

Page 1   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL
         SUMMARY JUDGMENT

by Taliban torture neither establish combatant status nor are they remotely reliable. Abdul Rahim's status as a torture victim is confirmed by the false confessions publicized by Al Qaeda and the Taliban, by witnesses as to his imprisonment in Kandahar, and by his current treatment for post-traumatic stress disorder.

Based on the material facts before this Court, Abdul Rahim's continued designation as an enemy combatant violates the Constitution and laws of this country because the Department of Defense lacks jurisdiction over Abdul Rahim. The Court should grant summary judgment because he is entitled to judgment as a matter of law. Fed. R. Civ. Pro 56(c). The Court should order his release forthwith and require the government to take remedial action to assure his release to a safe and secure location in disposing "of the matter as law and justice require" under 28 U.S.C. § 2243 (2000). In the alternative, the Court should order the respondents to show cause why Abdul Rahim's continued detention does not violate the laws and Constitution of the United States.

## Summary of Material Facts

In January 2000, Abdul Rahim was a 22-year old Syrian student living in the United Arab Emirates, enfolded within a strict but moderate Muslim family of teachers and businessmen. After a family quarrel, Abdul Rahim ran away from home and, because his father controlled his passport, attempted first to obtain refugee status, as a way to travel to Europe or North America, through offices in Abu Dhabi, then through deportation to Afghanistan. When he arrived at the Pakistan-Afghanistan border, the Taliban conscripted

him and took him to a camp near Kabul. After 18 days, Abdul Rahim tried to return home. As a consequence, the Taliban accused him of being an American and Israeli spy, brutally tortured him, and coerced false confessions that were videotaped.

Abdul Rahim remained in Taliban custody from January 2000 until American bombing in Kandahar in December 2001 resulted in the liberation of his political prison. For the next month, Abdul Rahim tried to return to his family through the assistance of the Red Cross and the United Nations. He and several other similarly situated freed political prisoners offered to provide testimony against the Taliban torturers. Shortly thereafter, the United States took him into custody, at first apparently because he had useful information regarding his torturers, then because he was supposedly a terrorist based on the torture-induced videotapes.

As confirmed by contemporaneous news stories and corroborating declarations and testimony, Abdul Rahim committed no belligerent acts during the time of war and is not an enemy combatant under any definition. At the time of his seizure, he was a liberated political prisoner of the Taliban who was only seeking safe passage home. Abdul Rahim is a torture victim of the Taliban over whom the military has no jurisdiction, especially because, to the extent jurisdiction is based on videotapes that were the products of brutal torture, he is being held indefinitely in violation of the Convention Against Torture and customary international law.

**Procedural Status**

On June 30, 2005, Abdul Rahim submitted a writ of habeas corpus stating that there was no basis for him to be held as an enemy combatant. Abdul Rahim stated he was jailed by Al Qaeda and Taliban forces for two years before the events of September 11, "and the evidence for that is the International Committee for the International Red Cross and I was accused of being a spy working for the United States of America." Abdul Rahim further alleged that he did not "pose any threat to the United States and its allies and the proof is the accusation of Al Qaeda and Taliban to me stating I was an American spy and not only that but also that I cooperated with the interrogators for the past three years up to the present time, and I am requesting from the interrogators to make a statement of that." The respondents filed a motion for a stay on July 18, 2005.

On August 2, 2005, Abdul Rahim, filed a supplemental petition for writ of habeas corpus stating the following:

> . . . I am and was a victim of Al Qaeda and the Taliban in the past. I have spent two years in their prison that so-called Sareezah Prison in Kandahar, Afghanistan. Then the American forces appeared and apprehended me; from prison they brought me to here, hence the ICRC requested from the American forces to release us. The American forces made promises that they were going to release us three days later. However, they have gone back on their promise and since those three days, here we are approaching the fourth year. How can that be? I was informed that it is my right to object in the American courts. Therefore, I say with all pride that I am not a threat to the U.S.A. or to any of its allies. I was a university student and I am wholly prepared to cooperate with the American government. This is in addition that I was cooperative and I have been for a period of more than three years. Thus, what do the American forces want with me?

