Exhibit D

**FEDERAL PUBLIC DEFENDER**
**DISTRICT OF OREGON**

101 SW Main Street, Suite 1700
Portland OR 97204
503-326-2123 / Fax 503-326-5524

Branch Offices:

151 W Seventh, Suite 510
Eugene OR 97401
541-465-6937
Fax 541-465-6975

15 Newtown Street
Medford OR 97501
541-776-3630
Fax 541-776-3624

STEVEN T. WAX
  Federal Public Defender
STEPHEN R. SADY
  Chief Deputy Defender
Steven Jacobson
Bryan E. Lessley ▲
Nancy Bergeson
Christopher J. Schatz
Ellen C. Pitcher
Craig Weinerman ▲
Mark Bennett Weintraub ▲
Gerald M. Needham
Thomas J. Hester
Ruben L. Iñiguez
Anthony D. Bornstein
Donnal S. Mixon+

Lisa Hay
Tonia L. Moro+
Susan Russell
Patrick J. Ehlers
Francesca Freccero
C. Renée Manes
Amy Baggio
Matthew M. Rubenstein
Caroline Davidson
Nell Brown
Lynn Deffebach★
Kristina Hellman★
Michelle Sweet★

▲ Eugene Office
+ Medford Office
★ Research/Writing Attorney

December 19, 2006

J. David Kinzie, M.D.
Professor of Psychiatry
Department of Psychiatry
Oregon Health & Science University
3181 SW Sam Jackson Park Road
Portland, OR 97239



Dear Dr. Kinzie:

Thank you for agreeing to provide information regarding treatment of torture victims in the context of the detention of our client, Abdul Rahim Abdul Razak Al Janko at Guantánamo. I advised you that, from early 2000 until December 2001, Abdul Rahim reports being in the custody of the Taliban in Kandahar in Afghanistan. During the first several months of his incarceration, he reports terrible mistreatment and a number of specific tortures. He has now been at Guantánamo for almost five years, where behavior modification techniques are used and where recently privileges have been terminated.

Our client has described a wide array of mistreatment while in the hands of the Taliban. He generally described blindfolding, loud noises, beatings, including with rifle butts, threats to kill and putting a gun to his head, starvation, extremes of temperature, untreated sickness, sleep deprivation, and cigarette burns among his sufferings. For the first three months of his confinement, Abdul Rahim was held by himself and suffered the most intense torments. For about six months thereafter he was kept in a cell with two other individuals. After that, he was released into the general population of political prisoners.

Abdul Rahim provided detailed accounts of several tortures:

- While he was blindfolded, the torturers subjected him to electric shocks. He heard what sounded like a crank being turned to generate the electric charge. The torturers attached wires to his little toes and to the lobes of his ears. He described the pain as being excruciating and that he had difficulty with his thinking afterwards.

Dr. J. David Kinzie
December 19, 2006
Page 2

- Abdul Rahim also described being repeatedly placed at the edge of drowning by being dunked in a bucket of icy water. On one occasion, while his hands were tied behind his back, a torturer grabbed him by the back of his long hair and submerged his head until he felt he was drowning in an oil drum filled with filthy water. He described his throat as straining painfully for air and having the sensation that his hands were trying to open his throat even though he knew they were tied behind him. He thinks he fainted because he remembers seeing red and that it seemed as if ghosts were walking around. He awoke on the ground. He was then dragged by his hair to a new location for interrogation. He recalls there being water in his system and having diarrhea.

- Abdul Rahim was hung from the ceiling for long times by his wrists, sometimes with his feet just touching the ground. The torturers treated him as if he were a punching bag for martial arts, punching and kicking him. He also described being beaten from his lower back downwards with a wire that had a ball or knot at the end with filaments extending from the insulation. The wire beatings caused welts that became infected. Being hung for long periods caused spasms then complete numbness or lack of sensation on his sides and under his arms, and pain in his shoulders. The guards would hit him in the shoulders with their rifle butts to wake him up.

- Abdul Rahim described the torturers beating of the soles of his feet with clubs. His torturers would place his feet between the receiver of an AK-47 and its strap. They would then twist the strap until the rifle held his feet securely, parallel and about three feet off the ground, while he was on his back with his buttocks just off the floor. He would be held that way, on his back with his feet exposed, while his torturers beat on the bottoms of his feet, which was extremely painful. He described that the bottoms of his feet turned black after each such treatment, which would follow having been hung from the ceiling and beaten. For nearly a month thereafter, walking would be very painful; even now, he reports that if he stands too long, he feels the sensation of pins and needles around the sides and heel of his feet and needs to get off his feet.

