**Steven T. Wax, OSB #85012**
**Federal Public Defender**
steve_wax@fd.org
**Stephen R. Sady**
**Chief Deputy Federal Public Defender**
steve_sady@fd.org
**Patrick J. Ehlers**
**Assistant Federal Public Defender**
patrick_ehlers@fd.org
101 SW Main Street, Suite 1700
Portland, Oregon  97204
Tel:    503-326-2123
Fax:    503-326-5524

**Attorneys for Petitioner**

PREVIOUSLY FILED WITH CSO AND
CLEARED FOR PUBLIC FILING

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ABDUL RAHIM ABDUL RAZAK AL GINCO,**<br><br>                                Petitioner,<br>v.<br>**GEORGE W. BUSH, et al.,**<br><br>                                Respondents. | CV 05-1310-RJL<br><br>**DECLARATION OF STEPHEN R. SADY IN SUPPORT OF EMERGENCY MOTION FOR HEARING REGARDING STAY** |

I, Stephen R. Sady, being first duly sworn, hereby depose and say:

1.     I am one of the attorneys assigned to represent Abdul Rahim Abdul Razak Al Ginco, who is presently detained at the United Stated Naval Base at Guantánamo Bay, Cuba;

2. This Court assigned the Federal Public Defender for the District of Oregon to represent Abdul Rahim on April 11, 2006, and I entered a notice of appearance to act on his behalf on that date (Docket Sheet 11);

3. I am the Chief Deputy Federal Public Defender for the District of Oregon and have been employed by the Federal Public Defender's Office since April 1, 1981, during the course of which I have represented thousands of indigent defendants and habeas petitioners, including criminally charged aliens and aliens in indefinite detention by immigration authorities, in trial level, appellate, and habeas corpus proceedings;

4. From the outset of my representation of Abdul Rahim, I have been concerned regarding his psychological state because:

    a. Contemporaneous press accounts indicated that, for the almost two years prior to his imprisonment by Americans, he had been tortured and imprisoned by the Taliban;

    b. From his Combatant Status Review Tribunal transcript (Docket Sheet 37, Exhibit 107), he referred to his torture by the Taliban, he stated he spent much time in the "psych block," and his personal representative, "who happens to be a nurse," advised that Abdul Rahim was taking medications including Depakote, Zoloft, and Zyprexa, which were prescribed as treatment for a number of serious psychological maladies including Post-Traumatic Stress Disorder (Exhibit 107 at 7); and

      c.    From over ten years of representing aliens indefinitely detained by immigration authorities, I am aware that time spent in indefinite custody is particularly stressful.

5.    I have met with Abdul Rahim in May, September, and December 2006, during which Abdul Rahim confirmed the torture to which he was subjected by the Taliban, as reflected in the letters to Dr. J. David Kinzie and Professor Darius Rejali, which are based on cleared notes, attached to the Emergency Motion for Hearing Regarding Stay (Motion) as Exhibits Exhibit D and G.

6.    During the meetings, Abdul Rahim related that he is still being given psychotropic medications; he also provided information that, from my years of experience regarding forensic psychological issues, lead me to the lay opinion that, from his experience as a torture victim, Abdul Rahim suffers from Post-Traumatic Stress Disorder;

7.    In the previous briefing before this Court, I have presented the reasons that the stay order should be lifted for consideration of the summary judgment motion because continued detention constitutes irreparable harm (Docket Sheet 35 and 40);

8.    This declaration is to provide support for our request for a hearing and ruling on the stay forthwith based on the additional irreparable harm to Abdul Rahim given his psychological vulnerability and Post-Traumatic Stress Disorder from torture by the Taliban;

9.    I believe that during the almost two years before coming into American custody in January 2002, Abdul Rahim was subjected to extreme and brutal torture by the Taliban based on the following:

      a.    The exhibits submitted in support of the Motion for Summary Judgment establish that he falsely confessed to the Taliban that he was an American

spy, which would only occur as the result of coercion and which is documented from as early as May 2000 (Docket Sheet 37);

b. Abdul Rahim has consistently and credibly recounted to me the torture he endured as is set out in the letters to Dr. Kinzie and Professor Rejali, attached to the Motion as Exhibits D and G;

c. Professor Rejali, an internationally recognized expert in the sociology and politics of torture, has submitted an expert opinion that the descriptions of torture Abdul Rahim has provided me are credible and consistent with practices Abdul Rahim would have no way of knowing prior to his capture by the Taliban, as reflected in the documents attached to the Motion as Exhibits E and F;

d. The statements of former detainees Ayrat Vakhitov and Jamal Al-Harith both reflect Abdul Rahim's mental illness from apparent torture during captivity and corroborate that Abdul Rahim has been kept on a psychiatric wing of Guantánamo since shortly after his arrival (Docket Sheet 37, Exhibit 102, paragraph 18; Docket Sheet 39, Exhibit 131, paragraphs 9 and 11).

e. The Combatant Status Review Tribunal proceedings, submitted as Docket Sheet 37, Exhibit 107, reflect that Abdul Rahim was attended by a nurse who recited a number of psychotropic medications that have been prescribed for persons suffering from mental illness, including Post-Traumatic Stress Disorder.

