PREVIOUSLY FILED WITH CSO AND
CLEARED FOR PUBLIC FILING

No. _____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

### ABDULRAHIM ABDUL RAZAK AL GINCO,

Prisoner, Guantánamo Bay Naval Station, Guantánamo Bay, Cuba,

Petitioner,

v.

### ROBERT M. GATES,

Secretary of Defense of the United States of America,

Respondent.

_____

## PETITION FOR IMMEDIATE RELEASE AND OTHER RELIEF
## UNDER THE DETAINEE TREATMENT ACT OF 2005

_____

Steven T. Wax
**Federal Public Defender**
Stephen R. Sady
**Chief Deputy Federal Public Defender**
Patrick J. Ehlers
**Assistant Federal Public Defender**
101 SW Main Street, Suite 1700
Portland, Oregon  97204
Telephone: (503) 326-2123
Facsimile:  (503) 326-5524

Attorneys for Petitioner

### Certificate As To Parties, Rulings, And Related Cases

**A.** **Parties And Amici:** The petitioner, Abdulrahim Abdul Razak Al Ginco, is an alien detained at the Naval Base at Guantánamo Bay, Cuba, in the custody of the respondent, Robert M. Gates, who is named in his official capacity as the Secretary of Defense of the United States of America.

**B.** **Ruling Under Review:** This case involves the Respondent's unlawful detention of the petitioner and the Combatant Status Review Tribunal proceedings that found the petitioner to be an enemy combatant.

**C.** **Related Case:** The petitioner has a habeas corpus case pending in the District Court, *Al Ginco v. Bush*, Civil No. 05-1310-RJL, and an interlocutory appeal regarding transfer pending this litigation in Court of Appeals No. 06-5191. On April 9, 2007, the petitioner filed a motion for a stay-and-abey order in the District Court; on April 4, 2007, he submitted a motion to sever the interlocutory appeal from other consolidated cases with this Court in anticipation of the filing of a motion to consolidate it with this action.

This case is one of many involving detention determinations by the Department of Defense regarding aliens at Guantánamo Bay. Although the petitioner is aware of several cases under the Detainee Treatment Act that have been filed in this Court, his petition raises unique factual issues as well as several legal issues that are not included in the other litigation. *See Paracha v. Gates et al.*, No. 06-1028 and No. 06-

1117; *Bismullah, et al., v. Gates, et al.*, No. 06-1197; *Parhat, et al., v. Gates, et al.*,

No. 06-1397; *Abdulzaher v. Gates, et al.*, No. 07-1031; and *Mahnut v. Gates, et al.*,

No. 07-1066.

_____

Steven T. Wax
Federal Public Defender

_____

Stephen R. Sady
Chief Deputy Federal Public Defender

_____

Patrick J. Ehlers
Assistant Federal Public Defender

# TABLE OF CONTENTS

**Page**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Statement of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      Nature Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      Course Of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      Custody Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.    When Abdul Rahim Arrived In Afghanistan, He Was A 22-Year-Old Syrian Kurd Student, With No History Of Political Or Religious Extremism, Who Had Left Home Over A Family Squabble . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    B.    Abdul Rahim Was In Afghanistan For Less Than A Month When He Was Taken Into Custody And Accused Of Being An American And Israeli Spy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    C.    The Taliban And Al Qaeda Subjected Abdul Rahim To Brutal Torture And Threats Of Death, Forced Him To Make False Videotaped Statements, And Incarcerated Him In Political Prisons For Almost Two Years . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

i

D.  American Bombing In Kandahar Led To The Liberation Of The Taliban Prison, After Which Abdul Rahim And Other Former Prisoners Sought Aid From The Red Cross And The United Nations In Returning To Their Home Countries . . . . . . . . . . . . . . . 21

E.  The American Military Took Abdul Rahim And Other Political Prisoners Of The Taliban Into Custody, First At The Kandahar Air Base, Then At Guantánamo Bay, Cuba, When He Offered To Provide Testimony Regarding Human Rights Violations . . . . . . . . 24

Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

I.  Where The Combatant Status Review Tribunal Considered And Relied Upon Videotapes Of Abdul Rahim That Are The Products Of Taliban Torture And Threats Of Death, The Enemy Combatant Determination Violated Article 15 Of The Convention Against Torture And, Therefore, The Detainee Treatment Act Because Either The Department Of Defense Standards And Procedures Incorporate Article 15, Or The Standards And Procedures Violate Article 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

II.  Where For Almost Two Years Prior To Being Taken Into United States Custody Abdul Rahim Suffered Imprisonment By The Taliban, The Temporal Nexus For Seizure Required By The Laws Of War And *Hamdan v. Rumsfeld*, 126 S.Ct. 2749 (2006), Compels Release Because Department Of Defense Standards And Procedures Either Incorporate Such A Requirement, Which Is Lacking In This Case, Or Violate The Laws And Constitution Of The United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

III.  Where Abdul Rahim Initially Approached United States Authorities Volunteering To Be A Witness To Human Rights Violations, The Enemy Combatant Designation Violated The Laws Of War And The Statutory And Constitutional Protections For Witnesses Because Either Witness Protections Are Incorporated Into Department Of Defense Standards And

Procedures, Or The Standards And Procedures Violate The Legal
Norms Requiring Some Degree Of Witness Protection . . . . . . . . . . 36

IV.   Where Abdul Rahim's Custody Followed His Torture And
Abusive Incarceration In Taliban Prisons, His Release Is
Required Because A Taliban Torture Victim And Political
Prisoner Does Not Meet Any Plausible Definition Of Enemy
Combatant, And Either The Department Of Defense Designation
As An Enemy Combatant Violated Its Own Standards And
Procedures, Or Those Standards And Procedures Violate The
Laws And Constitution Of The United States . . . . . . . . . . . . . . . . 39

V.   Where The Enemy Combatant Decision Was Made Without
Meaningful Notice, An Opportunity To Be Heard, And A Neutral
Decision-Maker, The Standards And Procedures Implemented By
The Department Of Defense Violated The Laws And Constitution
Of The United States, Especially Where, As Applied, The Record
Establishes Serious Prejudice From The Inadequate Procedural
Protections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

   A.   Abdul Rahim Received No Adequate Notice Of The
Charges, Allegations, And Evidence Upon Which His
Detention Was Based . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

   B.   There Was No Meaningful Opportunity To Be Heard Or
Present Evidence On Abdul Rahim's Behalf . . . . . . . . . . . . . 46

   C.   The CSRT's Failure To Provide For Representation By
Counsel Violated Due Process . . . . . . . . . . . . . . . . . . . . . . . 50

   D.   There Was No Neutral Decision-Maker . . . . . . . . . . . . . . . . . 53

   E.   The Recorder Process Rendered The Proceeding
Adversarial And Violated The CSRT Rules And Due
Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

iii

VI.   In The Alternative, If The Court Does Not Grant Full Relief
      Based On The Foregoing Claims, The Court Should Remand To
      The District Court For Full Habeas Corpus Review Or Conduct
      Such Proceedings Itself Because The Department Of Defense
      Lacked Initial Jurisdiction Over The Detainee . . . . . . . . . . . . . . . . 56

VII.  In The Alternative, If This Court Cannot Provide DTA Review
      Commensurate With Traditional Habeas Corpus And Does Not
      Grant Full Relief Based On The Foregoing Claims, The Court
      Should Remand For Prompt And Full Habeas Proceeding In The
      District Court Or Conduct Such Proceedings Itself Because The
      DTA And The MCA Violate The Suspension, Due Process, Equal
      Protection, Bill Of Attainder, And Ex Post Facto Clauses . . . . . . . 61

      A.   Construction Of The DTA In A Manner That Precludes
           Full Fact Development And Legal Review Would Render
           The Statute An Inadequate Substitute For Habeas Corpus
           And, Therefore, The MCA and DTA Would
           Unconstitutionally Suspend Or Eliminate The Writ Of
           Habeas Corpus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

      B.   Failure To Require The Equivalent Of Habeas Review
           Would Violate The Separation Of Powers Doctrine . . . . . . . 64

      C.   The Due Process Clause Requires Full Habeas Corpus
           Review Of Executive Detention . . . . . . . . . . . . . . . . . . . . . . 66

      D.   Elimination Of The Writ Of Habeas Corpus For Abdul
           Rahim Would Violate The Bill Of Attainder Clause Of The
           Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

      E.   Elimination Of The Writ Of Habeas Corpus For Abdul
           Rahim Would Violate The Equal Protection Clause . . . . . . . 69

      F.   Elimination of the Writ of Habeas Corpus Would Violate
           The Ex Post Facto Clause . . . . . . . . . . . . . . . . . . . . . . . . . . 72

G.    Elimination Of The Writ Of Habeas Corpus Would Violate Substantive Due Process ............................... 74

VIII.  Leave To Amend May Be Appropriate ...................... 75

Prayer for Relief .................................................. 76

v

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Application of Yamashita*,
    327 U.S. 1 (1946) ...................................................................... 57

*Armstrong v. Manzo*,
    380 U.S. 545 (1965) .................................................................. 53

*Baldwin v. Hale*,
    1 Wall. 223, 17 L. Ed. 531 (1864) ........................................... 53

*Barron v. Mayor of Baltimore*,
    32 U.S. (7 Pet.) 243 (1833) ...................................................... 67

*Battaglia v. General Motors Corp.*,
    169 F.2d 254 (2d Cir. 1948) ..................................................... 66

*Blackburn v. Alabama*,
    361 U.S. 199 (1960) .................................................................. 28

*Bolling v. Sharp*,
    347 U.S. 497 (1954) .................................................................. 70

*Boumediene v. Bush*,
    450 F. Supp. 2d 25 (D.D.C. 2006) ............................................. 9

*Boumediene v. Bush*,
    476 F.3d 981 (D.C. Cir. 2007), *cert denied*,
    2007 WL 957363 (Apr. 2, 2007) ..................................... 10, 61, 76

*Bousley v. United States*,
    523 U.S. 614 (1998) .................................................................. 73

*Brady v. Maryland*,
    373 U.S. 83 (1963) .................................................................... 49

*Bram v. United States*,
    168 U.S. 532 (1897) ................................................................. 28

*Church of the Lukumi Babalu Aye v. City of Hialeah*,
    508 U.S. 520 (1993) ................................................................. 71

*\*Clark v. Martinez*,
    543 U.S. 371 (2005) ............................................................ 12, 76

*Cleveland Board of Ed. v. Loudermill*,
    470 U.S. 532 (1985) ................................................................. 53

*Committee of U.S. Citizens Living in Nicaragua v. Reagan*,
    859 F.2d 929 (D.C. Cir. 1988) ................................................ 29

*Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.*,
    508 U.S. 602 (1993) ................................................................. 53

*County of Sacramento v. Lewis*,
    523 U.S. 833 (1998) ................................................................. 67

*\*Cummings v. Missouri*,
    71 U.S. 277 (1866) ................................................................. 69

*Duncan v. Kahanamoku*,
    327 U.S. 304 (1946) ................................................................. 65

*Filartinga v. Pena-Irala*,
    630 F.2d 876 (2nd Cir. 1980) ................................................ 29

*Foretich v. United States*,
    351 F.3d 1198 (D.C. Cir. 2003) .............................................. 69

*\*Foucha v. Louisiana*,
    504 U.S. 71 (1992) ................................................................. 43

*Fuentes v. Shevin,*
407 U.S. 67 (1972) ....................................................................... 53

*Gagnon v. Scarpelli,*
411 U.S. 778 (1973) ............................................................... 43, 52

*\*Hamdan v. Rumsfeld,*
126 S. Ct. 2749 (2006) ...................................... 4, 8, 33, 34, 37, 40, 56, 57, 59

*\*Hamdi v. Rumsfeld,*
542 U.S. 507 (2004) ...................................... 12, 34, 39, 40, 54, 56

*\*Harris v. Nelson,*
394 U.S. 286 (1969) ....................................................................... 12

*INS v. St. Cyr,*
533 U.S. 289 (2001) ....................................................................... 64

*Ingraham v. Wright,*
430 U.S. 651 (1977) ....................................................................... 68

*Jackson v. Denno,*
378 U.S. 368 (1964) ....................................................................... 28

*Khalid v. Bush,*
355 F. Supp. 2d 311 (D.D.C. 2005) ............................................. 57

*Kring v. Missouri,*
107 U.S. 221 (1883) ....................................................................... 67

*\*Lynce v. Mathis,*
519 U.S. 433 (1997) ................................................................ 73, 74

*Marbury v. Madison,*
5 U.S. (1 Cranch) 137 (1803) ...................................................... 65

*\*Mathews v. Eldridge,*
424 U.S. 319 (1976) ............................................................... 12, 43

*In re McDonald*,
    9 Am. Law Reg. 661, 16 F. Cas. 17 (D. Mo. 1861) ..................................... 67

*Middendorf v. Henry*,
    425 U.S. 25 (1976) ........................................................................... 52

*Ex parte Milligan*,
    71 U.S. 2 (1871) ............................................................................. 60

*Monongahela Navigation Co. v. United States*,
    148 U.S. 312 (1893) ......................................................................... 67

*Moore v. Dempsey*,
    261 U.S. 86 (1923) ........................................................................... 62

*Morrissey v. Brewer*,
    408 U.S. 471 (1972) .................................................................. 52, 54

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950) ......................................................................... 53

*Murray v. The Hoboken Land And Improvement Company*,
    59 U.S. 272 (1855) ........................................................................... 68

*Plyler v. Doe*,
    457 U.S. 202 (1982) ......................................................................... 71

*In re Quarles*,
    158 U.S. 532 (1885) ......................................................................... 38

*\*Rasul v. Bush*,
    542 U.S. 466 (2004) .......................................... 42, 51, 52, 70, 73

*Rivers v. Roadway Express, Inc.*,
    511 U.S. 298 (1994) ......................................................................... 73

