Steven T. Wax, OSB #85012
Federal Public Defender
steve_wax@fd.org
Stephen R. Sady
Chief Deputy Federal Public Defender
steve_sady@fd.org
101 SW Main Street, Suite 1700
Portland, Oregon 97204
Tel:    503-326-2123
Fax:    503-326-5524

Attorneys for Petitioner

PREVIOUSLY FILED WITH CSO AND
CLEARED FOR PUBLIC FILING

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDULRAHIM ABDUL RAZAK AL GINCO, <br><br>                         Petitioner, <br><br>         v. <br><br> GEORGE W. BUSH, et al., <br><br>                    Respondents. | CV 05-1310-RJL <br><br> MOTION TO LIFT STAY AND SCHEDULE EXPEDITED HEARING ON PENDING MOTION FOR SUMMARY JUDGMENT <br><br> EMERGENCY STATUS CONFERENCE REQUESTED |

The petitioner, through his attorneys, Steven T. Wax and Stephen R. Sady,

respectfully moves this Court for an order vacating the stay that has been in effect since

October 24, 2005, and scheduling on an expedited basis the motion for summary judgment

Page 1    MOTION TO LIFT STAY AND SCHEDULE EXPEDITED HEARING ON PENDING MOTION
FOR SUMMARY JUDGMENT

that has been pending in this Court since September 21, 2006, which also included a motion to lift the stay. The petitioner withdraws the motion for a stay and abey order pending exhaustion under the Detainee Treatment Act, which was filed on April 9, 2007, given the Supreme Court's opinion in *Boumediene v. Bush*, No. 06-1195 (U.S., June 12, 2008), that the DTA provides an inadequate substitute for the writ of habeas corpus and need not be exhausted before this Court can proceed.

This Court has authority to grant relief based on the extrinsic evidence provided to this Court pursuant to the Supreme Court's decision in *Boumediene*. The summary judgment submissions establish lack of military jurisdiction on four separate and related theories:

1)      Because a torture victim and political prisoner of the Taliban for almost two years prior to September 11, 2001, is not an enemy combatant under any statutorily authorized definition of that term, Mr. Ginco is factually innocent of the designation and is being imprisoned in the absence of a decision of a competent tribunal.

2)      Because Mr. Ginco was a Taliban torture victim and political prisoner for almost two years prior to the Authorization for the Use of Military Force, the temporal nexus for seizure required by the laws of war and *Hamdan v. Rumsfeld*, 126 S.Ct. 2749, 2795 (2006), forecloses Department of Defense initial jurisdiction;

3)      Because the Department of Defense considered and relied on videotapes of Mr. Ginco that are the products of Taliban torture and threats of death, the resulting imprisonment violated Article 15 of the Convention Against Torture, which bars the use of the results of torture in any proceedings and forecloses Department of Defense initial jurisdiction; and

4)      Because initial custody resulted from Mr. Ginco approaching United States authorities to volunteer to be a witness to human rights violations, including against American citizens, the Department of Defense lacked jurisdiction to

designate him as an enemy combatant, especially in light of statutory and constitutional protections for witnesses.

The procedural history, relevant facts, and applicable law are updated and summarized in the petition for mandamus, which is attached as Exhibit A, that is before the Supreme Court in *Ginco v. Gates*, No. 07-10553.

The petitioner requests that the Court convene an emergency status conference to consider this motion and to schedule further proceedings. In proceedings under the DTA, the Circuit Court granted a motion to expedite this case on August 23 and 24, 2007. Six months earlier, this Court considered a motion for an emergency hearing on the motion to lift the stay that was denied, apparently on jurisdictional grounds, the day following the Circuit Court's decision in *Boumediene* (February 20, 2007), which has now been reversed.

The need for emergency action persists: Mr. Ginco has established a prima facie case that he is unlawfully detained and, with six years in indefinite imprisonment compounded by the psychological trauma caused by two years of torture and abuse by the Taliban, he is suffering irreparable harm from delay. The emergency setting of a status conference and expedited scheduling is appropriate because Mr. Ginco is "entitled to a prompt" habeas corpus hearing. *Boumediene*, *supra* at \*66.

Respectfully submitted this 12th day of June, 2008.

　　　　　　　　　　　　　　　　　　　　*/s/ Steven T. Wax and Stephen R. Sady*
　　　　　　　　　　　　　　　　　　　　Steven T. Wax/Stephen R. Sady
　　　　　　　　　　　　　　　　　　　　Attorneys for Petitioner

No. _____

_____

IN THE

SUPREME COURT OF THE UNITED STATES

_____

In re Abdul Rahim Abdul Razak Al Ginco,
Inmate Serial Number 489, Guantánamo Bay
Naval Base, Guantánamo Bay, Cuba,

Petitioner.

_____

MOTION FOR LEAVE
TO PROCEED *IN FORMA PAUPERIS*

_____

The petitioner, Abdul Rahim Abdul Razak Al Ginco, requests leave to file the

attached petition for writ of mandamus to the United States Court of Appeals and

District Court for the District of Columbia without prepayment of costs and to

proceed *in forma pauperis* pursuant to Rule 39.1 of this Court and 18 U.S.C.

§3006A(d)(7). The petitioner was represented by counsel appointed under the

Criminal Justice Act in the District Court and the Court of Appeals for the District of

Columbia, and therefore no affidavit is required.

Respectfully submitted this 21ˢᵗ day of April, 2008.

Stephen R. Sady
Attorney for Petitioner

EXHIBIT A
Page 1 of 52

No. _____

_____

IN THE
SUPREME COURT OF THE UNITED STATES
_____

In re Abdul Rahim Abdul Razak Al Ginco,
Inmate Serial Number 489, Guantánamo Bay
Naval Base, Guantánamo Bay, Cuba,

Petitioner.

_____

On Petition For Writ Of Mandamus To The Court Of Appeals For The District Of
Columbia Regarding The Emergency Motion For Interim Relief Filed On October
31, 2007, Or, In The Alternative, To The District Court For The District Of
Columbia Regarding The Habeas Corpus Motion For Summary Judgment Pending
Since September 21, 2006

_____

PETITION FOR WRIT OF MANDAMUS
_____

Steven T. Wax
Federal Public Defender
Stephen R. Sady
*Counsel of Record*
Chief Deputy Federal Public Defender
101 SW Main Street, Suite 1700
Portland, Oregon 97204
Telephone: (503) 326-2123
Facsimile: (503) 326-5524

Attorneys for Petitioner

## QUESTIONS PRESENTED

The central two issues before this Court relate to procedures and remedies under the Detainee Treatment Act, or, alternatively, under the habeas corpus statutes, where the prisoner has established by extrinsic facts a substantial likelihood of success and immediate and irreparable harm:

> Where the Court of Appeals granted a motion to expedite proceedings under the DTA, and thereafter the military found that "new evidence" submitted by the prisoner's counsel created a "substantial likelihood" that the results of the CSRT under which the prisoner is being held would have been different, whether the Court of Appeals should rule forthwith on an emergency motion filed on October 31, 2008, requesting immediate conditional release and other interim relief; and

> In the alternative, where the petitioner filed a habeas corpus petition under 28 U.S.C. § 2241 based on *Rasul v. Bush*, 542 U.S. 466 (2004), and moved for summary judgment based on affirmative evidence establishing his innocence and the lack of initial military jurisdiction, whether the subsequent enactment of the jurisdiction-stripping provisions of the Military Commissions Act of 2006 violated constitutional limitations on Congress's authority to suspend or eliminate the writ of habeas corpus.

Because the petitioner invokes the extraordinary writ of mandamus, three additional issues must be addressed:

> Whether the petitioner lacks an adequate alternative remedy in any court based on the indefinite stay in the District Court, which has been in effect for two-and-a-half years, and the Court of Appeals' failure to rule on the pending motion for emergency interim relief since its filing on October 31, 2007, given the prisoner's affirmative evidence of lack of military jurisdiction and any other effective procedures for timely relief;

i

Whether the availability of interim or other relief from six years of indefinite imprisonment of a former prisoner of the Taliban, whose arrest followed from volunteering to provide the United States evidence regarding human rights violations against him and others, raises questions of exceptional importance regarding the administration and interpretation of the DTA, where initial military jurisdiction is at issue based on Mr. Ginco's prima facie evidence that

> 1) the temporal nexus required for military jurisdiction is lacking because Mr. Ginco was a political prisoner of the Taliban for almost two years prior to the Authorization for the Use of Military Force;

> 2) because Mr. Ginco was not only not taken on the battlefield, but approached the United States through journalists offering to testify to human rights violations, his imprisonment violates protections for voluntary witnesses;

> 3) the military's assertion of jurisdiction violates Article 15 of the Convention Against Torture because the military used the products of Taliban and Al Qaeda torture to provide the basis for detention; and

> 4) Mr. Ginco's continued imprisonment violates the AUMF because Mr. Ginco, as a political prisoner of the Taliban, does not meet any plausible definition of "enemy combatant."

