**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BOUMEDIENE v. BUSH | Civil Case No. 04-1166 (RJL) |
| SLITI v. BUSH | Civil Case No. 05-0429 (RJL) |
| KABIR v. BUSH | Civil Case No. 05-0431 (RJL) |
| MAMMAR v. BUSH | Civil Case No. 05-0573 (RJL) |
| AL-KHAIY v. BUSH | Civil Case No. 05-1239 (RJL) |
| AL GINCO v. BUSH | Civil Case No. 05-1310 (RJL) |
| AL BIHANI v. BUSH | Civil Case No. 05-1312 (RJL) |
| GHAZY v. BUSH | Civil Case No. 05-2223 (RJL) |
| RUMI v. BUSH | Civil Case No. 06-0619 (RJL) |
| OBAYDULLAH v. BUSH | Civil Case No. 08-1173 (RJL) |

**PETITIONERS' JOINT OPENING MEMORANDUM
REGARDING HABEAS PROCEDURES**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... iii

I.    PROCEDURAL FRAMEWORK FOR THESE STATUTORY HABEAS CASES .......... 1

    A.    The Habeas Statute Establishes The Default Procedural Framework For
          These Cases ................................................................................................ 1

    B.    Standard Factfinding Procedures Should Not Be Modified Except Upon A
          Specific Demonstration Of Need In Each Case ........................................ 3

II.   SPECIFIC ISSUES RAISED IN THE COURT'S ORDER ................................. 6

    A.    Upon The Request Of A Petitioner, The Court Should Enter An Interim
          Order Requiring The Government To Give Thirty Days' Notice Of Any
          Planned Transfer From Guantanamo ......................................................... 6

          1.    Where requested, the Court should order thirty days' notice of
                transfer under the All Writs Act in order to protect its jurisdiction ............ 7

          2.    In the alternative, Petitioners meet Federal Rule of Civil Procedure
                65's four-factor test for a preliminary injunction requiring thirty
                days' notice prior to transfer from Guantanamo ......................................... 8

    B.    Cases Should Be Adjudicated Promptly Whenever A Prisoner Is In
          Custody, Regardless Of Whether The Government Has "Cleared" Him ............. 12

    C.    Procedures For Adjudication Of Cases ................................................................. 16

          1.    Standards of proof and burdens of proof ................................................... 16

                (a)    The Government bears the burden of persuasion, which
                       must be carried beyond a reasonable doubt or, at a
                       minimum, by clear and convincing evidence ................................. 16

                (b)    The Court should consider the Government's evidence
                       neutrally, without any presumption of correctness ........................ 19

                (c)    Hamdi does not compel any different result ................................. 23

          2.    Standards and procedures governing discovery ........................................ 27

                (a)    The habeas statute authorizes discovery, with the specific
                       scope of discovery depending on the circumstances of the
                       particular case .............................................................................. 28

(b)    *Any limitation on discovery should be allowed, if at all, only upon a specific showing that a particular request is unduly burdensome, not on generalized invocations of "military affairs"* .........................................................31

(c)    *The Government has an affirmative duty to disclose exculpatory and impeaching evidence, which should be confirmed by a standing order of the Court*...................................32

3.    Standard and procedures for an evidentiary hearing.................................35

(a)    *Petitioners are entitled to an evidentiary hearing on disputed issues of material fact*.......................................................35

(b)    *Deviations from standard evidentiary and procedural rules—and particularly Petitioners' right of confrontation—should be assessed individually based on a specific showing of need* ............................................................36

CONCLUSION...............................................................................................................42

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

*Abdah v. Bush*, No. 04-1254, 2005 WL 711814 (D.D.C. Mar. 29, 2005), *appeal docketed*, No. 05-5224 (D.C. Cir. June 16, 2005) .............................................7, 10, 11, 12

*Adams v. United States*, 317 U.S. 269 (1942)................................................................8

*Addington v. Texas*, 441 U.S. 418 (1979) ....................................................................17

*Al-Joudi v. Bush*, No. 05-301 (GK), 2005 WL 774847 (D.D.C. Apr. 4, 2005), *appeal docketed*, No. 05-5231 (D.C. Cir. June 16, 2005) .............................................7, 9, 10, 12

*Al-Marri v. Pucciarelli*, No. 06-7427, 2008 WL 2736787 (4th Cir. July 15, 2008) (*en banc*)...........................................4, 5, 29, 32, 39, 40

*Al-Shareef v. Bush*, No. 05-CV-2458 (RWR), 2006 WL 3544736 (D.D.C. Dec. 8, 2006)............7

*Al-Shiry v. Bush*, No. 05-CV-0490 (PLF), 2005 WL 1384680 (D.D.C. Apr. 1, 2005), *appeal dismissed in part, motion to vacate denied without prejudice*, No. 05-5226, 2007 WL 4952433 (D.C. Cir. Aug. 9, 2007) ........................................7

*Berger v. United States*, 295 U.S. 78 (1935) ...............................................................34

*Bismullah v. Gates*, 501 F.3d 178 (D.C. Cir. 2007).......................................................34

*Bismullah v. Gates*, 503 F.3d 137 (D.C. Cir. 2007).......................................................33

*Blackledge v. Allison*, 431 U.S. 63 (1977)....................................................................36

*Boumediene v. Bush*, 128 S. Ct. 2229 (2008) ....1, 2, 3, 5, 14, 16, 17, 19, 20, 21, 23, 25, 26, 27, 29 30, 31, 36, 40, 42

*Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007) ....................................................2

*Bracy v. Gramley*, 520 U.S. 899 (1997) .....................................................................30

*Brady v. Maryland*, 373 U.S. 83 (1963) .........................................................31, 33, 34

*Campbell v. Minnesota*, 487 F.2d 1 (8th Cir. 1973) ....................................................36

*Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997) ......................................................35

*CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995)................9

*Crawford v. Washington*, 541 U.S. 36 (2004) .......................................................38, 42

*Demjanjuk v. Petrovsky*, 10 F.3d 338 (6th Cir. 1993) .................................................34

*El-Banna v. Bush*, No. 04-1144 (RWR), 2005 WL 1903561 (D.D.C. July 18, 2005) .................29

*Environmental Defense Fund v. EPA*, 485 F.2d 780 (D.C. Cir. 1973)............................................8

*Ex parte Bollman*, 8 U.S. 75 (1807)...........................................................................................20

*Ex parte Randolph*, 20 F. Cas. 242 (C.C.D. Va. 1833) (No. 11,558) ...........................................20

*Ex parte Robinson*, 20 F. Cas. 969 (C.C. Ohio 1855) (No. 11, 935)............................................20

*FTC v. Dean Foods Co.*, 384 U.S. 597 (1966) .............................................................................8

*Foucha v. Louisiana*, 504 U.S. 71 (1992).....................................................................................18

*Freeport-McMoRan Oil & Gas Co. v. FERC*, 962 F.2d 45 (D.C. Cir. 1992) .............................34

*G & V Lounge, Inc. v. Michigan Liquor Control Commission*, 23 F.3d 1071 (6th Cir.
1994) .......................................................................................................................................12

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ......................................................................................38

*Greene v. McElroy*, 360 U.S. 474 (1959) ....................................................................................38

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ...............................3, 6, 20, 23, 24, 25, 29, 32, 39, 40, 41

*Hamoud v. Bush*, No. 05-1894 (RWR), 2006 WL 1876947 (D.D.C. July 5, 2006), *appeal
docketed*, No. 06-5265 (D.C. Cir. Sept. 6, 2006).................................................................7

*Harris v. Nelson*, 394 U.S. 286 (1969) .........................................................22, 23, 28, 29, 30, 32

*Herrera v. Collins*, 506 U.S. 390 (1993) ......................................................................................39

*In re Ballay*, 482 F.2d 648 (D.C. Cir. 1973).................................................................................18

*In re Jung Ah Lung*, 25 F. 141 (D. Cal. 1885) .............................................................................21

*In re Oliver*, 333 U.S. 257 (1948)................................................................................................38

*In re Sealed Case*, 141 F.3d 337 (D.C. Cir. 1998).........................................................................8

*In re Winship*, 397 U.S. 358 (1970)........................................................................................16, 17

*Jian An Li v. Canarozzi*, 142 F.3d 83 (2d Cir. 1998)...................................................................41

*Johnson v. Zerbst*, 304 U.S. 458 (1938) ......................................................................................36

*Jones v. Cunningham*, 313 F.2d 347 (4th Cir. 1963)....................................................................36

*Kansas v. Hendricks*, 521 U.S. 346 (1997)........................................................................18, 19, 38

*Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005) .................................................1, 3

*Klay v. United Healthgroup, Inc.*, 376 F.3d 1092 (11th Cir. 2004)............................8

*Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953).......................................................38

*Kyles v. Whitley*, 514 U.S. 419 (1995).................................................................33, 35

*Lee v. Reno*, 15 F. Supp. 2d 26 (D.D.C. 1998) .........................................................10

*Machibroda v. United States*, 368 U.S. 487 (1962)....................................................37

*Marks v. United States*, 430 U.S. 188 (1977) ...........................................................24

*Monroe v. Blackburn*, 476 U.S. 1145 (1986)..............................................................34

*Owens v. Frank*, 394 F.3d 490 (7th Cir. 2005) ........................................................36

*Palko v. Connecticut*, 302 U.S. 319 (1937) ...............................................................37

*Parhat v. Gates*, No. 06-1397, 2008 WL 2576977
    (D.C. Cir. June 20, 2008)........................................21, 22, 25, 27, 30, 35, 41, 42

*Pointer v. Texas*, 380 U.S. 400 (1965)........................................................................37

*Rasul v. Bush*, 542 U.S. 466 (2004) ........................................................................1, 2

*Reid v. Covert*, 354 U.S. 1 (1957)................................................................................5

*SEC v. Vision Communications, Inc.*, 74 F.3d 287 (D.C. Cir. 1996)...............................8

*Schneiderman v. United States*, 320 U.S. 118 (1943)..................................................18

*Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313 (D.C. Cir. 1998)..........................9

*Speiser v. Randall*, 357 U.S. 513 (1958)....................................................................16

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993)..............................................26

*Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007) .......................................................35

*Stewart v. Overholser*, 186 F.2d 339 (D.C. Cir. 1950)...............................................36

*United States v. Agurs*, 427 U.S. 97 (1976) ........................................................33, 34

*United States v. Anderson*, 51 M.J. 145 (C.A.A.F. 1999)...........................................38

*United States v. Bagley*, 473 U.S. 667 (1985) .....................................................33, 34

*United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008)............................................................35

*United States v. Dunford*, 148 F.3d 385 (4th Cir. 1998)...............................................................41

*United States v. Fernandez*, 892 F.2d 976 (11th Cir. 1989).........................................................41

*United States v. Salerno*, 481 U.S. 739 (1987) ...........................................................................18

*Waley v. Johnston*, 316 U.S. 101 (1942).....................................................................................36

*Walker v. Johnston*, 312 U.S. 275 (1941) ..............................................................................35, 36

*Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d
     841 (D.C. Cir. 1977) ..............................................................................................................11

*Woodby v. INS*, 385 U.S. 276 (1966)......................................................................................18, 19

## CASE PLEADINGS

*Al Ginco v. Bush*, No. 06-5191 (D.C. Cir.)....................................................................................7

*Hamdi v. Rumsfeld*, No. 02-CV-439 (E.D. Va.) ...........................................................................30

*In re Guantanamo Bay Detainee Litigation*, Misc. No. 08-442 (TFH) (D.D.C.)............2, 7, 14, 32

*Kiyemba v. Bush*, No. 05-CV-01509 (D.D.C.), *appeal docketed*, No. 05-5487 (D.C. Cir.
     May 10, 2007)............................................................................................................................7