On October 14, 2005, the Court appointed counsel to represent Abdul Rahim, but no appearance was entered pursuant to that order. The Court entered a protective order and stayed proceedings on October 24, 2005.

On April 11, 2006, present counsel entered a notice of appearance pursuant to the Court's amendment of the appointment order. On May 2, 2006, out of concern regarding Syria's human rights record, counsel filed an anti-rendition motion, requiring either a court order or notice before release of Abdul Rahim. The Court denied this motion on May 30, 2006. Abdul Rahim filed an interlocutory appeal regarding that issue on June 22, 2006

On June 29, 2006, the Supreme Court entered its decision in *Hamdan*. On July 7, 2006, the respondents filed a motion for a filter team to review attorney-client material, which this Court denied on August 28, 2006. Contemporaneously with this motion, Abdul Rahim is filing a motion to modify the stay to permit the litigation of this motion.

## STATEMENT OF LAW

**I.      Abdul Rahim Is Not An Enemy Combatant Because He Committed No Belligerent Act Within The Time Of War, Committed No Belligerent Act Against The United States Or Its Allies, And Suffered Torture And Coercion That Induced His Pre-War Involuntary And False Statements.**

The Supreme Court has recognized both governmental authority to detain enemy combatants and limitations on that authority in *Hamdan*, *Hamdi v. Rumsfield,* 542 U.S. 507 (2004), and *Rasul v. Bush,* 542 U.S. 466 (2004). As stated in *Hamdi*, an enemy combatant would need to be "part of or supporting forces hostile to the United States or coalition

partners" and "engaged in an armed conflict against the United States" to justify detention. *Hamdi*, 542 U.S. at 526; *accord Hamdan* 126 S. Ct. at 2761 n.1. The *Hamdi* court noted that "[t]he permissible bounds of the [enemy combatant] category will be defined by the lower courts as subsequent cases are presented to them." *Hamdi*, 542 U.S. at 522 n.1. No conceivable definition of enemy combatant would include a freed political prisoner who had been subjected to brutal torture and confinement by the enemy prior to the declaration of war.

Persons not engaged in armed conflict, such as a prisoner and torture victim of the Taliban, are entitled to be free of restraint in the absence of a violation of the laws of war. William Winthrop, MILITARY LAW AND PRECEDENTS, at 816 (rev. 2d ed. 1920) (hereinafter Winthrop).In the treatise on the laws of war most cited by the *Hamdan* court, the author recognized the general rule of liberty with exceptions for charged and adjudicated violations of the law of war:

> While the peaceable citizens of a country under Military Government are in general exempt from military arrest or restraint of the person, the governing commander is authorized to apprehend and restrain all persons guilty of violations of the laws of war, hostile demonstrations, or public disorders, and in extreme cases to inflict upon them summary punishment.

Winthrop at 816. Abdul Rahim has not done anything remotely qualifying as a violation of the laws of war. The norm of liberty is also part of the Fourth Geneva Convention on the treatment of civilians. Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, [1955], 6 U.S.T. 3516, 75 U.N.T.S. 287 (hereinafter Geneva Convention IV).

The government cannot establish an exception to the norm of liberty based on the *Hamdan* opinion's outline of four general prerequisites for detention for violation of the laws of war: the offense must occur within the field of command; the offense must not be cognizable in other courts; and the offense must occur during the time of war; the offense must be committed by an individual of the enemy's army who is guilty of illegitimate warfare or other violations of the law of war. *Hamdan*, 126 S. Ct. at 2777.[1] None of the prerequisites for detention are established in Abdul Rahim's case.