Throughout his confinement, he suffered great deprivations. He was limited to one piece of bread during a 24-hour period during much of the time, as a consequence of which he lost a lot of weight. His jailors did not provide medical treatment, although on one occasion the Red Cross assisted him, providing treatment for an infection from one of the beatings. The conditions in the prison were extremely crowded and unsanitary. During the first three months, his torturers required him to clean filthy toilet areas without protection. During the time of his custody in the prison, over 100 of the other prisoners died of various sicknesses and from the deprivations of prison.

Abdul Rahim reports that he has had the same nightmares since his torture by the Taliban that include the torturers involved in his mistreatment. He also reports a great fear and vulnerability to being tortured anew.

Dr. J. David Kinzie
December 19, 2006
Page 3

Thank you for agreeing to review this material along with the summary judgment exhibits that I have provided. I look forward to your evaluation.

Very truly yours,

/S/

Stephen R. Sady
Chief Deputy Federal Public Defender

SRS:lmp:jll

# Exhibit E



# REED COLLEGE

January 23, 2007

POLITICAL SCIENCE
DEPARTMENT

3203 Southeast
Woodstock Boulevard
Portland, Oregon
97202-8199

telephone
503/771-1112

fax
503/777-7776

Stephen R. Sady
Chief Deputy Defender
Federal Public Defender
District of Oregon
101 SW Main Street, Suite 1700
Portland, OR 97204

Dear Mr. Sady,

I am a Professor of Political Science at Reed College. I am an internationally recognized expert on government interrogation and torture. My first book, *Torture and Modernity: Self, State and Society in Modern Iran* (Westview 1994), studies torturers and torture in Iran in 20th century. In 2003, I was named a Carnegie Scholar, one of the top national awards in American scholarship for my work on the study of violence. My forthcoming book, *Torture and Democracy* (Princeton University Press, November 2007) is a history and transmission of torture techniques around the world since the nineteenth century. It completes a twelve-year project started in 1995. The expert reviewers for Princeton University's editorial process describe this 800 page text – part history and social scientific explanation and part sourcebook – "a state-of-the art consideration" of modern torture[1] and that in writing it, "he [Darius Rejali] has read more widely in more disciplines than any analyst of torture whom I know or know of."[2]

You have asked me to review Mr. Abdul Rahim Abdul Razak al Ginco's account of his prison experience in Afghanistan and determine whether Abdul Rahim's[3] claims that he was tortured during that experience are credible.

In my opinion, Abdul Rahim's claims are credible.[4] Specifically, I draw attention to the following four points in his testimony.

---

[1] Anonymous Reviewer B, Princeton University Press expert evaluation, (PUP email to author, January 2, 2006).
[2] Anonymous Reviewer A, Princeton University Press expert evaluation, (PUP email to author, March 30, 2005).
[3] Because there are many spellings of his last name (al Jinko, al Ginco, al Jenko), I refer to Abdul Rahim by his first name for simplicity's sake.
[4] In forming my opinion, I reviewed materials provided to me by counsel for Abdul Rahim, including notes of interviewed with Abdul Rahim, Motion for Partial Summary Judgment (CV 05-1310-RJL); Statement of Material Facts (CV 05-1310 RJL); Memorandum of Points and Authorities in Support of Motion for

*I. Electrotorture.* Abdul Rahim describes being subjected to electrotorture while in the custody of the Taliban in Kandahar. He states, "while he was blindfolded, the torturers subjected him to electric shocks. He heard what sounded like a crank being turned to generate the electric charge. The torturers attached wires to his little toes and to the lobes of his ears."[5]

1. Abdul Rahim describes a cranking noise used to give him electroshock, indicating that the device used on him was a magneto. He correctly describes where the wires would be attached in the Afghan style of magneto torture.

2. Electrotorture requires specific machines, and each machine is recognizable. There are also different national styles of electrotorture, involving different ways of applying electroshock to the body.