10. During my most recent visit with Abdul Rahim, the notes of which were cleared on January 8, 2007, I became very concerned because his psychological condition seemed to be deteriorating substantially based on the following:

   a. On the morning of December 11, 2006, when I was scheduled to meet with Abdul Rahim, I was initially advised that he did not want to see me, even though he previously had written that he was eager for a visit;

   b. After I wrote him a note letting him know it was me who was visiting, Abdul Rahim wrote a letter stating that he wanted to meet with me;

   c. As a result of Abdul Rahim's letter, I was told that a visit would occur but would take some time to set up;

   d. After meeting with another client that morning but also being available in the camp in case Abdul Rahim was brought over, I was advised at about noon by members of the legal and medical staff that the meeting could not be set up until the afternoon and that Abdul Rahim would be in restraints, wearing a green smock intended to prevent self-injury, and that he had an abrasion on the side of his forehead from self-injury;

   e. From responses to my inquiries, it appeared that the medical staff did not consider Abdul Rahim to have been a Taliban torture victim, which led me to contact opposing counsel and obtain permission to provide information to the medical staff;

   f. When I attempted to meet with Abdul Rahim in the afternoon, I was told that he would not be able to meet with me because he was not medically approved

|   |   |
|---|---|
|   | for a visit and that he had hit his head again and opened a gash on his forehead, as reflected in the memo attached to the Motion as Exhibit A; |
| g. | My requests to speak with Abdul Rahim by telephone or to see him at the hospital or otherwise communicate with him were denied; |
| h. | Throughout December 12, 2006, I discussed with the legal representatives of the Joint Task Force my request to meet or to speak with Abdul Rahim, scheduled around other visits with detainees; I also was able to exchange letters with Abdul Rahim in which he continued to state that he wanted to meet with me; |
| i. | With the much-appreciated assistance of opposing counsel and Joint Task Force counsel, I was allowed to meet with Abdul Rahim for approximately 3.5 hours on December 13, 2006; |
| j. | During that time, Abdul Rahim was in restraints and without clothing other than a green smock and, although he was initially abashed to meet in such a state, we eventually were able to communicate effectively and in a manner that calmed him substantially; |
| k. | From our meeting, I believe Abdul Rahim is suffering intense psychological pain from his continued incarceration under the prevailing conditions at Guantanamo and that he is at serious risk for further physical injury. |
| l. | Abdul Rahim told me, "I want to see a judge and ask them to tell me what I have done against the United States, and I will tell them my story, word by |

word, and prove to them that I am not only innocent but also a victim of the war against terrorists."

11. Upon my return to the United States, I read the article in the New York Times (attached to the Motion as Exhibit H) in which the commander at Guantánamo stated that privileges were being taken away and that all prisoners were being treated as terrorists because "there are no medium security terrorists," which confirmed my concerns that Abdul Rahim's psychological vulnerability was being exacerbated by punitive measures and behavior modification approaches to his custody;

12. I also consulted with Dr. Kinzie, who is a internationally recognized expert in the treatment of torture victims (his qualifications are set out in Motion Exhibit C), and received the letter attached to the Motion as Exhibit B, opining that Abdul Rahim suffers from Post-Traumatic Stress Disorder and that the type of operant conditioning used to enforce discipline and obtain compliance, and irrationally punitive measures, were especially dangerous for Abdul Rahim;

13. On December 20, 2006, I provided the medical personnel at Guantanamo Bay with a summary letter, supported by evidentiary exhibits, regarding Abdul Rahim's torture by the Taliban as well as Dr. Kinzie's letter regarding treatment of torture victims in the hopes that this knowledge would ameliorate Abdul Rahim's treatment;

14. On January 9, 2007, I received my cleared notes from the Privilege Team regarding my December visit;

15. On January 23, 2007, I received the attached letter from Professor Rejali, whose expert qualifications are set forth in Motion Exhibit F, opining that, based on his expertise in the

techniques and sociology of torture, Abdul Rahim's accounts of Taliban torture are credible (Motion Exhibit E).

16.   I believe the Court should hear and rule on the stay motion forthwith because Abdul Rahim has endured and will continue to suffer imminent irreparable harm from the absence of a ruling that would either lead to the stay being lifted, which I believe should result in a favorable ruling on the merits, or a denial of the stay, which would permit Abdul Rahim to seek expedited review in the Court of Appeals for the District of Columbia, raising issues that are distinct from those encompassed in the cases currently pending in that court;

19.   I have conferred with Respondent's counsel, Andrew Warden, and he states that the Respondents oppose this motion.

Dated and signed this 29th day of January, 2007.

Stephen R. Sady
Chief Deputy Federal Public Defender

SUBSCRIBED AND SWORN to before me this 29th day of January, 2007.

Notary Public for Oregon
My Commission expires: 3·22·09

OFFICIAL SEAL
J LILLIE
NOTARY PUBLIC-OREGON
COMMISSION NO. 390238
MY COMMISSION EXPIRES MARCH 22, 2009

Page 8   DECLARATION OF STEPHEN R. SADY IN SUPPORT OF EMERGENCY MOTION FOR HEARING REGARDING STAY