*Romer v. Evans*,
    517 U.S. 620 (1996) ......................................................................... 72

ix

*Siderman de Blake v. Argentina,*
    965 F.2d 699 (9th Cir. 1992) ...................................................................... 29

*Stogner v. California,*
    539 U.S. 607 (2003) ................................................................................... 74

*Tennessee v. Lane,*
    541 U.S. 509 (2004) ................................................................................... 72

*United States Department of Agriculture v. Moreno,*
    413 U.S. 528 (1973) ................................................................................... 72

*United States v. Brown,*
    381 U.S. 437 (1965) ................................................................................... 69

*United States v. Hamilton,*
    3 U.S. (3 Dall.) 17 (1795) .......................................................................... 63

*United States v. Lovett,*
    328 U.S. 303 (1946) ................................................................................... 69

*Wardius v. Oregon,*
    412 U.S. 470 (1973) ................................................................................... 55

*Watkins v. Sowders,*
    449 U.S. 341 (1981) ................................................................................... 28

*Wolff v. McDonnell,*
    418 U.S. 539 (1974) ................................................................................... 43

*Ex parte Yerger,*
    75 U.S. 85 (1868) ....................................................................................... 64

*Yick Wo v. Hopkins,*
    118 U.S. 356 (1886) ................................................................................... 71

x

# DOCKETED CASES

*Al Ginco et al. v. Bush*,
　　No. 06-5191 ................................................................................. 8

*Al Ginco v. Bush*,
　　Civil No. 05-1310-RJL ............................................................... 2, 6

*Bismullah, et al., v. Gates, et al.*,
　　No. 06-1197 ................................................................................. 3

*Mahnut v. Gates, et al.*,
　　No. 07-1066 ................................................................................. 3

*Paracha v. Gates et al.*,
　　No. 06-1028 and No. 06- 1117 ................................................... 2

*Parhat, et al., v. Gates, et al.*,
　　No. 06-1397 ................................................................................. 3

# FEDERAL STATUTES

8 U.S.C. § 1101(a)(15) ...................................................................... 38

8 U.S.C. § 1231(a)(6) (1994) ........................................................... 75

8 U.S.C. § 1531 *et seq* ..................................................................... 44

10 U.S.C. § 948r(b) ........................................................................... 29

18 U.S.C. §§ 2340-2340B ................................................................ 36

18 U.S.C. § 2340A(a) ....................................................................... 36

18 U.S.C. § 3744 ............................................................................... 38

28 U.S.C. § 2241 ............................................... 3, 51, 57, 58, 70, 71, 73

28 U.S.C. § 2243 ................................................................. 3, 11, 52, 74

Detainee Treatment Act of 2005, Pub. L. No. 109-148, §§1001-06,
119 Stat. 2680, 2739-44 (Dec. 30, 2005) ................................................. 2

Foreign Relations Authorization Act, Pub. L. No. 103-236 § 506,
108 Stat. 382, 463-64 (1994) ................................................. 36

Military Commissions Act of 2006, Pub. L. No. 109-366,
120 Stat. 2600 (2006) ................................................. 9

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, §§ 1-3,
106 Stat. 73 (1992) ................................................. 36

## MISCELLANEOUS

John McCain, Faith of My Fathers (Perennial 2000) ................................ 31

Jonathan L. Hafetz, *The Untold Story Of Noncriminal Habeas Corpus
And The 1996 Immigration Acts,* 107 Yale L.J. 2509 (1998) ................................ 62

*William Winthrop, Military Law And Precedents, (rev. 2d ed. 1920) ................ 33

David Cole, *Jurisdiction and Liberty: Habeas Corpus and Due Process
As Limits On* Congress' Control Of Federal Jurisdiction,
86 Colo. L.J. 2481 (1998) ................................................. 65

No. _____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

### ABDULRAHIM ABDUL RAZAK AL GINCO,

Prisoner, Guantánamo Bay Naval Station, Guantánamo Bay, Cuba,

Petitioner,

v.

### ROBERT M. GATES,

Secretary of Defense of the United States of America,

Respondent.

---

## PETITION FOR IMMEDIATE RELEASE AND OTHER RELIEF
## UNDER THE DETAINEE TREATMENT ACT OF 2005

---

The petitioner, Abdulrahim Abdul Razak Al Ginco, through the attorneys who are assigned to represent him by the United States District Court for the District of Columbia on a Petition for a Writ of Habeas Corpus involving the same matter, hereby petitions this Court, pursuant to the Detainee Treatment Act of 2005, for an Order requiring his immediate release from imprisonment and such other relief as this Court deems just and proper.

1

## STATEMENT OF JURISDICTION

Jurisdiction is conferred on this Court to consider the claim of Guantánamo detainee Abdulrahim Abdul Razak Al Ginco,[1] who asserts he is being held in violation of law, by the Detainee Treatment Act of 2005, Pub. L. No. 109-148, §§ 1001-06, 119 Stat. 2680, 2739-44 (Dec. 30, 2005) (DTA). The petitioner has a claim under § 1005(e)(2)(B) because he is a Syrian Kurd for whom a Combatant Status Review Tribunal (CSRT) has been conducted who is being held prisoner at the Naval Base at Guantánamo Bay in the custody of the Respondent. Section 1005(e)(2)(C) of the DTA defines the scope of review as follows:

> (C) SCOPE OF REVIEW.–The jurisdiction of the United States Court of Appeals for the District of Columbia Circuit on any claims with respect to an alien under this paragraph shall be limited to the consideration of –
>
> (i) whether the status determination of the Combatant Status Review Tribunal with regard to such alien was consistent with the standards and procedures specified by the Secretary of Defense for Combatant Status Review Tribunals (including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence and allowing a rebuttable of presumption in favor of the Government's evidence); and
>
> (ii) to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to

---

[1] Abdul Rahim prefers the English spelling "Janko" rather than "Ginco." To avoid confusion, he will be referred to as Abdul Rahim in these pleadings.

make the determination is consistent with the Constitution and laws of
the United States.

To implement remedies for violations of the detainee's rights, the petitioner also

invokes the Court's authority to provide declaratory relief under 28 U.S.C. § 2201,

and its equitable power coextensive with the authority to dispose of the matter as law

and justice require pursuant to 28 U.S.C. § 2243.

In the alternative and in addition, the petitioner invokes this Court's authority

to provide swift and impartial habeas corpus relief under 28 U.S.C. §§ 2241 and

2242, as well as the Court's original jurisdiction under 28 U.S.C. §§ 1331, 1350,

2201, and 2202, under the Administrative Procedure Act, and under Articles I and II

of the Constitution, as well as the Fifth, Sixth, and Eighth Amendments. The Court's

authority is also invoked under the All Writs Act to issue all writs necessary or

appropriate in aid of its jurisdiction under 28 U.S.C. § 1651.

3

# CLAIMS FOR RELIEF

I.  Where The Combatant Status Review Tribunal Considered And Relied Upon Videotapes Of Abdul Rahim That Are The Products Of Taliban Torture And Threats Of Death, The Enemy Combatant Determination Violated Article 15 Of The Convention Against Torture And, Therefore, The Detainee Treatment Act Because Either

   • The Department Of Defense Standards And Procedures Incorporate Article 15, Or

   • The Standards And Procedures Violate Article 15.

II. Where For Almost Two Years Prior To Being Taken Into United States Custody Abdul Rahim Suffered Imprisonment By The Taliban, The Temporal Nexus For Seizure Required By The Laws Of War And *Hamdan v. Rumsfeld*, 126 S.Ct. 2749 (2006), Compels Release Because Department Of Defense Standards And Procedures Either

   • Incorporate Such A Requirement, Which Is Lacking In This Case, Or

   • Violate The Laws And Constitution Of The United States.

III. Where Abdul Rahim Initially Approached United States Authorities Volunteering To Be A Witness To Human Rights Violations, The Enemy Combatant Designation Violated The Laws Of War And The Statutory And Constitutional Protections For Witnesses Because Either

   • Witness Protections Are Incorporated Into Department Of Defense Standards And Procedures, Or

   • The Standards And Procedures Violate The Legal Norms Requiring Some Degree Of Witness Protection.

4

IV.   Where Abdul Rahim's Custody Followed His Torture And Abusive
      Incarceration In Taliban Prisons, His Release Is Required Because A Taliban
      Torture Victim And Political Prisoner Does Not Meet Any Plausible Definition
      Of Enemy Combatant, And Either

      •   The Department Of Defense Designation As An Enemy Combatant
          Violated Its Own Standards And Procedures, Or

      •   Those Standards And Procedures Violate The Laws And Constitution
          Of The United States.

V.    Where The Enemy Combatant Decision Was Made Without Meaningful
      Notice, An Opportunity To Be Heard, And A Neutral Decision-Maker, The
      Standards And Procedures Implemented By The Department Of Defense
      Violated The Laws And Constitution Of The United States, Especially Where,
      As Applied, The Record Establishes Serious Prejudice From The Inadequate
      Procedural Protections.

VI.   In The Alternative, If The Court Does Not Grant Full Relief Based On The
      Foregoing Claims, The Court Should Remand To The District Court For Full
      Habeas Corpus Review Because The Department Of Defense Lacked Initial
      Jurisdiction Over The Detainee.

VII.  In The Alternative, If This Court Cannot Provide DTA Review Commensurate
      With Traditional Habeas Corpus And Does Not Grant Full Relief Based On
      The Foregoing Claims, The Court Should Remand For Prompt And Full
      Habeas Proceeding In The District Court Because The DTA And The MCA
      Violate The Suspension, Due Process, Equal Protection, Bill Of Attainder, And
      *Ex Post Facto* Clauses.

VIII. Leave To Amend May Be Appropriate.

5

## STATEMENT OF THE CASE

**Nature Of The Case**

This is the direct request for relief from custody by Abdul Rahim Abdul Razak Al Ginco, a former Taliban torture victim and political prisoner, who has been in United States custody since January 2002 and is presently held at the Naval Base in Guantánamo Bay, Cuba. A parallel habeas corpus proceeding has been stayed in the District Court since October 24, 2005. *Al Ginco v. Bush*, Civil No. 05-1310-RJL. In these proceedings, Abdul Rahim seeks this Court's grant of relief because he has been unlawfully detained for more than five years and, in the Combatant Status Review Tribunal (CSRT), as well as in the Administrative Review Board (ARB), the Respondent relied on the products of Taliban torture and otherwise violated the standards and procedures for CSRTs and the laws and Constitution of the United States. Abdul Rahim requests expedited consideration because the petitioner is in psychological distress from being tortured for almost two years by the Taliban and from his treatment at Guantánamo by personnel who have failed to recognize and to adequately treat the infirmities resulting from his abuse at the hands of this Country's enemies.

6

**Course Of Proceedings**

On June 30, 2005, Abdul Rahim Abdul Razak Al Ginco submitted a *pro se*

document in the District Court for the District of Columbia stating that there was no

basis for him to be held as an enemy combatant, which the District Court deemed a

petition for habeas corpus (A-2).[2]  Abdul Rahim stated he was jailed by Al Qaeda and

Taliban forces for two years before the events of September 11, as the Red Cross

could corroborate, and he "was accused of being a spy working for the United States

of America."  Abdul Rahim further alleged that he did not "pose any threat to the

United States and its allies and the proof is the accusation of Al Qaeda and Taliban

to me stating I was an American spy and not only that but also that I cooperated with

the interrogators for the past three years up to the present time, and I am requesting

from the interrogators to make a statement of that."  Without filing a Return, the

Respondent's predecessor filed a motion for a stay on July 18, 2005 (A-4).

On August 2, 2005, Abdul Rahim, filed a supplemental petition for writ of

habeas corpus stating the following:

> . . . I am and was a victim of Al Qaeda and the Taliban in the past.  I
> have spent two years in their prison that so-called Sareezah Prison in
> Qandahar, Afghanistan.   Then the American forces appeared and
> apprehended me; from prison they brought me to here, hence the ICRC

---

[2] "A-" refers to the Appendix filed contemporaneously with this document
followed by a page number.

7

requested from the American forces to release us. The American forces made promises that they were going to release us three days later. However, they have gone back on their promise and since those three days, here we are approaching the fourth year. How can that be? I was informed that it is my right to object in the American courts. Therefore, I say with all pride that I am not a threat to the U.S.A. or to any of its allies. I was a university student and I am wholly prepared to cooperate with the American government. This is in addition that I was cooperative and I have been for a period of more than three years. Thus, what do the American forces want with me?

(A-15). On October 14, 2005, the Court appointed counsel to represent Abdul Rahim, but no appearance was entered pursuant to that order. The Court entered a protective order and stayed proceedings on October 24, 2005 (A-19).

On April 11, 2006, present counsel entered a notice of appearance pursuant to the Court's amendment of the appointment order.[3] On May 2, 2006, out of concern regarding Syria's human rights record, counsel filed an anti-rendition motion, requiring either a court order or notice before release of Abdul Rahim (A-21). After briefing, the District Court denied this motion on May 30, 2006 (A-23, 82). Abdul Rahim filed an interlocutory appeal regarding that issue on June 22, 2006, which is currently pending before this Court in *Al Ginco et al. v. Bush*, No. 06-5191 (A-83).

On June 29, 2006, the Supreme Court entered its decision in *Hamdan v. Rumsfeld*, 126 S.Ct. 2749 (2006). On July 7, 2006, the Respondent's predecessor

---

[3] The dates for documents not included in the Appendix are from the District Court's docket sheet (A-529).

filed a motion for a filter team to review previously seized attorney-client material. After full briefing by the parties and oral argument, the District Court denied the motion on August 28, 2006, in an opinion reported at *Boumediene v. Bush*, 450 F.Supp.2d 25 (D.D.C. 2006) (A-85).

On September 21, 2006, Abdul Rahim filed motions to lift the stay and for summary judgment based on a statement of material facts establishing that the Respondent's predecessor lacked jurisdiction over him and that he was innocent of the enemy combatant designation (A-99-355). On October 18, 2006, the Respondent filed a notice of the enactment of the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (2006), to which Abdul Rahim replied on November 8, 2006.