Whether the resolution of the questions raised in this petition are in aid of this Court's jurisdiction where the initial petition, based on *Rasul*, and the DTA motion have been indefinitely stalled, preventing the important constitutional and statutory issues they raise from being brought before and resolved by this Court, thereby causing immediate, continuing, and irreparable harm to the petitioner.

ii

## PARTIES TO THE PROCEEDING

Pursuant to Rule 14.1, the following list identifies the parties appearing here and in the courts below:

The petitioner, Abdul Rahim Abdul Razak Al Ginco, is a citizen of Syria being held prisoner in United States custody at the United States Naval Base at Guantánamo Bay, Cuba, who is the petitioner in *Ginco v. Bush*, 05-1310, a pending habeas corpus case in the United States District Court for the District of Columbia; in *Ginco v. Gates*, 07-1090, a pending DTA petition in the Court of Appeals for the District of Columbia; and *Ginco v. Bush*, 06-5191, a pending interlocutory appeal for a preliminary order in the habeas case in the Court of Appeals for the District of Columbia.

The named Respondents in the District Court habeas corpus proceedings, Civil Number 05-1310, are George W. Bush, President of the United States; Donald H. Rumsfeld, United States Secretary of Defense; Jay Hood, Army Brigadier General, Joint Task Force – GTMO; and Michael I. Bumgarner, Colonel, Commander, Joint Detention Operations Group – JTF– GTMO.   The District Court Judge is the Honorable Richard J. Leon. The Respondent in the Circuit Court Detainee Treatment Act proceeding is Robert M. Gates, Secretary of Defense of the United States of America.

iii

EXHIBIT A
Page 5 of 52

# TABLE OF CONTENTS

Page

Questions Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Parties to the Proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Petition for Writ of Mandamus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     B.    Statement Of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Reasons for Granting a Writ of Mandamus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

     A.    The Court of Appeals' Failure To Rule On The Emergency
            Motion Under The DTA And The Indefinite Stay Of Habeas
            Corpus Proceedings Establish That Adequate Relief Cannot Be
            Obtained In Any Other Form Or From Any Other Court . . . . . . . . . 24

     B.    This Petition Involves Exceptional Circumstances Warranting
            This Court's Exercise Of Discretion Because The Availability Of
            Interim Relief Presents And Encompasses Questions Of Great
            Importance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

          1.    The Temporal Nexus For Seizure Required By The Laws
                Of War And *Hamdan v. Rumsfeld*, 126 S.Ct. 2749 (2006),
                Is Lacking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

iv

2.  The Military Lacks Authority to Indefinitely Detain An Alien Who Approached United States Authorities To Provide Voluntary Witness To Human Rights Violations . . . 31

3.  Mr. Ginco's Imprisonment Is Based On The Products Of Taliban Torture And Threats Of Death, In Violation Of Article 15 Of The Convention Against Torture . . . . . . . . . . . 32

4.  A Taliban Torture Victim And Political Prisoner Does Not Meet Any Plausible Definition Of Enemy Combatant  . . . . . 35

C.  The Writ Will Aid In This Court's Jurisdiction . . . . . . . . . . . . . . . . 37

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

v

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Al Odah v. United States*,
   127 S. Ct. 3067 (June 29, 2007) (No. 06-1196) ...................... 6

*Application of Yamashita*,
   327 U.S. 1 (1946) ....................................... 24, 25

*Belbacha v. Bush*,
   No. 07-5258, 2008 WL. 680637 (D.C. Cir. Mar. 14, 2008) ........... 27

*Bismullah v. Gates*,
   501 F.3d 178 (D.C.Cir. 2007) .............................. 11, 12

*Bismullah v. Gates*,
   503 F.3d 137 (D.C.Cir. 2007) ................................ 12

*Blackburn v. Alabama*,
   361 U.S. 199 (1960) ........................................ 33

*Boumediene v. Bush*,
   127 S. Ct. 1478 (April 2, 2007) ............................... 10

*Boumediene v. Bush*,
   127 S. Ct. 3078 (June 29, 2007) ............................ 6, 11

*Boumediene v. Bush*,
   450 F. Supp. 2d 25 (D.D.C. 2006) .............................. 8

*Boumediene v. Bush*,
   476 F.3d 981 (D.C. Cir. 2007) ................................. 9

*Bram v. United States*,
   168 U.S. 532 (1897) ........................................ 33

vi

*Carafas v. LaVallee,*
    391 U.S. 234 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Clark v. Martinez,*
    543 U.S. 371 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 27

*Crowell v. Benson,*
    285 U.S. 22 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Gates v. Bismullah,*
    128 S. Ct. 1345 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Hamdan v. Rumsfeld,*
    126 S. Ct. 2749 (2006) . . . . . . . . . . . . . . . . . . . . . . 1, 7, 25, 28, 29, 30, 35

*Hamdi v. Rumsfeld,*
    542 U.S. 507 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 31, 35, 36

*Harris v. Nelson,*
    394 U.S. 286 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Jackson v. Denno,*
    378 U.S. 368 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Khalid v. Bush,*
    355 F. Supp. 2d 311 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Little v. Barreme,*
    6 U.S. 170 (1804) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Mathews v. Eldredge,*
    424 U.S. 319 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Ex parte Milligan,*
    71 U.S. 2 (1866) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Quarles,*
   158 U.S. 532 (1885) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Rasul v. Bush,*
   542 U.S. 466 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 24

*Sanders v. United States,*
   373 U.S. 1 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Siderman de Blake v. Argentina,*
   965 F.2d 699 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Stack v. Boyle,*
   342 U.S. 1 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Storti v. Massachusetts,*
   183 U.S. 138 (1901) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. United Mine Workers,*
   330 U.S. 258 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 27

*Watkins v. Sowders,*
   449 U.S. 341 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Zadvydas v. Davis,*
   533 U.S. 678 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## FEDERAL STATUTES

8 U.S.C. § 1101(a)(15) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

10 U.S.C. § 801 note . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

18 U.S.C. § 3144 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

28 U.S.C. § 1651(a), 2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

28 U.S.C. § 2241 ................................................ 3, 5

28 U.S.C. § 2243 ............................................... 3, 38

PETITION FOR WRIT OF MANDAMUS REQUIRING A RULING ON THE EMERGENCY MOTION PENDING IN THE COURT OF APPEALS OR, IN THE ALTERNATIVE, ON THE MOTION FOR SUMMARY JUDGMENT PENDING IN THE DISTRICT COURT

Pursuant to the All Writs Act, 28 U.S.C. § 1651(a), and Supreme Court Rule 20, the petitioner, Abdul Rahim Abdul Razak Al Ginco, a citizen of Syria imprisoned at the United States Naval Base in Guantánamo, Cuba, respectfully petitions the Court for a writ of mandamus to the United States Court of Appeals for the District of Columbia ordering that a ruling issue forthwith on his emergency motion for interim relief, including conditional release, that has been pending since October 31, 2007, or, in the alternative, to the United States District Court for the District of Columbia ordering that its October 14, 2005, stay of his habeas corpus proceedings be vacated and that the District Court adjudicate forthwith the summary judgment motion filed on September 21, 2006. In both the District Court and Court of Appeals, Mr. Ginco has submitted affirmative evidence establishing a prima facie case that he is unlawfully detained on the following grounds:

1)    Because Mr. Ginco was a Taliban torture victim and political prisoner for almost two years prior to the Authorization for the Use of Military Force, the temporal nexus for seizure required by the laws of war and *Hamdan v. Rumsfeld*, 126 S.Ct. 2749, 2795 (2006), forecloses Department of Defense initial jurisdiction;

1

2)  Because initial custody resulted from Mr. Ginco approaching United States authorities to volunteer to be a witness to human rights violations, the Department of Defense lacked jurisdiction to designate him as an enemy combatant, especially in light of statutory and constitutional protections for witnesses; and

3)  Because the Department of Defense considered and relied on videotapes of Mr. Ginco that are the products of Taliban torture and threats of death, the resulting imprisonment violated Article 15 of the Convention Against Torture, which bars the use of the results of torture in any proceedings and therefore forecloses Department of Defense initial jurisdiction;

4)  Because a torture victim and political prisoner of the Taliban for almost two years prior to September 11, 2001, is not an enemy combatant under any plausible definition of that term, Mr. Ginco is factually innocent of the designation and is being imprisoned in the absence of a decision of a competent tribunal.