*Parhat v. Gates*, No. 06-1397 (D.C. Cir.)...............................................................................21, 22

*Zuhair v. Bush*, No. 08-CV-0864 (EGS) (D.D.C.) .....................................................................7, 8

## STATUTES AND RULES

Classified Information Procedures Act, 18 U.S.C. App. III, § 4 .....................................................42

All Writs Act, 28 U.S.C. § 1651 ...........................................................................................7, 8, 29

28 U.S.C.
     §§ 2241 *et seq* ...................................................................................................................1, 2, 3
     § 2241...................................................................................................................................1, 29
     § 2243.............................................................................................................................1, 2, 27
     § 2246..........................................................................................1, 28, 29, 36, 37, 39, 40

Fed. R.
     App. P. 23(a)...........................................................................................................................11
     Civ. P. 45..................................................................................................................................37
     Civ. P. 65....................................................................................................................................9
     Civ. P. 81..................................................................................................................................29

Evid. 301 ........................................................................................................26

Evid. 403 ........................................................................................................41

Evid. 803-807 ...........................................................................................39, 40

Evid. 1101(e) ..................................................................................................37

Rules Governing Section 2254 Cases ........................................................................29

## LEGISLATIVE MATERIALS

Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment and
Punishment, *opened for signature* Dec. 10, 1984, S. Treaty Doc. No. 100-20
(1988), 1465 U.N.T.S. 85 .................................................................................11

Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2680....................2, 3, 21, 22, 23

Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, div. G,
subdiv. B, tit. XXII, 112 Stat. 2681 (reprinted at 8 U.S.C. § 1231 note)..........................11

Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 ...............................2, 3

## OTHER AUTHORITIES

Cooper, Christopher, *Detention Plan: In Guantanamo, Prisoners Languish in a Sea of
Red Tape*, Wall St. J., Jan. 26, 2005, at A1........................................................17

Denbeaux, Mark, *et al.*, Seton Hall University School of Law, *Report on Guantanamo
Detainees: A Profile of 517 Detainees Through Analysis of Department of
Defense Data* (2006), *available at* http://law.shu.edu/aaafinal.pdf ..................................40

*Frontline: Son of Al Qaeda* (PBS television broadcast, Apr. 11, 2004), transcript
available at http://www.pbs.org/wgbh/pages/ frontline/shows/khadr/interviews/
khadr.html ...............................................................................................17

Goldstein, Jared, *Habeas Without Rights*, 2007 Wis. L. Rev. 1165 (2007) .................................21

Hurd, Rollin C., *Treatise on the Right of Personal Liberty, and On the Writ of Habeas
Corpus and the Practice Connected with It: With a View of the Law of
Extradition of Fugitives* (2d ed. 1876)...............................................................14

Lassetter, Tom, *America's Prison for Terrorists Often Held the Wrong Men*, McClatchy
Newspapers, June 15, 2008, *available at* http://www.mcclatchydc.com/detainees/
story/38773.html .......................................................................................17

Memorandum from Deputy Secretary of Defense Gordon R. England, *Revised
Implementation of Administrative Review Procedures for Enemy Combatants
Detained at U.S. Naval Base Guantanamo Bay*, (July 14, 2006), *available at*
http://www.defenselink.mil/news/Aug2006/d20060809ARBProceduresMemo.pdf ........13

Oaks, Dallin H., *Legal History in the High Court-Habeas Corpus*, 64 Mich. L. Rev. 451
  (1966) .............................................................................................................19

Sherman, Mark, *Gonzales: No Guarantee Captives Aren't Tortured*, Associated Press,
  Mar. 8, 2005, *available at* http://community.seattletimes.nwsource.com/archive/
  ?date=20050308&slug=gonzales08 ..............................................................10

Petitioners respectfully submit this memorandum pursuant to the Court's order dated July 30, 2008.

## I.    PROCEDURAL FRAMEWORK FOR THESE STATUTORY HABEAS CASES

In addressing the issues raised in the July 30 Order, this Court should be guided by two considerations.  *First*, these cases are brought under and governed by the habeas statute, 28 U.S.C. §§ 2241 *et seq.*, which provides the appropriate procedural framework.  *Second*, deviations from ordinary procedural and evidentiary rules—notably the availability of an evidentiary hearing, the ability to confront witnesses, and the possibility of discovery—should be permitted, if at all, only upon a detailed showing by the Government that such a deviation is warranted in the circumstances of a particular case.

### A.    The Habeas Statute Establishes The Default Procedural Framework For These Cases

These petitions are governed by the federal habeas statute, 28 U.S.C. § 2241(c)(1) and (3), which the Supreme Court held is applicable to Guantanamo prisoners.  *See Rasul v. Bush*, 542 U.S. 466, 483 (2004); *see also Boumediene v. Bush*, 128 S. Ct. 2229, 2241 (2008) (stating that *Rasul* held that "28 U.S.C. § 2241 extended statutory habeas corpus jurisdiction to Guantanamo").   The procedures set forth in 28 U.S.C. §§ 2241 *et seq.* therefore apply to this case—a point this Court recognized over three years ago.  *See Khalid v. Bush*, 355 F. Supp. 2d 311, 323 n.15 (D.D.C. 2005) (Leon, J.) ("The habeas statute enumerates a very specific process that *the court and parties must follow*, which has several distinct and discernable steps.  *See* 28 U.S.C. §§ 2241-2255." (emphasis added)).  That process includes Petitioners' opportunity to traverse the Government's proffered return to the writ (*see* 28 U.S.C. § 2243 ¶ 6), to have disputed factual questions decided by an evidentiary hearing (*see id.* § 2243 ¶ 8), and to undertake discovery where needed (*see id.* § 2246).

There can be no doubt that these petitions remain governed by the habeas statute, just as they were at the time of this Court's 2005 decision.  Although section 7 of the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600, 2635 (MCA), purported to repeal section 2241 in these cases, the Supreme Court has held that section invalid.  *See Boumediene*, 128 S. Ct. at 2274.  The Court made clear that, without section 7 of the Military Commissions Act, the habeas statute governs.  *See id.* at 2266 (stating that section 2241 "would govern in MCA § 7's absence").  Apart from MCA § 7, which is no longer in force, neither the MCA nor the Detainee Treatment Act of 2005, Pub. L. No. 109-148, §§ 1001-06, 119 Stat. 2680 (DTA), contains any provision affecting habeas procedure.  *See, e.g.*, *Boumediene v. Bush*, 476 F.3d 981, 1001 (D.C. Cir. 2007) (Rogers, J., dissenting) ("*Rasul* held that federal court jurisdiction under 28 U.S.C. § 2241 is permitted for habeas petitions filed by detainees at Guantanamo . . . and this result is undisturbed because the MCA is void." (citing *Rasul*, 542 U.S. at 485 (Kennedy, J., concurring in the judgment)); *id.* (directing use on remand of procedures in 28 U.S.C. §§ 2241 *et seq.*).

In parallel briefing before Judge Hogan, the Government attempted to avoid the federal habeas statute by claiming that the repeal of statutory habeas in MCA § 7 somehow survived *Boumediene*.  Government's Br.  Regarding Procedural Framework Issues 4-5, *In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-442 (TFH) (D.D.C. July 25, 2008).  The Government's argument is utterly unsupported.  The Court clearly stated that MCA § 7 is unconstitutional.  *Boumediene*, 128 S. Ct. at 2275 ("The only law we identify as unconstitutional is MCA § 7, 28 U.S.C.A. § 2241(e) (Supp. 2007).").  Nothing in the DTA or MCA purported to modify statutory habeas procedures in the event that the repeal proved ineffective.  Indeed, the

Supreme Court expressly noted the absence of such a provision, pointing out that neither the

MCA nor the DTA contains any "saving clause." *Id.* at 2266.

Accordingly, these cases are in the same position as prior to the enactment of the MCA:

subject to the statutory procedures that Congress enacted, which set out "a very specific process

that the court and parties must follow." *Khalid*, 355 F. Supp. 2d at 323 n.15 (Leon, J.) (citing 28

U.S.C. §§ 2241 *et seq.*).   Thus, Congress's intent as to the conduct of these procedures is

contained in §§ 2241 *et seq.*, not in any unconstitutional provision of the MCA.

### B.    Standard Factfinding Procedures Should Not Be Modified Except Upon A Specific Demonstration Of Need In Each Case

The Supreme Court has repeatedly noted that habeas procedures are "adaptable" and may

be modified to the extent the circumstances of the case require. *E.g.*, *Boumediene*, 128 S. Ct. at

2262, 2267.  The Court has never held, however, that the normal procedural protections available

to habeas petitioners under federal law should be discarded across numerous cases on a

wholesale basis.  Rather, the Court's discussion of modifications has always been tied to the

circumstances of each individual case. *E.g.*, *id.* at 2267 (the "precise application and scope" of

habeas "changed depending on the circumstances"); *Hamdi v. Rumsfeld*, 542 U.S. 507, 539

(2004) (plurality opinion) (envisioning modification of procedures to accommodate "matters of

national security that *might arise* in an *individual case*" (emphasis added)).

In other Guantanamo habeas cases, the Government has sought to obtain wide-ranging

deviations from governing procedures and evidentiary rules, largely on the strength of statements

made in the plurality opinion in *Hamdi*.  The Government's reliance on the *Hamdi* plurality

opinion is misplaced for several reasons, which are discussed in detail below.  Most importantly,

however, the *Hamdi* plurality did not purport to make evidentiary or procedural rulings for all

future cases.  As Judge Traxler's controlling opinion for the en banc Fourth Circuit recently

observed, "the *Hamdi* plurality neither said nor implied that normal procedures and evidentiary demands would be lessened in *every* enemy-combatant habeas case, regardless of the circumstances." *Al-Marri v. Pucciarelli*, No. 06-7427, 2008 WL 2736787, at *45 (4th Cir. July 15, 2008) (Traxler, J., concurring in the judgment). Importantly, modifications of familiar procedures must be premised not on general Government invocations of "war efforts" or "national security," but rather on "the *actual* burdens the Government might face in defending the habeas petition in the normal way." *Id.* at *47.

In fact, few (and possibly none) of the cases before this Court presents any factual circumstances that could warrant significant deviations from "normal procedures and evidentiary demands." *Id.* at *45. Unlike *Hamdi*, which presented potential evidentiary challenges because Hamdi was "initially detained abroad by our allies on a battlefield in Afghanistan," *id.*, several of the cases before this Court do not involve significant actions by military personnel in a battle or combat context. For example, the Petitioners in *Boumediene* (No. 04-1166) were arrested by civilian police in Bosnia—not a "battlefield" by any measure—and handed over to U.S. officials following threats by U.S. diplomatic staff. Evidence regarding their arrest is highly unlikely to implicate any "military" affairs. Another non-battlefield seizure is the case of Mr. Ginco (No. 05-1310), who was tortured and jailed by the Taliban and who himself initiated contact with American authorities to proffer testimony regarding the human rights violations he and others suffered in Taliban prisons.

Moreover, much of the evidence in the Government's returns may consist of information gleaned by FBI or Defense Department interrogators at Guantanamo, which would be reflected in documents readily within the Government's reach. *See, e.g.*, *Al-Marri*, 2008 WL 2736787, at *43 n.8, *47 & n.15 (Traxler, J., concurring in the judgment) (noting that "civilian agencies"

such as the FBI, CIA, and Defense and Justice Departments could provide document discovery "without interfering with the war powers and war operations of the government").[1]

In most of the cases before this Court, the Government has yet to file *any* factual return; in the cases in which it has, the Government plans to seek leave to amend its allegations. *See* July 30 Order 2-3. Given the current state of the record, it is impossible to know what, if any, actual matters of military concern or national security might arise in these cases. It may well be that Petitioners and the Government could agree, in each particular case, on procedures that would protect Petitioners' right to meaningful habeas review without encroaching on legitimate national security concerns. Petitioners respectfully submit that this option should be explored and, to the extent there is disagreement, the matter presented to the Court in each individual case. The Court should then "weigh [Petitioner's] rights against the *actual* governmental burdens to determine whether a lessening of the normal procedures is warranted." *Al-Marri*, 2008 WL 2736787 at *46 n.14 (Traxler, J., concurring in the judgment).