A.     **The Temporal Basis For Department Of Defense Jurisdiction Is Lacking Because The Petitioner Was A Non-Combatant Prisoner Of The Taliban Well Before And After 9/11 And After He Was Liberated, Only Tried To Go Home With Help From The Red Cross And The United Nations.**

The *Hamdan* court firmly limited the Department of Defense's jurisdiction to that conferred by statute, including prominently the limitation to the temporal period of the declaration of war. The critical dates are the attack on the United States on September 11, 2001; the promulgation of the Authorization for the Use of Military Force on September 18, 2001; and the actual commencement of the armed conflict in Afghanistan on October 7, 2001. The *Hamdan* court stated that any offense "'must have been committed within the period of the war.'" 126 S. Ct. at 2777 (quoting Winthrop at 837). The *Hamdan* court noted

---

[1] These four prerequisites were also accepted by the *Hamdan* dissenters. 126 S. Ct. at 2826 ("I agree with the plurality that Winthrop's treatise sets forth the four relevant considerations for determining the scope of a military commission's jurisdiction, considerations relating to the (1) time and (2) place of the offense, (3) the status of the offender, and (4) the nature of the offense charged.") (Thomas, J. dissenting).

that the earliest time for Department of Defense jurisdiction would be September 11th. 126 S. Ct. at 2778 n. 31.

The same temporal qualification outlined in *Hamdan* applies to Abdul Rahim because the same statutory authorization is the predicate for detention of enemy combatants as well as for prosecution by military tribunals. As the *Hamdan* court held, the offense alleged must have been committed "*during*, not before, the relevant conflict." 126 S. Ct. at 2779 (emphasis in original); *see also Hamdi*, 542 U.S. at 518 (detention applies to individuals who fought against the United States "for the duration of the particular conflict in which they were captured"). The *Hamdan* court expressly disregarded any claims regarding acts prior to September 11, 2001. 126 S. Ct. at 2778

For almost two years before his liberation from the Taliban prison, Abdul Rahim was nothing more than a non-combatant victim of torture and illegal incarceration by the Taliban. He was despised by the Taliban for being a spy for the United States and Israel, an offense for which he barely escaped with his life. All relevant statements and actions by Abdul Rahim so far predated the AUMF that no conceivable basis exists for being held for being an enemy combatant during the later war.

The respondents can claim no conduct subjecting Abdul Rahim to their jurisdiction because, at all relevant times, he was a prisoner of the Taliban. Any earlier conduct is immaterial:

> As in the ordinary criminal law one cannot legally be pu[n]ished for what is not an offence at the time of the sentence, so a military commission cannot, (in the absence of specific statutory authority,) legally assume jurisdiction of, or impose a punishment for, an offence committed either before or after the war or other exigency authorizing the exercise of military power.

Winthrop at 837. The Department of Defense lacks any jurisdiction to hold Abdul Rahim because the requisite temporal nexus with the war prosecuted under the AUMF is lacking.

**B.    The Department Of Defense Lacks Jurisdiction To Hold The Petitioner Because He Was Not A Part Of Forces Hostile To, Nor Did He Engage In Armed Conflict Against, The United States And Its Allies.**

The paradigmatic person to be held as an "enemy combatant" is a member of Al Qaeda or the Taliban captured fighting on the battlefield against the United States and its allies. *Hamdi*, 542 U.S. at 521, 531. "The purpose of detention is to prevent captured individuals from returning to the field of battle and taking up arms once again." *Id*. at 518. Unlike Hamdi, there is not even an allegation that Abdul Rahim engaged the United States on the battlefield in support of our enemies. On the contrary, the Taliban considered him an enemy to be tortured, humiliated, and condemned.

Up until Abdul Rahim's 22nd year, he lived close to parents and relatives in Syria, then the United Arab Emirates. He attended schools and university with no involvement in violent politics and religion. When he left home as the result of a family argument, he ended up in Afghanistan for only the briefest of time before being taken into custody by the Taliban. During the time before his arrest in Afghanistan – less than a month – he did not engage in any hostilities or unlawful acts against the United States and its coalition allies.

Instead, he did not want to fight and stated he wanted to go home. As a consequence, he was arrested, tortured, and imprisoned.

Ever since the 1907 Hague Regulations were implemented, a liberating power has been subject to rules of occupation to protect persons in the liberated territory. The Hague Regulations and, after World War II, the Fourth Geneva Convention provide that the occupying power must treat noncombatants, including those who were detained by the adversary power, humanely. Geneva Convention IV at Art. 3. Those who have been mistreated by the adversary power, such as concentration camp survivors, must be given special care by organizations such as the International Committee of the Red Cross. *Id.* This Country signed the Fourth Geneva Convention protecting civilians and noncombatants largely in response to the inhumane manner in which displaced persons were treated in the wake of World War II. Theodor Meron, THE GENEVA CONVENTIONS AS CUSTOMARY LAW, 81 AM. J. INT'L L. 348, 364 (1987).