3. Electrotorture was introduced into Afghanistan in the 1980s, and the standard device was a hand-crank magneto. A magneto is a simple generator that produces a high voltage spark. Viewers of old movies may recall seeing operators spin a handle on a phone before they spoke or crank a handle on the hood of a car to drive. The faster the handle is turned the stronger the electric current becomes. This device allows torturers to modulate electric current. The device also makes a recognizable grinding sound when cranked. No other electrotorture device makes this sound.

4. The most common Afghan magneto "looks like an old-fashioned telephone with wires that are attached to the victim's body and a handle which is turned or pulled to apply the current."[6] Reports indicate the Afghans received them from Soviet and East German manufacturers. One device used in Kandahar was described as having "a distinctive handle" about "as big as a normal typewriter."[7] In terms of style of electrotorture, male Afghan prisoners mainly describe how the wires were attached to toes and ears. This in contrast to other countries where torturers prefer sexual organs, nipples, or the tongue.

5. A drawing by an Afghan political prisoner depicts how magnetos were used by the Soviet-era Afghan secret police, the Khad. Figure 1 below shows the hand crank magneto, the size of a typewriter, with wires attached to the toes; the interrogator's assistant turns the crank to generate electricity. The drawing appears in the work of Mr. M. Dadfar on torture victims (*The Impaired Mind*,

---

Partial Summary Judgment (CV 05-1310-RJL); Exhibits in Support of Statement of Material Facts (CV 05-1310-RJL).
[5] Stephen Sady, Letter detailing reported torture received by Abdul Rahim Abdul Razak Al Janko (November 13, 2006), 1.
[6] Amnesty International, *Afghanistan*, ASA 11/04/86 (New York: Amnesty International, 1986), 12.
[7] Shahdarak student, cited in Amnesty, *Afghanistan*, 13.

Peshawar, Pakistan, 1988). Mr. Dadfar became Minister of Higher Education in Afghanistan in the post-Taliban Karzai government.

6. Abdul Rahim could not have learned this method of electrotorture in the United Arab Emirates.[8] There are two known reports of electrotorture in the United Arab Emirates. One event occurred in 1987 and the other events during the year 2002 or 2003. The first event occurred when Abdul Rahim was 9 years old and before Abdul Rahim's family arrived to the UAE (1991) and the second occurred after Abdul Rahim left for Afghanistan (January 2000) and when he was in prison.

7. Further, electrotorturers in the Persian Gulf region use prods and, occasionally, stun guns. No magnetos are reported. Electrotorturers in the UAE applied electroshocks to the genitals. Had Abdul Rahim picked up his knowledge of electrotorture by hanging around jailhouses, he would have described the wrong devices and techniques for Afghanistan. In fact, the UAE police issued a good conduct report for Abdul Rahim's behavior,[9] and it is unlikely he was anywhere near a UAE torture chamber.

8. Abdul Rahim could not have learned about magneto torture in Syria. Syrian electrotorture began in the 1970s, but prisoner reports do not describe the specific device or devices used. Experts still do not know what devices were used in Syrian prisons, so it is even less likely Abdul Rahim would know. What is known is that the Syrians preferred to deliver electroshock to "sensitive parts of the body, particularly the genitals."[10] If Abdul Rahim had picked up his knowledge from accounts of Syrian electrotorture, he would have described the wrong method of attachment for Afghanistan.

9. Magnetos are, by contemporary standards, an archaic technique for electrotorture, and they are rapidly being displaced worldwide by stun guns and Tasers. They persisted in Afghanistan due to the relative isolation of the Taliban and the almost permanent war conditions for decades. It is not surprising that Taliban and al-Qaeda interrogators used electrotorture techniques developed by the Afghan Khad, the Soviet trained police, in the 1980s. The Taliban made use of whatever expertise existed though they generally favored traditional tortures (as in the *falaka* below). Torture techniques show high degrees of continuity despite changes in government. Leaders change, but an experienced torturer is rarely dispensed with. This is one of the main conclusions of *Torture and Modernity*. In periods of war and crisis, there is no incentive for research into innovation in torture;

---

[8] This is based on the Reed Torture Technique Dataset, a unique torture techniques dataset of approximately 10,000 observations of specific technique worldwide, classified by nation, since 1973.
[9] Pet Ex 106 at 4.
[10] Amnesty International, *Syria*, (London: Amnesty International, 1979), 12.

interrogators use existing expertise since the priority is on techniques that are painful and immediately available. Torture changes principally during periods of stability.