On January 25, 2007, counsel filed an emergency motion for a hearing on the stay because Abdul Rahim's psychological state was seriously deteriorating (A-356). The motion was supported by an affidavit and exhibits establishing that medical personnel were apparently not treating Abdul Rahim as the verified victim of Taliban torture that he is and that his treatment was aggravating rather than ameliorating the serious conditions suffered by persons with torture-induced mental health problems (A-364-435). On February 7, 2007, counsel submitted a second affidavit documenting a suicide attempt and continued extreme psychological distress (A-435-445).

9

The Respondent opposed the request for a hearing, to which Abdul Rahim replied. On February 20, 2007, this Court issued its opinion in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007). On February 21, 2007, the District Court entered a minute order denying the emergency motion for a hearing (A-446).

On March 6, 2007, this Court issued an order in the interlocutory appeal granting a motion to consolidate and, in light of the *Boumediene* decision, directed the parties to file motions to govern further proceedings by April 6, 2007. Abdul Rahim has filed a motion to sever the interlocutory appeal. On April 2, 2007, the Supreme Court denied the petition for certiorari in *Boumediene v. Bush*, with a statement by Justice Stevens and Justice Kennedy that Supreme Court review was premature before exhaustion of available remedies. 2007 WL 957363 (U.S. Apr. 2, 2007). On April 9, 2007, Abdul Rahim filed in the District Court a motion to stay that case and hold it in abeyance pending exhaustion of DTA remedies in this Court.

**Custody Status**

The Taliban arrested Abdul Rahim in late 1999 or early 2000, and he remained in its custody until December 2001, when the Taliban abandoned Kandahar, Afghanistan. He remained on the grounds of the prison as a protected person attempting to obtain help from the Red Cross and the United Nations to return home until late January 2002, at which time he was taken into United States custody at the

Kandahar prison, then transported to the Kandahar Air Base. Over a month later, Abdul Rahim was transported to the Naval Station at Guantánamo Bay, Cuba, where he has remained ever since. He has been in continuous custody of the United States for over five years – over seven years of total custody of the Islamic Republic of Afghanistan and the United States of America.

## STATEMENT OF FACTS

The following facts are derived from Abdul Rahim's sworn CSRT and ARB testimony, sworn statements of witnesses, contemporaneous public documents, and reports of expert witnesses on torture practices and the psychological maladies that result from torture.[4] Each statement is supported by citation to documents provided in the Appendix.[5] The Court should rule on the basis of this statement of facts unless the Respondent supplies specific and direct evidence controverting a material fact. To the extent the Court determines that a fact has been adequately controverted, the Court should convene an evidentiary hearing or remand the matter to the District

---

[4] Abdul Rahim still has not received a Return in the habeas corpus proceeding. *See* 28 U.S.C. § 2243 (requiring the filing of a return within three days from the issuance of an order to show cause, which shall issue "forthwith" after the habeas petition is filed).

[5] The CSRT and ARB material in the Appendix is from records publicly released by the Department of Defense in response to a Freedom of Information Act lawsuit filed by the Associated Press (A-211, 226).

Court for a full hearing commensurate with traditional habeas corpus and due process. *Harris v. Nelson*, 394 U.S. 286, 298 (1969); *Mathews v. Eldridge*, 424 U.S. 319, 333-35 (1976); *see Hamdi v. Rumsfeld*, 542 U.S. 507, 528-34 (2004) (applying *Mathews*). The DTA, which is silent or ambiguous regarding the procedures in this Court, must be construed under the Doctrine of Constitutional Avoidance to provide prompt review and full habeas corpus fact-development procedures. *See Clark v. Martinez*, 543 U.S. 371 (2005) (construing statute to avoid constitutional doubt regarding indefinite detention of inadmissible aliens).[6]

In the alternative, the Court should appoint a special master pursuant to Rule 48 of the Federal Rules of Appellate Procedure. The rule states, "A court of appeals may appoint a special master to hold hearings, if necessary, and to recommend factual findings and disposition in matters ancillary to proceedings in the court." Again, the special master's authority must be commensurate with normal habeas procedures. In either event, if facts are adequately controverted, the Court should order that discovery and hearing be completed without delay due to the urgency of this matter.

---

[6] Any interpretation of the DTA to provide less than full habeas corpus procedural protections would violate numerous clauses of the Constitution. *Infra* at 62-76.

**A.**     **When Abdul Rahim Arrived In Afghanistan, He Was A 22-Year-Old Syrian Kurd Student, With No History Of Political Or Religious Extremism, Who Had Left Home Over A Family Squabble.**

1.     Abdul Rahim is a Syrian Kurd born on June 24, 1978, in northwest Syria (A-143, 234).

2.     Abdul Rahim's father is a teacher of Islamic education, and Abdul Rahim has ten brothers and sisters (A-153-54).

3.     Abdul Rahim lived in Syria attending public school until the age of 13, when the family moved to the United Arab Emirates (A-154, 233).

4.     Abdul Rahim's adult brothers are teachers and businessmen (A-168, 178, 190).

5.     In the United Arab Emirates, Abdul Rahim continued attending school up to over two years of post-high school education (A-154, 215, 233).

6.     From childhood, Abdul Rahim had medical issues regarding a seizure disorder and, as a consequence, took medications prescribed by physicians and received special care from his family (A-154, 215, 233).

7.     Abdul Rahim attended school and lived with his two brothers, Adnan and Abdul Haleem, in the emirate of Ras El Khaimah, which is north of Dubai and Ajman, where the rest of the family was living (A-154, 169, 179, 190, 233).

13

8.    Abdul Rahim maintained close contact with his family and engaged in no misbehavior beyond the normal (A-154-55, 168, 178, 190, 234).

9.    Abdul Rahim had no affiliation or beliefs regarding extreme politics or religion (A-154-55, 168, 178, 190, 231, 239, 240).

10.    Abdul Rahim had friends and associates of all backgrounds, as is not uncommon in the blended society of the United Arab Emirates (A-154-55,[7] 213-14, 231, 240).

11.    A family argument led to his sudden departure from the United Arab Emirates in either December 1999 or January 2000 (A-155, 179, 191, 215).

12.    Abdul Rahim borrowed money – 400 to 500 dirhams – from outside the family for expenses related to a school trip (A-155, 169, 179, 190-91, 219, 233, 237, 238).

13.    When his brother Haleem insisted that his strict father be told that Abdul Rahim borrowed money outside the family, Abdul Rahim ran away from home (A-155, 169, 190-91, 215, 230, 237).

---

[7] "Abdul Rahim socialized with people of all backgrounds and showed a kind heart to all the communities in the United Arab Emirates, which includes a blend of different religious sects such as Hindus, Christians, Muslims, non-Muslims, and the like.  Abdul Rahim dealt with all as his brothers."

14.    The issue was not the relatively small amount of money involved but the honor of the family, which was sullied by the suggestion that the family would not or could not take care of Abdul Rahim's financial needs (A-155, 169, 179, 191, 215, 218, 219, 237, 238).

15.    Abdul Rahim decided to leave the United Arab Emirates in the aftermath of the quarrel regarding money that he feared would anger his father (A-179, 190-91, 218, 228).

16.    Abdul Rahim's family was aware of the incident leading to Abdul Rahim's sudden departure and confirm the details (A-155, 169, 179-80, 190-91).

17.    Abdul Rahim's father had control of Abdul Rahim's passport, as he had for all his sons, so Abdul Rahim did not have travel documents (A-155, 169, 180, 219-20.

18.    Because Abdul Rahim wanted to go Europe or Canada, he contacted several embassies and a United Nations office in Abu Dhabi seeking assistance (A-215, 219, 220, 228, 233, 235).

19.    After his efforts failed to produce a way out of the country, Abdul Rahim heard from a college friend connected to the Afghan embassy that, without a passport, he could be deported to Afghanistan and, as a refugee there, travel to Europe through humanitarian organizations (A-215, 219, 232).

15

20.     After a time looking for Abdul Rahim and hoping he would return, Abdul Rahim's father contacted the Ajman police on February 6, 2000, and filed the equivalent of a missing person report, a copy of which he retained, and turned Abdul Rahim's passport in to the Ajman police at the same time (A-155,[8] 170, 219-20, 232).

21.     Abdul Rahim's brother, Abdul Salam, obtained a copy of the original passport on September 6, 2006; the passport itself remains in the possession of the Ajman police (A-170[9]).

### B.     Abdul Rahim Was In Afghanistan For Less Than A Month When He Was Taken Into Custody And Accused Of Being An American And Israeli Spy.

22.     Upon arriving in Afghanistan in January 2000, Abdul Rahim's plan to seek passage to Europe was thwarted when he was conscripted by the Taliban militia (A-215-16, 232).

---

[8] The police report is attached to Abdul Razzak Mustafa Al Janko's declaration (A-158).

[9] The copy of the passport is attached to Abdul Salam's declaration (A-196-204).

16

23.    When Abdul Rahim explained his situation through an interpreter, the Taliban did not accept his plan and instead insisted he go to a training camp (A-215-16, 233[10]).

24.    Abdul Rahim repeatedly told the Taliban he did not want to go and would not go to the camp; the Taliban insisted he go to the camp near Kabul, and "they took me to the camp by force" (A-216,[11] 233).

25.    While Abdul Rahim was at the training facility, he was treated with suspicion and given low level jobs such as hauling water, cutting wood, and cleaning small arms (A-229, 236).

26.    After eighteen days, Abdul Rahim attempted to leave the camp, advising the Taliban that he wanted to return home (A-212, 228, 229, 235).

27.    When Abdul Rahim stated he wanted to leave, the Taliban took him into custody and accused him of spying for the United States and Israel (A-229, 232, 235).

---

[10] "I explained to them that I ran away from home and I wanted to live there for six months to a year in a simple life and to gain asylum from the United Nations. The Mujahaddin said I did not speak the language so I needed an interpreter. The interpreter asked me who sent me. I tried to explain to them that no one sent me I just ran away from my parents. They told me someone sent me because any Arab who comes to Afghanistan should be under supervision."

[11] "If I don't go to that camp, they can do whatever they want to me, kill me; I'm already scared that they are going to kill me."

17

28.    The spy accusation stemmed from Abdul Rahim's desire to go home, his ability to speak some English, and the arrest of another person as a spy three months earlier (A-220, 294).

C.    **The Taliban And Al Qaeda Subjected Abdul Rahim To Brutal Torture And Threats Of Death, Forced Him To Make False Videotaped Statements, And Incarcerated Him In Political Prisons For Almost Two Years.**

29.    First in Kabul, and later in Kandahar, the Taliban, as well as Al Qaeda officials, subjected Abdul Rahim to torture and threats of death during vicious interrogation sessions (A-216, 229, 235).

30.    As a result of the torture and threats starting in January 2000, Abdul Rahim falsely confessed to being a spy for the United States and Israel, confessions which were videotaped by his captors (A-235, 299).

31.    In May 2000, the Taliban, through the Taliban Minister of Foreign Affairs and Minister of Information, publicly announced Abdul Rahim's arrest for spying for the United States and Israel, and that he had confessed under interrogation, implicating others (A-243-45, 247, 249-50, 252-53, 266, 297-98).

32.    At around the same time, Abu Dhabi television broadcasted an interview of Abdul Rahim in which he confessed to being an American and Israeli spy (A-156, 170, 180, 189, 220).

18

33.    In July 2000, the Taliban published a print version of the Abu Dhabi television interview in the Taliban's magazine, Islamic Caliphate (A-255).

34.    Abdul Rahim's statements that he was an American and Israeli spy were false and the result of torture and threats of death (A-171-72, 180-81, 191, 213, 229).

35.    Most of the other statements in the videotape were the false results of torture and threats of death: Abdul Rahim did not live the decadent life described; the names of most individuals were thought up on the spot, including schoolmates' names; he did not attend Hanifa but had been at the training camp; and phrases Abdul Rahim mouthed were foreign to his own background (A-156, 170, 181, 191, 235[12]).

36.    Abdul Rahim appears in the videotape to be extremely pale, underweight, and under extreme stress (A-170, 181, 191).

37.    Al-Qaeda members tortured Abdul Rahim until he admitted he was a spy and subjected him to severe torture for about three months (A-213,[13] 235).

38.    The torture inflicted upon Abdul Rahim included severe beatings, electric shock, being hung from the ceiling, water torture, striking the bottom of his

---

[12] Abu Dhabi television asserted in a post-interview notation that the names Abdul Rahim provided appeared to be fictitious.

[13] "They told me to just say yes, so I told them I would if they would not touch me again. I had no choice but to say yes, they turned my life to hell and tortured me for three months."

19

feet with clubs, striking his hand with the butt of a gun, and sleep deprivation (A-147, 213, 216, 229,[14] 352, 416-17).

39.    Professor Darius Rajali, an international expert on state torture, found that Abdul Rahim's account of his torture by the Taliban and al Qaeda was credible because Abdul Rahim correctly described methods of torture unique to Afghanistan, and the video-taped confession is consistent with false confessions extracted after sleep deprivation and physical torture (A-395-404).

40.    Abdul Rahim's torture took place under the supervision and participation of Al Qaeda officials, including Mohammed Atef and Sayf Al-Adl (A-155, 319).

41.    Abdul Rahim's account of being tortured while in Taliban custody is similar to the accounts of torture by Saadiq Turkestani, Ayrat Vhakitov, Abdul Hakeem Bukhary, and Arkan Mohammed Ghafil Al Karim while they were in Taliban custody (A-154, 270-71, 281, 288-89, 292, 300, 319).

42.    After three months of torture, the Taliban transferred Abdul Rahim to a political prison in Kandahar (A-213, 216, 217, 239).