This Court's discretionary authority to grant the writ of mandamus is appropriate because: 1) no adequate relief is available given the indefinite delay in the Court of Appeals under the Detainee Treatment Act of 2006 and the indefinite stay in the District Court of the habeas corpus proceedings; 2) the affirmative extrinsic evidence establishing the unlawfulness of the petitioner's imprisonment, which has now lasted six years, raises questions of exceptional importance; and 3) without a ruling on the emergency motion for interim relief or the summary judgment motion, the Court cannot consider the unique and important issues that will otherwise be indefinitely delayed while the petitioner suffers severe and irreparable harm. The timely

2

adjudication Mr. Ginco seeks is required by both the DTA and habeas corpus to the extent that the DTA must be construed to include a remedy parallel to that provided under 28 U.S.C. § 2243 ("The court shall summarily hear and determine the facts, and dispose of the matter as law and justice require."), which incorporates the imperative for speedy resolution under the traditional writ of habeas corpus.

## JURISDICTION

This Court's jurisdiction is invoked pursuant to 28 U.S.C. § § 1651(a), 2241, and 2242, and under Article III of the United States Constitution.

## STATEMENT

For almost two years, Mr. Ginco suffered torture and inhumane treatment as a political prisoner of the Taliban. When American bombing resulted in his liberation from the Taliban, he offered United States authorities his testimony regarding human rights violations. Instead of being treated as a friendly non-combatant, he was taken into custody and has now spent over six years in harsh imprisonment in Guantánamo. Since September 2006, Mr. Ginco has asked the courts to release him based on extrinsic evidence that he is not an enemy combatant. He now petitions this Court to exercise its authority to grant a writ of mandamus. The procedural history shows that Mr. Ginco has made repeated and futile efforts to have his jurisdictional arguments heard on an expedited basis for almost 20 months and that no adequate relief is

3

available from any other court. The documents in the attached Factual Appendix were summarized in the Statement of Material Facts and supporting exhibits filed in the DTA action, which parallel the Statement of Material Facts submitted to the District Court in full compliance with Rule 56 of the Federal Rules of Civil Procedure. The facts establish a prima facie case that Mr. Ginco is not only not an enemy combatant but that, because the military lacked jurisdiction over him, no competent tribunal has made an enemy combatant determination. The extraordinarily important facts and legal issues raised by the emergency motion for interim relief will not timely reach this Court during the delays that daily result in irreparable and immediate injury to Mr. Ginco.

A.     **Procedural History**

1.     Subsequent to this Court's holding that the United States exercises "complete jurisdiction and control" over Guantánamo Bay in *Rasul v. Bush*, 542 U.S. 466, 480-81 (2004), military authorities provided notification of the *Rasul* holding to the prisoners in Guantánamo. On June 30, 2005, Abdul Rahim Abdul Razak Al Ginco submitted a pro se document in the District Court for the District of Columbia stating that there was no basis for him to be held in Guantánamo as an enemy combatant, which the District Court deemed a petition for habeas corpus filed under

4

28 U.S.C. § 2241. PA-HC 1.[1] Mr. Ginco stated he was jailed by Al Qaeda and Taliban forces for two years before the events of September 11, as the Red Cross could corroborate, and he had been "accused of being a spy working for the United States of America." PA-HC 2. Abdul Rahim further alleged that he did not "pose any threat to the United States and its allies and the proof is the accusation of Al Qaeda and Taliban to me stating I was an American spy and not only that but also that I cooperated with the interrogators for the past three years up to the present time, and I am requesting from the interrogators to make a statement of that." PA-HC 2. Without filing a Return, the Respondents filed a motion for a stay on July 18, 2005. PA-HC 4.

    2.       On August 2, 2005, Mr. Ginco, filed a supplemental petition for writ of habeas corpus stating the following:

> . . . I am and was a victim of Al Qaeda and the Taliban in the past. I have spent two years in their prison that so-called Sareezah Prison in Qandahar, Afghanistan. Then the American forces appeared and apprehended me; from prison they brought me to here, hence the ICRC requested from the American forces to release us. The American forces made promises that they were going to release us three days later. However, they have gone back on their promise and since those three days, here we are approaching the fourth year. How can that be? I was

---

[1] Citations in the procedural history are to three procedural appendices submitted herewith, the Procedural Appendix – Habeas Corpus (PA-HC), the Procedural Appendix – Interlocutory Appeal (PA-IA), and the Procedural Appendix – Detainee Treatment Act (PA-DTA).

> informed that it is my right to object in the American courts. Therefore,
> I say with all pride that I am not a threat to the U.S.A. or to any of its
> allies. I was a university student and I am wholly prepared to cooperate
> with the American government. This is in addition that I was
> cooperative and I have been for a period of more than three years. Thus,
> what do the American forces want with me?

PA-HC 15; *see also* PA-HC 17 (asking how he can be an enemy combatant when the Americans freed him from the Taliban jail and he considers himself "a friend to the Americans and I want you to know that I am not a threat at all."). On October 14, 2005, the Court appointed counsel to represent Mr. Ginco, but no appearance was entered pursuant to that order. PA-HC 22. The Court entered a protective order and stayed proceedings on October 24, 2005. PA-HC 23.

      3.      On January 4, 2006, the government filed a notice of the enactment of the Detainee Treatment Act of 2005, stating its intention to file a motion to dismiss on the ground that the DTA retroactively stripped the District Court of § 2241 jurisdiction. PA-HC 58. Because the District Court habeas cases were stayed pending the outcome in the Court of Appeals in the cases that are still pending before this Court,[2] on March 17, 2006, the Oregon Federal Public Defender Office, which was then representing four other prisoners in Guantánamo, filed an amicus brief in the Court of Appeals, asserting that the DTA operated prospectively only and, if

---

    [2] *Boumediene v. Bush*, 127 S.Ct. 3078 (June 29, 2007) (No. 06-1195); *Al Odah v. United States*, 127 S.Ct. 3067 (June 29, 2007) (No. 06-1196).

retroactive, exceeded Article I authority by eliminating the writ of habeas corpus, and violating the Due Process, Ex Post Facto Bill of Attainder, and Equal Protection Clauses. PA-HC 25-48.

4.    On April 11, 2006, the Oregon Federal Public Defender office entered a notice of appearance for Mr. Ginco pursuant to the District Court's amendment of its original appointment order. PA-HC 67. On May 2, 2006, out of concern regarding Syria's human rights record, counsel filed an anti-rendition motion, requiring either a court order or notice before transfer of Mr. Ginco. PA-HC 69. After briefing (PA-HC 71-129), the District Court denied this motion without explanation on May 30, 2006. PA-HC 130. Mr. Ginco filed an interlocutory appeal regarding that issue on June 22, 2006. PA-HC 131. On August 9, 2006, the government filed a motion to consolidate the appeal with notice-of-transfer cases it had appealed and sought to hold all cases in abeyance, which Mr. Ginco opposed. PA-IA 4, 9. The court granted the government's motion on August 28, 2006. PA-IA 12.

5.    On June 29, 2006, this Court entered its decision in *Hamdan v. Rumsfeld*, 126 S.Ct. 2749 (2006), holding that the DTA only operated prospectively. On July 7, 2006, the government filed a motion for a filter team to review previously seized attorney-client material. After full briefing by the parties and oral argument, the

7

EXHIBIT A
Page 18 of 52

District Court denied the government's motion on August 28, 2006, in an opinion reported at *Boumediene v. Bush*, 450 F.Supp.2d 25 (D.D.C. 2006). PA-HC 133.

    6.    On September 21, 2006, Mr. Ginco filed motions to lift the stay and for summary judgment based on a statement of material facts establishing that the military lacked jurisdiction over him and that he was innocent of the enemy combatant designation. PA-HC 147-92, 211-49.[3] The government opposed the motion to lift the stay (PA-HC 193), and on October 18, 2006, the government filed a notice of the post-filing enactment of the Military Commissions Act of 2006 (PA-HC 265). Mr. Ginco replied on November 8, 2006, asserting that the MCA could not constitutionally deprive the District Court of jurisdiction, that his pleadings established the need for an immediate ruling, and that the District Court should lift the stay and rule. PA-HC 281. As the stay in the District Court continued while the Court of Appeals received further briefing on the MCA in the *Boumediene* cases, the Oregon Federal Defender submitted a second amicus brief, this time focusing on habeas corpus factual development to establish the unlawfulness of Executive detentions. PA-HC 268-80. Counsel discussed Mr. Ginco's case at pages 6-7 of the brief.