Accordingly, Petitioners submit that restrictions on the habeas statute and applicable rules of procedure and evidence should not be dispensed in gross based on broad generalizations from

---

[1] Although *Al-Marri* rested on due process, the Supreme Court's decision in *Boumediene* identified a close connection between the procedural protections of habeas and those of the Due Process Clause. *See, e.g.*, *Boumediene*, 128 S. Ct. at 2268 (noting that analysis of "the necessary scope of habeas review" accords with "our test for procedural adequacy in the due process context"); *id.* at 2269 (noting that "there are places in the *Hamdi* plurality opinion where it is difficult to tell where its extrapolation of § 2241 ends and its analysis of the petitioner's Due Process rights begins"). Moreover, *Boumediene*'s constitutional analysis strongly supports the conclusion that these Petitioners are entitled to the Fifth Amendment's due process protections as well. *Boumediene* rejected the Government's argument that "*de jure* sovereignty is or has ever been the only relevant consideration in determining the geographic reach of the Constitution." *Id.* at 2258. Rather, application of a constitutional provision at Guantanamo depends upon, "in particular, whether judicial enforcement of the provision would be 'impracticable and anomalous.'" *Id.* at 2255 (quoting *Reid v. Covert*, 354 U.S. 1, 74-75 (1957) (Harlan, J., concurring in the result)). There is nothing impracticable or anomalous about requiring the Government to make a specific showing of actual burden—a routine showing in any federal court litigation—if it believes the circumstances warrant a deviation from standard procedures.

the Government.  Procedural or evidentiary adaptations should be carefully vetted and allowed, if at all, based only on a specific showing in "an individual case."  *Hamdi*, 542 U.S. at 539 (plurality opinion).

## II.    SPECIFIC ISSUES RAISED IN THE COURT'S ORDER

### A.    Upon The Request Of A Petitioner, The Court Should Enter An Interim Order Requiring The Government To Give Thirty Days' Notice Of Any Planned Transfer From Guantanamo

The Court should order the Government when requested to provide the Petitioners, Petitioners' counsel, and the Court with thirty days' advance notice of any proposed transfer of a Petitioner from Guantanamo and to provide the name of the country to which it proposes to transfer any Petitioner.  Each Petitioner before the Court faces unique circumstances upon transfer or release.  Certain Petitioners face little likelihood of being transferred to a country where they risk torture and therefore do not seek advance notice; others, however, have a serious and well-founded fear of torture upon return to countries with notoriously poor human rights records.  Accordingly, the Government should provide thirty days' notice to any Petitioner who requests such notice.

Petitioners and the Government share the goal that Petitioners not be rendered to foreign countries where they will be subject to illegal imprisonment, torture, or death.  In addition, in order to carry out their ethical duties to represent Petitioners—and most importantly, to ensure that Petitioners' rights are protected, both in Guantanamo and wherever the Government may choose to transfer them—it is critical that Petitioners' counsel have advance notice of any Government plans to transfer or release their clients.  Advance notice would place no significant burden on the Government: the Government would simply file and serve a one-page document thirty days before the planned transfer.

Such an order has ample precedent.  The Government has provided thirty days' notice in many Guantanamo cases for the past three years.  *See, e.g.*, *Al-Shareef v. Bush*, No. 05-CV-2458 (RWR), 2006 WL 3544736 (D.D.C. Dec. 8, 2006); *Hamoud v. Bush*, No. 05-CV-1894 (RWR), 2006 WL 1876947 (D.D.C. July 5, 2006), *appeal docketed*, No. 06-5265 (D.C. Cir. Sept. 6, 2006); *Al-Joudi v. Bush*, No. 05-301 (GK), 2005 WL 774847 (D.D.C. Apr. 4, 2005), *appeal docketed*, No. 05-5231 (D.C. Cir. June 16, 2005) (held in abeyance pending *Boumediene*); *Al-Shiry v. Bush*, No. 05-CV-0490 (PLF), 2005 WL 1384680 (D.D.C. Apr. 1, 2005), *appeal dismissed in part, motion to vacate denied without prejudice*, No. 05-5226, 2007 WL 4952433 (D.C. Cir. Aug. 9, 2007); *Abdah v. Bush*, No. 04-CV-1254, 2005 WL 711814 (D.D.C. Mar. 29, 2005), *appeal docketed*, No. 05-5224 (D.C. Cir. June 16, 2005); *Kiyemba v. Bush*, No. 05-CV-01509 (D.D.C. Sept. 13, 2005), *appeal docketed*, No. 05-5487 (D.C. Cir. May 10, 2007). Moreover, Judges Sullivan and Hogan have recently entered similar orders in the numerous cases before them.  *See, e.g.*, *Zuhair v. Bush*, No. 08-CV-0864 (EGS) (D.D.C. July 31, 2008); *In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-442 (TFH) (D.D.C. July 11, 2008).  This Court should do likewise.

The D.C. Circuit will hear oral argument on this issue on September 25, 2008.  *See Kiyemba v. Bush*, No. 05-5487; *Abdah v. Bush*, No. 05-5224.  Petitioners accordingly request an interim order requiring the Government to provide thirty days' notice of any transfer and to name the proposed receiving country, at least until the D.C. Circuit issues an opinion on the matter.[2]

       1.      Where requested, the Court should order thirty days' notice of transfer under the All Writs Act in order to protect its jurisdiction

The All Writs Act provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions," 28 U.S.C. § 1651(a), and "empowers a

---

[2] The issue is similarly raised in *Al Ginco v. Bush*, No. 06-5191 (D.C. Cir.).

district court to issue injunctions to protect its jurisdiction." *SEC v. Vision Commc'ns, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *see also FTC v. Dean Foods Co.*, 384 U.S. 597, 603-05 (1966); *Envtl. Def. Fund v. EPA*, 485 F.2d 780, 784 n.2 (D.C. Cir. 1973). The transfer of Petitioners to another country risks divesting this Court of jurisdiction over a particular habeas case. The Court should therefore require thirty days' notice of transfer in order to preserve its jurisdiction over these cases and to allow Petitioners an opportunity to respond. Notably, such an order does not require this Court to determine whether it has the authority actually to enjoin a transfer. *See, e.g.*, *Zuhair*, No. 08-CV-0864 (EGS) (D.D.C. July 31, 2008) (stating that nothing in the court's thirty-day-notice order "shall be construed as a determination that this Court has the power to enjoin the Government from transferring Petitioners from detention").

The issuance of orders under the All Writs Act does not require analysis of the factors relating to the granting of injunctive relief. *See, e.g.*, *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1100 (11th Cir. 2004) ("The requirements for a traditional injunction do not apply to injunctions under the All Writs Act because a court's traditional power to protect its jurisdiction, codified by the Act, is grounded in entirely separate concerns."). Rather, a court may proceed under the All Writs Act whenever it determines such action necessary "to achieve the ends of justice entrusted to it." *Adams v. United States*, 317 U.S. 269, 273 (1942). The risk that the Government might seek to moot particular cases by transferring Petitioners to foreign countries without affording Petitioners an opportunity even to *seek* relief to preserve jurisdiction is precisely the sort of situation the All Writs Act addresses. *Cf. In re Sealed Case*, 141 F.3d 337, 340 (D.C. Cir. 1998) (employing the All Writs Act to vacate a transfer to another judicial district and "keep[] the matter in this circuit").

2.      In the alternative, Petitioners meet Federal Rule of Civil Procedure 65's four-factor test for a preliminary injunction requiring thirty days' notice prior to transfer from Guantanamo

Although there is ample basis for a thirty-day notice order under All Writs Act, in the alternative the Court could reach the same result via preliminary injunction under Federal Rule of Civil Procedure 65.  Under Rule 65, the Court examines whether: (1) Petitioners will be "irreparably injured if an injunction is not granted"; (2) there is a "substantial likelihood" Petitioners will succeed on the merits; (3) an injunction will "substantially injure" the Government; and (4) the public interest will be furthered by the injunction.  *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998).  These four factors "interrelate on a sliding scale" and must be considered in relation to one another, for "'[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.'"  *Id.* at 1318 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).

Petitioners stand to suffer irreparable harm if transferred to the custody of another undisclosed country in two distinct ways.  First, the prospect of transfer to a country that permits the torture of prisoners and indefinite confinement without sufficient process "undeniably would constitute irreparable harm."  *Al-Joudi*, 2005 WL 774847, at *4.  Any uncertainty regarding the treatment awaiting Petitioners upon transfer is the result of the Government's refusal to disclose

any details concerning the imminent transfers.[3]  Second, transfer to the custody of another country potentially could "eliminate any opportunity for Petitioners to ever obtain a fair adjudication of their 'fundamental right to test the legitimacy of [their] executive detention'" (*Abdah*, 2005 WL 711814, at *4 (quoting *Lee v. Reno*, 15 F. Supp. 2d 26, 32 (D.D.C. 1998)))—a right that the Supreme Court has now upheld as protected by the Constitution.  Moreover, if Petitioners are removed before they are able to vindicate their rights before this Court, it is substantially more likely that they will be imprisoned and/or mistreated wherever they are transferred.  *See Al-Joudi*, 2005 WL 774847, at *3 n.7 ("[A] determination by a United States court that Petitioners are not enemy combatants might carry significant weight in their home country, thereby facilitating release from custody if they were transferred for continued detention.").

These risks of harm would be significantly reduced if counsel and the Court were informed of any planned transfer thirty days in advance.  Counsel would be able to determine whether to seek an order enjoining transfer.  In some instances, upon learning the identity of the proposed destination country, counsel may choose to waive the delay and allow for an immediate transfer.  Furthermore, advance knowledge of a likely transfer could better allow the Court to manage its resources.[4]

---

[3] The Government has offered no details regarding the assurances obtained from countries receiving transferred prisoners or the scope of monitoring that takes place following transfer.  As then-Attorney General Alberto Gonzales acknowledged in 2005, "We can't fully control what that country [accepting custody of prisoner] might do.  We obviously expect a country to whom we have rendered a detainee to comply with their representations to us. . . .  If you're asking me, 'Does a country always comply?'  I don't have an answer to that."  Mark Sherman, *Gonzales: No Guarantee Captives Aren't Tortured*, Associated Press, Mar. 8, 2005, *available at* http://community.seattletimes.nwsource.com/archive/?date=20050308&slug=gonzales08.

[4] Petitioners request that the Court grant a Thirty-Day Notice Order only upon request of the Petitioner.  Some Petitioners in these cases do not expect to request notice.