Upon his liberation from the Taliban prison, Abdul Rahim properly sought refuge through the intervention of non-governmental humanitarian organizations, such as the International Committee of the Red Cross and the United Nations. The New York Times quoted him as rejecting aid from reporters, expressing desperation, and relying on the Red Cross and the United Nations: "We just need the Red Cross or the United Nations to come take us out of here." Eric Eckholm, *Inmates Left By The Taliban Are Free, But Cannot Leave*, N.Y. Times, Dec. 16, 2001, Sec. 1B, at 6.

By detaining Abdul Rahim and thwarting his efforts to obtain refugee relief, the Department of Defense acted beyond its jurisdiction and immediate release should be ordered, with appropriate safeguards for his safety in the country of release.

### C.    The Department Of Defense Lacks Jurisdiction To Detain Based On Statements Obtained By Torture And Threat Of Death.

Under Article 15 of the Convention Against Torture, the United States "shall ensure that any statement which is established to have been made as a result of torture shall not be invoked as evidence in any proceedings, except against a person accused of torture as evidence that the statement was made."  United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 15, Apr. 18, 1988, 112 Stat. 2681, 2681-821, 1465 U.N.T.S. 85 (hereinafter CAT).  The United States recognizes that Article 15 applies to the detainees in Guantánamo Bay: "Article 15 of the Convention is a treaty obligation of the United States, and the United States is obligated to abide by that obligation in Combatant Status Review Boards and Administrative Review Boards."  U.S. Dep't. of State, Legal Advisor John B. Bellinger III, U.S. Delegation Oral Responses to CAT Committee Questions, Geneva, Switzerland (Question 42) (May 5, 2006) (available at http://www.state.gov/g/drl/rlsl) (Exhibit A). *See also* Dept. of Defense, Military Commission Instruction No. 10 (March 24, 2006) (applying Article 15 to bar products of torture in commission proceedings) (available at http://www.defenselink.mil/NEWS/Mar2006/d20060327MCI10.pdf).  This governmental recognition that the CAT prohibition on the use

of products of torture applies to Abdul Rahim merely confirms the pre-existing protection both directly under the Treaty, which is broadly phrased in terms of "proceedings," as well as customary international law.

The CAT obligation codifies principles and values at the core of this Country's laws and Constitution. "[W]hile an involuntary confession is inadmissible in part because such a confession is likely to be unreliable, it is also inadmissible even if it is true, because of the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will." *Watkins v. Sowders,* 449 U.S. 341, 347 (1981) (quoting *Jackson v. Denno*, 378 U.S. 368, 385 (1964) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206-07 (1960)); *see also Bram v. United States*, 168 U.S. 532 (1897). By using the products of Taliban torture, the respondents violate the central constitutional recognition of the unreliability of the products of torture and the refusal to ratify the use of such despicable tactics.

The depth of the repugnance for torture is reflected in the recognition of torture as not only a violation of customary international law, but as violation of *jus cognes.* In *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 717 (9th Cir. 1992), the court held that the unanimity with which torture is condemned elevated the right to be free from such treatment to an extraordinary level:

> [I]t would be unthinkable to conclude other than that acts of official torture violate customary international law. And while not all customary international law carries with it the force of a *jus cogens* norm, the prohibition against official torture has attained that status. In *CUSCLIN*, 859 F.2d at 941-42, the D.C. Circuit announced that torture is one of a handful of acts that constitute violations of *jus cogens*. In *Filartiga*, though the court was not explicitly considering *jus cogens*, Judge Kaufman's survey of the universal condemnation of torture provides much support for the view that torture violates *jus cogens*. In Judge Kaufman's words, "[a]mong the rights universally proclaimed by all nations, as we have noted, is the right to be free of physical torture." 630 F.2d at 890. Supporting this case law is the Restatement, which recognizes the prohibition against official torture as one of only a few *jus cogens* norms. Restatement § 702 Comment n (also identifying *jus cogens* norms prohibiting genocide, slavery, murder or causing disappearance of individuals, prolonged arbitrary detention, and systematic racial discrimination). Finally, there is widespread agreement among scholars that the prohibition against official torture has achieved the status of a *jus cogens* norm. . . .