*II. Beating of the Soles of the Feet (Falaka).* Abdul Rahim describes "the torturers beating of the soles of his feet with clubs. His torturers would place his feet between the receiver of an AK-47 and its strap. They would then twist the strap until the rifle held his feet securely, parallel and about three feet off the ground, while he was on his back with his buttocks just off the floor. He would be held that way on his back with his feet exposed, while his torturers beat the bottoms of his feet, which was extremely painful. He described that the bottoms of his feet turned black after each such treatment." He also states, "for nearly a month thereafter, walking would be very painful; even now, he reports that if he stands too long, he feels the sensation of pins and needles around the sides and heel of his feet and needs to get off his feet."[11]

1. Abdul Rahim describes here the *falaka*, a traditional way of applying pain in Afghanistan. And he correctly describes the short and long term sequelae (physiological consequences) of *falaka* torture.

2. The soles of the feet are not thickly muscled and so caning or whipping them is especially painful. Depending on the weight of the rod and the intensity and frequency of the blows, this practice can yield mildly swollen feet to broken bones that damage a person permanently. There are two traditional variants. In the Chinese style, the prisoner lies on his stomach with his legs bent, the soles of his feet facing upwards. In Russia, where this style is used, it is still called a "Chinese" torture. In the Middle Eastern style, the prisoner lies on his back, his feet bound by the ankles tightly to a pole with a strap. The pole is usually held by two men, with the soles of the feet exposed outward. This process is called the *falaka* or *falaqa* (Turkish, Arabic, Farsi), the *falanga* or *phalanga* (Greek), and *karma* or *arma* (Moroccan Arabic). Figures 2 and 3 below depict the *falaka* position in the Middle Eastern style.

3. In the Middle East and North Africa, *falaka* is still a customary practice. Often it is combined with electrotorture. Iraqi torturers under Saddam Hussein, for example, subjected over half their prisoners to electricity (63%) and the *falaka* (75%). The combination appears repeatedly in the 1970s (Syria, Israel, Turkey, Morocco and Iran), in the 1980s (Egypt, Iraq, Libya) and in the 1990s (Lebanon, Tunisia, Yemen, Saudi Arabia and Kuwait after the Gulf War). M. Dadfar reports that both electrotorture and *falaka* were standard tortures for interrogators of the Afghan Khad in the 1980s.

---

[11] Stephen Sady, Letter detailing reported torture received by Abdul Rahim Abdul Razak Al Janko (November 13, 2006), 2.

4. In Abdul Rahim's case, the technique applied here was standard. The use of a rifle receiver and strap instead of a traditional pole (*falak*) is not unusual. *Falaks* can be constructed out of any straight rod with a strap attached and torturers typically reach for the most suitable device at hand. *Falaka* torturers hit upon the rifle method in the 1930s, the first common users being the Yugoslav police.

5. Standard sequelae to *falaka* torture fall into two categories. In the initial acute phase, the feet swell with extensive discoloration of the soles due to bruising. This clears in a matter of weeks, but the long term pain persists in the chronic phase. In this phase, victims experience a deep dull cramping pain in the feet, which intensifies with weight bearing and muscle activity in the lower legs. Additionally, they experience a superficial burning, stinging pain in the soles. These pains are often accompanied with disturbing sensations of prickling and tingling. Walking is typically impaired, and victims must rest before they can continue. There is no known cure for these symptoms.

6. Abdul Rahim correctly characterizes the standard sequelae. There are various well-known physical injuries and symptoms also consistent with *falaka* injury, including microlesions (identified with bone scintigraphy), a thickening of the *planta facia* muscle (identified with magnetic resonance imaging (MRI)), a flattening of the heels and changes in proprioception (sense of the body in space) (identified through examination), and specific symptoms patients describe in non-directed interviews.[12] Some residual traces of these may exist in Abdul Rahim's case as well, but that would require qualified medical professionals.