43.    Abdul Rahim believed he was serving a 25-year prison sentence on the false accusation of being a spy (A213, 230-31).

---

[14] "They took me to Kabul again and then to Kandahar. There they started beating and torturing me. They used electric shock on me to get information from me. They started to torture me a lot. I lost the use of my right hand because of that."

44.    The political prison where Abdul Rahim confined also housed between 1,400 and 2,500 other political prisoners, mostly Afghans from the Northern Alliance (A-273, 303, 309, 316).

45.    The conditions in the Taliban prison were terrible: one piece of bread to eat all day; overcrowding; filthy living conditions; an abundance of rats and insects; poor medical care; and rampant disease (A-146, 216, 273, 304).

46.    Over one hundred Taliban prisoners died in the Kandahar prison (A-146-392).

47.    The International Committee of the Red Cross visited Abdul Rahim while he was in the Taliban prison (A-147, 330).

48.    Abdul Rahim remained in the prison, after the initial three months of torture, between approximately May 2000 to January 2002 (A-214, 309, 313).

**D.    American Bombing In Kandahar Led To The Liberation Of The Taliban Prison, After Which Abdul Rahim And Other Former Prisoners Sought Aid From The Red Cross And The United Nations In Returning To Their Home Countries.**

49.    On or about December 18, 2001, the Taliban abandoned the prison in Kandahar due to American bombing, and the new Afghan government took over (A-147, 239, 273, 303, 306, 309, 352).

50.     Almost all the political prisoners left the prison, eventually leaving behind Abdul Rahim; Jamal Al-Harith from Great Britain, Sadeeq Turkestani, a Uighur from Saudi Arabia; Abdul Hakeem Al-Bukhary from Saudi Arabia; and Ayrat Vakhitov from Russia (the Kandahar 5) (A-147, 217, 223, 239, 275, 284-85, 309, 313, 316, 320, 352).

51.     The Kandahar 5 remained as guests in the juvenile wing of the prison because the new warden warned them that local Afghans might be hostile to foreigners or might sell them to the United States for a $5,000.00 bounty (A-148, 307, 310, 324).

52.     Between mid-December 2001, and January 24, 2002, Abdul Rahim and others of the Kandahar 5 visited offices of the Red Cross and the United Nations, seeking assistance in returning to their home countries (A-148, 307, 309, 325, 352-53).

53.     Between mid-December 2001 and January 24, 2002, Abdul Rahim and others of the Kandahar 5 spoke to numerous journalists regarding their treatment as prisoners of the Taliban (A-148, 303, 307, 310, 313-14,[15] 316,[16] 319, 324).

---

[15] "The marks of maltreatment are visible."

[16] "All say they were captured and accused of spying by the Taliban and tortured to make them confess."

22

54.    Abdul Rahim stated that he had been tortured by Mohammed Atef and other Al Qaeda officials and initiated contact with United States authorities in order to testify regarding the human rights violations committed against him (A-216,[17] 239,[18] 320-21,[19] 328[20]).

55.    The Kandahar 5, as well as the new warden of the Kandahar prison, told journalists they had been the victims of Taliban torture while in custody in the Taliban prison (A-148, 275, 309, 317).

56.    On or about January 22, 2002, two Americans, one in uniform and the other in civilian clothes, visited the Kandahar 5 at the prison, advised they were from military intelligence, took photographs of the former prisoners, and advised they wanted information and would transfer the former prisoners home in about two weeks (A-148, 239).

---

[17] "We said we would be witnesses against the Taliban and al Qaida."

[18] Abdul Rahim and his Russian friend told journalists, "we wanted to be witnesses against the Taliban in court."

[19] "The men – a Russian, a Syrian, a Saudi, and a Saudi-born stateless man – said al-Adl and Muhammed Atef, a close aid of bin Laden's, killed in U.S. bombings in November, had interrogated them and authorized their torture."

[20] "[T]he other four 'prisoners' were desperate to be interviewed by the FBI. After repeated requests, passed on by journalists, they got their wish 12 days ago, when three federal agents arrived at the jail.  Now all five face being sent to Cuba. 'The bizarre thing is,' the US source said, 'they are now extremely cheerful.  They think this is a good thing.  We are not sure what to make of them.'"

23

**E.    The American Military Took Abdul Rahim And Other Political Prisoners Of The Taliban Into Custody, First At The Kandahar Air Base, Then At Guantánamo Bay, Cuba, When He Offered To Provide Testimony Regarding Human Rights Violations.**

57.    On or about January 24, 2002, the two Americans and a heavily armed detachment of American soldiers took Abdul Rahim and the others of the Kandahar 5 into custody and transported them to the Kandahar Air Base for what was supposed to be a few days (A-143,[21] 148-49, 275).

58.    On January 24, 2002, Attorney General John Ashcroft held a press conference announcing that videotape had been found in the wreckage of Mohammed Atef's dwelling in Kandahar, where Mohammed Atef had been killed by American bombing, and that five persons including "Abd Al-Rahim" were being sought as potential terrorists (A-218, 227, 235, 332, 339).

59.    In the January 28, 2002, issue of Time magazine, an article included a photograph of "Abd Al-Rahim" with four others on different tapes and reported the request of the government for public assistance to help "identify, locate and incapacitate" the individuals depicted (A-239, 344).

---

[21] The proximity of ISN numbers corroborates the seizure of Ayrat, Bukhary, Turkestani, Jamal, and Abdul Rahim (ISN 489) at the same time. Jamal, Ayrat, and Turkestani have been released from Guantánamo.

24

60.     For the first month at the Kandahar air base, the Kandahar 5 were treated relatively well, being kept apart from other prisoners and receiving extra blankets and chocolate (A-149).

61.     After about a month, the interrogators suddenly began treating Abdul Rahim very badly after showing him a magazine article claiming he was a terrorist (A-149, 230, 353[22]).

62.     Abdul Rahim's bad treatment by the Kandahar air base interrogators, after they confronted Abdul Rahim with the magazine article, included sleep deprivation, exercise to exhaustion, stress positions for hours at a time, use of police dogs, and rough treatment to take him to interrogation, although Abdul Rahim did not resist or use violence (A-149-50, 223).

63.     At the end of April or early May 2002, the American military transferred Abdul Rahim to Guantánamo Bay, Cuba, where he remains to this day (A-150, 354-55).

64.     Abdul Rahim was and is being treated with psychotropic medications for mental conditions including post-traumatic stress disorder (A-150-51, 217-18, 355).

---

[22] "When the Americans came, I told them about the videotape the Taliban made of me. By me telling them about the video it created confusion to the point that the Americans believed I was working for al Qaida. Here I am now I don't know if I am a spy for America or I work for al Qaida."

25

65.    The United States has released from Guantánamo three of the Kandahar 5: Jamal Al-Harith; Sadeeq Turkestani, and Ayrat Vakhitov (A-145, 223, 355).

66.    Abdul Rahim is suffering from serious and worsening psychological distress from his Taliban torture and lack of proper treatment for his psychological condition, which includes severe depression, self-injury, and attempted suicide (A-150, 217, 392-93, 431-33, 436-38).

# CLAIMS FOR RELIEF

I.   **Where The Combatant Status Review Tribunal Considered And Relied Upon Videotapes Of Abdul Rahim That Are The Products Of Taliban Torture And Threats Of Death, The Enemy Combatant Determination Violated Article 15 Of The Convention Against Torture And, Therefore, The Detainee Treatment Act Because Either**

- **The Department Of Defense Standards And Procedures Incorporate Article 15, Or**

- **The Standards And Procedures Violate Article 15.**

The United States has explicitly recognized that Article 15 of the Convention Against Torture applies to the detainees in Guantánamo Bay: "Article 15 of the Convention is a treaty obligation of the United States, and the United States is obligated to abide by that obligation in Combatant Status Review Boards and Administrative Review Boards." U.S. Dep't. of State, Legal Advisor John B. Bellinger III, U.S. Delegation Oral Responses to Article 15 Committee Questions, Geneva, Switzerland (Question 42) (May 5, 2006).[23] Under Article 15, the United States "shall ensure that any statement which is established to have been made as a result of torture shall not be invoked as evidence in any proceedings, except against a person accused of torture as evidence that the statement was made." United Nation Convention Against Torture and Other Cruel Inhuman or Degrading Treatment or

_____

[23] Available at http://www.state.gov/g/drl/rlsl

Punishment, art. 15, Apr. 18, 1988, Sen. Exec. Rpt. 101-30, 1465 U.N.T.S. 85 (ratified Oct. 21, 1994) (hereinafter Article 15). This governmental recognition that the Article 15 prohibition on the use of products of torture applies to Abdul Rahim merely confirms the protection provided directly under the Treaty, which is broadly phrased in terms of "proceedings," as well as under customary international law.

The Article 15 obligation codifies principles and values at the core of this Country's laws and Constitution. "[W]hile an involuntary confession is inadmissible in part because such a confession is likely to be unreliable, it is also inadmissible even if it is true, because of the 'strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will.'" *Watkins v. Sowders,* 449 U.S. 341, 347 (1981) (quoting *Jackson v. Denno*, 378 U.S. 368, 385 (1964) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206-07 (1960)); *see also Bram v. United States*, 168 U.S. 532 (1897). By using the products of Taliban torture, the Respondent violates the central constitutional recognition of the unreliability of the products of torture and the treaty refusal to condone the use of such despicable tactics.

The depth of the repugnance for torture is reflected in the recognition of torture as not only a violation of customary international law, but as violation of *jus cognes*.

28

In *Siderman de Blake v. Argentina*, 965 F.2d 699, 717 (9th Cir. 1992), the court held

that the unanimity with which torture is condemned elevated the right to be free from

such treatment to an extraordinary level:

> [I]t would be unthinkable to conclude other than that acts of official
> torture violate customary international law. And while not all customary
> international law carries with it the force of a *jus cogens* norm, the
> prohibition against official torture has attained that status.

The court found the fundamental and universal norms barring official torture is

established by an "extraordinary consensus." *Id.* (citing *Committee of U.S. Citizens*

*Living in Nicaragua v. Reagan*, 859 F.2d 929, 941-42 (D.C. Cir. 1988), and

*Filartinga v. Pena-Irala*, 630 F.2d 876, 884, 890 (2nd Cir. 1980)). The use of the

products of torture to detain Abdul Rahim violates Article 15 and customary

international law.

The Article 15 violation in the CSRT proceedings alone requires that this Court

grant relief. After these proceedings took place, Congress included a bar on the

products of torture in the Military Commissions Act. 10 U.S.C. § 948r(b); *see also*

U.S. Dep't of Defense, Military Commission Instruction No. 10 (March 24, 2006)

(applying Article 15 to bar products of torture in commission proceedings).[24] As a

prisoner who has never been accused of violating the laws of war, Abdul Rahim is

---

[24] Available at http://www.defenselink.mil/NEWS/Mar2006/
d20060327MCI10.pdf

directly protected by Article 15 because he is not facing a military commission. For future CSRT proceedings, the DTA called for revised procedures to require an assessment of whether a statement was "obtained as a result of coercion and the probative value, if any, of any such statement." 1005(b)(1) (A-450). CSRT procedures adopted in July 2006 address coercion but not torture (A-517). The ban on the products of torture is more specific than coercion, which can include state action far short of the Article 15 prohibition. The statute must be construed to conform to Article 15 on torture.

As set out in Abdul Rahim's sworn statements and confirmed by extrinsic evidence, Abdul Rahim's videotaped statements were the products of torture. Torture includes a wide array of coercive and injurious techniques, including threat of imminent death. Those employed by the Taliban were shamelessly brutal: Abdul Rahim suffered beatings, electric shock, near drowning, hanging from the ceiling, and intolerable conditions, all the while under immediate threat of death. His feet were bound, then beaten until they were black. Under torture and duress, Abdul Rahim made statements videotaped by his captors.

To stay alive, Abdul Rahim said what his captors wanted him to say, not what was true. The contents of the videotapes are manifestly false: if Abdul Rahim really were a spy for the United States and Israel, he would have long since returned home.

30

His accommodations to his torturers are analogous to the process undergone by a far
better prepared torture victim – Senator John McCain. Like Senator McCain, Abdul
Rahim confessed to crimes he did not commit; like Senator McCain, Abdul Rahim
espoused views of his captors that he did not truly hold; like Senator McCain, he
listed names of persons – mostly innocuous names of students from home – whereas
Senator McCain provided the starting line-up of the Green Bay Packers to his
torturers. John McCain, <u>Faith of My Fathers</u>, at 191, 194-95, 198, 244, 245
(Perennial 2000). Like Senator McCain, Abdul Rahim's statements are contradictory
and cagey, seeking to stay alive by appeasing his captors.

    Abdul Rahim struggles with the psychological agony of having been tortured:
"Every man has his breaking point." John McCain, *How the POW's Fought Back*,
U.S. News and World Report, May 14, 1973. Instead of receiving the treatment and
consideration that torture victims should receive, Abdul Rahim faced the nightmare
of another round of coercive interrogation, this time by United States interrogators
at the Kandahar air base, accusing him based on statements he made under torture to
save his life. His dilemma is plain from his statements to the military:

> [T]hey accused me of being a spy. And here, you guys accuse me of
> being al Qaida. No mercy. Who am I? . . . You take me from that prison
> and nothing changed in my life, I was taken from prison to prison. I ask
> the tribunal to please be merciful on me, and please be just and fair. (A-
> 213).

\*      \*      \*

> After two years the Americans came and saved me from the prison. When the Americans came I told them about the videotape the Taliban made of me. By me telling them about the video it created confusion to the point that the Americans believed I was working with al Qaida. Here I am now I don't know if I am a spy for America or I work for al Qaida. (A-230).

The videotaped statements, which are patently the false products of torture, continue to be used to subject him to United States detention.