---

    [3] On October 5, 2006, Mr. Ginco's counsel submitted the summary judgment arguments and exhibits to the Department of Defense's Office for the Administrative Review of the Detention of Enemy Combatants (OARDEC).

8

7.      On January 25, 2007, Mr. Ginco's counsel filed an emergency motion for a hearing on the stay because Mr. Ginco's psychological state was seriously deteriorating. PA-HC 295. The motion was supported by an affidavit and exhibits establishing that medical personnel were apparently not treating Mr. Ginco as the verified victim of Taliban torture that he is and that his treatment was aggravating rather than ameliorating the serious conditions suffered by persons with torture-induced mental health problems. PA-HC 302. On February 7, 2007, counsel submitted a second affidavit documenting a suicide attempt and continued extreme psychological distress. PA-HC 310. The government opposed the request for a hearing, to which Mr. Ginco replied. PA-HC 321, 335. On February 20, 2007, the Court of Appeals issued its opinion in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007). On February 21, 2007, the District Court entered a minute order denying the emergency motion for a hearing. PA-HC 348.

8.      On March 6, 2007, the Court of Appeals issued an order in the interlocutory appeal, *Ginco v. Bush*, No. 06-5191, granting a motion to consolidate with additional cases in which the government had appealed District Court orders granting 30-day notices. PA-IA 14. In light of the *Boumediene* decision, the Court of Appeals directed the parties to file motions to govern further proceedings by April 6, 2007. PA-IA 19. On March 22, 2007, the government requested that the Court of

9

Appeals dismiss the District Court orders and dismiss the underlying petitions. PA-IA 23. On April 4, 2007, Mr. Ginco filed a motion to sever the interlocutory appeal from the cases in which prisoners were appellees based on the unique issues presented based on the factual development in his case. PA-IA 33.

9.      On April 2, 2007, this Court denied the petition for certiorari in *Boumediene v. Bush,* with a statement by Justice Stevens and Justice Kennedy that Supreme Court review was premature before exhaustion of available remedies. 127 S.Ct. 1478 (2007). On April 9, 2007, Mr. Ginco filed in the District Court a motion to stay his habeas corpus case and hold it in abeyance pending exhaustion of DTA remedies in this Court. PA-HC 349. On April 19, 2007, based on the denial of certiorari in *Boumediene,* the government moved in the District Court to dismiss the habeas corpus proceedings. PA-HC 365. On the same day, Mr. Ginco filed his opposition to dismissal in the Court of Appeals. PA-IA 70. On May 2, 2007, Mr. Ginco filed in the District Court a memorandum in opposition to dismissal, to which the Respondent replied on May 10, 2007. PA-HC 387, 412. That motion is still pending.

10.      On April 11, 2007, the petitioner filed for relief under the DTA in the Court of Appeals and moved for expedited consideration of the jurisdictional issues based on the extrinsic evidence presented in the District Court summary judgment

10

proceedings. PA-DTA 1, 183. On May 1, 2007, following briefing, the Court of
Appeals deferred ruling on the motion to expedite pending a discovery decision in
*Bismullah v. Gates*, No. 06-1197 (D.C. Cir.). PA-DTA 193, 203, 215.

11.     On June 7, 2007, the Court of Appeals denied the government's motion
to dismiss the interlocutory appeal without prejudice and, based on its *Boumediene*
decision, granted the motion to dismiss Mr. Ginco's appeal for lack of subject matter
jurisdiction. PA-IA 120. After this Court's grant of certiorari in *Boumediene* on June
29, 2007, Mr. Ginco filed a petition for rehearing and rehearing en banc (PA-IA 121),
which resulted in orders on October 17, 2007, deferring the rehearing en banc and
holding the panel rehearing on the interlocutory appeal in abeyance pending
*Boumediene*. PA-IA 146-47.

12.     On July 23, 2007, the first business day following the initial appellate
decision in *Bismullah v. Gates*, 501 F.3d 178 (D.C.Cir. 2007), Mr. Ginco renewed his
request for expedition in his motion to govern proceedings, requested bifurcation of
jurisdictional issues to allow immediate consideration of the four jurisdictional
questions, and asserted that the court should rule without the necessity of addressing
the procedural issues in *Bismullah*. PA-DTA 216. On August 3, 2007, the
government filed an opposition to expedited consideration, asserting that extrinsic
evidence could not be considered: "Each of those claims rely upon extra-record

11

factual assertions, and thus would require the Court, contrary to *Bismullah*, to consider material outside the record." PA-DTA 225, 230. The Respondent also indicated that a petition for rehearing in *Bismullah* might be filed.[4]

13.    On August 23 and 24, 2007, the Court of Appeals granted expedition and set a schedule. PA-DTA 238, 239. The court denied Mr. Ginco's request for bifurcation of jurisdictional issues and ordered the filing of a certified index in compliance with *Bismullah* on October 3, 2007; the petitioner's brief on November 9, 2007; the respondent's brief on December 10, 2007; and the reply brief on December 24, 2007. On August 31, 2007, the government in *Paracha v. Gates*, No. 06-1038, with a specific reference to the order in Mr. Ginco's DTA case, moved to stay the production of the record described in *Bismullah*, asserting that production could not be completed in the pending cases on schedule and that a petition to rehear *Bismullah* would be filed on September 7, 2007.

14.    On September 13, 2007, the government filed a motion to remand Mr. Ginco's case to the military or to hold the DTA petition in abeyance based on the military's determination, which was made on August 24, 2007, that "new evidence"

---

[4] After the government petitioned for rehearing and rehearing en banc, the Court of Appeals amended the opinion and denied rehearing en banc. *Bismullah v. Gates*, 503 F.3d 137 (D.C.Cir. 2007), *denying rehearing en banc*, 514 F.3d 1291 (D.C.Cir. 2008). A petition for certiorari is pending. *Gates v. Bismullah*, 128 S.Ct. 1345 (2008).

12

provided by Mr. Ginco's habeas corpus counsel, supported by independent investigation, warranted the convening of a new Combatant Status Review Tribunal. PA-DTA 241. In order to warrant a new CSRT, the new evidence must be "material", which in turn is defined as "information [that] creates a substantial likelihood that the 'new evidence' would have altered the CSRT's prior determination that the detainee is an enemy combatant." OARDEC Instruction 5421.1, *Procedure for Review of 'New Evidence' Relating to Enemy Combatant (EC) Status* (May 7, 2007). PA-DTA 252. The Respondent represented that a new CSRT was expected within 60 days. PA-DTA 243.[5]

15.    On September 27, 2007, the government moved for a stay, stating that the new CSRT was anticipated in "late October." PA-DTA 266, 270. Mr. Ginco opposed both the remand and the stay motions, but agreed to adjust the production schedule to accommodate the late October date. PA-DTA 254, 281. On October 23, 2007, the Court of Appeals entered an order denying the government's motions for

---

[5] On September 17, 2007, Mr. Ginco's counsel submitted the DTA arguments and additional evidence to OARDEC and requested that counsel participate in the new CSRT as representative, witness, or observer.

13

remand and stay, setting October 31, 2007, for the filing of new motions to govern.
PA-DTA 300.[6]

16.  On October 31, 2007, Mr. Ginco's counsel, having been informed that

no CSRT would be held in October as previously indicated, filed an emergency

motion for immediate conditional release, expedited hearing, and other interim relief.

PA-DTA 308. Mr. Ginco asserted that, given that he had established both imminent

irreparable harm and substantial likelihood of success on the merits, the DTA had to

be construed to include the authority to grant interim relief, relying on authority

including *Clark v. Martinez*, 543 U.S. 371 (2005), and *United States v. United Mine*

*Workers*, 330 U.S. 258 (1997). On the same day, the government filed a status report

anticipating that the CSRT would occur by November 13, 2007, which was corrected

by a supplement to December 3, 2007. PA-DTA 332. The government filed an

opposition to the emergency motion on November 7, 2007, stating that the new CSRT

was "currently estimated to begin in early December," to which Mr. Ginco replied on

November 8, 2007. PA-DTA 335, 370. The government submitted a status report on

December 7, 2007, stating that the new CSRT was expected on or before December

14, 2007, not on December 3d as originally estimated. PA-DTA 420.