The prong of "likelihood of success" is not directly applicable to Petitioners' request for advance notice of transfer, since Petitioners do not at this time seek any prohibition on transfer. At this time, the Court need only inquire whether Petitioners should be given notice and an *opportunity* to challenge a transfer at all.  Such a challenge could clearly meet the standard of likely success at the appropriate time, in that "it will ordinarily be enough" that the questions raised are so "serious, substantial, difficult and doubtful, as to make them a fair ground for litigation."  *Washington Metro. Area Transit Comm'n v. Holiday Tours Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977).  Transfer of Petitioners without notice and leave of court is contrary to Federal Rule of Appellate Procedure 23(a), which requires that "pending review of a decision in a habeas corpus proceeding commenced before a court[,] the person having custody of the prisoner must not transfer custody to another unless a transfer is directed in accordance with this rule."  The *Abdah* court relied heavily on Rule 23(a) in finding that similarly situated petitioners had a likelihood of success, noting that "Rule 23(a) acquires an even greater importance in the context of Petitioners' case [because] transfer to another nation would almost assuredly deprive the court of its jurisdiction."  2005 WL 711814, at *5.[5]

In contrast to the dire repercussions facing the Petitioners if they are transferred without notice, this narrow and discrete request would impose no burden on the Government.  At this stage, Petitioners request only that they be given advance notice of the intent to transfer any

---

[5] The Foreign Affairs Reform and Restructuring Act of 1998 also provides that "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States."  Pub. L. No. 105-277, div. G, subdiv. B, tit. XXII, § 2242, 112 Stat. 2681, 2822 (reprinted at 8 U.S.C. § 1231 note).  Such a transfer would also violate the United States' obligations under the Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment and Punishment (CAT), which the President has signed and the Senate has ratified.  CAT, Art. 3, *opened for signature* Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85.

Petitioner.  As one judge noted, this request would "at most . . . require the Government to file a few pieces of paper."  *Al-Joudi*, 2005 WL 774847, at *6.  Advance notice to the Court and Petitioners' counsel would in no way prevent the Government from negotiating with foreign sovereigns concerning Petitioners' proposed transfers or release, nor would it require the Government to disclose any communications with any foreign nation.  *See id.* at *5 ("The Court fails to see any injury whatsoever that the Government would suffer from [ordering advance notice of transfer]."); *see also Abdah*, 2005 WL 711814, at *5 ("the court does not have any indication that notifying Petitioners' counsel thirty days ahead of planned transfers of their clients will intrude upon executive authority").  Further, many of the prisoners who have already been transferred were subject to Thirty-Day Notice Orders, and in many cases concerns were quickly resolved by visits to or phone calls with the affected prisoners.

The public interest also favors requiring the Government to provide advance notice to counsel and the Court of any intended removal of Petitioners from Guantanamo.  The public has a strong interest in ensuring that its Government does not improperly deprive Petitioners of their constitutionally-protected right to petition for habeas corpus and that the Government does not subject individuals to indefinite detention without due process.  *See Abdah*, 2005 WL 711814, at *6 ("'[I]t is always in the public interest to prevent the violation of a party's constitutional rights.'" (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994))).

### B.    Cases Should Be Adjudicated Promptly Whenever A Prisoner Is In Custody, Regardless Of Whether The Government Has "Cleared" Him

The Court should not give lower priority to cases where the Petitioner has been approved for release or transfer by a Government Administrative Review Board (ARB).  Such a sequencing scheme might be appropriate if ARB clearance indicated imminent and certain

release or transfer from Guantanamo or a higher likelihood thereof, but it clearly does not. Rather, Petitioners with ARB "clearances" remain just as subject to indefinite detention as other Petitioners, and accordingly are just as dependent on this Court's prompt action.

The ARBs were created "to determine whether the enemy combatant represents a continuing threat to the United States or its allies" and whether the individual should continue to be held for intelligence purposes. Memorandum from Deputy Secretary of Defense Gordon R. England, *Revised Implementation of Administrative Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay*, (July 14, 2006), *available at* http://www.defenselink.mil/news/Aug2006/d20060809ARBProceduresMemo.pdf. Many detainees cleared by the ARB remain in Guantanamo for years after the date of approval for transfer or release, while most of those who have been transferred out of Guantanamo thus far were never formally approved for transfer or release by the ARB.

ARB-cleared petitioners before this Court continue to be detained long after their authorization for transfer, some for nearly three years. Ahmad Abu Abduttawaab (No. 05-429) was cleared for transfer on October 5, 2005. Mammar Ameur (No. 05-573) was cleared for transfer on November 4, 2005. Ali Adel Al-Khaiy (No. 05-1239) was cleared for transfer on December 12, 2005. Ayman Al Shurafa (No. 05-431) was cleared for transfer on November 15, 2006. Abbas Abid Rumi (No. 06-619) was cleared for transfer on January 25, 2007. Fahd Abdullah Ghazy (No. 05-223) was cleared for transfer on September 24, 2007. Abdul Al Hadi (No. 05-429) was cleared for transfer in either later 2007 or early 2008. Adel Al Hakeemy (No. 05-429) was cleared for transfer on or about January 15, 2008. Yet, although the Government does not believe these men to be a threat to the United States or its allies, none has yet been transferred or released. On the contrary, the Government continues to claim the authority to

13

imprison Petitioners despite approval for release or transfer. *See* Notice 4-5, *In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-442 (D.D.C. July 9, 2008) (Dkt. 18) (attached as Exhibit A) ("[T]he Government reserves its rights with regard to all unresolved issues as to [cleared] detainees, including but not limited to questions about the effect of decisions of the Department of Defense approving a detainee for release or transfer [and] about the authority of the Department of Defense to hold such a detainee[.]").

Delaying any habeas cases because of a demonstrably inconsequential executive determination would be unfair and contrary to law. The Supreme Court's mandate to provide Guantanamo detainees with a prompt habeas hearing made no distinction between those who are cleared and those who are not. *See Boumediene*, 128 S. Ct. at 2275. Indeed, the right to habeas "may not be denied but ought to be granted to every man that is committed or detained in prison or otherwise restrained of his liberty." Rollin C. Hurd, *Treatise on the Right of Personal Liberty, and On the Writ of Habeas Corpus and the Practice Connected with It: With a View of the Law of Extradition of Fugitives* 222 (2d ed. 1876) (quoted in *Boumediene*, 128 S. Ct. at 2266-67).[6]

At least as long as the Government continues to detain ARB-cleared prisoners and claim a right to do so, prompt habeas corpus review remains essential. Holding the cases for all ARB-cleared petitioners until after proceedings for non-cleared detainees are complete would produce the absurd result that prisoners who are *not* cleared could obtain relief before prisoners who are

---

[6] It should be clear that the ARB is no substitute for prompt adjudication of a habeas corpus petition. The Supreme Court held that the Combatant Status Review Tribunal (CSRT) process was an inadequate substitute for habeas corpus for reasons that apply equally to the ARB process. Specifically, the Court criticized the limited ability provided to detainees to rebut the evidence against them based on the circumstances of confinement, lack of counsel, and lack of knowledge of the most critical allegations against them. *Boumediene*, 128 S. Ct. at 2260, 2269. Like the CSRTs, ARB proceedings are non-adversarial and "fall well short of the procedures and adversarial mechanisms that would eliminate the need for habeas corpus review." *Id.* at 2260. At least as long as cleared Petitioners remain in U.S. custody, their right to prompt habeas review endures with undiminished urgency.

cleared have a single hearing.  It may also enable the Government to manipulate the Court's docket by declaring individuals "cleared" (without releasing them) in order to delay cases in which the Government's evidence is weak.

The Government cannot justify delaying cleared Petitioners' proceedings by reference to diplomatic issues regarding transfer.  Indeed, there is strong reason to doubt whether the Government is actively negotiating for the prompt transfer of all cleared detainees.  For example, as recently as July 2008, Algeria has accepted the repatriation of two of its nationals from Guantanamo—at least one of whom was not cleared—while other cleared Algerian prisoners, including Mammar Ameur (No. 05-573) remain at Guantanamo.  Also, an April 2008 communication from the office of the Yemeni Minister of Foreign Affairs indicates that the United States had not informed the Minister of the ARB clearance of Yemeni detainee Fahd Abdullah Ghazy (No. 05-223), which had occurred over six months earlier, effectively demonstrating that the Government made no effort to negotiate transfer of that cleared prisoner.  Email from Najwa Al-Serri to James M. Hosking dated April 8, 2008 (attached as Exhibit B).  The Government's conduct of negotiations with foreign governments would certainly differ were this Court to order a petitioner—cleared or not—released; the Government might *then* negotiate more aggressively or less intransigently with a detainee's home country or with a third country that might accept that prisoner, in order to comply with the Court's directive.  Should the Government encounter diplomatic issues at that stage, it could periodically update the Court and petitioners' counsel on why it has been unable to implement the release order, through repatriation, resettlement or otherwise.

Petitioners' counsel believe that the cases before this Court will naturally fall into sequence based on the filing of returns and the nature and scope of each Petitioners' response.

To the extent that a prioritizing principle is needed, ARB-clearance cannot fulfill that function equitably. If a situation arises where multiple Petitioners are simultaneously poised to proceed to a merits hearing, Petitioners propose that priority be given to prisoners who have been in U.S. custody, whether at Guantanamo Bay or starting elsewhere, for the longest time.

### C. Procedures For Adjudication Of Cases

1. Standards of proof and burdens of proof

    (a) *The Government bears the burden of persuasion, which must be carried beyond a reasonable doubt or, at a minimum, by clear and convincing evidence*

*Boumediene* made clear that the ultimate burden of persuading the Court that Petitioners are lawfully imprisoned rests with the Government, although it left for the district court to decide the "*extent* of the showing required of the Government in these cases." 128 S. Ct. at 2271 (emphasis added).

As the Supreme Court has noted, the choice of a standard of proof is ultimately an allocation of the risk of error in factfinding:

> There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value–as a criminal defendant his liberty–this margin of error is reduced as to him by the process of placing on the other party the burden of producing a sufficiency of proof in the first instance, and of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt.

*Speiser v. Randall*, 357 U.S. 513, 525-26 (1958); *see also In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurring) ("[A] standard of proof represents an attempt to instruct the fact-finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication."). In addition to society's interest in being confident of the result, Petitioners have at stake an "interest of immense importance, both because of the possibility that [they] may lose [their] liberty upon [a determination of enemy

combatant status] and because of the certainty that [they] would be stigmatized by the [determination]." 397 U.S. at 363. When interests of such transcending value are implicated, proof beyond a reasonable doubt is the starting point of our jurisprudence.

Although proof beyond a reasonable doubt is the hallmark of *criminal* cases—and none of these Petitioners has been (or likely will ever be) charged with a crime—the standard of proof is appropriate here where "loss of liberty and stigma" and the interests of the Petitioners are of such magnitude that they should be protected by the "standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment." *Addington v. Texas*, 441 U.S. 418, 423, 427 (1979). The Petitioners' stake is no less important than that of a criminal defendant: Petitioners stand to be imprisoned "for the duration of hostilities that may last a generation or more," such that the risk of error is "too significant to ignore." *Boumediene*, 128 S. Ct. at 2270. And the Supreme Court identified a "considerable risk of error" in the Government's determination of Petitioners' detainability, given the Government's failure to provide any meaningful prior review proceeding. *Id.* The Government's own personnel have admitted that their detention decisions have been flawed: as early as 2002, the former Guantanamo commander stated that "[s]ometimes we just didn't get the right folks." Christopher Cooper, *Detention Plan: In Guantanamo, Prisoners Languish in a Sea of Red Tape*, Wall St. J., Jan. 26, 2005, at A1, A10.[7]

---

[7] *See also Frontline: Son of Al Qaeda* (PBS television broadcast, Apr. 11, 2004), transcript available at http://www.pbs.org/wgbh/pages/frontline/shows/khadr/interviews/khadr. html (quoting CIA operative who had spent a year undercover at Guantanamo as estimating that "only like 10 percent of the people that are really dangerous, that should be there and the rest are people that don't have anything to do with it, don't even, don't even understand what they're doing here"); Tom Lassetter, *America's Prison for Terrorists Often Held the Wrong Men*, McClatchy Newspapers, June 15, 2008, *available at* http://www.mcclatchydc.com/detainees/ story/38773.html (quoting U.S. intelligence analyst who stated that "[o]ver about three years, I

The interests in these cases support a higher standard of proof than the pretrial detention context addressed in *United States v. Salerno*, 481 U.S. 739 (1987). *Salerno* upheld a clear and convincing standard in significant part because the duration of pretrial detention is not indefinite; it is "limited by the stringent time limitations of the Speedy Trial Act." *Id.* at 747. Here, the detention is indefinite, potentially lasting a lifetime. Equally important to *Salerno* was the limited, narrow category of persons to whom detention could apply. *Id.* at 750. Here, the scope of the Government's enemy combatant definition is extremely broad and (Petitioners will argue) unlawfully so. Considering the scope, breadth, and duration of Petitioners' detention, this Court should not condone it absent the highest level of confidence in the Government's proof.