> Given this extraordinary consensus, we conclude that the right to be free from official torture is fundamental and universal, a right deserving of the highest status under international law, a norm of *jus cogens*. The crack of the whip, the clamp of the thumb screw, the crush of the iron maiden, and, in these more efficient modern times, the shock of the electric cattle prod are forms of torture that the international order will not tolerate. To subject a person to such horrors is to commit one of the most egregious violations of the personal security and dignity of a human being. That states engage in official torture cannot be doubted, but all states believe it is wrong, all that engage in torture deny it, and no state claims a sovereign right to torture its own citizens.. . . Under international law, any state that engages in official torture violates *jus cogens*.

*Id*. The use of the products of torture to detain Abdul Rahim violates the CAT and customary international law.

As set out in Abdul Rahim's sworn statements and confirmed by extrinsic evidence, Abdul Rahim's videotaped statements were the products of torture. "Torture" covers a wide

array of coercive and injurious techniques, including threat of imminent death. Those employed by the Taliban were shamelessly brutal: Abdul Rahim suffered beatings, electric shock, near drowning, hanging from the ceiling, and intolerable conditions, all the while under immediate threat of death. His hand is still not recovered four years after it was smashed with a gun butt, and his ankles show the scars of cigarette burns. His feet were bound, then beaten until they were black. Under torture and duress, Abdul Rahim made statements videotaped by his captors.

To stay alive, Abdul Rahim said what his captors wanted him to say, not what was true. The contents of the videotapes are manifestly false: if Abdul Rahim really were a spy for the United States and Israel, he would have long since of returned home, well rewarded for his sufferings. His accommodations to his torturers are analogous to the process undergone by a far better prepared torture victim – Senator John McCain. Like Senator McCain, Abdul Rahim confessed to crimes he did not commit; like Senator McCain, Abdul Rahim espoused views of his captors that he did not truly hold; like Senator McCain, he listed names of persons – mostly innocuous names of students from home – whereas Senator McCain provided the starting line-up of the Green Bay Packers to his torturers. John McCain, FAITH OF MY FATHERS, at 191, 194-95, 198, 244, 245 (Perennial 2000). Like Senator McCain, Abdul Rahim's statements are contradictory and cagey, seeking to stay alive by keeping his captors appeased.

Abdul Rahim struggles with the psychological agony of having been tortured – as Senator McCain has stated: "Every man has his breaking point." John McCain, *How the POW's Fought Back*, U.S. NEWS AND WORLD REPORT, May 14, 1973. Instead of receiving the treatment and consideration that torture victims should receive under the CAT – including treatment and compensation – Abdul Rahim faced the nightmare of another round of coercive interrogation, this time by United States interrogators at the Kandahar air base, accusing him based on statements he made under torture to save his life. His dilemma is plain from his statements to the military:

> After two years the Americans came and saved me from the prison. When the Americans came I told them about the videotape the Taliban made of me. By me telling them about the video it created confusion to the point that the Americans believed I was working with al Qaida. Here I am now I don't know if I am a spy for America or I work for al Qaida.

> \*      \*      \*

> [T]hey accused me of being a spy. And here, you guys accuse me of being al Qaida. No mercy. Who am I? . . . You take me from that prison and nothing changed in my life, I was taken from prison to prison.

The videotaped statements, which are patently the false products of torture, continue to be used to subject him to United States detention.

After surviving hellish torture and imprisonment by the Taliban, Abdul Rahim underwent a round of coercive interrogation at the Kandahar air base, and now languishes in American custody going in to his fifth year. No governmental agency, including the Department of Defense, can take jurisdiction adverse to individual liberty based on the

products of torture and threats of death. Nothing in the AUMF authorizes the government to use the products of torture in making detention decisions. The Court should find no jurisdiction because the detention cannot be based on the products of Taliban torture.