III. *Sleep Deprivation and Videotaped Confession.* Abdul Rahim states that he confessed to being an American and Israeli spy after being tortured. In the videotape, Abdul Rahim appears "extremely pale, underweight and under extreme stress."[13]

1. Abdul Rahim's videotaped confession is consistent with coerced confessions in similar circumstances. In particular, the interrogation approach resembles that of Chinese interrogators during the Korean War for US aviators. In February 1952, the Chinese revealed footage of American POWs freely confessing to use biological warfare in Korea with no apparent signs of torture that would cause such a confession. To get these confessions, interrogators subjected the prisoners to relay interrogation and sleep deprivation, in some cases lasting 85 days. Additionally, prisoners were isolated in cold huts and water-soaked holes, forced to stand for hours, doused with water in subzero temperatures, put before firing squads, trussed or suspended with ropes, put

---

[12] Kirstine Amris and Karen Prip, *Falanga Torture* (Copenhagen, Denmark: International Rehabilitation Council for Torture Victims, 2003).
[13] Statement of Material Facts (CV 05-1310 RJL) at 36.

before bright lights, threatened and beaten. In the end, 38 American aviators confessed in part or in full to false war crimes.

2. Similarly, Abdul Rahim states that he confessed after he was subjected to "loud noises, beatings, including with rifle butts, threats to kill and putting a gun to his head, starvation, extremes of temperature, untreated sickness, sleep deprivation and cigarette burns."[14] Additionally, he was subjected to water torture, suspension by the wrists, *falaka* and electrotorture. Many similar instances of forced confessions have been documented and studied, the most famous of which are the Stalinist show trials of the 1930s. In these cases, prisoners appeared to confess freely and denied being tortured.

3. Sleep deprivation, in particular, is associated with generating apparently freely given, false confessions. Researchers have long known that sleep deprivation generates major cognitive deficiencies similar to alcoholic inebriation, including heightened suggestibility and errors in judgment. They also know that repeating statements leads subjects to increase their perception of them being true. And subjects are more confident when experimenters repeat affirmative questions (Do you know John?) than non-affirmative questions (You haven't met, have you?). Under such circumstances, prisoners will confess to what has been suggested to them and repeat phrases they have learned. They are easily manipulated and eager to please.

4. Throughout the interview, Abdul Rahim's interviewer leads Abdul Rahim in his confession, repeating affirmative questions for Abdul Rahim to confirm. Examples of such questions are "In the UAE?" "This man Faisal Saud Al Qasimy, is from the Emirates?" "Did they promise you money?", all of which are affirmed by Abdul Rahim.[15] There also appears to be a second person in the room besides the interviewer. Abdul Rahim looks to this man who prompts him at various points to round off, complete, or add dimensions to his statement. This is particularly true toward the end of his statement.[16] Additionally, Abdul Rahim used "a number of phrases that are not part of his normal vocabulary, the vocabulary used at the school we both attended, or the vocabulary of our religious tradition."[17]

5. Sleep deprivation has physical as well as cognitive effects, rendering other tortures more excruciating. Experts agree that sleep deprivation is a basic physiological need state, similar to hunger and thirst and as necessary for survival. Additionally, sleep deprivation reduces a body's tolerance for musculoskeletal pain, causing deep aches first in the lower part of the body,

---

[14] Stephen Sady, Letter detailing reported torture received by Abdul Rahim Abdul Razak Al Janko (November 13, 2006), 1.
[15] Pet. Ex 114 at 22, 23.
[16] Pet. Ex 130.
[17] Pet. Ex, 104 at 6.

238 followed by similar pains in the upper body. Animal tests suggest that REM
239 sleep deprivation increases sensitivity to mechanical, thermal and noxious
240 electrical stimuli. Often sleep deprivation is found in combination with other
241 tortures, particular suspension and positional torture. Abdul Rahim also was
242 subjected to suspension and electrotorture as part of his torture regimen, and
243 in a sleep deprived condition, these tortures would have been that much more
244 painful.
245
246 **IV. *False Elements in Abdul Rahim's Videotaped Confession.*** "Abdul Rahim
247 states that his statement that he was an American and Israeli spy were false."[18]
248
249 1. One might think that confessing falsely is relatively easy to achieve under
250 torture. Certainly, some prisoners confess to avoid further torture, as well as to
251 reconcile their actual psychological condition with the story their torturers
252 wanted to hear. However, entirely fictitious confessions are notoriously hard
253 to achieve, even with torture. In reality, most coerced confessions have
254 certain typical characteristics and these characteristics are present in the
255 manner Abdul Rahim confessed.
256
257 2. Typically, coerced confessions mix truth with falsity. Torturers are more
258 successful in forcing false confessions if they get prisoners to weave fictions
259 into their own life stories than invent new life stories of treachery and
260 espionage. This was the conclusion of Lawrence Hinkle and Harold Wolff
261 who studied Soviet and Chinese false confessions. They were hired in 1953
262 by then CIA Director Allen Dulles, and their study is the definitive
263 government report on Communist techniques of interrogation.[19] Similarly,
264 Abdul Rahim confessed to being an American and Israeli spy. But his
265 confession was not entirely false. Rather it mixed truth with fiction. Abdul
266 Rahim used real events and people from his past in the UAE to embroider this
267 confession. As he proceeds to his journey to Afghanistan and leaves behind
268 the events with which he was familiar, he looks increasingly off camera at a
269 second person who prompts or approves his statements.
270
271 3. Moreover often in coerced confessions, prisoners use their confession to
272 signal that the confession was not freely given. Careful studies of Stalinist
273 prisoners showed that often prisoners made subtle compromises between
274 collaboration and resistance in their false confessions. They would pepper
275 their fantastic confessions with false information their interrogators *could not*
276 corroborate, including unlikely details, impossible claims, and subtle