After surviving hellish torture and imprisonment by the Taliban, Abdul Rahim now languishes in American custody going in to his sixth year. No governmental agency, including the Department of Defense, can take action adverse to individual liberty based on the products of torture and threats of death. Abdul Rahim is entitled to relief because the consideration of and reliance on torture-induced videotapes by the CSRT and the ARB either violated the Respondent's own standards and practices, which should be deemed to have incorporated Article 15, or the standards and procedures violate the laws and Constitution of the United States by permitting the use of the products of torture and threats of death. In either case, Abdul Rahim is entitled to relief under the DTA.

II.   **Where For Almost Two Years Prior To Being Taken Into United States Custody Abdul Rahim Suffered Imprisonment By The Taliban, The Temporal Nexus For Seizure Required By The Laws Of War And *Hamdan v. Rumsfeld*, 126 S.Ct. 2749 (2006), Compels Release Because Department Of Defense Standards And Procedures Either**

- **Incorporate Such A Requirement, Which Is Lacking In This Case, Or**

- **Violate The Laws And Constitution Of The United States.**

The temporal nexus to the time of war is utterly lacking in the present case. Because Abdul Rahim was a non-combatant prisoner of the Taliban well before and after 9/11, and because after he was liberated, he only tried to go home with help from the Red Cross and the United Nations, the enemy combatant designation violates the laws of war because no charged action occurred after the 9/11 attacks.

The *Hamdan* court firmly limited the Department of Defense's lawful actions to those authorized by statute, including prominently the limitation to the temporal period of the declaration of war. 126 S. Ct. at 2777 (any offense "'must have been committed within the period of the war.'") (citing William Winthrop, Military Law And Precedents at 837 (rev. 2d ed. 1920) (hereinafter Winthrop). The critical dates are the attack on the United States on September 11, 2001; the promulgation of the Authorization for the Use of Military Force on September 18, 2001; and the actual commencement of the armed conflict in Afghanistan on October 7, 2001. The

33

*Hamdan* court noted that the earliest time for Department of Defense jurisdiction would be September 11, 2001.  126 S. Ct. at 2778 n. 31.

The same temporal qualification outlined in *Hamdan* applies to Abdul Rahim because the same statutory authorization is the predicate for detention of enemy combatants as well as for prosecution by military tribunals.  As the *Hamdan* court held, the offense alleged must have been committed "*during*, not before, the relevant conflict." 126 S. Ct. at 2779 (emphasis in original); *see also Hamdi*, 542 U.S. at 518 (detention applies to individuals who fought against the United States "for the duration of the particular conflict in which they were captured").  The *Hamdan* court expressly disregarded any claims regarding acts prior to September 11, 2001. 126 S. Ct. at 2778.

The incorporation of a temporal requirement into CSRT standards and proceedings is supported by President Bush's Executive Order authorizing the Respondent to detain indefinitely any individual who, "at the relevant times," is an alien determined to be a member of al Qaida or engaged in acts of terrorism." Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833 (Nov. 13, 2001).  At the relevant times, Abdul Rahim met none of these conditions.

34

For almost two years before his liberation from the Taliban prison, Abdul Rahim was nothing more than a non-combatant victim of torture and illegal incarceration by the Taliban. He was despised by the Taliban for being a spy for the United States and Israel, an offense for which he barely escaped with his life. All relevant statements and actions by Abdul Rahim so far predated 9/11 that no conceivable basis exists for being held for being an enemy combatant during the later war.

The Respondent can claim no conduct subjecting Abdul Rahim to military jurisdiction because, at all relevant times, Abdul Rahim was a prisoner of the Taliban:

> As in the ordinary criminal law one cannot legally be pu[n]ished for what is not an offence at the time of the sentence, so *a military commission cannot*, (in the absence of specific statutory authority,) *legally assume jurisdiction of*, or impose a punishment for, *an offence committed* either *before* or after *the war or other exigency authorizing the exercise of military power*.

Winthrop at 837 (emphasis added). Abdul Rahim is entitled to relief because the Department of Defense standards and procedures must be interpreted as incorporating the temporal requirements of the laws of war to limit the jurisdiction to indefinitely hold an individual. If not so incorporated, the standards and procedures violate the laws of war and the Constitution, especially the ex post facto limitations incorporated into the laws of war. In either case, Abdul Rahim is entitled to relief under the DTA.

III. **Where Abdul Rahim Initially Approached United States Authorities Volunteering To Be A Witness To Human Rights Violations, The Enemy Combatant Designation Violated The Laws Of War And The Statutory And Constitutional Protections For Witnesses Because Either**

- **Witness Protections Are Incorporated Into Department Of Defense Standards And Procedures, Or**

- **The Standards And Procedures Violate The Legal Norms Requiring Some Degree Of Witness Protection.**

Abdul Rahim's status as a voluntary witness to human rights violations renders the CSRT proceedings fundamentally flawed. Congress has criminalized extra-territorial human rights violations[25] and provided for civil remedies for victims of official torture.[26] This Congressional framework requires at least a minimal level of protection for voluntary witnesses such as Abdul Rahim.

The evidence establishes that Abdul Rahim initiated contact with United States authorities to report and to provide testimony against his Taliban torturers. The CSRT includes Abdul Rahim's account of the American detention beginning with his desire to be a witness "against the Taliban in court,"[27] and freed detainee Ayrat

---

[25] *E.g.*, 18 U.S.C. § 2340A(a) Foreign Relations Authorization Act, Pub. L. No. 103-236 § 506, 108 Stat. 382, 463-64 (1994) (codified as 18 U.S.C. §§ 2340-2340B).

[26] *E.g.*, Torture Victim Protection Act of 1991, Pub. L. No. 102-256, §§ 1-3, 106 Stat. 73 (1992).

[27] A-239.

Vahkitov swore that Abdul Rahim "offered to provide testimony about the use of torture against us by the former regime."[28]  Ironically, a governmental source could not understand the potential witnesses' faith in American justice:

> [T]he other four "prisoners" were desperate to be interviewed by the FBI.  After repeated requests, passed on by journalists, they got their wish 12 days ago, when three federal agents arrived at the jail.  Now all five face being sent to Cuba.

> "The bizarre thing is," the US source said, "they are now extremely cheerful.  They think this is a good thing.  We are not sure what to make of them."[29]

The CSRT standards and procedures do not permit the seizure and indefinite detention of voluntary witnesses because, both under the law of war and by other laws and the Constitution of the United States, witnesses do not fall within the scope of military authority for indefinite detention.  Persons not engaged in armed conflict, such as witnesses to Taliban torture, are entitled to be free of restraint in the absence of a violation of the laws of war.  Winthrop, at 816.  In the treatise on the laws of war most cited by the *Hamdan* court, the author recognized the general rule of liberty with exceptions for charged and adjudicated violations of the law of war:

> While the peaceable citizens of a country under Military Government are in general exempt from military arrest or restraint of the person, the

---

[28] A-148.

[29] A-328.

37

governing commander is authorized to apprehend and restrain all persons guilty of violations of the laws of war, hostile demonstrations, or public disorders, and in extreme cases to inflict upon them summary punishment.

Winthrop at 816. Abdul Rahim did nothing remotely qualifying as a violation of the laws of war.[30]

The Constitution and statutes of the United States also afford protection to federal witnesses like Abdul Rahim. By providing evidence to the United States, he has implicated the constitutional right to be a witness in federal court recognized in *In re Quarles*, 158 U.S. 532, 536 (1885) (the constitutional right to bear witness to a violation of law "does not depend upon any of the amendments to the constitution but arises out of the creation and establishment by the constitution itself of a national government, paramount and supreme within its sphere of action."). Congress has also recognized the authority to protect federal witnesses under the material witness statute (18 U.S.C. § 3744) and the provisions for immigration protection of alien witnesses (8 U.S.C. § 1101(a)(15)(s)).

_____

[30] The norm of liberty is also part of the Fourth Geneva Convention on the treatment of civilians. Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 (hereinafter Geneva Convention IV). *See also* U.S. Army Reg. 190-8 § 1-6(g) (Oct. 1, 1997) ("Persons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed.").

By approaching the United States to offer testimony regarding federal crimes and violations of international humanitarian law, Abdul Rahim should have been protected from indefinite detention as an enemy combatant. As a nonenemy alien who has offered America assistance, and as opposed to an enemy taken on the battlefield, his status as a witness alone forecloses long-term detention for interrogation purposes. *Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004) ("Certainly, we agree that indefinite detention for the purpose of interrogation is not authorized.").

The CSRT standards and procedures should be read to incorporate basic protection of witnesses; to the extent they do not provide such protection to Abdul Rahim, they violate the laws and Constitution of the United States.

IV.   **Where Abdul Rahim's Custody Followed His Torture And Abusive Incarceration In Taliban Prisons, His Release Is Required Because A Taliban Torture Victim And Political Prisoner Does Not Meet Any Plausible Definition Of Enemy Combatant, And Either**

- **The Department Of Defense Designation As An Enemy Combatant Violated Its Own Standards And Procedures, Or**

- **Those Standards And Procedures Violate The Laws And Constitution Of The United States.**

As a torture victim and political prisoner of the Taliban, Abdul Rahim is not an enemy combatant under any plausible definition of the term. As stated in *Hamdi*, an enemy combatant would need to be "'part of or supporting forces hostile to the

39

United States or coalition partners' and 'engaged in an armed conflict against the United States' to justify his detention." *Hamdi*, 542 U.S. at 526; *accord Hamdan* 126 S. Ct. at 2761 n.1.[31]  The CSRT procedures define "enemy combatant" as follows:

> an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces.

(A-454).  No conceivable definition of enemy combatant would include a freed political prisoner who had been subjected to brutal torture and confinement by the enemy prior to war.

The paradigmatic person to be held as an "enemy combatant" is a member of Al Qaeda or the Taliban captured fighting on the battlefield against the United States and its allies. *Hamdi*, 542 U.S. at 521, 531.  "The purpose of detention is to prevent captured individuals from returning to the field of battle and taking up arms once again."  *Id.* at 518.  In the present case, there is not even an allegation that Abdul Rahim engaged the United States on the battlefield in support of our enemies.  On the contrary, the Taliban considered him an enemy to be tortured, humiliated, and condemned.

---

[31] The *Hamdi* court noted that "[t]he permissible bounds of the [enemy combatant] category will be defined by the lower courts as subsequent cases are presented to them." *Hamdi*, 542 U.S. at 522 n.1.

40

Ever since the 1907 Hague Regulations were implemented, a liberating power has been subject to rules of occupation to protect persons in the liberated territory. The Hague Regulations and, after World War II, the Fourth Geneva Convention provided that the occupying power must treat noncombatants humanely, including those who were detained by the adversary power. Geneva Convention IV art. 3. Those who have been mistreated by the adversary power, such as concentration camp survivors, should be given special care by organizations such as the International Committee of the Red Cross – this Country signed the Fourth Geneva Convention protecting civilians and noncombatants largely in response to the inhumane manner in which displaced persons were treated in the wake of World War II. Theodor Meron, *The Geneva Conventions As Customary Law*, 81 AM. J. INT'L L. 348, 364 (1987).

Upon his liberation from the Taliban prison, Abdul Rahim properly sought refuge through the intervention of non-governmental humanitarian organizations, such as the International Committee of the Red Cross and the United Nations. The New York Times quoted him as rejecting aid from reporters, expressing desperation, and relying on the Red Cross and the United Nations: "We just need the Red Cross or the United Nations to come take us out of here" (A-307).

41

By detaining Abdul Rahim and thwarting his efforts to obtain refugee relief, the Department of Defense violated its own standards and procedures and, to the extent the seizure and indefinite detention is authorized by those standards and procedures, they violate the laws and Constitution of the United States. In either case, Abdul Rahim is entitled to relief under the DTA.

## V. Where The Enemy Combatant Decision Was Made Without Meaningful Notice, An Opportunity To Be Heard, And A Neutral Decision-Maker, The Standards And Procedures Implemented By The Department Of Defense Violated The Laws And Constitution Of The United States, Especially Where, As Applied, The Record Establishes Serious Prejudice From The Inadequate Procedural Protections.

The CSRT procedures and standards violated basic procedural due process rights. The Department of Defense hastily created the CSRT process following the Supreme Court's June 28, 2004, decision in *Rasul v. Bush*, 542 U.S. 466 (2004). On July 7, 2004, the Deputy Secretary of Defense issued an order establishing the CSRTs and briefly addressing the standards and procedures to be used in determining whether a detainee was properly classified as an enemy combatant (A-454). On July 29, 2004, Navy Secretary Gordon England issued a memorandum for the implementation of the CSRT process (A-458). The CSRT procedures and standards fail to provide the most fundamental due process rights includes a neutral

42

decision-maker; adequate notice of the charges, allegations, and evidence upon which the detention was based, and a meaningful opportunity to contest the allegations.

Because the CSRT procedures – both on their face and in practice – fail to satisfy even the minimum of due process, they are inconsistent with the Constitution and the laws of the United States. The Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539, 557-58, 563-67 (1974), held that due process requires certain minimum procedural safeguards – timely notice, opportunity to be heard (including calling witnesses and presenting evidence) by an impartial hearing board, and written findings of fact supporting reason for decision – even for those not afforded the full panoply of procedural rights. *See also Mathews*, 424 U.S. at 333-35; *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973). The balance of interests before the CSRT overwhelmingly favors significant procedural protections: the individual interest in being free from indefinite detention reflects core values warranting protection against erroneous determinations (*Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental actions."); while the governmental interest is diluted by the three-year delay in obtaining even an initial review and should be informed by the huge costs to American prestige and resources in wrongful detention of innocent men.

43

Abdul Rahim did not receive recognized due process protections, either because the CSRT procedures are inadequate or, if read to provide minimal due process protections, the process Abdul Rahim received was constitutionally deficient. The inadequacies of the CSRT process, either as written or as applied, is especially problematic in this case where, at all relevant times, Abdul Rahim suffered from psychological impairments from his torture at the hands of the Taliban. For any one, or all, of the reasons articulated below, Abdul Rahim is entitled to relief under the DTA.