---

[6] The court stated, "Based on the respondent's representations, the Court
expects the new Combatant Status Review Tribunal to be completed expeditiously."

14

17.    On December 10, 2007, with no decision on the emergency motion, Mr. Ginco filed a supplement requesting that the unclassified exculpatory evidence in the government's possession be provided prior to a scheduled attorney visit to Guantánamo, which the government opposed. PA-DTA 423, 427. On December 13, 2007, the Court of Appeals entered an order denying without prejudice the supplement, deferring ruling on discovery issues, and requiring "a status report on the progress of the new CSRT proceeding, and a status report every 14 days thereafter until a new CSRT determination is made." PA-DTA 435.

18.    The government's status reports documented further delays:

12/20/07:    "We are informed that respondent continues to work toward finalizing information needed to convene the CSRT....[and] expects to present the unclassified summary to the petitioner within the next 7-10 days. PA-DTA 435-37.

1/3/08:    "At this time, respondent expects to present the unclassified summary to the petitioner within the next 7 days." PA-DTA 439.

1/17/08:    The petitioner was presented the unclassified summary on January 10, the tribunal has been constituted, and "No hearing date has been set." PA-DTA 442.

1/31/08:    "No hearing date has been set." PA-DTA 445.

On February 6, 2007, Mr. Ginco filed an objection to status report and second supplement to the emergency motion, stating that the delays and lack of information

15

conveyed in the status reports required the Court of Appeals to act on the emergency

motion to prevent irreparable harm.  PA-DTA 448.

19.     On February 14, 2008, the government filed a status report stating that

a CSRT hearing was scheduled for that day.  PA-DTA 459.  The government also

responded to Mr. Ginco's objection.  PA-DTA 462.  The next status report on

February 28, 2008, stated that the new CSRT had been held but did not say what

happened, but only that "post-hearing procedures" were occurring, referencing rules

that a legal and Director review should follow the CSRT.  PA-DTA 466.[7]  The March

13th status report said the same thing.  PA-DTA 469.  On March 25, 2008, Mr.

Ginco's counsel submitted a third supplement to the emergency motion, again

pointing out the severe psychological injury from continued incarceration and the

extensive evidence of actual innocence, concluding:

> In his earlier pleadings, Mr. Al Ginco has urged this Court to grant him interim
> relief including an order directing his conditional release pending conclusion
> of the DTA proceedings.  The DTA has now been filed for almost a year, with
> expedited review ordered more than seven months ago, the new CSRT
> authorized over six months ago, and the emergency motion pending for almost
> five months.  Mr. Al Ginco now renews his request for interim relief.

PA-DTA 472, 475.  On March 27, 2008, the government's status report stated that

post-hearing procedures identified the need for "supplemental action" by the CSRT

---

[7] OARDEC did not respond to Mr. Ginco's counsel's September 17th request
that he attend the new CSRT as attorney, observer, or witness.

16

members, that "it is not clear" when a decision will be finalized, and that the

government continues to move forward "as expeditiously as possible." PA-DTA 480.

The government also filed an opposition to the third supplement. PA-DTA 483. The

April 10th status report is virtually identical. PA-DTA 489.

20.    The Court of Appeals has not ruled on the merits of Mr. Ginco's

emergency motion for interim relief that has been pending since October 31, 2007.

B.    **Statement Of Facts**

1.    In both the habeas and DTA proceedings, counsel filed exhibits and

declarations corroborating Mr. Ginco's pro se claims that he was a Syrian Kurd

student who ran away from home in the United Arab Emirates, had been in Taliban

prisons for two years prior to being seized by the United States, and had taken no

belligerent action against the United States or its allies. Factual development

proceeded from readily available sources to demonstrate that, contrary to the military

allegations in the first CSRT transcript, Mr. Ginco was not a voluntary participant in

an al Qaeda training camp nor a suicide martyr.[8]

---

[8] Citations to the Statement of Facts are from the Factual Appendix (FA)
submitted herewith. The Statement of Material Facts submitted in the district court
summary judgment action, *Ginco v. Bush*, No. 05-1310 (document 37) (October 10,
2006) (PA-HC 211), provides more detailed citations to the sworn statements and
other evidence, which were attached to the summary judgment motion, supporting
each of Mr. Ginco's contentions. The Statement was elaborated to include the more
recent report of a torture expert and information related to Mr. Ginco's psychological

17

2.    In traveling to Mr. Ginco's former home in the United Arab Emirates, his attorney secured sworn statements from family members and supporting documents that corroborated Mr. Ginco's account of himself as a nonviolent and apolitical student who ran away from home, sought to travel through Afghanistan to the West because his father retained his passport, and faced conscription by the Taliban militia shortly after arriving in Afghanistan. His family provided detailed sworn statements regarding his good character and lack of political or religious extremism, as well as copies of his passport and the report of his disappearance to Emirate authorities. FA 11-67.

3.    The CSRT and ARB transcripts elaborated on his pro se claim that, after 18 days at a Taliban camp, he attempted to leave to go home and was, as a consequence, denounced as a spy for the United States and Israel. FA 73-74, 87, 90, 93. The internet furnished public news articles from 2000 in which the Taliban's interior and foreign ministers trumpeted Mr. Ginco's name as a captured and confessed American spy. FA 101-25. Freed Guantánamo detainees from Russia and Great Britain, who had been in the Taliban prison with Mr. Ginco, provided sworn statements corroborating Mr. Ginco's testimony regarding his imprisonment by the Taliban. FA 3-9, 289-293.

---

distress in the DTA petition, again with supporting evidence. PA-DTA at 28-41.

18

4.    Investigation verified Mr. Ginco's assertion that videotape of him was the product of Taliban torture. After the Taliban abandoned his prison in Kandahar, journalists spoke with Mr. Ginco and four others, who described confessing to being spies after brutal torture. FA 161-86. The journalists also described the efforts of the prisoners to return home through the offices of the Red Cross and the United Nations and to communicate to United States authorities to report the human rights violations they had witnessed. Mr. Ginco's family also provided a video recording of an interview of Mr. Ginco that was broadcast on Abu Dhabi television in which, displaying the stress of his torture, he falsely stated that he was an American spy.[9]

5.    The torture inflicted upon Mr. Ginco included severe beatings, electric shock, being hung from the ceiling, water torture, striking the bottom of his feet with clubs, striking his hand with the butt of a gun, and sleep deprivation. FA 234-35, 290. Mr. Ginco's torture in Taliban custody involved the participation of Al Qaeda officials, including Mohammed Atef and Sayf Al-Adl. FA 5, 178-79. Mr. Ginco's account of being tortured while in Taliban custody is similar to the accounts of torture by other former Taliban prisoners, two from the declarations of freed detainees and two from publicly available sworn CSRT testimony. FA 3, 127, 145, 289. Professor Darius Rajali, an international expert on state torture, found that Mr. Ginco's account

---

[9] A copy of the interview was filed in the courts below.

19

of his torture, provided through information cleared by habeas counsel, was credible because he correctly described methods of torture unique to Afghanistan, and the video-taped confession is consistent with false confessions extracted after torture. FA 238-47.

6.    On or about December 18, 2001, the Taliban abandoned the prison in Kandahar due to American bombing, and the new Afghan government took over. FA 5, 97, 161, 165, 167. Over one thousand Afghan political prisoners returned home, leaving five foreigners including Mr. Ginco housed in a juvenile wing of the prison while they sought assistance from the United Nations and the Red Cross. *Id.*; FA 6, 183, 188, 290. Between mid-December 2001 and January 24, 2002, Mr. Ginco and other former Taliban prisoners spoke to numerous journalists regarding the human rights violations of torture and inhumane conditions in the prison: one piece of bread to eat all day; overcrowding; filthy living conditions; an abundance of rats and insects; poor medical care; and rampant disease. FA 4, 131, 290-91.

7.    As verified by contemporaneous journalistic accounts, Mr. Ginco came to the attention of United States authorities as the result of his requests to journalists that they contact the Americans so he could testify regarding the human rights violations. FA 74, 97, 186. Mr. Ginco's American detention began when he asked journalists to contact American authorities so he could be a witness "against the

20

Taliban in court." The sworn statement of former detainee Ayrat Vahkitov corroborates that Mr. Ginco "offered to provide testimony about the use of torture against us by the former regime." FA 6. The journalists themselves reported that the former Taliban prisoners initiated the contact with the United States to provide testimony:

> [T]he other four "prisoners" were desperate to be interviewed by the FBI. After repeated requests, passed on by journalists, they got their wish 12 days ago, when three federal agents arrived at the jail. Now all five face being sent to Cuba.