At the very least, however, the Government should be held to proof by clear and convincing evidence. As the D.C. Circuit has explained: "in situations where the various interests of society are pitted against restrictions on the liberty of the individual, a more demanding standard is frequently imposed, such as proof by clear, unequivocal and convincing evidence." *In re Ballay*, 482 F.2d 648, 662 (D.C. Cir. 1973). Indeed, the Supreme Court has repeatedly held that, where the Government seeks to impose serious deprivations of liberty, the Government must justify the sufficiency of its case by clear and convincing evidence. *See Woodby v. INS*, 385 U.S. 276, 286 (1966) (deportation); *Schneiderman v. United States*, 320 U.S. 118, 122-23 (1943) (denaturalization); *Kansas v. Hendricks*, 521 U.S. 346, 361-62 (1997) (indefinite civil commitment of sex offender); *Foucha v. Louisiana*, 504 U.S. 71, 81-83 (1992) (continued commitment of criminal defendant found not guilty by reason of insanity); *Salerno*, 481 U.S. at 750 (pretrial detention based on dangerousness).

---

assessed around 40 of these individuals, mostly Afghans. . . .  I only can remember recommending that ONE should be kept at GITMO").

Petitioners face an even more serious deprivation of liberty than persons in these categories. Deportees remain at liberty in the country to which they are returned; pretrial detainees may prove their innocence and win release in a full-blown criminal trial; and civilly committed persons are confined within their home state, where they may have contact with and visits from relatives and loved ones. Petitioners are not only confined, but are *isolated* and *totally deprived of direct contact* with anyone other than guards, interrogators, counsel, and (in some but not all cases) other prisoners. This near-complete restraint, essentially without parallel in the American justice system, should not be allowed on a mere preponderance of the evidence. *See, e.g.*, *Woodby*, 385 U.S. at 285 (refusing to base grievous deprivation of liberty "upon no higher degree of proof than applies in a negligence case").

> (b)     *The Court should consider the Government's evidence neutrally, without any presumption of correctness*

The Court's role in reviewing executive detention on habeas is to assess the credibility of the Government's evidence, not to presume it reliable or correct. *Boumediene* reaffirmed the importance of the Court's independent review of the Government's evidence: habeas necessarily requires "authority to assess the sufficiency of the Government's evidence against the detainee." 128 S. Ct. at 2270. In executive detention cases like these, where the Petitioners have received no prior fair, adversarial review, the Court's first task is to perform a searching review of the Government's evidence, in addition to hearing the controverting evidence submitted by the Petitioner. *See id.* (common law habeas courts "'examined the written depositions on which [the petitioner] had been arrested or committed, and others even heard oral testimony to determine whether the evidence was sufficient to justify holding him'" (quoting Dallin H. Oaks, *Legal History in the High Court-Habeas Corpus*, 64 Mich. L. Rev. 451, 457 (1966))).

19

Accordingly, the Government's return must consist not merely of "evidence," but of "*credible* evidence" that constitutes "*meaningful* support" for the Government's position that the petitioner should be imprisoned. *Hamdi*, 542 U.S. at 534 (plurality opinion) (emphasis added). The Court then assesses the reliability of the Government's evidence as presented. Because the burden is on the Government to prove that imprisonment is lawful, the writ must issue if the Government fails to present evidence that the Court is able to assess as "credible." *See, e.g.*, *Boumediene*, 128 S. Ct. at 2271 (recognizing that a "showing [is] required of the Government in these cases," but leaving the "extent of the showing" as a "matter to be determined").

Indeed, *Boumediene* specifically rejected the Government's argument that the returns it has filed so far—namely "decisions" of Combatant Status Review Tribunals (CSRTs)—were entitled to deference. The Court treated the fact that the CSRT accorded the Government's evidence a "presumption of validity" as a *defect*, not as an acceptable variation on habeas procedures. 128 S. Ct. at 2260. Although habeas courts do owe "considerable deference" to "the judgment of a court of record," the CSRT procedure took these cases "outside these categories . . . for here the detention is by executive order." *Id.* at 2268.[8]

---

[8] Common law habeas courts afforded no deference to an executive official's view of the facts. In *Ex parte Bollman*, 8 U.S. 75, 125 (1807), Chief Justice Marshall declined to defer to a magistrate's determination that the facts justified holding a pretrial detainee for treason; instead, the Court held five days of factual hearings during which it "fully examined and attentively considered" the relevant evidence and ordered the petitioner released. Similarly, in *Ex parte Randolph*, 20 F. Cas. 242 (C.C.D. Va. 1833) (No. 11,558), Chief Justice Marshall reviewed the commitment of a civil debtor by local municipal authorities, took new evidence, and reached his own conclusions despite prior factual findings by executive officials. *Accord Boumediene*, 128 S. Ct. at 2268 (citing *Ex parte Robinson*, 20 F. Cas. 969, 971 (C.C. Ohio 1855) (No. 11, 935) (McLean, J.)). One court aptly summarized the state of the law:

> [T]o require the court in its investigation to be governed by the decision of an executive officer, acting under instructions from the head of the department in Washington, would be an anomaly wholly without precedent, if not a flagrant absurdity.

The D.C. Circuit's decision in *Parhat v. Gates*, No. 06-1397, 2008 WL 2576977 (D.C. Cir. June 20, 2008), issued after *Boumediene*, provides valuable guidance regarding the skepticism with which the Court should treat the Government's evidence.  In *Parhat*, the D.C. Circuit (Garland, J., joined by Sentelle, C.J., & Griffith, J.) invalidated a determination by a CSRT that the petitioner was properly detained as an enemy combatant.  Notably, *Parhat* reviewed the Government's case for detention under the DTA, which both the Supreme Court and the D.C. Circuit recognized involves *less* searching review than is required on habeas.  *See Boumediene*, 128 S. Ct. at 2266 ("[T]he procedures adopted [in the DTA] cannot be as extensive or as protective of the rights of the detainees as they would be in a § 2241 proceedings."); *Parhat*, 2008 WL 2576977, at *15 ("The habeas proceeding will have procedures that are more protective of Parhat's rights than those available under the DTA.").  Importantly, *Parhat* reviewed *only* the Government's evidence; it did not consider any evidence proffered by the prisoner.

The D.C. Circuit's analysis in *Parhat* makes clear that, even in the constrained context of DTA review, the Court may not presume that the Government's evidence is true, correct, or reliable.  Rather, the court "must be able to assess the reliability of the [Government's] evidence ourselves," 2008 WL 2576977, at *12—a requirement no less applicable in habeas than under the more restrictive DTA.  For instance, the Government relied in *Parhat* on "four government intelligence documents" asserting that a particular organization (ETIM) was associated with Al Qaeda.  *Id.* at *11.  In its submissions, the Government demanded that the D.C. Circuit pay "extraordinary deference" to its assertions regarding ETIM.  Corrected Resp. Br. 32, *Parhat* (D.C. Cir. Mar. 6, 2008) (attached as Exhibit C).  Despite the Government's arguments, the D.C.

---

*In re Jung Ah Lung*, 25 F. 141, 143 (D. Cal. 1885); *see also* Jared Goldstein, *Habeas Without Rights*, 2007 Wis. L. Rev. 1165 (2007) (Appendix) (collecting cases).

Circuit refused to credit these "intelligence documents" because, *inter alia*, the Government did not provide "any of the underlying reporting upon which the documents' bottom-line assertions are founded, nor any assessment of the reliability of that reporting." *Parhat*, 2008 WL 2576977, at *11. Far from presuming them to be true, the D.C. Circuit held that the "bare assertions" in the intelligence documents could not support Parhat's imprisonment. *Id.*; *see also id.* (declining to credit government lists designating terrorist organizations because they did not "disclose[] the grounds upon which the designation was made").

The Government will likely urge this Court to accord its evidence a "presumption" of validity, regardless of whether it bears any indicia of credibility. The D.C. Circuit already rejected a similar argument in *Parhat*, where the Government asked the D.C. Circuit to treat Government documents as reliable merely because "the State and Defense Departments would not have put them in intelligence documents were that not the case." *Id.* at *13. The D.C. Circuit noted that the Government's position came "perilously close to suggesting that whatever the government says must be treated as true." *Id.* Any "presumption" of correctness of Government evidence that required the Court to take Government assertions as true, no matter how lacking in supporting detail or indicia of reliability, would be similarly problematic.

Given the D.C. Circuit's rejection of an evidentiary presumption under the DTA—a system far more favorable to the Government than the statutory habeas system that governs here—this Court should *a fortiori* reject a presumption in these cases. Rather, the Court should perform a meaningful review of the Government's evidence to ensure "that miscarriages of justice within [the Court's] reach are surfaced and corrected." *Harris v. Nelson*, 394 U.S. 286, 291 (1969). A judicial *assessment* of the facts, rather than a presumption that the facts are as the

Government asserts them, is essential to the searching habeas review mandated by the Supreme Court.

The manner in which each case is presented for the Court's adjudication may vary. In some cases, the Petitioner may choose to challenge the Government's evidence as lacking any indicia of credibility, as the Parhat petitioner did, and therefore move for judgment prior to presenting any additional evidence. Other Petitioners might combine such a challenge with a traverse proffering additional evidence controverting the Government's allegations. In either situation, the Court should treat the parties' evidence neutrally, without placing any thumb on the scale in the Government's favor.

### (c)    Hamdi *does not compel any different result*

In parallel briefing, the Government has seized upon the *Hamdi* plurality's statement that "the Constitution would not be offended by a presumption in favor of the Government's evidence, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided." 542 U.S. at 534 (plurality opinion). The Government's first error is to treat this statement in a *plurality* opinion as binding, which it clearly is not—particularly not in light of the later statements in *Boumediene* and *Parhat*, which are binding.[9]

---

[9] The *Boumediene* Court stressed that the *Hamdi* plurality's discussion of procedures "did not garner a majority of the Court." 128 S. Ct. at 2269. Even the dissenting Justices in *Boumediene* did not suggest that the *Hamdi* plurality's discussion of procedures was a binding holding. *See id.* at 2284 (Roberts, C.J., dissenting); *id.* at 2302 (Scalia, J., dissenting). In fact, only four Members of the Supreme Court joined the *Hamdi* plurality's procedural discussion. The critical fifth vote for the disposition in *Hamdi* was supplied by Justice Souter. *See* 542 U.S. at 553 (Souter, J., concurring in part, dissenting in part, and concurring in the judgment) (stating that he was "joining with the plurality to produce a judgment"). Justice Souter specifically noted his disagreement with the plurality's statements regarding habeas procedures. *See id.* (Souter, J., concurring in part, dissenting in part, and concurring in the judgment) (stating that he "would not reach any questions of what process [Hamdi] may be due in litigating disputed issues in a proceeding under the habeas statute" and that he "did not adopt the plurality's resolution of constitutional issues that [he] would not reach"); *id.* at 553-54 (disagreeing with the plurality's

The Government's second error is to ignore the remaining language of the *Hamdi* opinion, which makes clear that the plurality was not decreeing a procedure for all cases or, for that matter, even for Hamdi's case. The plurality was much more cautious, carefully hedging its suggestions as options to be assessed in the circumstances of each case. The plurality thus stated that "the exigencies of the circumstances *may demand* that . . . enemy-combatant proceedings *may be tailored* to alleviate their uncommon *potential* to burden the Executive at a time of ongoing military conflict." 542 U.S. at 533 (emphasis added). It stated that hearsay "*may need to be accepted* as the most reliable available evidence from the Government." *Id.* at 533-34 (emphasis added). And in explaining how the "presumption" it described would function, the plurality stated only that, after the Government showed "credible evidence" of enemy combatant status, "the onus *could* shift to the petitioner," and that "[a] burden-shifting scheme *of this sort would meet the goal*" of balancing the relevant interests. *Id.* at 534 (emphasis added). This language—sprinkled throughout with tentative "mays," "coulds," and "woulds"—reveals that the plurality was not making definitive statements of the procedures to be employed, but rather was making suggestions for the district court to consider based on "the exigencies of the circumstances" on remand. *Id.* at 533-34. Indeed, at the end of the opinion, the plurality specifically proposed that the district court "pay proper heed to the matters of national security that *might* arise *in an individual case*." *Id.* at 539 (emphasis added). Thus, even if this Court

---

suggestion "that the Government could claim an evidentiary presumption casting the burden of rebuttal on Hamdi").