## II. Partial Summary Judgment Is The Appropriate Procedure For Granting Relief Or, In The Alternative, An Order To Show Cause.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Federal Rules of Civil Procedure are "applicable to proceedings for . . . habeas corpus . . ., to the extent that the practice in such proceedings is not set forth in statutes of the United States, the Rules Governing Section 2254 Cases, or the Rules Governing Section 2255 Proceedings, and has heretofore conformed to the practice in civil actions." Fed. R. Civ. P. 81(a)(2). Summary judgment has been held to be an appropriate vehicle for deciding habeas corpus cases. *See Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977).

The Court's threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the

plaintiff." *Anderson*, 477 U.S. at 252. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Upon a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e); *see also Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1041 (D.C. Cir. 2003); *Laningham v. United States Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). Mere conclusory allegations by the non-movant cannot defeat summary judgment. *See Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Banks v. Chesapeake and Potomac Tel. Co.*, 802 F.2d 1416, 1430-31 (D.C. Cir. 1986).

The Statement Of Material Facts establishes that Abdul Rahim is not an enemy combatant and that the Department of Defense lacks jurisdiction to keep him in custody. Partial summary judgment is the appropriate procedural vehicle for this Court to grant the petitioner relief. In the alternative, the Court should order the respondents to show cause why Abdul Rahim's continued detention does not violate the laws and Constitution of the United States pursuant to 28 U.S.C. § 2243.

III.  **The Court Should Order Abdul Rahim Released With Protections Against Rendition To Countries Where He Faces Torture Or Death.**

The Court has broad authority under 28 U.S.C. § 2243 to formulate equitable relief and "law and justice require." *See Sanders v. United States*, 373 U.S. 1, 17 (1963) (habeas corpus is governed by equitable principles). The "broad and flexible power" conferred on this Court in formulating a remedy "is derived from the equitable nature of habeas corpus relief." *United States v. Handa*, 122 F.3d 690, 691 (9th Cir. 1997). The Court should require that any release to another country is with adequate assurance for his safety as required by the CAT. In the meantime, Abdul Rahim should be released on conditions in the United States as an unadmitted alien pending a safe haven for him. *Clark v. Martinez*, 543 U.S. 371 (2005).

In *Martinez*, the petitioners were Mariel Cubans who were indefinitely detained because they could not be repatriated to Cuba in the reasonably foreseeable future. The Court held that the government did not have the authority to indefinitely detain them even though they had never been "admitted" into the United States, rejecting the government's argument that it had the authority to detain because the Mariel Cubans were paroled into the United States, and thus, stood as if on the border requesting admission. *Martinez*, 543 U.S. at 386. *Martinez* held that they were to be treated as any other person who was subject to deportation but who could not be removed. *Martinez*, 543 U.S. at 385. Under the removal statute, 8 U.S.C. §1231(a)(6), as interpreted in *Zadvydas v. Davis,* 533 U.S. 678 (2001),

detention while removal was being arranged was limited to six-months, after which the person was to be released on conditions of supervision until repatriation is effectuated. *Martinez*, 543 U.S. at 385-86.

Abdul Rahim is in an analogous position to the petitioners in *Martinez*, with a stronger bases for admission. As demonstrated above, the government does not have jurisdiction to detain Abdul Rahim as an enemy combatant, but nonetheless transported him into an area the Supreme Court found to be the functional equivalent of United States soil for jurisdictional purposes in *Rasul*. He is entitled to at least as much consideration as someone who sought to illegally enter the country and should have the same limited right to be free of confinement pending repatriation. Abdul Rahim, like Mr. Martinez, has been in custody much longer than the 6 months allowed, and should be released on conditions of supervision until he can be repatriated.

Respectfully submitted on September 20, 2006.

/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

/s/ Stephen R. Sady
Stephen R. Sady
Chief Deputy Federal Public Defender

/s/ Patrick J. Ehlers Jr.
Patrick J. Ehlers Jr.
Assistant Federal Public Defender