---

[18] Statement of Material Facts (CV 05-1310 RJL) at 34.
[19] Lawrence Hinkle and Harold Wolff, "Communist Interrogation and Indoctrination of 'Enemies of the States'," *A.M.A. Archives of Neurology and Psychiatry* 76 (August 1956): 169. The classified version, *Communist Control Techniques*, (April 2, 1956) is available at the National Security Archives, George Washington University Library.

contradictions. "A defendant might consent to admit something he knew to be at sharp variance with facts that could be easily ascertained by any questioner."[20] In this way, the prisoners suggested that their confessions were nowhere near as freely given as their public appearance suggested.

4. Likewise, Abdul Rahim described his own life in implausible terms. He described the decadent life he led in the UAE, but in fact "Abdul Rahim did not live the decadent life described"[21] and the events he described would have been detectable in his highly supervised family life. Rather than invent names of fictional characters for his story of espionage, he tended to use names of schoolmates, people whose lives and movements could be easily ascertained by any questioner. Abdul Rahim's brothers immediately recognized the falsity of these claims.[22] Abdul Rahim's Afghan interrogators would have been unable to corroborate whether he was using fictitious names or real names and events (and so they could not easily determine whether he was in fact cooperating or not). It would have been less risky for Abdul Rahim to have invented something entirely fictitious. But the fact that he did not take the easier road suggests, like that of the Soviet prisoners, that he was resisting even as he was forced to collaborate.

**Conclusion.** I find Abdul Rahim's account of torture at the hands of the Taliban credible. He correctly describes short and long term sequelae of *falaka* torture on his own body. He correctly describes unusual details of unique electrotorture devices, details requiring exposure to these techniques in Afghan prisons. His accounts of torture and the combination of techniques used are consistent with other independent accounts. His videotaped confession is consistent with studies of other false confessions extracted under sleep deprivation combined with other physical tortures.

Sincerely yours,



Darius Rejali
Professor of Political Science
Reed College

Figure 1: Drawing of Magneto Torture from Afghanistan. From M.A. Dadfar, *The Impaired Mind* (Peshawar, Pakistan: Psychiatry Center for Afghan Refugees, 1988), facing page 19.

---

[20] Nathan Leites and Elsa Bernaut, *Ritual of Liquidation* (Glencoe, IL: The Free Press, 1954), 305.
[21] Statement of Material Facts (CV 05-1310 RJL) at 35.
[22] Pet. Ex 105 at 8, Pet. Ex 106 at 9.

317  Figure 1: Drawing of Magneto Torture from Afghanistan.  From M.A. Dadfar,
318  *The Impaired Mind* (Peshawar, Pakistan: Psychiatry Center for Afghan Refugees,
319  1988), facing page 19.



320

321    Figure 2: Traditional *Falaka* in an Iranian religious school. From Darius
322    Rejali, *Torture and Modernity* (Boulder, CO: Westview Press, 1994),
323    appendix of photographs.
324



325
326
327    Figure 3: Painting of Modern *Falaka* torture. From Kirstine Amris and
328    Karen Prip, *Falanga Torture* (Copenhagen, Denmark: International
329    Rehabilitation Council for Torture Victims, 2003), 2.
330



331