The due process inadequacies of the CSRT are in stark contrast to the rules of procedure established in the Alien Terrorist Removal Court of the United States. There, suspected alien terrorists are afforded a myriad of procedural due process rights before they can be removed from the United States, including access through appointed counsel to classified evidence, discovery, proof by a preponderance of terrorist status, and appeal rights. 8 U.S.C. § 1531 *et seq.* The statute also provides for release consideration pending removal and review of detention at least every six months. At least those procedural minimums should apply to Abdul Rahim's detention at a United States base on territory over which the United States exercises complete authority and control.

44

### A.   Abdul Rahim Received No Adequate Notice Of The Charges, Allegations, And Evidence Upon Which His Detention Was Based.

Abdul Rahim did not receive adequate notice of the charges or the evidence relied upon. He stated during the hearing:

> Nobody has accused me while I've been here for three years. All they ask me about is other people, other detainees here, about whom I know, about who tortured me, who put me in prison. What I don't understand is, nobody accused me with all these accusations until now. I don't know who this is, I didn't get to see the report from the recorder. I'm sorry. I don't know where he gets these accusations from, you know. I was put in prison, I was there, and they tortured me. Even if you say I'm one of them, after two years in Taliban prison, they tortured be for three months; do you think I'm going to be with them?

(A-216). The hearing did nothing to clarify the charges or the evidence. The unclassified summary, submitted as evidence, contained only vague and unsupported allegations that he was a member of al Qaeda, was trained by al Qaeda, associated with an unnamed al Qaeda weapons specialist, and "volunteered to be a suicide martyr" (A-212). No other information was presented to support the allegations. The government called no witnesses for the detainee to question, nor was evidence offered to which the detainee could respond.

The Recorder was tasked to obtain and to examine reasonably available information in the possession of the government "bearing on" the detainee's status and to present that information – even if exculpatory – to the Tribunal. Nevertheless,

there was no reciprocal obligation to share that information with the detainee or personal representative or even confirm that such evidence was presented. Thus, although the evidence in the government's possession was overwhelmingly exculpatory, Abdul Rahim did not have access and could not adequately rebut the charges or refute the evidence.

The accusation that Abdul Rahim is an "enemy combatant" is hopelessly vague. No temporal qualification is explicit, which would have foreclosed an adverse finding in this case. Nor was he ever provided a definition which – if he had one – would have demonstrated that a torture victim of the Taliban and voluntary witness to Taliban human rights violations did not meet the definition.

The notice component of the CSRT, by written standards and in practice, failed to meet minimal due process requirements.

## B.    There Was No Meaningful Opportunity To Be Heard Or Present Evidence On Abdul Rahim's Behalf.

The vagueness of the allegations provided Abdul Rahim with no rebuttal opportunity other than to deny the charges. The process prohibited Abdul Rahim from receiving legal assistance and, instead, allowed only the service of a personal representative. A personal representative purportedly assisted Abdul Rahim in preparing for the hearing, but apparently, spent almost no time with him – there were

46

only five personal representatives available for the 558 hearings conducted. Mark Denbeaux et al, *No-Hearing Hearings: CSRT, the Modern Habeas Corpus*? 2.1 (2006) (*available at* http://law.shu.edu/news/final_no_hearings_report.pdf) (Denbeaux Rpt). Moreover, the personal representatives were specifically forbidden from serving as the detainees' advocates. In practice, they were indistinguishable from the other uniformed guards and interrogators, fostering distrust for the process. CSRT record shows that the personal representative adhered to this very limited role.

Abdul Rahim's personal representative was a nurse, more familiar with his medical condition than the charges against him, and did not review the unclassified summary with Abdul Rahim beforehand. The personal representative merely read the detainee's statement, and, even then, Abdul Rahim needed to correct the account (A-215). The personal representative made no effort to obtain any information that was reasonably available through the Internet corroborating Abdul Rahim's version of events.[32]

------

[32] Only after Abdul Rahim was excused from the hearing did the Tribunal presumably review classified material. The personal representative may, but was not required to, "comment upon classified information submitted by the Recorder" in these closed sessions. Such comments, if made, were made without input from Abdul Rahim because the personal representative was not permitted to discuss classified information with him. Abdul Rahim had no opportunity to rebut any classified evidence against him.

As indicated by the exhibits to the summary judgment motion, abundant and readily available information corroborated that Abdul Rahim was accused and convicted by the Taliban as an American spy, that he was tortured by the Taliban, that he sought the help of the Red Cross and United Nations when the Taliban prison was liberated, that he offered to assist the Americans by testifying against the Taliban, and that at no time was he ever involved in hostile or belligerent acts against the United States or its allied forces. In contrast, the only additional information the personal representative provided was a statement as to Abdul Rahim's medical condition and the medications he was taking (A-217).

Although Abdul Rahim could not present a defense, he asked the Tribunal to ask any detainee of his reputation as an accused American spy and, specifically, to interview two witnesses, both of whom were imprisoned by the Taliban with Abdul Rahim, and both of whom were released following a finding that they were not enemy combatants:

> Sir, you can ask any Detainee, here, about Janko, #489, Syrian, they are going to say, oh, he's a spy. And, my friends, who use to be with me in prison, I hope you talk to them, or ask for them, # 491 and #493. They are my witnesses that I was in prison. I had a British friend, he went back to Britain, he's gone, and I had a Russian friend, he's also gone, so basically, I'm lonely now. I hope that you listen to my situation. That's it.

48

(A-223). Abdul Rahim could only bring the witnesses existence to the Tribunal's attention, but he could not call them as witnesses.

Despite having held the other detainees for years under constant interrogation, the exculpatory evidence – which we now have from their sworn statements (A-145, 351) – was not provided at the hearing. At a constitutional minimum, exculpatory information should have been presented and considered by the CSRT. *Cf. Brady v. Maryland*, 373 U.S. 83 (1963) (due process requires disclosure of exculpatory evidence). Abdul Rahim also implored the Tribunal to consider the results of several polygraph examinations testing his association with al Queda and statements of being a suicide martyr (A-218).

During the hearing, the Reporter failed to perform the minimal responsibilities given because the government had in its possession exculpatory information that could be corroborated with a simple internet search. The circumstances of Abdul Rahim's arrest after the Taliban prison was liberated that were known to the Recorder established that Abdul Rahim was not a member of al Qaeda, but had been accused of being a spy for the Americans and Israel. Five other detainees interrogated by the United States military, and an Internet search for the numerous articles about Abdul Rahim's capture and torture, could have provided complete corroboration. Similarly, the charge that he was associated with an "al Qaeda weapons specialist" fails because

apparently the associate was also a Taliban prisoner well before 9/11 who Abdul Rahim falsely accused to the Taliban, under torture, of being an American spy (A-288-89, 291-92, 294-95, 297-300).

Lastly, any statement regarding being a suicide martyr referred to the videotaped products of Taliban torture. The government knew that Abdul Rahim was not an American spy. The propaganda confession and concomitant statements – which occurred over 18 months before 9/11 – to appease torturers provide no probative evidence. The Recorder either only looked for inculpatory information and made unsupported conclusions in fashioning the allegations, or ignored the responsibility to search and to examine all available information in possession of the government bearing on Abdul Rahim's status as a supposed enemy combatant.[33]

The CSRT provided an inadequate hearing either in violation of its own standards and procedures or pursuant to unconstitutional standards and procedures.

### C. The CSRT's Failure To Provide For Representation By Counsel Violated Due Process.

For aliens detained since January 2002, the failure of the CSRT procedures and standards to provide for counsel – whether appointed or retained – for hearings many

---

[33] Although no Return has been filed, the CSRT that is available reflects that, even under the unconstitutionally deferential standard incorporated into the DTA, the Tribunal's conclusion was not supported by a preponderance of the evidence "even allowing a rebuttal presumption in favor of the Government's evidence."

months after they were determined to have habeas corpus rights in *Rasul*, violated procedural due process rights. At the time of filing, Abdul Rahim had jurisdiction to proceed before the federal court under 28 U.S.C. § 2241 based on *Rasul*. The Supreme Court left to the federal courts to determine to precise due process balancing in the federal § 2241 proceedings. *Rasul*, 542 U.S. at 485. Where actual liberty is at issue, the participation of counsel – including appointed counsel – depends on the facts of the specific situation. In the context of probation and parole revocations, the Supreme Court has called for evaluation of the specific procedure to determine whether counsel is necessary to due process:

> It is neither possible nor prudent to attempt to formulate a precise and detailed set of guidelines to be followed in determining when the providing of counsel is necessary to meet the applicable due process requirements. The facts and circumstances in preliminary and final hearings are susceptible of almost infinite variation, and a considerable discretion must be allowed the responsible agency in making the decision. *Presumptively, it may be said that counsel should be provided in cases where, after being informed of his right to request counsel, the probationer or parolee makes such a request, based on a timely and colorable claim (i) that he has not committed the alleged violation of the conditions upon which he is at liberty; or (ii) that, even if the violation is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate, and that the reasons are complex or otherwise difficult to develop or present. In passing on a request for the appointment of counsel, the responsible agency also should consider, especially in doubtful cases, whether the probationer appears to be capable of speaking effectively for himself.* In every case in which a request for

counsel at a preliminary or final hearing is refused, the grounds for refusal should be stated succinctly in the record.

*Gagnon*, 411 U.S. at 790-91 (emphasis added); *see also Morrissey v. Brewer*, 408 U.S. 471, 489 (1972). Unlike prisoners, probationers, and parolees, Abdul Rahim has never been convicted of a crime, with full right to counsel, so there was no predicate Sixth Amendment compliant determination that he should be deprived of liberty.

Abdul Rahim meets all the requirements for appointment of counsel before the CSRT: he has claimed innocence and lack of military jurisdiction; he has provided substantial reasons why he should be released under any circumstances; and he is not capable of effectively speaking for himself given his isolation, mental health issues, and lack of legal training. Especially where the federal court delayed in reviewing his detention by failing to follow the statutory requirement for an order to show cause "forthwith" and a Return within three days (28 U.S.C. § 2243), the need for counsel at the *Rasul*-inspired CSRT proceedings was essential to due process of law.[34]

The CSRT standards and procedures either must be interpreted to require appointment of counsel under the facts of this case or they violate the laws of

---

[34] In contrast to over five years of indefinite detention, the Supreme Court found counsel not to be necessary as a matter of due process in summary court martial proceedings because the maximum punishment was 30 days and the subject of the procedure had the option to waive summary proceedings in favor of a special court martial with appointed counsel. *Middendorf v. Henry*, 425 U.S. 25, 42-47 (1976).

Constitution of the United States.  Either way, Abdul Rahim is entitled to release from his unlawful detention.

### D.     There Was No Neutral Decision-Maker.

Due process requires an adjudicator who is neutral and accepts the basic duty to be informed of the facts relevant to the decision and to learn the detainees version of those facts.

> [A] citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker. *See Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case' " (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950))); *Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.*, 508 U.S. 602, 617, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) ("due process requires a 'neutral and detached judge in the first instance' ") (quoting *Ward v. Monroeville*, 409 U.S. 57, 61-62, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972))). "For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.' It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'" *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (quoting *Baldwin v. Hale*, 1 Wall. 223, 233, 17 L.Ed. 531 (1864); *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965) (other citations omitted)). These essential constitutional promises may not be eroded.

53

*Hamdi v. Rumsfeld*, 542 U.S. at 533; *see also Morrissey v. Brewer*, 408 U.S. 471, 489 (1972) (minimum requirements of "due process include . . . (e) a 'neutral and detached' hearing body").

An "interrogation by one's captor . . . hardly constitutes a constitutionally adequate fact-finding before a neutral decision maker." *Hamdi*, 542 U.S. at 537. Here, the Tribunal members are not civilians, but rather military officers subject to a chain of command that publicly proclaimed that all Guantánamo detainees are enemy combatants and the "worst of the worst."[35]

Aside from the Tribunal's institutionalized bias, the neutrality of the decision-maker was inherently compromised by the lack of meaningful input from the

_____

[35] *See, e.g.*, Department of Defense News Briefing – Gen. Richard B. Myers, Chairman, Joint Chiefs of Staff (Jan. 11, 2002), *available at* http://www.defenselink.mil/transcripts/2002/t01282002_t0128asd.html (prisoners are "the worst of the worst"); *Rumsfeld: Captives Will Not be POWs*, USA TODAY, Jan. 28, 2002, at A1 (quoting Secretary Rumsfeld: "[The prisoners are] among the most dangerous, best-trained vicious killers on the face of the Earth."); Department of Defense News Briefing – Secretary Rumsfeld and Gen. Myers (Jan. 28, 2002) ("These are people that would gnaw through hydraulic lines in the back of a C-17 to bring it down, so these are very, very dangerous people, and that's how they're being treated.") *available at* http://www.defenselink.mil/transcripts/2002/t01112002_t0111sd.html; Department of Defense News Briefing – ASD PA Clarke and Rear Adm. Stufflebeem (Jan. 28, 2002) *available at* http://www.defenselink.mil/transcripts/2002/t01282002_t0128asd.html (Rear Admiral John D. Stufflebeem: "These are the worst of the worst, and if let out on the street, they will go back to the proclivity of trying to kill Americans and others. So that is well established.").

detainee and the presumption of guilt. The Tribunal had only the information provided by the Recorder and did not go beyond that record, either through independent inquiry or through the detainee. There were no means for the Tribunal to test whether the Recorder did in fact search for all information bearing on the detainee's status, including exonerating information, or whether all information was indeed presented to the panel. The CSRT process thus prevented the Tribunal from independently testing the context and reliability of the evidence before it, foreclosing its role as a neutral fact-finder.