FA 186. The information provided by Mr. Ginco included crimes against persons he believed to be United States citizens.

7.      On or about January 22, 2002, two Americans, one in uniform and the other in civilian clothes, visited Mr. Ginco and others at the Kandahar prison, advised they were from military intelligence, took photographs of the former prisoners, and advised they wanted information and would transfer the former prisoners home in about two weeks. FA 6-7, 74, 133. On or about January 24, 2002, the two Americans and a heavily armed detachment of American soldiers took Mr. Ginco and other former Taliban prisoners into custody and transported them to the Kandahar Air Base for what was supposed to be a few days. *Id.*

21

8.      On January 24, 2002, Attorney General John Ashcroft held a press conference announcing that videotape had been found in the wreckage of Mohammed Atef's dwelling in Kandahar, where Mohammed Atef had been killed by American bombing, and that five persons including "Abd Al-Rahim" were being sought as potential terrorists. FA 190, 197. In the January 28, 2002, issue of *Time* magazine, an article included a photograph of "Abd Al-Rahim" with four others on different tapes and reported the request of the government for public assistance to help "identify, locate and incapacitate" the individuals depicted. FA 205.

9.      For the first month at the Kandahar air base, the five prisoners seized from the Taliban prisoner were treated relatively well, being kept apart from other prisoners and receiving extra blankets and chocolate. FA 7. After approximately one month, the interrogators suddenly began treating Mr. Ginco very badly after showing him a magazine article claiming he was a terrorist. FA 7, 88. Mr. Ginco's bad treatment by the Kandahar air base interrogators, after they confronted him with the magazine article, included sleep deprivation, exercise to exhaustion, stress positions for hours at a time, use of police dogs, and rough treatment to take him to interrogation, although he did not resist or use violence. FA 7-8, 81, 291.

10.      At the end of April or early May 2002, the military transferred Mr. Ginco to Guantánamo Bay, Cuba, where he remains to this day. FA 8. He was and is being

22

treated with psychotropic medications for mental conditions including post-traumatic stress disorder. FA 8, 75. Mr. Ginco is suffering from serious and worsening psychological distress from his Taliban torture and lack of proper treatment for his psychological condition, which includes severe depression, self-injury, and attempted suicide. FA 209, 220, 278, 291-92.

## REASONS FOR GRANTING A WRIT OF MANDAMUS

In order for this Court to grant a writ of mandamus, Mr. Ginco must demonstrate under Supreme Court Rule 20.1 that adequate relief cannot be obtained in any other form or from any other court, that exceptional circumstances warrant the exercise of the Court's discretionary powers, and that the writ will be in aid of the Court's appellate jurisdiction. Each of these elements is present in this case. No adequate remedy exists to provide relief from the indefinite delays in this case – both in the habeas corpus proceedings and under the DTA. Only this Court can provide speedy resolution of questions related to the interpretation and administration of the DTA where the prisoner has established both substantial likelihood of success on the merits and severe and continuing irreparable harm. The record reflects that, in exhausting all available means of relief, Mr. Ginco has clearly raised exceptionally important statutory and constitutional questions for this Court to review. Because the delays below have prevented a ruling for this Court to review, the grant of mandamus

23

relief is necessary for this Court to be able to exercise its jurisdiction over the merits of Mr. Ginco's case. In the alternative, the Court should remand to the District Court to provide interim relief under the habeas corpus statute because the absence of DTA interim relief demonstrates, given the textual and practical limitations of the DTA, there is no timely and effective alternative remedy to habeas corpus.

A.    **The Court of Appeals' Failure To Rule On The Emergency Motion Under The DTA And The Indefinite Stay Of Habeas Corpus Proceedings Establish That Adequate Relief Cannot Be Obtained In Any Other Form Or From Any Other Court.**

The procedural history of this case establishes the futility of both the DTA and the habeas courts in providing relief to a person who has established a prima facie case that the military lacked, and lacks, jurisdiction or authority to detain him. For six years, the military has held Mr. Ginco in indefinite detention. Following *Rasul*, the military claimed Mr. Ginco is an enemy combatant pursuant to a CSRT held in 2004. However, in September 2006, Mr. Ginco submitted exhibits in support of a motion for summary judgment establishing that the military lacked initial jurisdiction over his body. This Court has recognized that, even where the safeguards for individual freedom are at a very low level, the military must establish its statutory jurisdiction over the person detained. *Application of Yamashita*, 327 U.S. 1, 8

24

(1946);[10] *Ex parte Milligan*, 71 U.S. 2, 131 (1866) (deciding jurisdictional question of whether Milligan was a prisoner of war to whom suspension of habeas corpus applied); *see Crowell v. Benson*, 285 U.S. 22, 54 (1932) (limiting administrative fact-finding "where the determinations of fact are fundamental or 'jurisdictional'").[11]

Although Mr. Ginco has repeatedly raised the issue before the District Court and the Court of Appeals, the question of initial military jurisdiction has never been addressed on the merits. The District Court refused repeated requests to lift the stay while this Court considered *Hamdan* and *Boumediene* and to address the merits of Mr. Ginco's much different case on an expedited basis. Once this Court denied certiorari in *Boumediene*, with two Justices referencing the potential DTA remedy, Mr. Ginco filed a DTA petition incorporating the summary judgment evidence, making the same jurisdictional arguments, and requesting expedited consideration. Although eventually granting the motion for expedition, and denying the

---

[10] Judge Leon, in his decision finding against habeas rights for Guantánamo prisoners, explicitly noted *Yamashita*'s exception for challenges to initial military jurisdiction. *Khalid v. Bush*, 355 F.Supp.2d 311, 329 (D.D.C. 2005) (courts may inquire whether the detention complained of is within the authority of those detaining the petitioner).

[11] When a fact forms the constitutional or statutory basis for the exercise of power by an Executive Branch adjudicatory tribunal, an Article III court must make an independent finding of the fact and may in its discretion take evidence as to that fact. Louis L. Jaffe, *Judicial Control of Administrative Action* 625 (1965).

25

Respondent's motion for a remand or stay, the Court of Appeals has imposed a de facto stay by suspending discovery and briefing both under the DTA and in the interlocutory appeal regarding notice of transfer. Even after the extrinsic evidence provided by counsel established a "substantial likelihood" of a different result, the Court of Appeals has failed to rule on the emergency motion for interim relief, including conditional release, that would provide the only remaining vehicle for protection against continued irreparable harm to Mr. Ginco.

B.    **This Petition Involves Exceptional Circumstances Warranting This Court's Exercise Of Discretion Because The Availability Of Interim Relief Presents And Encompasses Questions Of Great Importance.**

Mr. Ginco contends that the DTA must be interpreted to provide the Court of Appeals with authority to grant interim relief including conditional release pending final disposition of his case where he has established both a substantial likelihood of success on the merits and imminent and continuing irreparable harm. The government argues that the text of the DTA forecloses such relief. Especially given the inherent need for rapid disposition of this type of claim, the Court of Appeals must rule to either provide Mr. Ginco the relief he seeks or the ability to seek redress from this Court from a denial of relief.

The text of the DTA does not address the question of initial military jurisdiction and the availability of interim relief. However, a necessary concomitant

26

of the judicial authority conferred by the DTA includes equitable authority to administer the litigation. *See generally United Mine Workers*, 330 U.S. at 293; *Belbacha v. Bush*, No. 07-5258, 2008 WL 680637, at *4 (D.C. Cir. Mar. 14, 2008). As in *Zadvydas v. Davis*, 533 U.S. 678, 689-92 (2001), and *Martinez*, 543 U.S. at 381-83, where liberty is at stake, the Court construes statutes to avoid the potential serious constitutional doubt whether a person's detention can continue with no prompt vehicle for determining initial military jurisdiction.

The availability of interim relief under the DTA also implicates questions regarding the adequacy of the DTA as a substitute for habeas corpus. The failure to even consider Mr. Ginco's claims, which would have been subject to a summary judgment motion in habeas almost twenty months ago, confirms the DTA's utter inadequacy as a substitute for habeas corpus. The defects illustrated by the present case include the DTA's failure to provide prompt review, to provide for presentation of extrinsic evidence of innocence, and to include a remedy of release.[12]

---

[12] The Solicitor General in the *Boumediene* argument acknowledged that such a remedy may be read into the DTA. Transcript of Oral Argument at 35, *Boumediene v. Bush*, No. 06-1195 (Dec. 5, 2007) ("[I]f the D.C. Circuit finds a defect in the CSRT, we think the proper remedy would be to order a remand for a new CSRT. But, certainly, if this Court thinks the constitutional line is -- essentially necessitates that the D.C. Circuit have the authority to order a release, there is no obstacle to that.").