As the narrowest opinion supporting the judgment, Justice Souter's concurrence governs the issue of habeas procedures. *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds[.]'" (citation omitted)). Accordingly, the *Hamdi* plurality opinion is not authoritative on the issue of habeas procedures—and it certainly does not displace the D.C. Circuit's binding and more recent analysis in *Parhat*, which forecloses a presumption of correctness of Government evidence.

were to take guidance from the non-binding opinion of the *Hamdi* plurality, it should take guidance from the opinion in full, not simply the snippets that the Government quotes out of context. *Cf. Boumediene*, 128 S. Ct. at 2258 ("[W]e do not accept the idea that the above-quoted passage . . . is the only authoritative language in the opinion and that all the rest is dicta.").

Moreover, the plurality's reference to a "presumption" did not purport to insulate the Government's evidence from all judicial assessments of credibility. The plurality nowhere stated that it would presume that the Government's evidence was *correct*, even where it was unsupported by detail that would allow the court to "assess the reliability of the assertions in the documents." *Parhat*, 2008 WL 2576977, at *11. Rather, the plurality explained that the "presumption" it proposed was no more than a "burden-shifting scheme" that depended on the Government first "put[ting] forth *credible* evidence." *Hamdi*, 542 U.S. at 534 (emphasis added); *see also id.* (shifting of burden occurs only "once [the Government] has put forth *meaningful support* for its conclusion that the detainee is in fact an enemy combatant" (emphasis added)). Thus, even under the plurality's approach, this Court must determine whether the Government's proffered evidence is "credible" prior to the application of any presumption or shifting. That is precisely what occurred in *Parhat*, where the D.C. Circuit conducted a neutral assessment of the Government's evidence and concluded that there was no reliable basis for an enemy combatant determination.

The plurality's reference to a "presumption" and a "burden-shifting scheme" must also be understood in light of the Supreme Court's precedent regarding evidentiary presumptions. The Court has stated that "all presumptions" function as "described in Federal Rule of Evidence 301." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993). That Rule makes clear that what is shifted is a burden of *production*, not an ultimate burden of persuasion. *See* Fed. R.

Evid. 301 ("[A] presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast."). Here, of course, the burden of persuasion remains at all times on the Government, which is required to show a lawful basis for imprisonment. *See Boumediene*, 128 S. Ct. at 2271 (a "showing [is] required of the Government in these cases"). As the Supreme Court has held, "the shifted burden of production bec[omes] irrelevant" once Petitioner has presented evidence controverting the Government's allegations. *St. Mary's*, 509 U.S. at 507. The Court's ultimate evaluation of a full record—containing both the Government's evidence and the Petitioner's evidence—involves no thumb on the scale for the Government. *See id.* at 510-11 ("The presumption, having fulfilled its role of forcing the [Petitioner] to come forward with some response, simply drops out of the picture.").

Thus, even if the *Hamdi* plurality's reference to a burden-shifting scheme were binding on this Court—which it is not—it would still require that the Court first evaluate the Government's return neutrally, without deference or presumption of truth, to determine whether there is any objective basis to conclude that it is "credible." If the return contains no way for the Court to assess the reliability of the Government's assertions, the burden would not shift, and the Court may order relief immediately, regardless of whether the Petitioner submits additional evidence in a traverse. *See, e.g.*, *Parhat*, 2008 WL 2576977, at *18 (holding enemy combatant determination invalid and ordering relief following review of Government's evidence only). If the Government's return sets forth indicia of credibility, then the Court should evaluate the Petitioner's controverting evidence, filed as a traverse. *See* 28 U.S.C. § 2243. At that point, however, the shifting of burdens falls away, and the evidence of both parties is evaluated

neutrally, with the ultimate burden of persuasion resting with the Government. *See Boumediene*, 128 S. Ct. at 2271. To the extent the return and traverse raise disputes of material fact, an evidentiary hearing should be held. *See* 28 U.S.C. § 2243; *infra* Part II.C.3.

Accordingly, Petitioners submit that the proper course for these cases is for the Government first to submit its factual returns as ordered by the Court. July 30 Order 2-3. Following receipt and review of those returns, and appropriate consultation with their clients at Guantanamo, counsel for Petitioners may seek judgment based on the Government's evidence alone (as occurred in *Parhat*) and/or may file a traverse setting forth evidence controverting the Government's allegations. Regardless of the route any Petitioner seeks in any particular case, the Court must view all parties' evidence neutrally and, particularly, must *assess* the reliability of the Government's evidence, rather than simply presuming it.

2.    Standards and procedures governing discovery

Discussion of discovery at this point is necessarily tentative. Petitioners cannot determine what discovery might be necessary until the Government submits its factual returns (or, in the *Boumediene* case, its proposed amended factual returns). The habeas statute expressly authorizes discovery and accords substantial discretion to the Court to craft discovery based on the specific facts and needs of each case. Once Petitioners have reviewed the Government's factual allegations, Petitioners' counsel in each case may seek leave to conduct limited and targeted discovery based on the information and allegations contained within the Government's returns. Petitioners will focus their discovery on issues germane to the legitimacy of their detention.

However, there are two matters that would benefit from the Court's resolution at this time. First, the Court should clarify that, to the extent the Government believes that particular discovery requests are unduly burdensome, it must make case-specific, supported proffers to that

effect, rather than generalized and unsupported invocations of "national security" or "military affairs." Given that many Petitioners were not taken into custody in any combat situation, the information sought by Petitioners will frequently not present any concerns that would justify limiting the full disclosure of the facts. Second, the Court should order the Government to disclose any information in its possession that could undermine its allegations against Petitioners.

> (a)    *The habeas statute authorizes discovery, with the specific scope of discovery depending on the circumstances of the particular case*

The federal habeas statute expressly authorizes discovery in habeas proceedings. Section 2246 provides that, if a party introduces an affidavit, the opposing party "shall have the right to propound written interrogatories to the affiants." *See also Harris*, 394 U.S. at 296 (noting that § 2246 provides for "interrogatories for the purpose of obtaining evidence from affiants where affidavits were admitted into evidence"). The Supreme Court has also held that, pursuant to the All Writs Act, 28 U.S.C. § 1651, habeas courts are authorized to expand discovery beyond measures specified in § 2246 and that it is "the inescapable obligation of the courts" to grant leave for discovery in appropriate circumstances. *Harris*, 394 U.S. at 299. The Court instructed district courts to "fashion appropriate modes of procedure, by analogy to existing rules or otherwise in conformity with judicial usage," to permit a petitioner to "secur[e] facts where necessary to accomplish the objective of the proceedings." *Id.* Further, the Federal Rules of Civil Procedure apply to these habeas petitions, unless inconsistent with 28 U.S.C. § 2241. *See* Fed. R. Civ. P. 81(a)(4).

A Petitioner is thus entitled to "the taking of evidence in habeas proceedings by deposition, affidavit or interrogatories." *Hamdi*, 542 U.S. at 525 (plurality opinion) (citing § 2246); *see also Al-Marri*, 2008 WL 2736787, at *49 n.16 (Traxler, J., concurring in the

judgment) (citing "discovery" as part of the "process normally available [to persons] who challenge their executive detention"); *El-Banna v. Bush*, No. 04-1144, 2005 WL 1903561 (D.D.C. July 18, 2005) (Roberts, J.) (ordering the government to preserve evidence regarding petitioners' detention at Guantanamo, in view of the habeas court's plenary power of inquiry and petitioners' right to discovery); Rule 6 of the Rules Governing Section 2254 Cases (authorizing discovery in § 2254 cases; applicable to other types of habeas cases through Rule 1(b)).

*Boumediene* specifically noted that the availability of discovery to a habeas petitioner counted among the procedural rights that, historically, "preserve[d] the writ and its function." 128 S. Ct. at 2263 (citing *Harris*, 394 U.S. at 299-300). *Boumediene* further noted the habeas court's discretion to "accommodate" the Government's interest in protecting sources and methods of intelligence gathering (*id.* at 2276)—a statement that necessarily presumed that habeas petitioners would be able to make requests for disclosure of information.

Though it is clear that discovery is permissible in the habeas context, the scope of discovery in these cases is not amenable to common resolution. Discovery in habeas cases generally requires leave of court and should be allowed if the request is based on "specific allegations" by the petitioner. *See Harris*, 394 U.S. at 300 (where "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry").

The availability of discovery in habeas litigation therefore depends on the facts of a particular case and the nature of the discovery sought. *See, e.g.*, *Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (holding that "given the facts of this particular case," the habeas court abused its discretion when it denied discovery to the petitioner). Indeed, once the Government has

produced its factual returns, differences in its allegations or the nature of evidence relied upon might cause different Petitioners to approach discovery in different ways, possibly forgoing discovery altogether. *Compare Parhat*, 2008 WL 2576977, at *5 (noting that petitioners, though entitled to production of all "Government Information," asked the court to review CSRT determinations based on the CSRT record alone), *with* Order, *Hamdi v. Rumsfeld*, No. 02-CV-439, at 1 (E.D. Va. Oct. 11, 2004) (ordering, on remand from Supreme Court, that the Government produce copies of all documents on which it intended to rely in its case-in-chief against Hamdi prior to the hearing).

While Petitioners' approaches to discovery may vary, the Court should be more permissive in considering discovery requests than in cases such as *Harris*, which involved a collateral attack on a prior state court judgment. In a typical habeas proceeding, a petitioner previously would have had a full opportunity for discovery pursuant to state or federal rules of criminal procedure, would have been provided full access to exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and would have had the full opportunity to confront and cross-examine all prosecution witnesses. A regime of partially constrained discovery thus makes sense in a post-conviction context, where the full apparatus of criminal procedure and constitutional law presumptively afforded the convict all the information he could legitimately demand. By contrast, in the present challenges to executive detention, where Petitioners have not had a prior fair or adversarial adjudication, ordinary post-conviction limitations do not apply. Accordingly, the need for discovery in these cases may well be more compelling. *See Boumediene*, 128 S. Ct. at 2267 ("[T]he common-law habeas court's role was most extensive in cases of pretrial and noncriminal detention, where there had been little or no previous judicial review of the cause for detention.").