Moreover, the burden of proof was hostile to the neutrality of the Tribunal: "There is a rebuttable presumption that the Government Evidence . . . submitted by the Recorder to support a determination that the detainee is an enemy combatant, is genuine and accurate" (A-466). No such reciprocal presumption applied to evidence that might "suggest that the detainee should not be designated as an enemy combatant" (A-470). *Cf. Wardius v. Oregon*, 412 U.S. 470 (1973) (statute that did not require reciprocal discovery in criminal case violated due process). Under the CSRT standards, the Tribunal had an institutionalized prejudgment regarding Abdul Rahim's enemy combatant classification. The "rebuttable" presumption becomes more problematic because the evidence is classified and kept secret from the detainee, rendering him unable to challenge, explain, or rebut.

55

### E.    The Recorder Process Rendered The Proceeding Adversarial And Violated The CSRT Rules And Due Process.

The CSRT process is supposedly "non-adversarial," but the role of the Recorder fatally compromised that characterization. In this civil "non-adversarial" proceeding, the Recorder acted as investigator and prosecutor because that individual was charged with gathering all the evidence against the detainee and deciding what evidence will be shared with the detainee, preparing the unclassified summary that contained the allegations against the detainee, then presenting the classified and unclassified evidence to the Tribunal. By creating a non-neutral Recorder with prosecutorial responsibilities, the CSRT process was decidedly adversarial, thereby requiring due process protections absent from the proceedings.

### VI.    In The Alternative, If The Court Does Not Grant Full Relief Based On The Foregoing Claims, The Court Should Remand To The District Court For Full Habeas Corpus Review Or Conduct Such Proceedings Itself Because The Department Of Defense Lacked Initial Jurisdiction Over The Detainee.

Respondents' authority to seize and detain individuals in the military prison in Guantánamo Bay, Cuba, is limited by the authorization granted by Congress in the Authorization for the Use of Military Force (AUMF) of September 18, 2001, the Executive Order of November 13, 2001, and the laws of war. *See Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2777-78 (2006); *Hamdi*, 542 U.S. at 533. The class of

persons who can be held as enemy combatants was further refined by the issuance of the Department of Defense definition of that term by then Deputy Secretary of Defense Wolfowitz on July 6, 2004. That limitation was recognized by the Supreme Court in its decision in *Hamdan*, 126 S.Ct. at 2761 n.1.

Seizure of a person who does not fall within the class of people who may be seized and imprisoned pursuant to that authority is unlawful because the Department of Defense has no authority over such a person, and no tribunal constituted by the Department of Defense is competent to take any action with respect to any such person. Abdul Rahim is not within the class of persons the Department of Defense may seize and detain. Hence, the MCA is inapplicable to his case, and, if relief is not granted under claims I-V, the case should proceed before the District Court for full and prompt § 2241 hearing. *See Khalid v. Bush*, 355 F.Supp.2d 311, 329 (D.D.C. 2005) (citing *Application of Yamashita*, 327 U.S. 1 (1946), for the proposition that federal courts had jurisdiction to determine "the legality of the 'authority of those detaining the petitioner.'").

The DTA and the MCA do not apply to Abdul Rahim because no gateway procedure protects against holding non-combatants where the military has no jurisdiction. The record facts, fully corroborated by supporting exhibits, establish that: 1) the authority of the Department of Defense to seize and detain individuals is

57

limited; 2) the Department of Defense does not, and never has, had jurisdiction over Abdul Rahim because he does not fall within the class of persons the Department of Defense is authorized to seize and detain; and 3) thus, no Department of Defense tribunal has jurisdiction over Abdul Rahim or is competent to make any determinations with respect to him. Any statutory withdrawal of jurisdiction from the federal courts is limited to those persons over whom the Department of Defense has jurisdiction. Because Abdul Rahim is not within the class of persons the Department of Defense was authorized to seize and detain or to whom section 7 of the MCA applies, either the MCA must be construed in a manner that results in the conclusion that he is not within the class of persons to whom the jurisdiction stripping provision can be applied, or, alternatively, the Court should conclude that section 7 of the MCA violates several provisions of the Constitution and cannot be applied to Abdul Rahim's case.

A further reason the MCA does not apply is derived from Section 7(a), a new section to 28 U.S.C. § 2241(e)(1) that purports to strip the federal courts of jurisdiction over habeas corpus cases:

> No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

58

The key phrases in this section of the statute involve the "determin[ation]" that an alien has been "properly detained" as "an enemy combatant." Adbul Rahim does not fit this definition.

The term "properly detained" cannot be construed to apply where no competent tribunal has made the requisite determination.  To give meaning to the term "properly," a modifier in the statute of the term "detained," the limitation to, not all about who have been "determined to be enemy combatants," but only some who have been so detained.  The limitation must include those over whom the military never had initial jurisdiction.

Finally, in *Hamdan*, the Supreme Court detailed the steps that the Executive, through the military, must go through in order to seize and to detain an individual as an enemy combatant.  Those steps include on-site determinations by a battlefield commander and subsequent determinations that comply with the laws of war. *Hamdan*, 126 S. Ct. at 2776-77.  There is no information showing that any battlefield determination was made, under any standards, by any responsible official.  Thus, a straightforward construction of section 7 of the MCA reveals that Abdul Rahim was not "properly detained" and is, therefore, not within the class of persons covered by the MCA.  This Court should exercise full habeas corpus jurisdiction over Abdul Rahim.

The question of the Respondent's initial authority to seize and detain Abdul

Rahim is similar to the question the Supreme Court addressed in *Ex parte Milligan,*

71 U.S. 2 (1871). Milligan was arrested at his home by military authority and tried

before a military commission under the authority of the suspension of habeas corpus

by statute and Presidential proclamation in 1863. The suspension of the writ was for

> cases where, by his authority, military, naval, and civil officers of the
> United States, 'hold persons in their custody either as prisoners of war,
> spies, or aiders and abettors of the enemy,...or [are] otherwise amenable
> to military law, or the rules and articles of war...

71 U.S. at 5. Milligan's petition asserted that the suspension was ineffective as to

him because he had not been in the military, within the limits of any state in rebellion,

or violated the rules of law. *Id.* at 7-8. The question posed by the Court was whether

"upon the facts stated in Milligan's petition, and the exhibits filed, had the military

commission mentioned in it *jurisdiction*, legally to try and sentence him." *Id.* at 118

(emphasis in original). The Court entertained the writ, answered the threshold

question of jurisdiction, and notwithstanding the Executive's assertion of jurisdiction

over Milligan, concluded that the Executive did not have jurisdiction over him and

upheld the grant of Milligan's petition for a writ of habeas corpus. *Id.* at 131.

This Court did not address or resolve the question of initial lack of military

jurisdiction in *Boumediene*. Thus, if this Court does not grant full relief based on the

previously stated claims, the Court should remand to the District Court for a prompt and full evidentiary hearing with full authority to provide complete equitable habeas corpus relief or provide such relief itself.

**VII. In The Alternative, If This Court Cannot Provide DTA Review Commensurate With Traditional Habeas Corpus And Does Not Grant Full Relief Based On The Foregoing Claims, The Court Should Remand For Prompt And Full Habeas Proceeding In The District Court Or Conduct Such Proceedings Itself Because The DTA And The MCA Violate The Suspension, Due Process, Equal Protection, Bill Of Attainder, And Ex Post Facto Clauses.**

The *Boumediene* denial of certiorari occurred in a context in which the efficacy of the DTA procedure is unknown. To the extent this Court cannot provide full habeas review and does not grant full relief based on the foregoing claims, this Court should remand to the District Court for full and prompt habeas proceedings or conduct such proceedings itself because the DTA and MCA, in the context of this case, are unconstitutional.

**A. Construction Of The DTA In A Manner That Precludes Full Fact Development And Legal Review Would Render The Statute An Inadequate Substitute For Habeas Corpus And, Therefore, The MCA and DTA Would Unconstitutionally Suspend Or Eliminate The Writ Of Habeas Corpus.**

Under statute and the common law, habeas corpus review has historically addressed questions of both law and fact raised by the executive detention of an individual. *See* Jonathan L. Hafetz, *The Untold Story Of Noncriminal Habeas Corpus*

61

*And The 1996 Immigration Acts*, 107 Yale L. J. 2509, 2535 (1998). Factual review has been an historically recognized component of habeas litigation in the federal system. *See, e.g., Moore v. Dempsey*, 261 U.S. 86, 92 (1923) (noting that a judge of the United States has a "duty of examining the facts for himself" in addressing a petition for habeas relief); *Commonwealth ex rel. Bressler v. Gane*, 3 Grant 447, 1863 WL 4691, at *14 (Pa. 1863) ("The plain principle of the common law is that cause must be shown for the detention by the return, and the body of the prisoner must be brought into court as commanded by the writ, 'so he may make answer' to such return, or, in other words, he may traverse the return.").

From the federal judiciary's earliest days, habeas review of the reasons advanced for detaining an individual has contemplated consideration of evidence extrinsic to the return made by the responding party:

> Lewis examined the affidavits produced against the prisoner, to show, that although he attended at several meetings of the insurgents, his deportment, upon those occasions, was calculated to restore order and submission to the laws: *and he added the affidavits of several of the most respectable inhabitants of the western counties, in testimony of the propriety of the prisoner's conduct throughout the insurrection.*

*United States v. Hamilton*, 3 U.S. (3 Dall.) 17, 17-18 (1795) (emphasis added). Any construction of the DTA that would preclude fact development would render it an inadequate substitute for habeas corpus.

The evidence presented by Abdul Rahim underscores the importance of fact development in any review of his detention and the inadequacy of the CSRT as a reliable fact-finding process. With relatively little effort through the assistance of counsel in his habeas corpus case, Abdul Rahim was able to gather the exhibits that have been submitted to the District Court. The CSRT procedure did not permit him, as an incarcerated person without any access to counsel or investigation, to have any possibility of generating this information. The Department of Defense made no effort to investigate or confirm Abdul Rahim's claims of innocence. Were review in this proceeding to be limited to the "record" created in the CSRT process, it would only add to the unconstitutional process that has kept Abdul Rahim incarcerated.

The writ of habeas corpus is so fundamental to individual liberty and government of limited powers that the founders precluded its suspension in Article I, Section 9, clause 2, in the absence of "rebellion" or "invasion." While the writ may be suspended in these rare situations, the Constitution gives Congress no authority to eliminate the writ. Without an equivalent substitute, the situation that confronts the Court with respect to Abdul Rahim is an elimination of the writ for a particular class of people whose membership in that class is determined solely by the Executive.

Although the only direct reference in the Constitution to the writ of habeas corpus is in the Suspension Clause, that reference presupposes the existence of the

63

writ of habeas corpus and its availability by the judiciary to test the legality of detention by the Executive for citizens and aliens alike. *See INS v. St. Cyr*, 533 U.S. 289, 301 (2001). Indeed, the importation of the common law writ of habeas corpus into our country was noted by this Court more than 100 years before the decision in *St. Cyr*. In *Ex parte Yerger*, 75 U.S. 85, 95 (1868), the Court observed that the "great writ of habeas corpus has been for centuries esteemed the best and only sufficient defense of personal freedom." *Yerger* went on to note that the great writ had been "brought to America by the colonists, and claimed as among the immemorial rights descended to them from their ancestors." *Yerger*, 75 U.S. at 96.

Congress lacks authority to eliminate the writ of habeas corpus.

**B.      Failure To Require The Equivalent Of Habeas Review Would Violate The Separation Of Powers Doctrine.**

The structure of the Constitution, with its separation of powers in three distinct branches, and the Due Process Clause of the Fifth Amendment which incorporates that structure, require procedures for a writ of habeas corpus with fact development as a necessary concomitant of its vital importance and constitutional role. *Compare* Laurence Claus, *The One Court That Congress Cannot Take Away: Singularity, Supremacy, and Article III* (Oct. 6, 2006), *available at* http://sscn.com/abstract=935368 *with* David Cole, *Jurisdiction and Liberty: Habeas*

64

*Corpus and Due Process As Limits On Congress' Control Of Federal Jurisdiction,* 86 Colo. L.J. 2481, 2424, 2494-5 (1998). The Constitution's structure and text reveals that limited review under the DTA would violate several distinct provisions of the constitution.

In *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803), the Supreme Court stated that the separation of powers doctrine was one of the governmental principles "on which the whole American fabric has been enacted." The Supreme Court has repeatedly noted the dangers of collapsing into any one branch of our government, the duties that are assigned to the others. *See, e.g., Duncan v. Kahanamoku*, 327 U.S. 304, 322 (1946) (the "founders" were "opposed to governments that placed in the hands of one man the power to make, interpret and enforce the laws."). DTA review short of habeas corpus-type fact development would violate this fundamental principle.

The writ of habeas corpus exists as a component of the judicial power of the United States as expressed in the text of the Constitution. Congress cannot abrogate federal court habeas jurisdiction in a manner that prevents the federal courts from fulfilling their constitutionally mandated function – to review Executive Branch acts that result in the detention of individuals in the absence of a properly made charge,

trial, and conviction – without contravening the judicial power of the United States

and violating the doctrine of separation of powers.[36]

## C.     The Due Process Clause Requires Full Habeas Corpus Review Of Executive Detention.

The Fifth Amendment "contains restrictions which are obviously intended for

the exclusive purpose of restraining the exercise of power by the departments of the

general government." *Barron v. Mayor of Baltimore*, 32 U.S. (7 Pet.) 243 (1833); *see*

*also Kring v. Missouri*, 107 U.S. 221, 226 (1883)(noting that the first ten amendments

were "all designed to operate as restraints on the general government.").[37]   Chief

---

[36]     [T]he exercise of Congress of its control over jurisdiction is subject to compliance with at least the requirements of the Fifth Amendment. That is to say, while Congress has the undoubted power to give, withhold, and restrict the jurisdiction of courts other than the Supreme Court, it must not so exercise that power as to deprive any person of life, liberty, or property without due process of law or to take private property without just compensation.