27

This Writ comes before the Court in the unusual posture of a prima facie factual showing that, despite holding the prisoner for six years, the military never had initial jurisdiction over his person and has no authority to detain him. The invocation of the DTA requires that the Court of Appeals review whether the use of CSRT standards and procedures to make the determination are inconsistent with the Constitution and laws of the United States. 10 U.S.C. § 801 note (Matters Relating to Detainees; Sec. 1405(e)(2)(C)). Where extrinsic evidence establishes lack of jurisdiction, the DTA must provide for a prompt and meaningful remedy to comport with the requirement that detention be authorized by statute. *Hamdan*, 126 S.Ct. at 2774 n. 23 (the Executive "may not disregard limitations that Congress has, in proper exercise of its own war powers, placed on his powers."). Further, regardless of the outcome of the new CSRT, the jurisdictional questions that have been pending since September 2006, especially as they effect the remedy, should be addressed and resolved.[13]

---

[13] The seven months and counting since the military authorized a new CSRT, as well as the Respondent's citation to *Ginco* in the *Boumediene* briefing (Brief for the Respondents at 56, *Boumediene v. Bush*, No. 06-1195 (Oct. 9, 2007)), which may indicate litigation issues extraneous to his case, accentuate the importance of interim relief.

28

    *1.    The Temporal Nexus For Seizure Required By The Laws Of War And*
          *Hamdan v. Rumsfeld, 126 S.Ct. 2749 (2006), Is Lacking.*

Because Mr. Ginco was a non-combatant prisoner of the Taliban well before and after 9/11, and because after he was liberated, he only tried to go home with help from the Red Cross and the United Nations, the enemy combatant designation violates the laws of war because no relevant acts occurred after the 9/11 attacks. This Court firmly limited the Department of Defense's lawful actions to those authorized by statute, including prominently the limitation to the temporal period of the declaration of war. *Hamdan*, 126 S. Ct. at 2777 (any offense "must have been committed within the period of the war.'") (citing William Winthrop, *Military Law And Precedents* at 837 (rev. 2d ed. 1920) (hereinafter Winthrop). The earliest time for Department of Defense jurisdiction would be September 11, 2001. *Hamdan*, 126 S. Ct. at 2778 n. 31.

Although this case involves no allegation that Mr. Ginco violated the laws of war, the same temporal qualification outlined in *Hamdan* applies to Mr. Ginco because the same statutory authorization is the predicate for detention of enemy combatants as for prosecution by military tribunals. As the Court has held, jurisdiction must be based on acts "*during,* not before, the relevant conflict." *Hamdan*, 126 S. Ct. at 2779 (emphasis in original); *see also Hamdi v. Rumsfeld*, 542

29

U.S. 507, 518 (2004) (detention applies to individuals who fought against the United States "for the duration of the particular conflict in which they were captured"). The Court expressly disregarded any claims regarding acts prior to September 11, 2001. *Hamdan*, 126 S. Ct. at 2778. The Executive Order authorizing detention includes the temporal limitation to individuals who, "at the relevant times," are aliens determined to be a member of al Qaeda or engaged in acts of terrorism. *Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism*, 66 Fed. Reg. 57,833 (Nov. 13, 2001). Under the laws of war, the military cannot legally assume jurisdiction based on conduct before the war on other exigency authorizing the exercise of military power. Winthrop at 837.

For almost two years before his liberation from the Taliban prison, Mr. Ginco was nothing more than a non-combatant victim of torture and illegal incarceration by the Taliban. He was despised by the Taliban for being a spy for the United States and Israel, an offense for which he barely escaped with his life. Unless he committed a violation of the laws of war during the war, he is, like other non-combatants, "in general exempt from military arrest or restraint of the person." Winthrop at 816. All statements and actions by Mr. Ginco so far predated 9/11 that no conceivable basis exists for being held as an enemy combatant during the later war.

30

2.    *The Military Lacks Authority To Indefinitely Detain An Alien Who Approached United States Authorities To Provide Voluntary Witness To Human Rights Violations.*

Mr. Ginco initiated contact with United States authorities to report and to provide testimony against his Taliban torturers. Mr. Ginco's American detention began when he asked journalists to contact American authorities and offered to provide testimony about the Taliban's use of torture. The information provided by Mr. Ginco included crimes in violation of the laws of the United States.

Under the laws of war, voluntary witnesses do not fall within the scope of military authority for indefinite detention. Persons not engaged in armed conflict, such as witnesses to Taliban torture, are entitled to be free of restraint in the absence of a violation of the laws of war. Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 (hereinafter Geneva Convention IV); Winthrop at 816. Mr. Ginco did nothing remotely qualifying as a violation of the laws of war. As a nonenemy alien who has offered America assistance, as opposed to an enemy taken on the battlefield, his status as a witness alone forecloses long-term detention for interrogation purposes. *Hamdi*, 542 U.S. at 521 ("Certainly, we agree that indefinite detention for the purpose of interrogation is not authorized.").

31

The Constitution and statutes of the United States also afford protection to federal witnesses like Mr. Ginco. By providing evidence to the United States, he has implicated the constitutional right to be a witness in federal court, a right recognized in *In re Quarles*, 158 U.S. 532, 536 (1885) (the constitutional right to bear witness to a violation of law "does not depend upon any of the amendments to the constitution, but arises out of the creation and establishment by the constitution itself of a national government, paramount and supreme within its sphere of action."). Congress has also recognized the authority to protect federal witnesses under the material witness statute (18 U.S.C. § 3144) and the provisions for immigration protection of alien witnesses (8 U.S.C. § 1101(a)(15)(s)). By approaching the United States to offer testimony regarding federal crimes and violations of international humanitarian law, Mr. Ginco should have been protected from indefinite detention as an enemy combatant.

3.   *Mr. Ginco's Imprisonment Is Based On The Products Of Taliban Torture And Threats Of Death, In Violation Of Article 15 Of The Convention Against Torture.*

The United States has explicitly recognized that Article 15 of the Convention Against Torture applies to the detainees in Guantánamo Bay:[14] "Article 15 of the

---

[14] United Nation Convention Against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment, art. 15, Apr. 18, 1988, Sen. Exec. Rpt. 101-30, 1465 U.N.T.S. 85 (ratified Oct. 21, 1994) (hereinafter Article 15).

32

Convention is a treaty obligation of the United States, and the United States is obligated to abide by that obligation in Combatant Status Review Boards and Administrative Review Boards."   U.S. Dep't. of State, Legal Advisor John B. Bellinger III, *U.S. Delegation Oral Responses to Article 15 Committee Questions*, Geneva, Switzerland (Question 42) (May 5, 2006).  PA-HC 189.  Under Article 15, the United States "shall ensure that any statement which is established to have been made as a result of torture shall not be invoked as evidence in any proceedings, except against a person accused of torture as evidence that the statement was made."

The Article 15 obligation codifies principles and values at the core of this Country's laws and Constitution.  "[W]hile an involuntary confession is inadmissible in part because such a confession is likely to be unreliable, it is also inadmissible even if it is true, because of the 'strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will.'" *Watkins v. Sowders*, 449 U.S. 341, 347 (1981) (quoting *Jackson v. Denno*, 378 U.S. 368, 385 (1964) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206-07 (1960)); *see also Bram v. United States*, 168 U.S. 532, 542-43 (1897).  By using the products of Taliban torture, the government violated the central constitutional recognition of the unreliability of the products of torture and the treaty refusal to condone the use of

33

such despicable tactics. *Siderman de Blake v. Argentina*, 965 F.2d 699, 717 (9th Cir. 1992) (the prohibition against official torture has attained the force of a *jus cogens* norm).

Mr. Ginco's videotaped statements were the products of torture. Torture includes a wide array of coercive and injurious techniques, including threat of imminent death. Those employed by the Taliban were shamelessly brutal: Mr. Ginco suffered beatings, electric shock, near drowning, hanging from the ceiling, and intolerable conditions, all the while under immediate threat of death. His feet were bound, then beaten until they were black. Under torture and duress, Mr. Ginco made statements videotaped by his captors.