Finally, these cases present a number of unique challenges to Petitioners in gathering evidence. Substantial time has passed; the events at issue occurred in and involve distant countries; English is not the native language of most detainees; Petitioners' ability to communicate with their attorneys is severely circumscribed; and Petitioners' mental health may have suffered as a result of their confinement. Individual Petitioners may need to undertake some preliminary discovery in order to be able to identify the evidence that is helpful to their case. Others may need to investigate whether statements against them were obtained by coercion or torture and are therefore unreliable. The Supreme Court has long recognized that "[t]he very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Harris*, 394 U.S. at 291. These cases will especially require "initiative and flexibility" in the administration of discovery. The Court should apply that principle to the discovery requests made in each case, based on an evaluation of each Petitioner's legitimate need for discovery in order to have a meaningful opportunity to test and counter the Government's allegations.

> (b)    *Any limitation on discovery should be allowed, if at all, only upon a specific showing that a particular request is unduly burdensome, not on generalized invocations of "military affairs"*

Petitioners expect the Government to seek a blanket order forbidding discovery—as it has before Judge Hogan—based on general references to "fishing expeditions" into "military affairs." *E.g.*, Government's Br. Regarding Procedural Framework Issues 1, 3, 17, *In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-442 (TFH) (D.D.C. July 25, 2008). Petitioners accept that discovery in these cases must pay appropriate heed to national security concerns, but those concerns are only relevant if they are *in fact* implicated by *actual* discovery requests, of which none has yet been propounded. Petitioners expect their requests to be appropriately "prudent and incremental," as the *Hamdi* plurality cautioned. 542 U.S. at 539. Moreover, given

31

that many Petitioners were not taken into custody in circumstances that implicate U.S. military actions on the battlefield, it is likely that much of the information Petitioners request may be supplied without affecting legitimate national security interests or requiring the Government to locate information "'buried under the rubble of war.'"  Government's Br.  Regarding Procedural Framework Issues 27, 37, *In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-442 (TFH) (D.D.C. July 25, 2008) (quoting *Hamdi*, 542 U.S. at 532).  As Judge Traxler's controlling opinion for the Fourth Circuit demonstrated, many documents bearing on detention are likely within the possession of *civilian* agencies and readily locatable within the United States.  *See Al-Marri*, 2008 WL 2736787, at *47.

Accordingly, the Court should order that, following the propounding of discovery requests in any particular case, the parties meet and confer in an effort to minimize areas of dispute.  To the extent the parties are unable to reach agreement, the Government should be required to demonstrate the *actual* burdens that would result from a disputed request.  Following rebuttal by Petitioner, the Court could then rule on specific discovery requests in the context of a specific record, rather than on the unsupported parade of horribles the Government currently advances.

> (c)    *The Government has an affirmative duty to disclose exculpatory and impeaching evidence, which should be confirmed by a standing order of the Court*

Another aspect of discovery that would benefit from decision at this juncture involves the Government's ongoing obligation to disclose to Petitioners "exculpatory" and "impeaching" material in its possession—*i.e.*, evidence that tends to undermine the Government's theory of a Petitioner's continued detention.  *See Brady*, 373 U.S. at 87; *see also United States v. Agurs*, 427 U.S. 97, 106-07 (1976); *United States v. Bagley*, 473 U.S. 667 (1985).  The Government "has a duty to learn of any favorable evidence known to the others acting on the government's behalf,"

*Kyles v. Whitley*, 514 U.S. 419, 437 (1995), and must disclose exculpatory and impeaching evidence that is "material," *Bagley*, 473 U.S. at 668.

In requesting that the Government disclose exculpatory materials, Petitioners are not asking to send the Government on a "fishing expedition." Rather, the Government has represented that it expects to review its files in order to ensure that its future returns (or amended returns) contain up-to-date information. Transcript of Status Conference Hearing for Guantanamo Cases before Judge Richard J. Leon at 28 (July 10, 2008). Moreover, the Government has also been conducting a review of its files in order to comply with its obligations under *Bismullah v. Gates*, 503 F.3d 137 (D.C. Cir. 2007), which required disclosure of all information reasonably available to the Government. *See id.* at 142 ("the record on review must include all the Government Information, as defined by the DoD Regulations"); *Bismullah v. Gates*, 501 F.3d 178, 181 (D.C. Cir. 2007) (Government Information is "defined by the Secretary of Navy as 'such reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant,' which includes any information presented to the Tribunal by the detainee or his Personal Representative"). The Government's search for exculpatory materials can therefore occur expeditiously, concomitant with this review.

Failure to disclose exculpatory information "undermines confidence in the outcome." *Bagley*, 473 U.S. at 678. Thus, this obligation not only guarantees fair treatment for detainees subject to a substantial liberty deprivation, *Brady*, 373 U.S. at 87, but it is also necessary to preserve the fundamental truth-seeking function of an adjudicatory proceeding, *Monroe v. Blackburn*, 476 U.S. 1145, 1148 (1986). *Freeport-McMoRan Oil & Gas Co. v. FERC*, 962 F.2d 45, 47 (D.C. Cir. 1992) (reiterating the Supreme Court's admonition that a government lawyer

"'is the representative not of an ordinary party to a controversy,' . . . 'but of a sovereignty whose obligation . . . is not that it shall win a case, but that justice shall be done'" (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935))).

In the criminal context, the Government has a duty to disclose exculpatory material in the possession of the prosecution regardless of whether the defendant requests such material. *Agurs*, 427 U.S. at 110-12. A similar duty has been applied in civil contexts involving serious Government deprivations of liberty. *See, e.g.*, *Demjanjuk v. Petrovsky*, 10 F.3d 338, 353 (6th Cir. 1993) (applying *Brady* to civil immigration cases where the government seeks denaturalization or extradition based on proof of alleged criminal activities). The Supreme Court made clear that willful blindness is not sufficient: "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles*, 514 U.S. at 437. "Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned." *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (en banc); *see also United States v. Chapman*, 524 F.3d 1073, 1085-1086 (9th Cir. 2008) (holding that reckless failure to disclose exculpatory information as required by the Constitution may constitute flagrant misconduct in violation of due process).

The Government's duty to disclose should continue during the pendency of habeas proceedings. *See Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007) (noting that the state's "ongoing duty to disclose exculpatory information . . . extends throughout the legal proceedings that may affect guilt or punishment, including post-conviction proceedings"). Petitioners submit that the Court should put the Government on notice, well in advance, that *sua sponte* disclosure of these materials is an essential element of its production obligations.

3.    Standard and procedures for an evidentiary hearing

(a)    *Petitioners are entitled to an evidentiary hearing on disputed issues of material fact*

As discussed above, the Court may be able to decide some cases in the Petitioner's favor without holding an evidentiary hearing.  *See, e.g,*, *Parhat*, 2008 WL 2576977, at *7 (invalidating enemy combatant determination because Government evidence did not provide a reliable basis for the determination).  In other cases, the petition, return, and the traverse will raise disputed issues of material fact.  In those situations, the Court should hold an evidentiary hearing in order to resolve those factual issues.  *See, e.g.*, *Walker v. Johnston*, 312 U.S. 275, 286 (1941) ("if the petition, the return, and the traverse raise substantial issues of fact it is the petitioner's right to have those issues heard and determined in the manner the statute prescribes"); *accord Blackledge v. Allison*, 431 U.S. 63, 71-72 (1977); *see also Johnson v. Zerbst*, 304 U.S. 458, 466-67 (1938) (habeas petitioner is entitled to "a judicial inquiry in a court of the United States into the very truth and substance of the causes of his detention . . . [s]uch a judicial inquiry involves the reception of testimony").  Although proof may be offered by affidavit, disputes of fact generally cannot be decided on affidavits alone.  *Jones v. Cunningham*, 313 F.2d 347, 349 n.4 (4th Cir. 1963) ("[I]ssues of fact presented in habeas corpus proceedings may not be established by ex parte affidavits."); *Campbell v. Minnesota*, 487 F.2d 1, 4 n.3 (8th Cir. 1973) (affidavits under 28 U.S.C. § 2246 "cannot be used to resolve substantial disputed questions of fact"); *Owens v. Frank*, 394 F.3d 490, 498 (7th Cir. 2005) ("When the issue is one of credibility, resolution on the basis of affidavits can rarely be conclusive." (internal quotation marks omitted)).

The need for evidentiary hearings to resolve factual disputes is acknowledged throughout habeas corpus jurisprudence.  *See Boumediene*, 128 S. Ct. at 2266 (explaining that § 2241

35

"accommodates the necessity for factfinding that will arise in some cases" by authorizing an

appellate court to transfer a case to a district court "whose institutional capacity for factfinding is

superior to his or her own"); *Stewart v. Overholser*, 186 F.2d 339, 342 (D.C. Cir. 1950) ("When

a factual issue is at the core of a detention challenged by an application for the writ it ordinarily

must be resolved by the hearing process.  This is a chief purpose of the habeas corpus

proceeding."); *see also id*. at 342-43 (collecting cases).

As part of the traverse and hearing process, Petitioners are entitled to present any

evidence that may reasonably bear on their "enemy combatant" designation, including evidence

that a confession from the detainee or the statements of persons implicating him was procured by

torture.  *See Waley v. Johnston*, 316 U.S. 101, 104 (1942) (holding that petitioner is entitled to a

hearing on "the material issue whether the plea was in fact coerced by the particular threats

alleged"); *accord Machibroda v. United States*, 368 U.S. 487, 493 (1962) ("There can be no

doubt that, if the allegations [regarding coercion] contained in the petitioner's motion and

affidavit are true, he is entitled to have his sentence vacated."); *see also Overholser*, 186 F.2d at

345 (ordering factual hearing "involving the taking of testimony followed by a decision based on

the facts and the law" regarding the petitioner's sanity).

> (b)    *Deviations from standard evidentiary and procedural rules—and particularly Petitioners' right of confrontation—should be assessed individually based on a specific showing of need*

As discussed above, habeas is a flexible remedy that can accommodate necessary

modifications in procedure in light of the circumstances of the case.  However, deviations from

the familiar evidentiary and procedural rules that govern ordinary litigation should not be

imposed as a matter of course.  Indeed, the particular nature of the Government's allegations in a

given case, and the Petitioner's rebuttal thereto, may not warrant any deviation from familiar

procedures.

One important default protection is that Petitioners, through their counsel, have the right to cross-examine available witnesses, either in court or by deposition, and to object to inadmissible hearsay. *See* Fed. R. Evid. 1101(e); 28 U.S.C. § 2246. Moreover, the Court plainly has the power to compel the attendance of witnesses within its jurisdiction and to authorize the taking of depositions outside of its jurisdiction. *See* Fed. R. Civ. P. 45. There is no doubt that the opportunity to confront a witness is a central and crucial feature of the common law adversarial system. *Pointer v. Texas*, 380 U.S. 400, 408 (1965) (Harlan., J., concurring) (the "right of confrontation is 'implicit in the concept of ordered liberty'" (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937))). As Justice Scalia explained, "[i]t is a rule of the common law, founded on natural justice, that no man shall be prejudiced by evidence which he had not the liberty to cross examine." *Crawford v. Washington*, 541 U.S. 36, 49 (2004) (internal quotation marks omitted). This feature is not limited to the criminal context:

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so he has an opportunity to show that it is untrue . . . [This principle] is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. . . . This Court has been zealous to protect these rights from erosion . . . [including] in all types of cases where administrative and regulatory actions were under scrutiny.

*Greene v. McElroy*, 360 U.S. 474, 496-97 (1959); *see also In re Oliver*, 333 U.S. 257, 273 (1948) (the right to the opportunity to be heard in one's defense includes one's "right to examine the witnesses against him").