*Battaglia v. General Motors Corp.*, 169 F.2d 254, 257 (2d Cir. 1948) (footnote omitted).

[37] In *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 324 (1893), the Supreme Court observed that the first ten amendments had been adopted to address what some contended, notwithstanding Hamilton's argument to the contrary in Federalist No. 84, were deficiencies in the Constitution's protection of individual rights: "The first 10 amendments to the constitution, adopted as they were soon after the adoption of the constitution, are in the nature of a bill of rights, and were adopted in order to quiet the apprehension of many that without some such declaration of rights the government would assume, and might be held to possess, the power to

among these restrictions is the Due Process Clause, which serves the same function in the constitutional text as the words "by the law of the land" served in the Magna Carta with respect to protecting the individual against arbitrary action on the part of government. *In re McDonald*, 9 Am. Law Reg. 661, 16 F.Cas. 17, 21 (D. Mo. 1861); *cf. County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998).

Early in its history, the Supreme Court observed that the words "due process of law" were "undoubtedly intended to convey the same meaning as the words, 'by the law of the land,' in Magna Charta." *Murray v. The Hoboken Land And Improvement Company*, 59 U.S. 272, 276 (1855). Article 39 of the Magna Carta states: "No freemen shall be taken or imprisoned or disseised or exiled or in any way destroyed, nor will we go upon him nor send upon him, except by the lawful judgment of his peers or by the law of the land."

Concerning the scope of the protection afforded personal liberty by the Due Process Clause of the Fifth Amendment, in *Ingraham v. Wright*, 430 U.S. 651, 672-74 (1977) (footnotes and citation omitted), the Supreme Court stated as follows:

> The Due Process Clause of the Fifth Amendment, later incorporated into the Fourteenth, was intended to give Americans at least the protection against governmental power that they had enjoyed as Englishmen against the power of the crown. . . . Among the historic liberties so

---

trespass upon those rights of persons and property which by the Declaration of Independence were affirmed to be unalienable rights."

67

protected was a right to be free from and to obtain judicial relief, for unjustified intrusions on personal security. While the contours of this historic liberty interest in the context of our federal system of government have not been defined precisely, they always have been thought to encompass freedom from bodily restraint and punishment. It is fundamental that the state cannot hold and physically punish an individual except in accordance with due process of law.

In our government with its three separate branches, due process has historically required that the body that decides whether particular governmental action is lawful must be different from the body that performs that particular action. Judicial review without fact development in the necessarily fact-intensive setting that involves the question of whether a person committed certain acts would violate due process.

**D.     Elimination Of The Writ Of Habeas Corpus For Abdul Rahim Would Violate The Bill Of Attainder Clause Of The Constitution.**

Any elimination of habeas corpus review solely for claims brought by members of the small class aliens held as enemy combatants would violate the Bill of Attainder Clause (Article I, section 9, clause 3). The Supreme Court has condemned precisely this type of "deprivation of any rights, civil or political," including "the privilege of appearing in courts," when imposed on an otherwise disfavored minority. *Cummings v. Missouri*, 71 U.S. 277, 320 (1866); *see United States v. Brown*, 381 U.S. 437, 445-47 (1965).

68

To qualify as a Bill of Attainder, a legislative enactment must (1) apply with specificity to an identified individual or group, and (2) impose punishment. *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003). The element of specificity is satisfied if a statute singles out a person or class by name or applies to "easily ascertainable members of a group." *United States v. Lovett*, 328 U.S. 303, 315 (1946). The target group of the DTA is any "alien detained by the Department of Defense at Guantánamo Bay, Cuba." § 1005(e)(1). These individual could not be more discretely identified.[38] The second element is also present because denial of equal access to the courts meets the historic definition of punishment, especially here where the practical effort of the statute is prolonged detention. The government's efforts to strip the federal courts of habeas corpus jurisdiction solely from this disfavored group underscores the importance of full judicial review of this type of detention.

E.     **Elimination Of The Writ Of Habeas Corpus For Abdul Rahim Would Violate The Equal Protection Clause.**

The Fifth Amendment's guarantee of due process incorporates the Fourteenth Amendment's equal protection clause. *Bolling v. Sharp*, 347 U.S. 497, 498-500 (1954). In *Rasul*, the Court found that § 2241 applied equally to United States

---

[38] Although the MCA expanded the target, the detainees were and are specifically singled out for adverse treatment.

69

citizens and to aliens held at Guantánamo Bay: "Considering that the statute draws no distinction between Americans and aliens held in federal custody, there is little reason to think that Congress intended the geographical coverage of the statute to vary depending on the detainee's citizenship." 542 U.S. at 481.

The DTA, by its express terms, strips aliens detained in Guantánamo of access to the courts, while maintaining the rights of United States citizens (". . . an application for a writ of habeas corpus filed by or on behalf of an alien . . . or . . . any other action . . . relating to any aspect of the detention of an alien . . .") (emphasis added). § 1005(e)(1) and (2). The MCA does the same thing to aliens more generally. The statutory distinctions based on alienage, regardless of legal status, violated the guaranteed equal protection under law.

The restriction on access to the courts based on national origin requires strict scrutiny for two reasons. First, discrimination based on alienage targets a suspect class: disparate treatment for persons based on their alienage, without respect to legal status, is generally prohibited as a classification based on national origin. *Plyler v. Doe*, 457 U.S. 202, 214 (1982) (Fourteenth Amendment's phrase "sought expressly to ensure that the equal protection of the laws was provided to the alien population"); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) ("The fourteenth amendment to the constitution is not confined to the protection of citizens. . . . [Its] provisions are

70

universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws."). By limiting the habeas-stripping to aliens, the DTA recognized the courts' continued § 2241 jurisdiction over United States citizens at Guantánamo Bay. Strict scrutiny is also required because the target group of aliens is de facto Muslim, which implicates equal protection as well as First Amendment concerns. *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542 (1993).

Second, discrimination regarding a fundamental right, such as access to the courts, triggers heightened protections. *Tennessee v. Lane*, 541 U.S. 509, 528 (2004) (right of access to the courts "call[s] for a standard of review at least as searching, and in some cases more searching, than the standard that applies to sex-based classifications"); *Romer v. Evans*, 517 U.S. 620, 633 (1996) ("Central both to the idea of the rule of law and to our own Constitution's guarantee of equal protection is the principle that government and each of its parts remain open on impartial terms to all who seek its assistance."). The constitutional and statutory prohibitions on arbitrary detention and torture mean little without a judicial remedy.

Congressional hostility to detainees and prejudgment of the merits of their claims does not even provide a rational basis for discrimination against detained

71

aliens. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973). To avoid constitutionality infirmity, the Court should construe the statute to avoid the serious constitutional doubts regarding discriminatory access to the courts by providing equivalent habeas corpus procedures regardless of where the detainee was born.

F.     **Elimination of the Writ of Habeas Corpus Would Violate The *Ex Post Facto* Clause.**

The specific prohibition on *ex post facto* laws is one aspect of the "broader constitutional protection against arbitrary changes in the law." *Lynce v. Mathis*, 519 U.S. 433, 440 (1997). To fall within the ex post facto prohibition, a law must be "retrospective – that is, 'it must apply to events occurring before its enactment' – and it 'must disadvantage the offender affected by it.'" 519 U.S. at 441 (quoting *Weaver v. Graham,* 450 U.S. 24, 29 (1981)). Both elements are present in Abdul Rahim's case.

At the time the Respondent detained him and when Abdul Rahim filed his habeas petition, Abdul Rahim had a statutory right to prompt and full habeas review

of his claims in the District Court, as decided in *Rasul*.[39]  Nevertheless, the District Court and the government did not follow the statutory requirements for issuance of an order to show cause why the writ should not be granted "forthwith," with filing of a Return by the Respondent within three days, with an option to expand the time for the Return, for good cause, "not exceeding twenty days." 28 U.S.C. § 2243.  As the facts of this case demonstrate, prompt review with traditional habeas corpus fact-development would have resulted in freedom for Abdul Rahim almost two years ago. If the DTA and MCA are construed to foreclose the availability of full habeas review, Abdul Rahim will be disadvantaged by the retrospective application of subsequent legislation just as surely as the retrospective expansion of a statute of limitations constituted an *ex post facto* law in *Stogner v. California*, 539 U.S. 607 (2003).

The *ex post facto* disadvantage to Abdul Rahim is far more penal than the loss of good time credits that the Supreme Court found to be unconstitutionally retroactive in *Lynce* and *Weaver*.  Abdul Rahim has suffered indefinite detention for over five years under harsh and degrading incommunicado confinement half a world away from

---

[39]The construction of the § 2241 statute in *Rasul* stated what the statute had always meant.  *Bousley v. United States*, 523 U.S. 614, 625-26 (1998) (judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision giving rise to that construction) (Stevens, J., concurring); *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 311 n.12 (1994) ("[W]hen this court construes a statute, it is explaining its understanding of what the statute has meant continuously since the date when it became law.").

73

his home. The Respondent and other governmental actors have repeatedly characterized all Guantánamo detainees, including by implication Abdul Rahim, as "terrorists" and "the worst of the worst." *Supra* at 54 n.35. Under the laws of war, Abdul Rahim, as a non-combatant not seized on the battlefield, can only be detained under the laws of war if he has committed a crime. *Supra* at 37-38. The result of retrospective application of the DTA and the MCA to Abdul Rahim, if he is not permitted to fully present his case and seek full equitable relief available in habeas corpus, is prolonged imprisonment.

### G.     Elimination Of The Writ Of Habeas Corpus Would Violate Substantive Due Process.

Without the opportunity to develop facts, the DTA procedures would violate substantive due process liberty interests. In considering the constitutionality of the authorization for detention contained in 8 U.S.C. § 1231(a)(6) (1994), the Supreme Court stated in *Zadvydas*:

> A statute permitting indefinite detention of an alien would raise a serious constitutional problem. The Fifth Amendment's Due Process Clause forbids the Government to 'depriv[e]' any 'person . . . of . . . liberty . . . without due process of law.' Freedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the liberty that clause protects.

533 U.S. at 690. The Court ultimately resolved the case by interpreting the statute to forbid indefinite detention. Identical concerns arising out of the substantive liberty

74

component of the Due Process Clause apply here. The liberty interests are especially compelling because a reading of the statute that would foreclose factual development would leave persons like Abdul Rahim unable to bring to any neutral forum allegations not only wrongful indefinite detention but use of torture. Should the Court adopt a very narrow interpretation of the statute, it would be required to address the due process question raised but avoided in *Zadvydas* and *Martinez* on the indefinite detention of deportable and inadmissible aliens.

The MCA and DTA must either incorporate full habeas corpus protections against unlawful detention – including prompt action, full factual development, and a reasoned decision by a judge independent of the Executive Branch – or they are unconstitutional as applied to Abdul Rahim.

## VIII.  Leave To Amend May Be Appropriate.

Abdul Rahim has filed this Petition without benefit of any official records or documents relating to his CSRT proceeding other than the records released publicly pursuant to the Freedom of Information Act litigation. While Abdul Rahim believes that he has set forth compelling facts and arguments in support of his prayer for immediate release, he reserves the right to amend this petition and add additional claims in the event that Respondent controverts the facts set forth herein.

Further, the existing mechanisms for access to Guantánamo Bay and for communication between attorney and client have proved workable in this case under the district court protective orders and memoranda of understanding. Abdul Rahim anticipates that those procedures will remain in place under the Motion To Stay-and-Abey that is pending in the District Court. In the event that problems develop, Abdul Rahim will seek this courts intervention either through amendment of this petition or separate motion. *See Boumediene v. Bush*, 2007 WL 957363 (Ap. 2, 2007) ("Were the Government to take additional steps to prejudice the position of the petitioners to seeking review in this court 'courts of competent jurisdiction,'... should act promptly to ensure the office and purposes of the writ of habeas corpus are not compromised.").

**PRAYER FOR RELIEF**

On the basis of the foregoing, Abdul Rahim respectfully requests that the Court grant the following relief:

- order the Respondent to release the petitioner from custody;

- declare that Abdul Rahim is not and was not an enemy combatant;

- ban transfer of Abdul Rahim to his home country without specific approval of this Court after an opportunity to be heard on forced repatriation questions;

76

- preserve the status quo regarding access by attorneys to the petitioner during the pendency of these proceedings;

- grant expedited scheduling of all proceedings to mitigate the imminent and irreparable harm the petitioner is suffering;

- in the alternative, order the district court to proceed with Abdul Rahim's petition for a writ of habeas corpus on an expedited basis or provide such relief in this Court;

- grant interim relief in the form of conditional release in the United States pursuant to the procedures for inadmissible aliens in *Clark v. Martinez*, 543 U.S. 371 (2005); and

- fashion such other remedies as law and justice require under the laws and Constitution of the United States.

Dated this 10th day of April, 2007.

Steven T. Wax
Federal Public Defender

Stephen R. Sady
Chief Deputy Federal Public Defender

Patrick J. Ehlers
Assistant Federal Public Defender

77

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2007, I filed and served the foregoing Memorandum in Support of Petition for Immediate Release and Other Relief Under the Detainee Treatment Act of 2005 by causing two copies to be delivered to the Privilege Review Team via Federal Express, with the original and four copies to be forwarded to the Court, and one copy to be conformed and returned to our office.

I further certify that upon receiving clearance from the Privilege Review Team, one copy will be forwarded to the following counsel of record via U.S. mail:

Peter D. Keisler
Jonathan F. Cohn
Douglas N. Letter
Robert M. Loeb
Catherine Y. Hancock
Civil Division, Room 7268
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C.  20530-0001

Terry Marcus Henry
U.S. Department of Justice
P.O. Box 883
20 Massachusetts Avenue, NW
Suite 7144
Washington, DC 20044

Judry Laeb Subar
U.S. Department of Justice
Federal Programs Branch
20 Massachusetts Avenue, NW
Room 7342
Washington, DC 20530

Jill C. Dozark