Instead of receiving the treatment and consideration that torture victims should receive, Mr. Ginco faced the nightmare of another round of coercive interrogation, this time by United States interrogators at the Kandahar air base, accusing him based on statements he made under torture to save his life. His dilemma is plain from his statements to the military:

> [T]hey accused me of being a spy. And here, you guys accuse me of being al Qaida. No mercy. Who am I? . . . You take me from that prison and nothing changed in my life, I was taken from prison to prison. I ask the tribunal to please be merciful on me, and please be just and fair. (FA 71).

*       *       *

34

> After two years the Americans came and saved me from the
> prison. When the Americans came I told them about the videotape the
> Taliban made of me. By me telling them about the video it created
> confusion to the point that the Americans believed I was working with
> al Qaida. Here I am now I don't know if I am a spy for America or I
> work for al Qaida. (FA 88).

The videotaped statements and other products of Mr. Ginco's torture, continue to be

used to subject him to United States imprisonment and as a predicate for military

jurisdiction over him.

> 4.    *A Taliban Torture Victim And Political Prisoner Does Not Meet Any*
>        *Plausible Definition Of Enemy Combatant.*

The AUMF authorized force against persons the President "determines

planned, authorized, committed or aided the terrorist attacks that occurred on

September 11, 2001, or harbored such organizations or persons." AUMF § 2(a); *see*

*Little v. Barreme*, 6 U.S. 170 (1804) (military constitutionally limited to seizure of

ships as specified in authorizing legislation). An enemy combatant is "part of or

supporting forces hostile to the United States or coalition partners' and 'engaged in

an armed conflict against the United States' to justify his detention." *Hamdi*, 542

U.S. at 526; *accord Hamdan*, 126 S. Ct. at 2761 n.1. Under any permissible reading,

Mr. Ginco is not an enemy combatant.

The paradigmatic person to be held as an "enemy combatant" is a member of

Al Qaeda or the Taliban captured fighting on the battlefield against the United States

35

and its allies. *Hamdi*, 542 U.S. at 521, 531. "The purpose of detention is to prevent captured individuals from returning to the field of battle and taking up arms once again." *Id*. at 518. No conceivable definition of enemy combatant would include a freed political prisoner who had been subjected to brutal torture and confinement by the enemy prior to war. In the present case, there is not even an allegation that Mr. Ginco engaged the United States on the battlefield in support of our enemies. On the contrary, the Taliban considered him an enemy to be tortured, humiliated, and condemned.

Ever since the 1907 Hague Regulations were implemented, a liberating power has been subject to rules of occupation to protect persons in the liberated territory. The Hague Regulations and, after World War II, the Fourth Geneva Convention provided that the occupying power must treat noncombatants humanely, including those who were detained by the adversary power. Geneva Convention IV art. 3. Those who have been mistreated by the adversary power, such as concentration camp survivors, should be given special care by organizations such as the International Committee of the Red Cross – this Country signed the Fourth Geneva Convention protecting noncombatants largely in response to the inhumane manner in which displaced persons were treated in the wake of World War II. Theodor Meron, *The Geneva Conventions As Customary Law*, 81 Am. J. Int'l L. 348, 364 (1987).

Upon his liberation from the Taliban prison, Mr. Ginco properly sought refuge through the intervention of non-governmental humanitarian organizations, such as the International Committee of the Red Cross and the United Nations. The New York Times quoted him as rejecting aid from reporters, expressing desperation, and relying on the Red Cross and the United Nations: "We just need the Red Cross or the United Nations to come take us out of here." FA 165. By detaining Mr. Ginco and thwarting his efforts to obtain refugee relief, the Department of Defense acted beyond its jurisdiction.

C.      The Writ Will Aid In This Court's Jurisdiction.

Mr. Ginco recognizes that the courts are dealing with novel and complex issues related to Guantánamo prisoners. But without a ruling from the courts below, this Court has no power to provide the guidance necessary to provide timely relief to innocent persons detained under extremely harsh circumstances. The Court of Appeals must rule for the prisoner to either receive relief or have an order from which to seek review from this Court.

Three distinct aspects of the DTA are involved in the emergency motion: 1) whether the statute must provide procedural mechanisms for providing a speedy

37

remedy, especially compared to the habeas remedy;[15] 2) whether the DTA court can consider extrinsic evidence as could a habeas court;[16] and 3) whether interim conditional release is available.[17] Resolution of these types of issues is at the core of this Court's jurisdiction. The failure of the lower courts to act prevents this Court from providing the necessary guidance about the constitutionality of these aspects of the DTA.

## Conclusion

This case presents a compelling need for this Court's immediate intervention: a prima facie case establishing a prisoner's factual innocence and the military's lack

---

[15] *Storti v. Massachusetts*, 183 U.S. 138, 143 (1901), ("[S]ubstantial justice, promptly administered, is ever the rule in habeas corpus"); *see Carafas v. LaVallee*, 391 U.S. 234, 238 (1968) (characterizing habeas corpus as an "effective and speedy instrument by which judicial inquiry may be had into the legality of the detention of a person."); *Stack v. Boyle*, 342 U.S. 1, 4 (1951) (in the context of a bail application, "Relief in this type of case must be speedy if it is to be effective."). The norm of speedy disposition is codified in 28 U.S.C. § 2243, which provides for a return in three days, which cannot be expanded beyond 20 days even for good cause, and a hearing within five days of the return unless additional time is allowed for good cause.

[16] *Harris v. Nelson*, 394 U.S. 286, 298 (1969) (discussing fact development in habeas corpus); *see also Mathews v. Eldredge*, 424 U.S. 319, 333 (1976) (fact development at a hearing as essential to due process).

[17] *See Sanders v. United States*, 373 U.S. 1, 17 (1963) ("habeas corpus has traditionally been regarded as governed by equitable principles"); 28 U.S.C. § 2243 (authorizing relief "as law and justice require").

38

of jurisdiction. Mr. Ginco's contentions raise issues that are essential to a determination of what the rule of law means in the context of post-September 11th legislation. Mr. Ginco has exhausted all other forums for relief; he has repeatedly and vigorously raised all issues raised here in the lower courts. He needs a ruling from the lower courts that is essential to this Court's jurisdiction to decide the merits: either the Court of Appeals should be directed to rule forthwith on Mr. Ginco's request for interim relief or, in the alternative, if this Court determines that the DTA does not provide an adequate remedy, the District Court should be directed to proceed with the summary judgment motion.

Respectfully submitted this 21st day of April, 2008.

Steven T. Wax
Federal Public Defender

Stephen R. Sady
*Counsel of Record*
Chief Deputy Federal Public Defender

39

EXHIBIT A
Page 50 of 52

## CERTIFICATE OF SERVICE

I, Stephen R. Sady, counsel of record and a member of the Bar of this Court, certify that pursuant to Rule 29.3, service has been made of the within Motion for Leave to Proceed *In Forma Pauperis* and Petition for Writ of Mandamus on the counsel for the government by overnight delivery, a certified true, exact and full copy thereof addressed to:

Paul Clement
Solicitor General
Room 5614
Department of Justice
950 Pennsylvania Avenue, N. W.
Washington, DC 20530-0001

Copies have also been provided as follows:

Robert Mark Loeb
Matthew M. Collette
Catherine Y. Hancock
U.S. Department of Justice
(DOJ) Office of the Attorney General
Room 7212
950 Pennsylvania Avenue, NW
Washington, DC  20530

Terry Marcus Henry
Andrew I. Warden
U.S. Department of Justice, Civil Division
Federal Programs Branch
20 Massachusetts Avenue, NW
Washington DC  20530

Nancy Dunn, Clerk of the Court
U.S. Court of Appeals
E. Barrett Prettyman U.S. Courthouse
333 Constitution Ave., NW
Washington, D.C. 20001

Nancy Mayer-Whittington, Clerk of Court
United States District Court
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Further, the original and ten copies were mailed to the Honorable William K.

Suter, Clerk of the United States Supreme Court, by overnight delivery, addressed to

1 First Street, N.E., Washington, D.C., 20543, for filing on this 21st day of April,

2008.

Dated this 21st day of April, 2008.

_____
Stephen R. Sady
*Counsel of Record*
Attorney for Petitioner

Subscribed and sworn to before me this 21st day of April, 2008.

OFFICIAL SEAL
JILL C DOZARK
NOTARY PUBLIC-OREGON
COMMISSION NO. 398412
MY COMMISSION EXPIRES OCTOBER 28, 2009

_____
Notary Public of Oregon

EXHIBIT A
Page 52 of 52