Indeed, in upholding the legality of other administrative detention schemes, the Supreme Court has insisted on the preservation of this principle even where the stakes are much lower. *See, e.g.*, *Hendricks*, 521 U.S. at 361-362 (civil commitment of violent sexual offenders); *Kwong*

*Hai Chew v. Colding*, 344 U.S. 590, 596-597 (1953) (deportation); *Goldberg v. Kelly*, 397 U.S. 254, 270 (1970) (termination of government benefits); *United States v. Anderson*, 51 M.J. 145, 149 (C.A.A.F. 1999) (stating, in the context of military trials, "[t]here are few subjects perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement" (internal quotation marks omitted)).

The particular considerations as to confrontation and compelling attendance of witnesses are not amenable to common preliminary decision. Such decisions will depend on the particular circumstances surrounding the evidence and the witnesses involved, including the availability of the witness, the materiality of the evidence, the reliability of other means of presenting the evidence, and how important the evidence is to the dispute. Where the materiality of the evidence submitted is greater, the importance of confrontation and cross-examination must correspondingly increase. Likewise, where a Petitioner asserts that evidence is unreliable, he should be permitted to argue that it must be excluded unless cross-examined.

Similarly, the right of confrontation counsels caution in the admission of hearsay. To be sure, the habeas statute permits admission of affidavits in the court's discretion, but such permission triggers the opposing party's "right to propound written interrogatories to the affiants, or to file answering affidavits." 28 U.S.C. § 2246. Moreover, the discretion to admit evidence by affidavit must be exercised with caution. *See Herrera v. Collins*, 506 U.S. 390, 417 (1993) ("affidavits are disfavored [in a habeas corpus action] because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations").

In acknowledging that hearsay "may" sometimes be accepted as "the most reliable available evidence," the *Hamdi* plurality did not suggest that the Government could put in its entire case on paper without making any witnesses available for live testimony. *See* 542 U.S. at 533-34 (plurality opinion). Like its other statements regarding procedural matters, the plurality's comment was tentative: hearsay "may" be accepted. The plurality's language suggests that it was merely acknowledging that courts have discretion to admit affidavits under 28 U.S.C. § 2246 or other hearsay under Federal Rules of Evidence 803-807, and that the reliability of such hearsay will frequently be the decisive factor as to whether it should be admitted. *See also Al-Marri*, 2008 WL 2736787, at *49 (Traxler, J., concurring in the judgment) (hearsay is admissible only if government bears its burden to demonstrate that reliance on non-hearsay evidence would be "unduly burdensome"). At a minimum, hearsay not otherwise admissible under Rules 803-807 of the Federal Rules of Evidence should be made under oath and subject to the statutory requirements of 28 U.S.C. § 2246.[10]

In determining whether to admit or rely on hearsay in lieu of live testimony or a deposition, the Court's discretion should be guided by a number of considerations. The application of these considerations will vary widely from case to case and statement to statement. *See Al-Marri*, 2008 WL 2736787, at *45 (Traxler, J., concurring in the judgment) (before admitting hearsay evidence, court must "weigh the competing interests of the litigants in light of

---

[10] Notably, the *Hamdi* plurality addressed only "the narrow question" of the process due an enemy soldier captured in combat against the United States in Afghanistan. 542 U.S. at 516 (plurality opinion); *id.* at 513, 517, 522 n.1; *see also id.* at 549 (Souter, J., concurring) ("[T]he Government here repeatedly argues that Hamdi's detention amounts to nothing more than customary detention of a captive taken on the field of battle."). In a traditional battlefield capture where there are obvious visible signs of hostility, there may be a diminished risk of error. The same is not true for Petitioners in cases before this Court, who were taken into custody in situations far removed from any "field of battle." Accordingly, Government-proffered hearsay in these cases will likely have far fewer indicia of reliability than the evidence the *Hamdi* plurality envisioned.

the factual allegations and burdens placed before it for consideration").  In particular, the Court

should consider the Petitioners' substantial liberty interests and the high risk of error.  Petitioners

face indefinite detention.  *See, e.g.*, *Boumediene*, 128 S. Ct. at 2270 ("the consequence of error

may be detention of persons for the duration of hostilities that may last a generation or more").

Many Petitioners were not captured by the U.S. military, were not captured on any battlefield,

and are not alleged to have committed any hostile acts against the United States or its allies.  *See*

*generally* Mark Denbeaux *et al.*, Seton Hall University School of Law, *Report on Guantanamo*

*Detainees: A Profile of 517 Detainees Through Analysis of Department of Defense Data* 2-4

(2006), *available at* http://law.shu.edu/aaafinal.pdf (only 5% of Guantanamo prisoners were

captured by United States forces on the battlefield).  Under these circumstances, the risk of

factual error is exceptionally high.  Moreover, the burden on the Government of providing live

testimony will be lower, particularly where the testimony is of employees of civilian agencies

posted in the United States or at Guantanamo, as opposed to U.S. military personnel actively

engaged in combat operations abroad.

    The Court should also consider whether the hearsay affidavit is necessary and is the

"most reliable available evidence."  *Hamdi*, 542 U.S. at 533-34 (plurality opinion); *see also*

*United States v. Dunford*, 148 F.3d 385, 393 (4th Cir. 1998) (the requirement of circumstantial

guarantees of trustworthiness is the "most important element" for admissibility under the residual

hearsay exception).  Out-of-court statements should be viewed skeptically and can and should be

excluded if they lack reliability, particularly where the Government shows no basis for

concluding that the declarant could not appear for cross-examination.  *See Parhat*, 2008 WL

2576977, at *9 (rejecting hearsay evidence that lacked indicia of reliability); *United States v.*

*Fernandez*, 892 F.2d 976, 982-83 (11th Cir. 1989) (rejecting hearsay based on unreliability of

declarant); *Jian An Li v. Canarozzi*, 142 F.3d 83, 88 (2d Cir. 1998) (affirming exclusion of deposition testimony under Federal Rules of Evidence 403 due to lack of reliability of source).

Therefore, before accepting hearsay evidence from the Government, the Court must have adequate information to assess the reliability of the source and to determine that the information presented is credible. The D.C. Circuit did precisely that in *Parhat*. In rejecting "intelligence reports" as a basis for supporting the petitioner's classification as an "enemy combatant," the D.C. Circuit noted that there was no information concerning the sources of the allegations allowing the court to assess their reliability. 2008 WL 2576977, at *11. As the D.C. Circuit held, information concerning the reliability of the declarant is essential in evaluating the evidence. *See id.*

Although the Court may take into consideration the Government's interest in protecting its sources and methods of intelligence gathering, *Boumediene*, 128 S. Ct. at 2276, such interests cannot be an excuse for crediting hearsay without sufficient information to assess its reliability. *Parhat*, 2008 WL 2576977, at *13 ("[W]e do *not* suggest that hearsay evidence is never reliable—only that it must be presented in a form, or with sufficient additional information, that permits the Tribunal and court to assess its reliability"). This Court may protect legitimate national security interests without sacrificing reliable factfinding, including, for example, providing information only to counsel with security clearances or by adapting procedures under the Classified Information Procedures Act, 18 U.S.C. App. III, § 4. *See Parhat*, 2008 WL 2576977, at *13.

For present purposes, however, the Court should reaffirm the fundamental principle that no Petitioner may "be prejudiced by evidence which he had not the liberty to cross examine." *Crawford*, 541 U.S. at 49 (internal quotation marks omitted). As with other procedural issues,

the Government is free to make a specific, targeted showing that honoring that right to confrontation with respect to a particular witness or document would impose an actual undue burden on the Government. The Court should rule on such situations as they arise; there is no need to impose a broad general ruling that cannot anticipate what will actually happen in each case.

## CONCLUSION

For the foregoing reasons, the Court should order the Government to give (if requested by any Petitioner) thirty days' notice of any planned transfer from Guantanamo to the affected Petitioner, his counsel, and the Court. Petitioners should be given equal priority for adjudication regardless of whether they have ARB clearances. The Court should consider the Government's evidence neutrally, without any presumption of correctness, and require proof beyond a reasonable doubt or, at the very least, clear and convincing evidence of detainability. Finally, the Court should address discovery requests, the parameters of evidentiary hearings on disputed issues of fact, and other procedural and evidentiary matters as they arise in each particular case.

Respectfully submitted,

/s/ Richard A. Grigg
Richard A. Grigg
Spivey & Grigg
48 East Avenue
Austin, TX 78701
(512) 474-6061

*Counsel for Petitioner Obaydullah in No. 08-1173*

/s/ Ramzi Kassem
Ramzi Kassem
Michael J. Wishnie
  *Supervising Attorneys*
Jennifer Hojaiban
Brian K. Mahanna
Joseph A. Pace
  *Law Student Interns*
Allard K. Lowenstein International Human
Rights Clinic
National Litigation Project
Yale Law School
127 Wall Street
New Haven, CT 06511
(203) 432-0138

*Counsel for Petitioner Ameur in No. 05-573*

/s/ Billy H. Nolas
Billy H. Nolas, Assistant Federal Defender
(*admitted*)
Maureen Rowley, Chief Federal Defender
Matthew Lawry
Shawn Nolan
Mark Wilson
Brett Sweitzer
Assistant Federal Defenders
Federal Community Defender Office for
The Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
 (215) 928-0520
*Counsel for Petitioner Rumi* in No. 06-619

 /s/ Allyson J. Portney
Stephen H. Oleskey (*admitted pro hac vice*)
Robert C. Kirsch (*admitted pro hac vice*)
Mark C. Fleming (*admitted pro hac vice*)
Gregory P. Teran (*admitted pro hac vice*)
Allyson J. Portney (*admitted pro hac vice* )
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
 Boston, MA  02109
(617) 526-6000

Seth P. Waxman (*admitted*)
Paul Wolfson *(admitted)*
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6800

Douglas F. Curtis *(admitted)*
Paul M. Winke (*admitted pro hac vice*)
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, NY  10022
(212) 230-8800

*Counsel for Petitioners Boumediene, et al.,
in No. 04-1166*

/s/ Julia C. Symon
Julia C. Symon (DC Bar No. 456828)
Clifford Chance US LLP
2001 K Street NW
Washington, DC  20006
(202) 912-5000

James M. Hosking
Clifford Chance US LLP
31 West 52nd Street
New York, NY 10019
(212) 878-8000

*Counsel for Petitioners Ghazy*, *et al. in No.
05-2223*

/s/ Stephen R. Sady
Stephen R. Sady
Chief Deputy Federal Public Defender
101 SW Main Street  Suite 1700
Portland, Oregon  97204
503-326-2123

*Counsel for Petitioner Al Ginco in No. 05-1310*

/s/ Shereen J. Charlick
Shereen J. Charlick
Steven F. Hubachek
Ellis M. Johnston, III
Stephen D. Demik
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California  92101-5008
(619) 234-8467

*Counsel for Petitioner Al Bihani in No. 05-1312*

/s/ Zachary Katzenlson
Zachary Katznelson
Reprieve
PO Box 52742
London EC4P 4WS
United Kingdom
011 44 207 353 4640

*Counsel for Petitioners  Sliti et al. in No. 05-429 and Petitioner Kabir in No. 05-0431*

/s/ Brian Mendelsohn
Brian Mendelsohn (Pursuant to LcvR 83.2)
Matthew Dodge
Federal Defender Program, Inc.
Suite 1700, The Equitable Building
100 Peachtree Street, N.W.
Atlanta, Georgia  30303
(404) 688-7530

*Counsel for Petitioner Al-Khaiy in No. 05-1239*

August 12, 2008

## <u>CERTIFICATE OF SERVICE</u>

I, Allyson Portney, hereby certify that on August 12, 2008 I electronically filed and

served the foregoing PETITIONERS' JOINT OPENING MEMORANDUM REGARDING

HABEAS PROCEDURES by causing one paper copy to be delivered to counsel of record for the

Government by Federal Express.


/s/ Allyson Portney_____
Allyson Portney