# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BOUMEDIENE, | ) | |
|      Petitioner, | ) | |
|      v. | ) | Civil Action No. 04-cv-1166 (RJL) |
| GEORGE W. BUSH, | ) | |
|      President of the United States, | ) | |
|      et al., | ) | |
|           Respondents | ) | |
| | ) | |
| SLITI, | ) | |
|      Petitioner, | ) | |
|      v. | ) | Civil Action No. 05-cv-0429 (RJL) |
| GEORGE W. BUSH, | ) | |
|      President of the United States, | ) | |
|      et al., | ) | |
|           Respondents | ) | |
| | ) | |
| KABIR, | ) | |
|      Petitioner, | ) | |
|      v. | ) | Civil Action No. 05-cv-0431 (RJL) |
| GEORGE W. BUSH, | ) | |
|      President of the United States, | ) | |
|      et al., | ) | |
|           Respondents | ) | |
| | ) | |
| MAMMAR, | ) | |
|      Petitioner, | ) | |
|      v. | ) | Civil Action No. 05-cv-0573 (RJL) |
| GEORGE W. BUSH, | ) | |
|      President of the United States, | ) | |
|      et al., | ) | |
|           Respondents | ) | |
| | ) | |
| AL KAHAIY, | ) | |
|      Petitioner, | ) | |
|      v. | ) | Civil Action No. 05-cv-1239 (RJL) |
| GEORGE W. BUSH, | ) | |
|      President of the United States, | ) | |
|      et al., | ) | |

|  |  |  |
|---|---|---|
| Respondents | ) | |
| | ) | |
| | ) | |
| AL GINCO, | ) | |
|     Petitioner, | ) | |
|     v. | ) | Civil Action No. 05-cv-1310 (RJL) |
| GEORGE W. BUSH, | ) | |
|     President of the United States, | ) | |
|     et al., | ) | |
|     Respondents | ) | |
| | ) | |
| | ) | |
| AL BIHANI, | ) | |
|     Petitioner, | ) | |
|     v. | ) | Civil Action No. 05-cv-1312 (RJL) |
| GEORGE W. BUSH, | ) | |
|     President of the United States, | ) | |
|     et al., | ) | |
|     Respondents | ) | |
| | ) | |
| | ) | |
| GHAZY, | ) | |
|     Petitioner, | ) | |
|     v. | ) | Civil Action No. 05-cv-2223 (RJL) |
| GEORGE W. BUSH, | ) | |
|     President of the United States, | ) | |
|     et al., | ) | |
|     Respondents | ) | |
| | ) | |
| | ) | |
| RUMI, | ) | |
|     Petitioner, | ) | |
|     v. | ) | Civil Action No. 06-cv-0619 (RJL) |
| GEORGE W. BUSH, | ) | |
|     President of the United States, | ) | |
|     et al., | ) | |
|     Respondents | ) | |
| | ) | |
| | ) | |
| OBAYDULLAH, | ) | |
|     Petitioner, | ) | |
|     v. | ) | Civil Action No. 08-cv-1173 (RJL) |
| GEORGE W. BUSH, | ) | |
|     President of the United States, | ) | |
|     et al., | ) | |
|     Respondents | ) | |

_____)

**GOVERNMENT'S BRIEF REGARDING PRELIMINARY AND PROCEDURAL
FRAMEWORK ISSUES**

**INTRODUCTION AND SUMMARY**

Pursuant to *Boumediene* v. *Bush*, 128 S. Ct. 2229 (2008), the judges of this Court have

ordered expedited review in over 200 constitutionally-derived habeas cases filed by aliens

captured abroad and detained as enemy combatants at the United States Naval Station at

Guantanamo Bay, Cuba, including in the 10 captioned cases before this Court.  In its order of

July 31, 2008, the Court ordered the parties to brief the following issues relating to the these

wartime constitutional habeas actions: (1) several procedural framework issues, including the

standard of proof and burdens borne by the respective parties; the scope of discovery; and the

standard for obtaining an evidentiary hearing and the procedures governing such a hearing; (2)

whether this Court can require the government to provide 30 day advance notice of transfer; and

(3) whether detainees who have not been approved for release or transfer should receive higher

priority in adjudication of habeas petitions.  The procedural framework issues are closely related

and their resolution turns on a common core of legal principles that govern the unique

circumstances of the cases now before the Court.  Those principles provide overarching guidance

for the cases under consideration.

For habeas review of wartime status determinations, the Supreme Court has stressed that

any "factfinding process" must be "prudent and incremental."  *Hamdi* v. *Rumsfeld*, 542 U.S. 507,

539 (2004) (plurality); *see also Boumediene*, 128 S. Ct. at 2276 ("In considering both the

procedural and substantive standards used to impose detention to prevent acts of terrorism,

proper deference must be accorded to the political branches."). Pursuant to *Hamdi*, it is the Government's burden to present, in its return, sufficient credible evidence to establish that a petitioner is properly held as an enemy combatant. Although petitioners have no right to any discovery, as part of its return, the Government will provide any evidence that tends materially to undermine information presented in the return to support the petitioner's classification as an enemy combatant, which the attorneys preparing the factual return encounter in developing the return. Upon the filing of the Government's return, a petitioner may question the sufficiency of the Government's showing and supplement the record with his own evidence. After rebuttal submissions, the Court may then determine whether the evidence adequately establishes petitioner's enemy combatant status.

No discovery is allowed in these cases. Under the historical habeas practice constitutionalized in the Suspension Clause, moreover, any discovery obligation that could conceivably be appropriate in this setting (which would amount to constitutionally-compelled process for wartime status determinations), will be readily satisfied by the Government's provision of material exculpatory evidence as set forth above.[1] For a "prudent and incremental" process, the Court should not even consider further discovery until it reviews the returns and traverses in individual cases. And even if the Court then concludes that more factfinding may be necessary (historical habeas practice notwithstanding), it should reject the liberal discovery standards set forth in the Federal Rules of Civil Procedure (which are generally inapplicable

---

[1]"Exculpatory" in this context does not refer to information that exculpates a detainee from criminal liability, inasmuch as the issue of criminal liability is not material to the authority of the Department of Defense to detain the petitioners in these cases. Rather, it refers to evidence that tends materially to undermine the information presented in the return to support the petitioner's classification as an enemy combatant.

even to modern statutory habeas proceedings outside the context of wartime status

determinations).  *See Harris v. Nelson*, 394 U.S. 286, 292-98 (1969).  Rather, it should provide

that any discovery request must be approved by the Court and must be predicated on a strong

and particularized showing of need.  Any such discovery must also take account of the

exigencies posed by ongoing warfare and the responsibilities of potential witnesses.  As a fellow

judge on this Court has recognized, "[t]he discovery process alone risks aiding our enemies by

affording them a mechanism to obtain what information they could about military affairs and

disrupt command missions by wresting officials from the battlefield to answer compelled

deposition and other discovery inquiries."  *In re Iraq and Afghanistan Detainees Litigation*, 479

F. Supp. 2d 85, 105 (D.D.C. 2007) (Hogan, J.).

Likewise, the presentation of live testimony at an evidentiary hearing is generally

inappropriate even under modern statutory habeas practice, and is certainly not constitutionally

mandated for wartime status determinations.  No constitutional or evidentiary standard prohibits

the Court from relying on the paper record submitted by the parties in finding facts.  A "prudent

and incremental" approach would require the Court to consider the parties' written submissions

first, before even considering whether to receive live testimony.  Moreover, any testimony

presented directly to the Court would present enormous logistical difficulties in the context of

concurrent and expedited proceedings in over 200 cases involving detainees captured in wartime

at locations around the world.  Indeed, this sort of evidentiary hearing would make expedition of

these cases impossible.  Under controlling Supreme Court precedent, an evidentiary hearing in

this context is appropriate only when, absent a hearing, the petitioner has made a more

persuasive showing to rebut the government's evidence (which is entitled to a presumption of

validity) and weight of the evidence therefore supports the petitioner. Even if such a hearing is held, there are no Confrontation Clause or Compulsory Process Clause rights. The courts lack authority to order the admittance of aliens held as enemy combatants at a secure military base in Cuba into the United States to appear live at hearings. And, under controlling Supreme Court precedent, the Court plainly may consider hearsay evidence in such these proceedings and this Court should therefore hold that it is always admissible. Indeed, it is readily apparent that in many cases both petitioners and the Government will have no choice but to rely upon hearsay for their best evidence. The issue is not whether such evidence should be considered, but the weight it should be accorded. That is a determination that must be made on a case-by-case basis. In making such determinations, "the Constitution would not be offended by a presumption in favor of the Government's evidence." *Hamdi*, 542 U.S. at 534.

    With respect to the other common issues, this Court should not order that notice be provided to petitioners' counsel prior to transfer. Jurisdiction to consider such non-core habeas issues has been withdrawn, and there is no basis for a court requiring notice prior to transfer because a court has no proper role in prohibiting a transfer. *See Munaf v. Geren*, 128 S.Ct. 2207, 2225 (2008). Indeed, as this Court has previously held, the basis for questioning the Government's transfer decisions is speculative. *Sliti v. Bush*, 407 F. Supp. 2d 116, 118 (D.D.C. 2005). It also makes practical sense for this Court to prioritize cases where a detainee has not yet been approved for transfer or release by the Government. The Government is actively seeking to have such detainees transferred, and it has already successfully transferred hundreds of detainees approved for release. Any such transfers, of course, would obviate the need for further proceedings.

**DISCUSSION**

I.     **THE COURT SHOULD ENTER AN ORDER IMPLEMENTING THE PROCEDURES AND METHODOLOGY SET FORTH IN THE CONTROLLING PLURALITY OPINION IN *HAMDI***

The "capture and detention of lawful combatants and the capture, detention, and trial of unlawful combatants, by 'universal agreement and practice,' are 'important incident[s] of war.'" *Hamdi*, 542 U.S. at 518 (quoting *Ex parte Quirin*, 317 U.S. 1, 28 (1942)); *accord id.* at 587-88 (Thomas, J., dissenting).  While, to be sure, federal courts have "review[ed] applications for habeas relief in a wide variety of cases involving executive detention, in wartime as well as in times of peace," *Rasul* v. *Bush*, 542 U.S. 466, 474 (2004), the scope of review has been particularly limited in cases dealing with the military in periods of armed conflict.  *See Burns* v. *Wilson*, 346 U.S. 137, 139 (1953) ("[I]n military habeas corpus the inquiry, the scope of matters open for review, has always been more narrow than in the civil cases.").

These cases present the question of what habeas procedures are constitutionally compelled to review the continued detention of aliens captured and detained abroad as enemy combatants.  For that question, the most relevant precedent is *Hamdi*.  In that case, the Supreme Court established a framework for adjudicating *statutory* habeas petitions filed on behalf of *citizens* detained in the United States as enemy combatants.  *A fortiori*, these procedures are more than sufficient in the context of *constitutional* habeas actions filed by *aliens* detained as enemy combatants in Cuba.

First, the *Hamdi* framework implemented modern statutory habeas under section 2241; because the Military Commissions Act (MCA) repealed that provision for aliens held as enemy

combatants, the procedures here should contain only those required by the Suspension Clause itself, as identified in *Boumediene* and as reflected in longstanding historical habeas practice. Although *Boumediene* did not specify the precise procedural rules for constitutional habeas proceedings involving wartime status determinations for aliens captured and held outside the United States, *see* 128 S. Ct. at 2271, the Court did identify certain elements that are "constitutionally required," *id.* at 2270.  Beyond those constitutionally required procedures, however, the Court in *Boumediene* recognized that in "considering . . . the procedural . . . standards used to impose detention to prevent acts of terrorism, proper deference *must be accorded to the political branches*." *Id*. at 2276 (emphasis added).  Because the MCA eliminates statutory habeas for these petitioners in its entirety, and is unconstitutional only to the extent that the Suspension Clause mandates habeas review in this context of its own force, the only appropriate procedures are those required by the Constitution itself. *Id.* at 2278 (Souter, J., concurring) ("Subsequent legislation eliminated the statutory habeas jurisdiction over these claims, so that now there must be constitutionally based jurisdiction or none at all.").  Moreover, *Boumediene* explicitly "[did] not hold" that constitutional habeas proceedings for wartime status determinations must duplicate statutory proceedings under § 2241 and modern habeas practice. 128 S. Ct. at 2267, 2274.  Thus, while the procedures afforded under the modern habeas statute and rules might define a ceiling of protection, they clearly do not define a floor.

Second, because aliens are entitled to lesser (and certainly not greater) constitutional protections than citizens like Hamdi, the framework that the Supreme Court deemed constitutionally sufficient for *citizens* held as wartime enemy combatants is more than constitutionally adequate for *aliens* captured under similar circumstances and detained as

wartime enemy combatants.  The proposition that citizens and non-citizens may be extended

different constitutional protections is well established.  *See, e.g.*, *United States* v.

*Verdugo-Urquidez*, 494 U.S. 259, 273 (1990).  *Cf. Mathews* v. *Diaz*, 426 U.S. 67, 79-80 (1976)

("In the exercise of its broad power over naturalization and immigration, Congress regularly

makes rules that would be unacceptable if applied to citizens.").  *Boumediene*, does not affect

this bedrock principle.  Simply put, if the *Hamdi* framework was sufficient for a citizen, it

necessarily must be good enough for an alien – particularly if, as in *Hamdi*, the detainee was

captured outside the United States.  *See Al-Marri* v. *Pucciarelli*, — F.3d —, 2008 WL 2736787,

*42 (4th Cir. July 15, 2008) (Traxler, J., concurring) (recognizing that many of the exigencies

underlying the rationale in *Hamdi* emerge, in part, from the extraterritorial capture).   Indeed, for

this reason, as the controlling plurality recognized in *Hamdi*, "the full protections that

accompany challenges to detentions in other settings may prove unworkable and inappropriate in

the enemy-combatant setting."  *Hamdi*, 542 U.S. at 535.  Habeas review accommodates such

limitations because the writ's "precise application . . . change[s] depending upon the

circumstances."  *Boumediene*, 128 S. Ct. at 2267.

Third, because the petitioners are at a location where lesser constitutional protections

apply than was the citizen in *Hamdi*, the framework that the Supreme Court found appropriate

for a citizen held in the United States must necessarily be sufficient.  *Hamdi*'s procedural

framework was sufficient for a detainee held *in the United States*, where the Constitution applies

with full force.  This case, on the other hand, involves a detainee held in Cuba, where the

Constitution has diminished application under a multi-factor test.  *See Boumediene*, 128 S. Ct. at

2259.  It is a debatable proposition which specific constitutional provisions apply at Guantanamo

and to what extent they apply, but obviously the protection provided by the Constitution is not *more extensive* than it was in *Hamdi*, where the detention was in the United States.  Thus, in this respect as well, the *Hamdi* procedures *a fortiori* provide constitutionally-adequate procedures for habeas review.

The *Hamdi* framework is fully consistent with the constitutionally-required elements of habeas identified by *Boumediene*.  Under *Boumediene*, a constitutional habeas court must have "some authority to assess the sufficiency of the Government's evidence against the detainee." 128 S. Ct. at 2270.  It also must "have the authority to admit and consider relevant exculpatory evidence that was not introduced during the earlier proceeding."  *Ibid.* (concluding that it is "constitutionally required" that petitioners have the opportunity "to supplement the record on review").  Beyond those critical procedures, "deference must be accorded to the political branches" in devising "the procedural . . . standards used to impose detention."  *Id.* at 2276.  The procedural framework in *Hamdi* provides the necessary elements of habeas review that, according to *Boumediene*, "accords with [the] test for procedural adequacy in the due process context."  *Id.* at 2268 (citing *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976)).  In sum, the *Hamdi* framework allows this Court to assess the sufficiency of the evidence and allows the petitioners to submit their own evidence (and, of course, the *Hamdi* framework allows this Court to address legal issues raised by petitioners).  Indeed, it would be startling if the Suspension Clause, which primarily preserves jurisdiction and a cause of action to challenge detention, of its own force mandated adjudicatory procedures beyond those required by the Due Process Clause itself.

*Hamdi* also is a vital precedent on the procedures to be employed in habeas even though

the *Boumediene* Court concluded that *Hamdi* had not approved of Combatant Status Review

Tribunal-type administrative procedures as being an adequate habeas substitute.  *See* 128

S. Ct. at 2269-70.  *Boumediene* did not address all of the *procedures* to be employed and did not

hold that the *Hamdi* framework was inappropriate for federal court habeas proceedings.

Moreover, *Boumediene* disclaims addressing what procedures are required in these cases,

leaving *Hamdi*'s analysis untouched.  *See id.* at 2277 ("It bears repeating that our opinion does

not address the content of the law that governs petitioners' detention."); *id.* at 2276 (the

"remaining questions are within the expertise and competence of the District Court to address in

the first instance").  The four-justice plurality opinion in *Hamdi* authored by Justice O'Connor is

the controlling opinion.  *Marks* v. *United States*, 430 U.S. 188, 193 (1977).[2]  Accordingly, the

plurality opinion is binding on this Court.  *See Agostini v. Felton*, 521 U.S. 203, 237-38 (1997)

("[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons

rejected in some other line of decisions, the Court of Appeals should follow the case which

directly controls, leaving to this Court the prerogative of overruling its own decisions").

Under *Hamdi*'s framework, *citizen* enemy combatants are entitled to the "core"

protections that constitute the "minimum requirements of due process."  *Hamdi*, 542 U.S. at 535,

538.  These core procedural rights are threefold:  first, a detainee "must receive notice of the

factual basis for his classification"; second, a detainee must have "a fair opportunity to rebut the

---

[2]In *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991), the court of appeals reasoned
that *Marks* applies if the plurality opinion can "be meaningfully regarded as 'narrower' than
another."  Here, Justice Thomas's opinion, which would have dismissed the habeas petition
because "we have no right to insist upon" "additional procedural protections," 542 U.S. at 579
(Thomas, J., dissenting), plainly is "narrower" than the plurality's imposition of burden-shifting
procedures.  The plurality opinion is therefore binding.

Government's factual assertions"; and, third, the hearing must occur "before a neutral

decisionmaker."  *Id.* at 533.  No more can be required as applied to *alien* enemy combatants

captured abroad.  Indeed, *Boumediene* did not upset the well-established holding that the Fifth

Amendment and other individual rights secured by the Constitution do not apply to alien enemy

combatants lacking any voluntary connection to the United States.  *See Verdugo-Urquidez*, 494

U.S. 259; *Johnson* v. *Eisentrager*, 339 U.S. 763, 783 (1950).

       Third, adopting the *Hamdi* framework provides the appropriate balance between an alien

detainee's right under *Boumediene* to challenge his continued detention with the Government's

competing legitimate interests.  In *Hamdi*, as in *Boumediene*, the Court anticipated that

petitioners challenging their status as enemy combatants, like other habeas petitioners, "would

have some opportunity to present and rebut facts" but noted that courts could "vary the ways in

which they do so as mandated by due process."  *Hamdi*, 542 U.S. at 526.  Therefore, in assessing

what process is constitutionally required for evaluating the detainee's habeas petition, the *Hamdi*

plurality applied the balancing test from *Mathews* v. *Eldridge*, under which "'the private interest

that will be affected by the official action'" is balanced "against the Government's asserted

interest, 'including the function involved' and the burdens the Government would face in

providing greater process."  542 U.S. at 529 (quoting *Mathews*, 424 U.S. at 335).  On the one

side of the balance, the Court weighed the detainee's liberty interest in being free from physical

detention.  *Ibid.*  "On the other side of the scale are the weighty and sensitive governmental

interests in ensuring that those who have in fact fought with the enemy during a war do not

return to battle against the United States."  *Id.* at 531.  In addition, the Court considered the

burdens additional procedures "may impose on the military" in the context of ongoing hostilities.

*Id.* at 533; *see id.* at 536 ("[O]ur due process assessment must pay keen attention to the particular

burdens faced by the Executive in the context of military action."). *Boumediene* is fully

consistent in expressing concern that "it does not follow that a habeas corpus court may

disregard the dangers the detention in these cases was intended to prevent" and that "[c]ertain

accommodations can be made to reduce the burden . . . on the military." 128 S. Ct. at 2276.

Thus, the *Hamdi* plurality recognized that "the exigencies of the circumstances may

demand that, aside from the[] core elements [of notice and an opportunity to rebut the

Government's factual assertions], enemy-combatant proceedings may be tailored to alleviate

their uncommon potential to burden the Executive at a time of ongoing military conflict."

*Hamdi*, 542 U.S. at 533. Similar concerns are present given the analogous circumstances, such

capture outside the United States, between the citizen-detainee in *Hamdi* and the alien-detainees

here. The *Hamdi* plurality thus explained, for example, that "[h]earsay . . . may need to be

accepted as the most reliable available evidence from the Government in such a proceeding." *Id.*

at 533-34. Similarly, the *Boumediene* Court, while not providing an exhaustive explanation of

permissible procedures, recognized that similar accommodations would need to be made. For

example, *Boumediene* noted that "the Government has a legitimate interest in protecting sources

and methods of intelligence gathering; and we expect that the District Court will use its

discretion to accommodate this interest to the greatest extent possible." 128 S. Ct. at 2276.

In light of these competing interests, and to provide a *workable* mechanism to balance

them, as well as to address the unique separation-of-powers concerns presented by enemy

combatant litigation, the *Hamdi* plurality endorsed a "burden-shifting scheme" under which the

Government has the initial burden to "put[] forth credible evidence that the habeas petitioner

meets the enemy-combatant criteria."  *Hamdi*, 542 U.S. at 534.  The plurality noted that "the

Constitution would not be offended by a presumption in favor of the Government's evidence, so

long as that presumption remained a rebuttable one and fair opportunity for rebuttal were

provided."  *Ibid.*  Under such a scheme, following a showing of credible evidence by the

Government, the burden could "shift to the petitioner to rebut that evidence with more

persuasive evidence that he falls outside the criteria."  *Ibid.*  This approach "meet[s] the goal of

ensuring that [any wrongly accused person] has a chance to prove military error while giving due

regard to the Executive once it has put forth meaningful support for its conclusion that the

detainee is in fact an enemy combatant."  *Ibid.*  These *Hamdi* procedures, which the Court

explained are constitutionally sufficient for habeas proceedings involving U.S. citizens detained

as enemy combatants in the United States, are *a fortiori* constitutionally sufficient for habeas

procedures involving aliens detained as enemy combatants outside the United States.  And

because the procedures are spelled out by controlling Supreme Court plurality, they are binding

on this Court.

## II.     APPLICATION OF THESE PRINCIPLES TO THE CURRENT PROCEEDINGS.

The decisions in *Boumediene* and *Hamdi* thus provide a basic framework to govern these

proceedings.  The precise application of these principles may vary in certain cases.  But it is

essential that the Court establish general baseline principles to make possible the expedited

consideration of these cases.

### A.     The Parties' Respective Burdens.

The burden-shifting framework proposed by the Government seeks to address the special

circumstances of these cases.  *Cf. Hamdi*, 542 U.S. at 534.  It therefore differs from typical

habeas actions, where the petitioner alone generally bears the burden of proof.  *See Garlotte* v.
*Fordice*, 515 U.S. 39, 46 (1995) ("[T]he habeas petitioner generally bears the burden of proof.");
*Eagles* v. *United States ex rel. Samuels*, 329 U.S. 304, 314 (1946) ("[Petitioner] had the burden
of showing that he was unlawfully detained."); *Williams* v. *Kaiser*, 323 U.S. 471, 472, 474
(1945) (similar); *Walker* v. *Johnson*, 312 U.S. 275, 286 (1941) (similar); *Johnson* v. *Zerbst*, 304
U.S. 458, 468 (1938) (similar).

The process in each of these cases begins with the Government's submission of a factual
return that "puts forth credible evidence that the habeas petitioner meets the enemy-combatant
criteria." *Hamdi*, 542 U.S. at 534; *see* Order of July 11, 2008 (directing submission of factual
returns).  The Government's production of evidence gives the petitioner full "notice of the
factual basis for his classification."  *Hamdi*, 542 U.S. at 533.  In addition to making the "credible
evidence" on which the Government relies part of the record, any material exculpatory evidence
discovered by the attorneys preparing the Government's return will be provided to the petitioner
or petitioner's counsel, as is more fully addressed in the next section.

If the Government files a return supported by credible evidence, the burden shifts to the
petitioner to rebut, "with more persuasive evidence," the Government's classification.  *Hamdi*,
542 U.S. at 534.[3]  This affords the petitioner "a fair opportunity to rebut the Government's
factual assertions before a neutral decisionmaker," *id.* at 533, and gives the Court a chance "to
admit and consider relevant exculpatory evidence that was not introduced during the earlier
proceeding."  *Boumediene*, 128 S. Ct. at 2270.  The parties should then have the opportunity to
brief the legality of detention based on the record and to make arguments as to the credibility and

_____

[3]The petitioner may also file a motion for judgment at this stage.

weight of the evidence presented.  However, if a petitioner is unable to overcome the
Government's evidence with "more persuasive evidence," no further steps need be taken and the
Government prevails.

*Hamdi* sets an evidentiary standard requiring that the Government come forward with
"credible evidence that the habeas petitioner meets the enemy-combatant criteria."  *Hamdi*, 542
U.S. at 534.  That "credible evidence" standard is the appropriate burden of persuasion to
employ in these cases, rather than a more onerous standard such as the "clear and convincing
evidence" standard that petitioners have proposed in Judge Hogan's cases. Petitioners in those
cases derived the "clear and convincing" standard from domestic civil commitment cases, but it
is entirely inappropriate to incorporate that law in this context.   Cases involving pre-trial
detention or civil commitment strike at the heart of liberty in this nation in peacetime, where
"liberty is the norm, and detention . . . without trial is the carefully limited exception."  *United
States v. Salerno*, 481 U.S. 739, 755 (1987).  In those cases, "the Court deemed it inappropriate
to ask the individual 'to share equally with society the risk of error.'"  *Jones v. United States*,
463 U.S. 354, 367 (quoting *Addington v. Texas*, 441 U.S. 418, 427 (1979)).  This is an entirely
different context.  It involves fundamental questions pertaining to the security of the nation itself,
questions heightened by technological advances that give terrorist organizations the ability to
inflict devastation on a massive scale, a power heretofore limited only to nation-state actors and
vividly illustrated by the attacks of September 11th, 2001.  Here the risk of error tips decisively
in favor of society's interests in self-preservation.  And indeed, the Executive's actions in
response to these threats have been taken with the full authority of Congress, not to prevent
criminality or deviant dangerous behavior that threatens individuals, but for the preservation of

the nation and its citizenry writ large in a time of war.  Unsurprisingly, petitioners' own cases specifically distinguish detention that arises as part of "the exigencies of war."  *Salerno*, 481 U.S. at 748.

The concerns that led to the "clear and convincing" standard in the domestic law-enforcement and civil confinement contexts have no applicability in the context of wartime detention of the enemy.  There is no "norm" against detention without trial in these circumstances – instead, trials are *not* the norm when taking military action abroad that includes the detention of the enemy.  Third Geneva Convention, Art. V; Army Reg. 190-8.  Moreover, it would be misguided at best to impose on our service members – who place themselves in harm's way on a daily basis in defense of our country – the obligation to "share equally" in the risk of error, much less share *the bulk* of the burden of error if enemy combatancy has not been established by clear and convincing evidence.  Indeed, if anything, when fighting a war overseas, as the United States is doing today, against belligerents who show no respect for the traditional laws of war, the risk of error must be weighed heavily *the other way* to protect our soldiers, our citizens, and our homeland.  *Cf. Salerno*, 481 U.S. at 750-51 ("as our cases hold, this right [not to be detained] may, in circumstances where the government's interest is sufficiently weighty, be subordinated to the greater needs of society"); *Addington*, 441 U.S. at 430 ("[n]or should the state be required to employ a standard of proof that may completely undercut its efforts to further the legitimate interests of . . . the state . . . that are served by civil commitments").

In sum, as *Hamdi* explained, the Court must "giv[e] due regard to the Executive once it has put forth meaningful support for its conclusion that the detainee is in fact an enemy combatant."  *Hamdi*, 542 U.S. at 534.  For wartime detention decisions, the primary risk of error

must fall in a way so as to protect the United States, its citizens, and its service members, rather than the opposite as petitioners suggest.  That end is served by a standard whereby the detention is justified if the government submits "credible evidence that the habeas petitioner meets the enemy-combatant criteria" and the petitioner has not specifically rebutted that evidence with his own "more persuasive" evidence.  *Hamdi*, 542 U.S. at 534.

**B.    Discovery Is Not Required or Appropriate in these Proceedings.**

**1.**  There is no significant history of discovery in habeas proceedings and discovery is certainly *not* constitutionally required.  The point of habeas is to provide the court with evidence to justify the detention (and to provide petitioners the opportunity to submit their evidence that detention is unlawful), *Boumediene*, 128 S. Ct. at 2270; the purpose is not to provide alien enemy  detainees an opportunity to obtain additional materials from the Government in a time of war that go beyond that showing.

Even outside the context of wartime status determinations, there is no significant history of discovery in habeas cases prior to 1969, and there has never been a suggestion that the Constitution requires discovery in such proceedings.  *See Harris v. Nelson*, 394 U.S. 286, 293 (1969) (in concluding that Federal Rules of Civil Procedure on discovery do *not* apply to habeas proceedings, explaining that "prior to [the promulgation of the federal rules in] 1938" there was no showing made that "discovery was actually being used in habeas proceedings").[4]  In fact, it was "not until many years later" that factual questions were even considered in federal habeas cases, making it inconceivable that discovery would be an essential component of the writ.  *Id*. at

---

[4]Indeed, in 1938, discovery was "one of the most significant innovations" in civil cases generally.  *Id*. at 295.

295.

Thus, in these constitutionally-based habeas proceedings, there can be no question that the relevant settled habeas practice – not only in 1789, but for almost two centuries thereafter – would preclude discovery. *See id*. That habeas practice of 1789 did not contemplate discovery or factfinding by the habeas petitioner is clear. Indeed, "[o]ne of the maxims of eighteenth-century habeas corpus practice had been that the petitioner could not controvert the facts stated in the return." Gerald L. Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L. Rev. 961, 986 (1998) (citing, *inter alia*, R.J. Sharpe, The Law of Habeas Corpus 61-68 (1976)). The facts alleged by the Executive to continue to hold an individual "were to be taken as true, and the court was to determine whether the justification was legally sufficient." *Id.* Even in executive detention cases, courts traditionally conducted only limited factual review. *See INS v. St. Cyr*, 533 U.S. 289, 306 (2001) ("some evidence" review). While courts from the period permitted the prisoner to "allege additional facts consistent with the return that might rebut the appearance of justification," Neuman, 98 Colum. L. Rev. at 986, that was not a constitutional requirement and certainly did not suggest that discovery was ever appropriate. Indeed, *Hamdi*, itself specifically rejected the trial court's anticipated discovery into various military affairs. *Hamdi*, 542 U.S. at 528, 531–32.

The Supreme Court has thus held, for example, that in view of the history of the writ and the intended scope of the Federal Rules of Civil Procedure a petitioner does not have the right to serve interrogatories on his custodian (although the Federal Rules would otherwise allow for broad discovery in civil suits). *Harris*, 394 U.S. at 292-98. Significantly, in 1938, when the federal rules were initially adopted, the expansion of statutory habeas corpus practice to its

present scope was only in its primordial stages.  *Mooney v. Holohan*, 294 U.S. 103 (1935);

*Johnson v. Zerbst*, 304 U.S. 458 (1938); *Waley v. Johnston*, 316 U.S. 101, (1942).  And it was

not until many years later that the federal courts considering a habeas corpus petition began to

even make an *independent* determination of the factual basis of claims that state convictions had

violated the petitioner's federal constitutional rights.[5]  *Brown v. Allen*, 344 U.S. 443 (1953).

Thus, the notion that the *Constitution*, or traditional habeas practice as of 1789 or later, requires

any discovery to enemy combatant petitioners is demonstrably false.

That the Constitution did not require such innovations to the habeas practice of 1789 is

further demonstrated by the need for subsequent legislation to expand factfinding authority of

federal courts, which did not occur until after the Civil War.  *See* Act of Feb. 5, 1867, ch. 28, § 1,

14 Stat. 385 (stating that a "petitioner may deny any of the material facts set forth in the return,

or may allege any fact to show that the detention is in contravention of the constitution or laws of

the United States," and requiring the federal court to "proceed in a summary way to determine

the facts of the case, by hearing testimony and the arguments of the parties interested").  And it

was in 1890 that the Supreme Court, citing the Civil War era statute, held that the federal courts

could have a proper role in determining certain non-jurisdictional facts.  *Cunningham v. Neagle*,

135 U.S. 1, 70-75 (1890).  The statutory expansion of the factfinding role only proves the point

such functions are never constitutionally *required*.  So too here.  Alien detainees at Guantanamo

_____

[5]  "It is also of some relevance that in 1948, when Congress enacted 28 U.S.C. § 2246 expressly referring to the right of parties in habeas corpus proceedings to propound written interrogatories, its legislation was limited to interrogatories for the purpose of obtaining evidence from affiants where affidavits were admitted in evidence. Again, the restricted scope of this legislation indicates that the adoption in 1938 of the Federal Rules of Civil Procedure was not intended to make available in habeas corpus proceedings the discovery provisions of those rules," *Harris*, 394 U.S. at 296, let alone that the *Constitution* requires any discovery at all.

may be permitted to invoke 1789 habeas practice, but that does not entitle them to any discovery against the Government, or anyone else. And while they may provide their *own* evidence and version of events for this Court's consideration, any discovery they may be granted from the Government is a matter of Executive discretion rather than a constitutional entitlement.

Modern developments in statutory habeas procedure cannot alter this constitutional ceiling. Thus, it is of no moment that in *Harris* the Court interpreted the All Writs Act, 28 U.S.C. § 1651, to authorize limited discovery in statutory habeas cases at the discretion of the court. Indeed, the fact that discovery, even in modern statutory habeas cases, is *entirely discretionary*, *see Harris*, 394 U.S. at 300, Habeas Rule 6(a), provides a complete answer to the question whether it is constitutionally required. Moreover, recent developments in habeas practice cannot alter the fact that there was no constitutional requirement for discovery in habeas cases. The Suspension Clause cannot operate as a "one-way ratchet that enshrines in the Constitution every grant of habeas jurisdiction" conferred by statute or judge-made common law, *see St. Cyr*, 533 U.S. at 341-42 (Scalia, J., dissenting), for if it did, then the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which limited state prisoners' access to the writ, would be unconstitutional, a proposition the Supreme Court rejected in *Felker v. Turpin*, 518 U.S. 651, 662-664 (1996) ("judgments about the proper scope of the writ are 'normally for Congress to make'"). Thus, there is significant support for the historical approach to habeas as providing the constitutional baseline. *See Swain v. Pressley*, 430 U.S. 372, 384-85 (1977) (Burger, C.J., concurring in part and concurring in the judgment); Friendly, *Is Innocence Irrelevant?  Collateral Attack on Criminal Judgments*, 38 U. Chi. L. Rev. 142, 170 (1970). Congress's repeal of habeas jurisdiction, in conjunction with the fact that constitutionally-

derived habeas corpus does not require discovery, is therefore fatal to the claim that discovery is appropriate in these proceedings.

   2.   Although not constitutionally required, when filing its factual returns, the Government will provide any evidence that tends materially to undermine information presented in the return to support the petitioner's classification as an enemy combatant, which is encountered in developing the returns by the attorneys preparing them (including the Department of Justice attorneys assigned to the case and those Department of Defense attorneys working on the case with them).[6]  This voluntary disclosure will make discovery from the Government unnecessary under the governing precedents and background habeas principles.  Indeed, to date, no discovery has been allowed in the context of enemy combatant habeas cases.  In *Hamdi*, the Supreme Court expressly rejected the imposition of a "process [that] would approach the process that accompanies a criminal trial" including "quite extensive discovery of various military affairs." *Hamdi*, 542 U.S. at 528; *see id.* at 531–33.  In turn, *Boumediene* did not identify discovery as one of the critical, constitutionally-compelled elements of adequate habeas review, 128 S. Ct. at 2270, and instead rejected the notion that "[h]abeas corpus proceedings need . . . resemble a criminal trial, even when the detention is by executive order." *Id.* at 2269.  Accordingly, even assuming any discovery were required or appropriate, *Boumediene* and *Hamdi* set down a clear marker beyond which habeas discovery cannot properly extend, and which is far less

---

   [6]Materials that are not classified or otherwise protected will be available for viewing by the detainee.  Detainee's counsel in most instances will be able to view classified materials.  In some cases, highly sensitive information will only be disclosed to the court for in camera review, and not to detainee's counsel.  As the Court cautioned in *Boumediene*, "the Government has a legitimate interest in protecting sources and methods of intelligence gathering [and] and we expect that the District Court will use its discretion to accommodate this interest to the greatest extent possible." 128 S. Ct. at 2276 (citing *United States* v. *Reynolds*, 345 U.S. 1, 10 (1953).

burdensome than the "extensive discovery" that is applicable to criminal proceedings. *Hamdi*, 542 U.S. at 528. The Government's voluntary disclosures clearly exceed that marker.

In domestic criminal proceedings, the Government's constitutional discovery obligation is defined by the *Brady v. Maryland*, 373 U.S. 83 (1963), line of precedents. Thus, beyond the required production of material exculpatory evidence under *Brady*, the "[t]here is no general constitutional right to discovery in a criminal case." *Weatherford* v. *Bursey*, 429 U.S. 545, 559 (1977). Accordingly, even in the criminal context, it is well established that the Due Process Clause requires no open-ended discovery beyond the prosecution's *Brady* obligations. *Ibid.*; *see Gray* v. *Netherland*, 518 U.S. 152, 167-68 (1996); *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987) ("[a] defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [Government's] files"); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("We have never held that the Constitution demands an open file policy (however such a policy might work out in practice)"); Fed. R. Crim. P. 16, 1975 Advisory Cmte. Notes ("the defendant has no constitutional right to discover any of the prosecution's evidence (unless it is exculpatory within the meaning of *Brady*)"). Requiring discovery here, in the civil habeas context, is therefore not only inconsistent with *Hamdi* – which rejected the criminal discovery model as overly burdensome – it is contrary to the *Boumediene* Court's reasoning that criminal-type processes are inappropriate. 128 S. Ct. at 2269.

The Government's proposed disclosure is narrower than a prosecutor's *Brady* obligations, but nonetheless satisfies any plausible discovery obligation that would be appropriate in these proceedings. First, there is, as we have explained, *no* constitutionally-derived disclosure obligations in civil cases, much less cases involving wartime status

determinations. Second, the Government's proposal, while narrower than *Brady*, still goes well beyond what *Hamdi* anticipated. *See* 542 U.S. at 528, 532. And nothing in *Hamdi* or *Boumediene* suggested that discovery rising to the level of *Brady* requirements was appropriate in these cases. Third, as we have explained, there is no constitutionally-based requirement for discovery in habeas cases *at all*, much less a constitutionally-based requirement for *Brady* type disclosures. The *Brady* rule, after all, "trace[s] its origins to early 20th-century strictures against misrepresentation," *Kyles*, 514 U.S. at 432, but such a recent derivation is *too* recent to be relevant in determining the scope of constitutional habeas under the Suspension Clause. And because the *Brady* obligation stems from the Fifth Amendment's due process obligations in domestic *criminal* cases, which has no application either to habeas cases or to these petitioners, the Government's provision of material exculpatory evidence in these cases is undoubtedly a matter of Executive discretion rather a constitutionally required element of these proceedings.

At the same time, because the Government has no interest in erroneously holding a person who does not pose a threat to the United States and in order to implement *Hamdi*'s direction that the Government submit "credible" evidence to the Court, the Government will provide all evidence discovered by its attorneys in preparing the factual return that tends materially to undermine the information presented in the return to support the petitioner's classification as an enemy combatant. *Cf. Brady*, 373 U.S. at 87 (in domestic criminal case, prosecutor must provide known "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment").

While the Government will turn over material exculpatory evidence discovered by its attorneys in preparing the factual return, the Government will not conduct an open-ended search

for evidence relating to the petitioner, exculpatory or otherwise.  Imposing such a requirement would be improper for several reasons.  First, as we have explained, because there is no *Brady* obligation in this context and no requirement for discovery, *see supra*, pp. 16-22, there also is no obligation to conduct an open-ended search for exculpatory material; rather, at its core habeas is about giving petitioner an opportunity to present his best evidence to this Court.  *See Boumediene*, 128 S. Ct. at 2270 (habeas court must have "authority to admit and consider relevant exculpatory evidence that was not introduced during the earlier proceeding" by the petitioner).  Second, imposing an obligation to search affirmatively for material exculpatory evidence would be the kind of "quite extensive discovery" rejected by the controlling plurality in *Hamdi*.  542 U.S. at 528.  Finally, such an approach would be extraordinarily burdensome in a time of ongoing war, *see Bismullah III*, 514 F.3d at 1301-02 (Henderson, J. dissenting).  The United States military and our intelligence agencies cannot be required to devote substantial resources in a time of war for evidentiary fishing expeditions.  It is therefore not the "prudent and incremental" approach to factfinding that the *Hamdi* plurality required in this context. *Hamdi*, 542 U.S. at 539; *Boumediene*, 128 S. Ct. at 2262 ("habeas corpus procedures" should be "modified to address" "practical barriers").

We have explained how the Government's voluntary disclosure more than satisfies any discovery obligation that could conceivably be appropriate in this context.  On the other hand, the D.C. Circuit's vacated *Bismullah* decision, which created an expansive appellate record based on the specific requirements of Combatant Status Review Tribunal procedures, does not provide a helpful guidepost for determining the scope of disclosure or discovery in habeas proceedings, for four reasons.  *See Bismullah v. Gates*, 501 F.3d 178, 192 (D.C. Cir. 2007).

First, *Bismullah* was wrongly decided, garnered the support of less than a majority of the en banc

court, and has been vacated by the Supreme Court. *See Bismullah v. Gates*, 514 F.3d 1291,

1298-99, 1306 (D.C. Cir. 2008) (four judges agreed with panel decision; five judges disagreed;

and one voted against en banc to avoid delaying the resolution of *Boumediene*) (*Bismullah III*).

The court erred by conflating the scope of the appellate record with the issues that are reviewable

by the court and by adopting a review function for itself that went well beyond the narrow

review intended by Congress.  Second, the *Bismullah* decision went well beyond even a

prosecutor's *Brady* obligations, which we have already shown are not required in this context.

*See Bismullah v. Gates*, 503 F.3d 137, 140 (D.C. Cir. 2007) (*Bismullah II*) (whether or not ruling

"impose[s] . . . a greater obligation to 'turn over' exculpatory evidence . . . than [*Brady*]" is

"irrelevant").  Third, *Bismullah* addressed the requirements of a unique regulatory and statutory

scheme that is not at issue here.  *See* CSRT Procedures, Enc. 1, § (E)(3) (defining "Government

Information"); *id.*, Enc. 2 (discussing role of the CSRT Recorder in reviewing Government

Information).  The D.C. Circuit in no way suggested that its expansive and unprecedented

definition was constitutionally required, but rather was simply that panel's reading of the

operative regulations for CSRTs.  *Bismullah II*, 503 F.3d at 140.  Fourth, *Bismullah* created an

expansive and overbroad appellate record primarily to address the Court's concern that a CSRT

determination is not "the product of an open and adversarial process . . . [but] is the product of a

necessarily closed and accusatorial process," in which the detainee lacked a meaningful

opportunity to submit his own evidence. *Bismullah III*, 514 F.3d at 1296 (Ginsburg, C. J.,

concurring in denial of rehearing en banc); *see also Boumediene*, 128 S. Ct. at 2270. Here, on the

other hand, the record before a habeas court will be the result of an adversarial process where

- 26 -

each petitioner has an opportunity to submit his own evidence, with the assistance of counsel.

In sum, the Government will provide the evidence discovered by its attorneys in preparing the factual return that tends materially to undermine the information presented in the return to support the petitioner's classification as an enemy combatant – a voluntary disclosure that goes well beyond what *Hamdi* envisioned for a U.S. Citizen and is not constitutionally required, but that will assist this Court in reviewing these habeas cases.

**3.**   Even if the Court concluded additional discovery were constitutionally required, it should occur only very rarely, and each specific discovery request must be approved by the district court, as is contemplated by rules for statutory habeas. Such an extraordinary request should be granted only after the district court has decided that other less intrusive steps cannot resolve the issue, and the discovery authorized must itself be incremental. *See Hamdi*, 542 U.S. at 539 (factfinding must be "both prudent and incremental"); *Boumediene*, 128 S. Ct. at 2262 ("habeas corpus procedures" should be "modified to address" "practical barriers"). Discovery that is not both extraordinarily rare and narrow is also antithetical to the expedited disposition of the over 200 habeas cases pending in this Court.

We have explained that neither *Hamdi* or *Boumediene* called for *any* discovery in this context; *Hamdi*, instead, reversed a discovery order and *Boumediene* identified the constitutionally-required elements of habeas proceedings but in no way suggested that discovery was one of those elements. Thus, in the rare case where a court considers ordering discovery, as the Supreme Court instructed in *Hamdi*, it is imperative that this Court "proceed with the caution . . . necessary in this setting" to create a "process that is both prudent and incremental." *Hamdi*, 542 U.S. at 539. The controlling opinion in *Hamdi* made clear that the procedures and

- 27 -

factfinding mechanisms available to detainees should reflect their "'probable value' and the burdens they may impose on the military." *Id.* at 533 (quoting *Mathews*, 424 U.S. at 335); *see Boumediene*, 128 S. Ct. at 2262 ("habeas corpus procedures" should be "modified to address" "practical barriers").

In weighing the probable value of discovery or testimony against the burdens created, the Court should be limited by statutory habeas practice, including the rules adopted by the Supreme Court to govern statutory habeas proceedings, which set a *ceiling*, not a floor, for proceeding under *constitutional* habeas. Habeas corpus proceedings are civil actions but are not subject to all rules or statutes governing civil actions. Indeed, it is clear that there was no intention to extend to habeas corpus, as a matter of right, the broad discovery provisions which, even in ordinary civil litigation, were "one of the most significant innovations" of the rules. *Hickman v. Taylor*, 329 U.S. 495, 500 (1947). Thus, rules for statutory habeas substantially limit the availability of discovery by requiring leave of the court, following a showing of good cause, before a specific discovery request is allowed. *See* Habeas Rule 6(a) (codifying *Harris* v. *Nelson*, 394 U.S. 286 (1969)); *see also Bracy* v. *Gramley*, 520 U.S. 899, 904 (1997) ("A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course."). A discovery request must be quite specific: it must "provide reasons for the request" and "include any proposed interrogatories and requests for admission, and must specify any requested documents." Habeas Rule 6(b).

As the Supreme Court explained in *Harris*, the extensive discovery contemplated by the Federal Rules of Civil Procedure is "ill-suited to the special problems and character of [habeas] proceedings," 394 U.S. at 296, observing that ordinary discovery procedures can be

"exceedingly burdensome and vexatious." *Id.* at 297; *see* 28 U.S.C. § 2243 (habeas court "shall summarily hear and determine the facts"). As the Court recognized, the burden on the Government, "which is necessarily and properly incident to the processing and adjudication of habeas corpus proceedings, would be vastly increased" by allowing ordinary discovery, and "the benefit to prisoners would be counterbalanced by the delay which the elaborate discovery procedures would necessarily entail." *Harris*, 394 U.S. at 297.

Such concerns apply with particular force in the expedited consideration of petitions filed by over 200 detainees. As the Court noted in *Hamdi*, discovery raises several governmental concerns, including the need to protect intelligence, the need to avoid "discovery of various military affairs," and the risk of "futile search[es] for evidence buried under the rubble of war." 542 U.S. at 528, 532; *see also In re Iraq and Afghanistan Detainees Litigation*, 479 F. Supp. 2d at 105 ("The discovery process alone risks aiding our enemies by affording them a mechanism to obtain what information they could about military affairs and disrupt command missions by wresting officials from the battlefield to answer compelled deposition and other discovery inquiries . . ."); *Al Odah* v. *United States*, 329 F. Supp. 2d 106, 106-07 (D.D.C. 2004) (holding that enemy combatants were required to request leave from the court before serving their discovery requests, and denying their request for leave to conduct discovery as premature and inadequately substantiated).

Discovery can be authorized properly only as a last resort – if it all – if the submissions otherwise fail to show that the detention is lawful, and only if other "incremental" steps, *Hamdi*, 542 U.S. at 539, such as the expansion of the record pursuant to Habeas Rule 7, is ineffective. *See* Habeas Rule 7(a)–(b) (allowing submission of affidavits to expand the record "[i]f the

petition is not dismissed"); Rule 7, 1976 Advisory Committee Notes ("[t]he purpose [of Rule 7] is to enable the judge to dispose of some habeas petitions not dismissed on the pleadings, without the time and expense required for an evidentiary hearing").

It is thus a petitioner's burden to show, on the basis of "specific allegations" that "if the facts are fully developed" he may be "entitled to relief." *Bracy*, 520 U.S. at 908-09 (quotation marks omitted); *cf. O.K.* v. *Bush*, 344 F. Supp. 2d 44, 56 (D.D.C. 2004) (denying hearing in habeas action involving Guantanamo detainee because hearing was not relevant to relief sought); *Rich* v. *Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999) (affirming denial of discovery and evidentiary hearing because petitioner failed to explain how "habeas relief might be available if favorable evidence were developed" and because evidentiary process in habeas proceedings "was never meant to be a fishing expedition"); *Williams* v. *Bagley*, 380 F.3d 932, 974 (6th Cir. 2004) (holding that "[c]onclusory allegations are not enough to warrant discovery" in habeas proceedings); *see also Hamdi*, 542 U.S. at 538 (holding that petitioner must be given an opportunity "to present *his own* factual case" (emphasis added)).

Moreover, were the Court to find additional discovery constitutionally required, such discovery must itself be "incremental," *Hamdi*, 542 U.S. at 539. For example: limited interrogatories or requests for admission must be sought prior to depositions; document requests must be considered only after requests for admission, and must be narrow and focused on specific documents, not open-ended. To this end, as provided for in the federal habeas rules, petitioner's requests for leave to take discovery must "include any proposed interrogatories and requests for admission, and must specify any requested documents," Habeas Rule 6(b), so that the court can properly determine whether discovery is required and, if so, ensure that the

petitioner employs the least intrusive or burdensome means to garner the discoverable information.  Further, care must be taken to safeguard the Government's "legitimate interest in protecting sources and methods of intelligence gathering."  *Boumediene*, 128 S. Ct. at 2276.

Such concerns, and the exigencies of considering many cases on an expedited basis, strongly indicate that, if discovery beyond the Government's voluntary disclosures is to be permitted, it should, at least in the first instance, take the form of specific Court-approved interrogatories that may be answered by any appropriate Government personnel possessing the requisite knowledge.  The Court should also allow the Government the opportunity to suggest substitute proceedings for actual depositions involving other detainees or substitutes for discovery requested as to certain types of information.  To do otherwise would be impracticable in this context, would not be incremental or prudent, and would do nothing to ensure that petitioners obtain "prompt" adjudication of their claims, *Boumediene*, 128 S. Ct. at 2275.[7]

## C. The Presentation of Evidence.

In the normal course of these cases, the Government expects that the Court will be able to

---

[7] Even under the Federal Rules of Civil Procedure's far more generous provisions for discovery, a court may limit the methods or extent of discovery when "the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(2)(c).  On that basis, courts have held that in certain instances, for example, interrogatories are the most appropriate discovery method.  *See, e.g.*, *Kyle Eng'g Co.* v. *Kleppe*, 600 F.2d 226, 231-32 (9th Cir. 1979) (holding that interrogatories were more appropriate than deposing a high-ranking Government official); *Am. Civil Liberties Union* v. *Gonzales*, 237 F.R.D. 120, 122-23 (E.D. Pa. 2006) (finding plaintiffs had not shown that oral deposition was the "least intrusive or burdensome means" of discovery and instead allowing plaintiffs to serve interrogatories); *Fed. Sav. & Loan Ass'n* v. *Fed. Home Loan Bank Bd.*, 96 F.R.D. 619, 621-22 (D.D.C. 1983) (denying plaintiff's request to depose two members of the Federal Home Loan Bank Board on the ground that plaintiff had not shown "that the information it hope[d] to elicit from them is not ascertainable by way of interrogatories addressed to the Board, the deposition of a single spokesman designated to testify for it, or the testimony of . . . other witnesses").

decide individual cases on the written record.  Although in many cases a hearing in which

counsel may argue about the significance of the record presented will be appropriate, hearings

involving live witness testimony will be almost entirely inappropriate.  What *Hamdi* and

*Boumediene* make clear, in prescribing a "prudent and incremental" approach that recognizes

"proper deference" to the political branches in the "procedural and substantive standards used to

impose detention to prevent acts of terrorism," is that evidentiary hearings with live testimony

should be the *last* resort, only after all other alternatives have failed.  *Hamdi*, 542 U.S. at 539;

*Boumediene*, 128 S. Ct. at 2276; *see id.* at 2262 ("habeas corpus procedures" should be

"modified to address" "practical barriers").  The absence of live testimony in no way presents an

impediment to the effective resolution of these cases.  Courts can and should rely on affidavits

from reliable sources and intelligence gathered by agents of the United States Government in the

course of performing their sworn duties.  While such evidence may not always resemble the

records found in traditional criminal cases, it is no less reliable in this context.  Indeed, it is often

the basis for critical wartime decisions involving life and death.  There is neither a Sixth

Amendment nor hearsay bar to the consideration of such evidence, which *Hamdi* recognized

would often be the most reliable evidence in these cases.

     **1.  *Availability of an Evidentiary Hearing*.**

As with discovery, there is no constitutional entitlement to an evidentiary hearing in

habeas cases.  Historically habeas at most looked at the legal basis for detention.  *See*, *supra* p.

18-22.  Thus, there was no significant early history of evidentiary hearings in habeas, either in

1789 or for decades thereafter.  Indeed, there were no statutory provisions at all for a hearing

prior to the 1867 Act.  *See* 28 U.S.C. § 2243.  And, as with discovery, the fact that even under

*modern* practice *outside* the context of wartime status determinations, a "trial may be had *in the discretion* of the federal court," *Brown v. Allen*, 344 U.S. 443, 463-64 (1953) (emphasis added), only confirms that a testimonial hearing is not constitutionally required. Thus, while the courts historically have looked at the sufficiency of the factual submissions, there is no tradition of trial-type proceedings. *See Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 135 (1807) (determining whether "there is . . . sufficient evidence" to "justify his commitment" based on the written record); *id.* at 101 (habeas is "appellate in its nature"); *see also St. Cyr.*, 533 U.S. at 306 (traditional habeas review in executive detention context was for "some evidence"). More importantly, neither *Hamdi* nor *Boumediene* suggested that a testimonial hearing would be appropriate or required in these circumstances. Instead, they simply require that this Court be able to consider factual submissions of the parties on the propriety of detention. *See Boumediene*, 128 S. Ct. at 2270 (what is "constitutionally required" under Suspension Clause is the "authority to admit and consider relevant exculpatory evidence that was not introduced during the earlier proceeding"); *Hamdi*, 542 U.S. at 533 (Fifth Amendment requires that detainee simply have a "fair opportunity to rebut the Government's factual assertions"). Thus, the Constitution does not require a testimonial hearing with live witnesses, as opposed to documentary evidence and written testimony by affidavit.

Further, *Hamdi* makes clear that evidentiary hearings with live testimony, if they occur at all, will be exceptional. At its most basic level, the controlling opinion in *Hamdi* teaches that courts reviewing wartime status determinations must "proceed with the caution . . . necessary in this setting" to create a "process that is both prudent and incremental." *Hamdi*, 542 U.S. at 539. The *Hamdi* plurality made clear that the procedures and factfinding mechanisms available to

wartime detainees should reflect their "'probable value' and the burdens they may impose on the military." *Id.* at 533 (quoting *Mathews*, 424 U.S. at 335). *Hamdi* emphatically rejects the notion that soldiers must be distracted from "the serious work of waging battle" to provide eyewitness accounts of actions that occurred half a world away. *Id.* at 531-32; *see id.* at 533-34 ("Hearsay, for example, may need to be accepted as the most reliable available evidence from the Government in such a proceeding."). Evidentiary hearings with live testimony also pose heightened risks and burdens to what *Boumediene* recognized as the Government's obviously "legitimate interest in protecting sources and methods of intelligence gathering." *See Boumediene*, 128 S. Ct. at 2276; *see also Hamdi*, 542 U.S. at 532 ("discovery into military operations would . . . intrude on the sensitive secrets of national defense"). And routine evidentiary hearings also would conflict with the guidance from the Supreme Court, and the strongly expressed desire of various judges of this Court, to adjudicate the Guantanamo habeas actions as expeditiously as possible. *See Boumediene*, 128 S. Ct. at 2275.

For all these reasons, evidentiary hearings with live testimony should be granted only rarely (if at all), only as a last resort, and only after the Court has reviewed the parties' written submissions. In our judgment, evidentiary proceedings should be allowed only when the court determines that, absent an evidentiary hearing, and affording the government's evidence a presumption of validity, the petitioner has nonetheless submitted "more persuasive evidence" (*Hamdi*, 542 U.S. at 534) such that the weight of the evidence supports the habeas petitioner. *Cf. Schriro v. Landrigan*, 127 S. Ct. 1933, 1940 (2007) ("It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing"). As *Hamdi* itself provides, at the initial stage of written

submissions, once the Government establishes a plausible case for detention, the evidence is presumed correct and the detainee must then produce a traverse with "more persuasive" evidence for the proceedings to continue.  542 U.S. at 534.  Even assuming that the Constitution sometimes might require an evidentiary hearing with live witnesses, that issue could not arise, consistent with the "prudent and incremental" process required by *Hamdi*, until *after* a detainee has rebutted the Government's initial showing with "more persuasive" evidence.  542 U.S. at 534, 539.  *Cf. Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999) (affirming denial of discovery and evidentiary hearing because petitioner failed to explain how "habeas relief might be available if favorable evidence were developed" and because evidentiary process in habeas proceedings "was never meant to be a fishing expedition").  Indeed, even under modern statutory habeas outside the context of wartime status determinations, a habeas court must "summarily hear and determine the facts, and dispose of the matter as law and justice require."  28 U.S.C. § 2243.  Thus, "the district court need not hold an evidentiary hearing for each habeas petitioner." *Tijerina v. Thornburgh*, 884 F.2d 861, 866 (5th Cir. 1989) (citing *Kaufman v. United States*, 394 U.S. 217 (1969); *Harris v. Nelson*, 394 U.S. 286 (1969)).

Under these principles, at an absolute minimum, insubstantial disputes should not give rise to an evidentiary hearing with live testimony.  For example, a petitioner should not be permitted to haul United States servicemembers away from the battlefield if a knowledgeable affiant testifies that a detainee was captured with missiles and the detainee simply makes a general denial, because doing so would completely undermine the *Hamdi* burden-shifting framework.  With the assistance of counsel, petitioners should have an unfettered ability to present their best evidence, and to challenge the Government's evidence, through written

submissions.  That by itself is far more than the process historically available in habeas.  To the extent that petitioners wish to go even further, and to demand an evidentiary hearing with live witnesses, the courts should defer ruling on those demands until after reviewing the written submissions, and should grant them rarely if ever.  As even modern statutory habeas practice makes clear, habeas courts "summarily hear and determine the facts."  28 U.S.C. § 2243.

    **2.  *Procedures Governing Hearings.***

    ***a.  Confrontation and Compulsory Process Rights.***  No constitutional provision gives rise to confrontation and compulsory process rights for habeas review of wartime status determinations governing aliens captured and held abroad as enemy combatants.

    First, the Sixth Amendment rights to confrontation and compulsory process are limited by the terms of the Constitution to criminal proceedings.  *See* U.S. Const., amend. VI ("[i]n all *criminal prosecutions*, the accused shall enjoy the right . . . to be confronted with the witnesses against him; to have compulsory process") (emphasis added).  It establishes a trial right that applies exclusively to criminal trials.  *See California* v. *Green*, 399 U.S. 149, 157 (1970) ("[I]t is this literal right to 'confront' the witness at the time of trial that forms the core of the values furthered by the Confrontation Clause.").  Thus, the Supreme Court has held that the Sixth Amendment does not compel the presence of a prisoner in collateral proceedings.  *See United States* v. *Hayman*, 342 U.S. 205, 222 (1952) ("The existence of power to produce the prisoner does not, of course, mean that he should be automatically produced in every Section 2255 proceeding.  This is in accord with procedure in habeas corpus actions.").  Habeas is not, of course, a criminal proceeding, so the rights conferred by the Amendment do not apply.  *See Coleman* v. *Balkcom*, 451 U.S. 949, 954 (1981) (Marshall, J., dissenting from denial of

certiorari) ("A habeas corpus proceeding is, of course, civil rather than criminal in nature, and consequently the ordinary Sixth Amendment guarantee of compulsory process . . . does not apply."); *Oken* v. *Warden, MSP*, 233 F.3d 86, 93 (1st Cir. 2000) (same). Accordingly, the Sixth Amendment does not confer on petitioners a right to compel the production of military personnel who provided evidence to the habeas court.

The Suspension Clause also does not confer a right of confrontation or compulsory process in constitutionally-based habeas proceedings. Instead, *Boumediene* created a limited set of Suspension Clause rights to allow the petitioner to submit his own evidence to expand the record, but did not address the issue of compulsory process and nowhere suggested that there was a right to bring into court those individuals who provided affidavits in support of detention.

The Fifth Amendment also does not entitle petitioner to compulsory process or confrontation. First, it is doubtful whether the detainees here have rights conferred by the Fifth Amendment at all. *See Verdugo-Urquidez*, 494 U.S. at 273; *Agostini*, 521 U.S. at 237-38. In any event, even if the Fifth Amendment applies it cannot encompass confrontation or compulsory process because *Hamdi* very plainly explained that detention could be justified based upon information about a detainee's capture made by "a knowledgeable affiant" who would "summarize [the Government's] records." *Hamdi*, 542 U.S. at 534. While a petitioner must have an opportunity "to present his own factual case to rebut the Government's return," that opportunity does require a right to obtain testimony of the affiant. *Id.* at 538.

In other contexts, the Supreme Court has recognized that district courts have the discretion to order a prisoner produced at in a collateral review proceeding in which "there are substantial issues of fact as to events in which the prisoner participated," *Hayman*, 342 U.S. at

223 (noting that "[w]hether the prisoner should be produced depends upon the issues raised by the particular case"). However, *Hayman* involved modern practice under the habeas statute and rules, as opposed to the traditional, eighteenth-century practice enshrined in the Suspension Clause. Moreover, *Hayman* did not involve wartime status determinations, and *Boumediene* and *Hamdi* make clear that the standards are fundamentally different in this context. Finally, *Hayman* did not involve aliens detained outside sovereign United States territory. This distinction is critical because courts lack the authority to order aliens admitted into the United States: "The conditions of entry for every alien . . . have been recognized as matters . . . wholly outside the power of [courts] to control." *Fiallo* v. *Bell*, 430 U.S. 787, 796 (1977). That power is constitutionally assigned to the political branches. *U.S. ex rel. Knauff* v. *Shaughnessy*, 338 U.S. 537, 542 (1950). Accordingly, as Judge Robertson has correctly concluded, even under modern statutory habeas, the district courts cannot order into the United States even a Guantanamo detainee who already has succeeded on the merits of his habeas petition. *Qassim* v. *Bush*, 407 F. Supp. 2d 198, 202-03 (D.D.C. 2005). *A fortiori*, the Court cannot order, under narrower constitutional habeas, the admission into the United States of a Guantanamo detainee who may wish to testify on his behalf during ongoing proceedings.

If a court should determine that the detainee's participation (or another detainee's participation) in a hearing is essential to the Court's adjudication, the Court could permit participation by telephone or video conference from Guantanamo. Such an approach would give the detainee more process than is constitutionally compelled, while at the same time eliminating the grave separation-of-powers and security concerns that otherwise would apply.

   **b.  *Admissibility of Hearsay Evidence*.**  *Hamdi* establishes that hearsay will be the norm,

not the exception, in the parties' submissions both in the factual return and traverse, and during an evidentiary hearing if one is required. As the controlling plurality explained, "[h]earsay . . . may need to be accepted as the most reliable available evidence from the Government" in these habeas proceedings. *Hamdi*, 542 U.S. at 533-34. That statement does not set forth a standard for admissibility, but rather identifies what is likely the *best* evidence available for enemy combatant determinations given the wartime context that led to these detentions. Indeed, the *Hamdi* plurality specifically directed the lower courts to consider the second-hand statements of Government officials regarding a detainee's actions and the circumstances of the detainee's capture, where the official is familiar with relevant Government practices and has reviewed the Government's "records and reports." *See id.* at 512-13, 534, 538 ("a habeas court . . . may accept affidavit evidence like that contained in the Mobbs Declaration").

    This principle is critical. Without it, soldiers would be summoned back from remote battlefields to testify to the circumstances of distant captures. Intelligence reports might be excluded without live, in-court testimony from confidential sources. A tip from a custodial interrogation in the field could require the in-court appearance of military interrogators, or even the present or former detainee subject to the interrogation. None of these absurd consequences is remotely compelled by traditional wartime or habeas practices, by the Fifth Amendment or the Suspension Clause, or by *Hamdi* and *Boumediene*.

    To the contrary, as the Supreme Court recognized in *Hamdi*, "military officers who are engaged in the serious work of waging battle would be unnecessarily and dangerously distracted by [developing the case in chief for] litigation half a world away," by a judicially-made prohibition against the use of hearsay evidence to support wartime status determinations.

*Hamdi*, 542 U.S. at 531-32.  In war there is no evidence room and chain of custody procedures.

Evidence of combatancy (*i.e.*, weapons) is generally destroyed, not retained.  Indeed, much of

the physical evidence may be "buried under the rubble of war."  *Hamdi*, 542 U.S. at 532.

Moreover, the events giving rise to the military detention of the Guantanamo detainees took

place overseas, where the Government does not have the same freedom to operate.  Additionally,

because habeas proceedings could result in the erroneous release of enemy combatants (as has

the Department of Defense administrative review process, which the Supreme Court has held to

be an inadequate substitute for habeas[8]), requiring the live testimony of soldiers or others

involved in the war effort could easily jeopardize their safety.  *See Boumediene*, 128 S. Ct. at

2276 (habeas procedures must ensure protection of intelligence sources).

　　Even if the Constitution required some limits on consideration of hearsay, those limits

would surely devolve to the *weight* the habeas court should give to the evidence rather than the

question of admissibility.  The hearsay rule is "grounded in the notion that untrustworthy

evidence should not be presented to the triers of fact" and the view that "[o]ut-of-court

statements . . . lack the conventional indicia of reliability: they are usually not made under oath

or other circumstances that impress the speaker with the solemnity of his statements; the

declarant's word is not subject to cross-examination; and he is not available in order that his

demeanor and credibility may be assessed by the jury." *Chambers* v. *Mississippi*, 410 U.S. 284,

---

[8]*See* Mintz, John, *Released Detainees Rejoining The Fight*, Washington Post (Oct. 22, 2004) ("One of the repatriated prisoners is still at large after taking leadership of a militant faction in Pakistan"; he had "maintained the fiction that he was an innocent Afghan tribesman" while at Guantanamo); Rubin, Alissa, *Former Guantanamo Detainee Tied to Mosul Suicide Attack*, New York Times (May 8, 2008) (reporting that "[a] former Kuwaiti detainee at the United States prison camp at Guantanamo Bay, Cuba, was one of the bombers in a string of deadly suicide attacks in the northern Iraqi city of Mosul last month").

298-99 (1973) (citing *Green*, 399 U.S. at 158). Nonetheless, considerations of "trustworthiness" or "reliability" routinely justify the admission of hearsay pursuant to numerous well-recognized exceptions. *See, e.g.*, *United States v. D'Anjou*, 16 F.3d 604, 610 (4th Cir. 1994); *Guam v. Ignacio*, 10 F.3d 608, 612 (9th Cir. 1993); *Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272, 277 (5th Cir. 1991); *Gass v. United States*, 416 F.2d 767, 772 (D.C. Cir. 1969). Moreover, although the Federal Rules of Evidence governing introduction of hearsay encompass bench trials, the courts have repeatedly recognized that the hazards associated with the introduction of hearsay evidence before jury trials apply with much diminished force in trials before a judge. *See, e.g.*, *United States ex rel. Ford* v. *Pate*, 425 F.2d 178, 180 (7th Cir. 1970) (admission of potential hearsay "occurred during a bench trial which reduced the likelihood of prejudice"); *see also United States* v. *Cardenas*, 9 F.3d 1139, 1155 (5th Cir. 1993); *Gulf States Utilities Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981) ("The exclusion of this evidence under Rule 403's weighing of probative value against prejudice was improper. This portion of Rule 403 has no logical application to bench trials."). Accordingly, in civil bench trials, "many experienced judges admit hearsay they deem reasonably reliable and probative, either 'for what it is worth' or on some more explicit rejection of the hearsay rule and its some 30 exceptions." *Cobell* v. *Norton*, 224 F.R.D. 1, 5 (D.D.C. 2004) (citing *McCormick on Evidence*, 137 (2d ed. 1972), and Kenneth C. Davis, *Hearsay in Nonjury Cases*, 83 Harv. L. Rev. 1362 (1970)) (internal citations omitted). Moreover, in pretrial detention hearings before a judge, Congress expressly provided that the limitations on hearsay *do not apply*. 18 U.S.C. § 3142 ("The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing.").

- 41 -

Thus, to the extent that any constitutional question is presented at all, the issue in these cases would be not whether hearsay evidence should be admitted, but what weight particular evidence should be accorded in a particular proceeding.  Exclusion of hearsay, which must be reviewed by the judge in any event, would serve no useful purpose.  To the contrary, allowing battles over the admissibility (rather than the probative value) of hearsay evidence would only impede the expedited resolution of these cases.  In contrast, "[i]t is well settled that in a non-jury trial the introduction of incompetent evidence does not require a reversal in the absence of an affirmative showing of prejudice.  The presumption is that the improper testimonial evidence, taken under objection, was given no weight by the trial judge and the Court considered only properly admitted and relevant evidence in rendering its decision."  *United States* v. *McCarthy*, 470 F.2d 222, 224 (6th Cir. 1972); *see also Holt* v. *Sarver*, 442 F.2d 304 (8th Cir. 1971) (noting that in nonjury cases there will typically be no reversal for the erroneous reception of evidence); *Can-Am Engineering Co.* v. *Henderson Glass*, Inc., 814 F.2d 253, 255 (6th Cir. 1987) (holding that it makes no difference whether evidence is admitted or not in a court trial where the record did not indicate that judge used the testimony in his decision).

Of course, in weighing the hearsay evidence, "the Constitution would not be offended by a presumption in favor of the Government's evidence."  *Hamdi*, 542 U.S. at 534.  Indeed, in light of the unique context in which these habeas cases arise and the primary issue involved, *i.e.*, whether the United States may legally detain combatants to prevent them from returning to the battlefield, such a presumption is both appropriate and necessary. The costs of an erroneous determination against the Government – which could ultimately result in the deaths of more American soldiers or civilians, either on the field of battle or from terrorist attacks – are grave.

Thus, evidence submitted by the Government, including hearsay evidence, can and must be accorded appropriate weight.

* * *

As discussed, the proposed framework addresses the principles set forth by the Supreme Court in *Hamdi* and *Boumediene*.  Those principles permit meaningful judicial review of wartime status determinations, while at the same time recognizing that "enemy combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict."  *Hamdi*, 542 U.S. at 533; *see also Boumediene*, 128 S. Ct. at 2276 ("In considering both the procedural and substantive standards used to impose detention to prevent acts of terrorism, proper deference must be accorded to the political branches.").  Therefore, we respectfully request that the Court enter an order adopting the Government's proposed framework in these cases.

## III.     This Court Should Not Require Advance Notice of Transfer.

This Court lacks the authority to order advance notice of transfer and, even if it had that authority, it should decline to exercise it.  The only purpose that could be served by filing a notice of transfer is to give petitioners an opportunity to challenge that transfer.  But, this Court lacks authority to limit or preclude transfer and, were there any question, a provision in Section 7 of the MCA which survives *Boumedine* makes plain that a petitioner may not challenge the transfer.  Even if this Court had jurisdiction, "it is for the political branches, not the judiciary, to assess practices in foreign countries" with respect to determining whether transfer is appropriate.  *Munaf*, 128 S.Ct. at 2225.  Finally, as this Court has recognized, petitioner challenges to transfer in the past have been "premised upon unsubstantiated conjecture rather than 'certain' or

'imminent' harm"; and such allegations are "*directly refuted* by [the Government's] sworn declarations." *Sliti v. Bush*, 407 F. Supp. 2d 116, 118 (D.D.C. 2005). Accordingly, this Court should not require that notice be given prior to transfer of detainees.[9]

**A.** First, there is no subject-matter jurisdiction to enter an order requiring advance notice of transfer. Instead, Section 7 of MCA bars the district court from entertaining any challenge to the Government's transfer of Guantanamo detainees. That aspect of the jurisdictional bar is unaffected by the Supreme Court's decision in *Boumediene*. MCA § 7 expressly withdrew from any court's jurisdiction two independent and separately enumerated types of actions that Guantanamo detainees might bring. Specifically, Congress eliminated jurisdiction under statutory habeas corpus generally, 28 U.S.C. § 2241(e)(1), and separately withdrew jurisdiction concerning any aspects of the detention beyond the core habeas question of the legality of detention, including challenges to "transfer" and "conditions of confinement[.]" 28 U.S.C. § 2241(e)(2).

It is clear that *Boumediene* invalidated the MCA only to the extent that it precluded courts from exercising core habeas functions, that is, entertaining challenges to the legality of petitioners' detention, not issues relating to "transfer." *See Boumediene*, 128 S.Ct. at 2274 ("[W]e need not discuss the reach of the writ with respect to claims of unlawful conditions of treatment or confinement."); *id*. at 2262 ("Petitioners, therefore, are entitled to the privilege of habeas corpus to *challenge the legality of their detention*.") (emphasis added). Indeed, the

---

[9] We note that the D.C. Circuit, in *Kiyemba v. Bush*, No. 05-5487 (D.C. Cir.), has scheduled supplemental briefing and oral argument on the question whether habeas courts can properly require advance notice of transfer in light of *Munaf* and *Boumediene*. *Kiyemba* is scheduled for oral argument in the D.C. Circuit on September 25.

petitioners in *Boumediene* never challenged the constitutionality of § 2241(e)(2).[10] This Court

should therefore preserve as much of the statute as is constitutional, including all of section

2241(e)(2), as Judge Urbina recently concluded in a related context. *See In re Guantanamo Bay*

*Habeas Litigation*, Nos. 05-1509, et al., Order Denying Motion for TRO and Preliminary

Injunction, at 6 (August 7, 2008) (Urbina J.) ("[T]his court interprets Boumediene to invalidate

only 28 U.S.C. § 2241(e)(1)" and not 2241(e)(2)."); *see also Alaska Airlines, Inc. v. Brock*, 480

U.S. 678, 685 (1987) ("[T]he unconstitutional provision must be severed unless the statute

created in its absence is legislation that Congress would not have enacted"); *Tilton v.*

*Richardson*, 403 U.S. 672, 684 (1971).

Moreover, a transfer claim is also not at the constitutional core of habeas.   Instead, a

habeas action has historically been understood as a vehicle for challenging one thing only – the

fact and duration of detention.   Thus, the Supreme Court, even pursuant to statutory habeas, has

rejected expansion of the statutory writ to include conditions-of-confinement claims.   *See Bell v.*

*Wolfish*, 441 U.S. 520, 526 n.6 (1979).   Thus, the Suspension Clause holding of *Boumediene*

affords no basis for invalidating § 2241(e)(1) insofar as it precludes any attempt to challenge

conditions of confinement through habeas corpus.   *See, e.g.*, *Ayotte v. Planned Parenthood of*

*N. New England*, 546 U.S. 320, 329 (2006) ("[W]e try not to nullify more of a legislature's work

---

[10]   Although *Boumediene* refers generally to § 7 without identifying a particular
subsection of 28 U.S.C. § 2241(e), *see, e.g., Boumediene*, 128 S.Ct. at 2274 ("MCA § 7 thus
effects an unconstitutional suspension of the writ"); *id.* at 2275 ("The only law we identify as
unconstitutional is MCA § 7, 28 U.S.C.A. § 2241(e) (Supp. 2007)"), that is an insufficient basis
to construe the Court's opinion to invalidate all of § 7, particularly when the Court's rationale for
invalidating § 2241(e)(1) has no application to § 2241(e)(2).   Indeed, at one point in its opinion,
the Court seems to acknowledge that its general reference to § 7 is short-hand for the bar against
habeas jurisdiction in § 2241(e)(1).   *See id.* at 2265 (stating that § 7 is the source of the relevant
"jurisdiction-stripping language," but citing specifically to subsection § 2241(e)(1)).

than is necessary . . . .").

The Supreme Court's decision in *Munaf v. Geren*, 128 S. Ct. 2207 (2008), decided the

same day as *Boumediene*, further supports this understanding of the writ's reach.  In *Munaf*, the

Court emphasized that "[h]abeas is at its core a remedy for unlawful executive detention . . . The

typical remedy is, of course, release."  *Munaf*, 128 S. Ct. at 2221 (citing *Hamdi v. Rumsfeld*, 542

U.S. 507, 536 (2004) (plurality opinion) and *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973)

("[T]he traditional function of the writ is to secure release from illegal custody.")).  Accordingly,

the Court refused to extend even statutory habeas relief to include the *Munaf* petitioners'

collateral challenge to their transfer to Iraqi custody.  *Munaf*, 128 S.Ct. at 2228 ("Habeas corpus

does not require the United States to shelter such fugitives from the criminal justice system of

the sovereign with authority to prosecute them.").  Likewise here, petitioners' challenges to

future transfer out of United States custody are beyond core habeas relief.  Jurisdiction was

therefore lacking to consider petitioners' requests, and the district court's orders should be

vacated.

**B.**  Even if this Court did have jurisdiction, it should not enter an injunction requiring

notice of transfer.  First, such an order would impinge upon separation-of-powers principles by

impermissibly encroaching upon the President's as Commander-in-Chief and the Executive

Branch's authority to negotiate with foreign nations.  *See Munaf*, 128 S.Ct. at 2225 ("[e]ven with

respect to claims that detainees would be denied constitutional rights if transferred, we have

recognized that it is for the political branches, not the judiciary, to assess practices in foreign

countries and to determine national policy in light of those assessments").

Moreover, in implementing its transfer policy, the United States engages in sensitive

negotiations with other nations.  Williamson Decl. ¶¶ 9-12; Hodgkinson Decl. ¶ 5.  Requiring

advance notice, which would necessarily lead to the litigation of transfer-related issues, would

undermining the Executive Branch's ability to speak for the United States with one voice in

dealing with foreign nations.  *See id.* ¶ 12; *Crosby v. National Foreign Trade Council*, 530 U.S.

363, 381 (2000) (disapproving acts that "compromise the very capacity of the President to speak

for the nation with one voice in dealing with other governments").[11]  Reviewing transfer would

also be inconsistent with the Rule of Non-Inquiry.  See *United States v. Kin-Hong*, 110 F.3d 103,

110 (1st Cir. 1997) (courts cannot inquire into "the fairness of a requesting nation's justice

system" and "the procedures or treatment which await a surrendered fugitive in the requesting

country").  As The Supreme Court explained in *Munaf*, rejecting claims that transfer would

result in poor treatment, "[t]he Judiciary is not suited to second-guess such determinations –

determinations that would require federal courts to pass judgment on foreign justice systems and

undermine the Government's ability to speak with one voice in this area."  128 S. Ct. at 2226;

*see also Almurbati v. Bush*, 366 F. Supp. 2d 72, 80 (D.D.C. 2005) ("[O]nce the respondents

---

[11]*See also Harbury v. Hayden*, 522 F.3d 413, 419, 421 n.3 (D.C. Cir. 2008) ("judicial
restraint in the area of foreign affairs is often appropriate[;]" "courts are cautious [not] to intrude
deeply into the foreign policy and national security decisionmaking process of the Executive
Branch"); *Joo v. Japan*, 413 F.3d 45, 52-53 (D.C. Cir. 2005) (adjudication that "would undo"
Executive's foreign policy judgment in foreign policy "would be imprudent to a degree beyond
our power"); *Schneider v. Kissinger*, 412 F.3d 190, 197 (D.C. Cir. 2005) ("pass[ing] judgment
on the [foreign] policy-based decision of the executive . . . is not the stuff of adjudication");
*People's Mojahedin Org. v. Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999) ("[I]t is beyond the
judicial function for a court to review foreign policy decisions of the Executive Branch.") (citing
*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103 (1948)); *Holmes v. Laird*,
459 F.2d 1211, 1215 (D.C. Cir. 1972) ("'[T]he controlling considerations are the interacting
interests of the United States and of foreign countries, and in assessing them [the courts] must
move with the circumspection appropriate when [a court] is adjudicating issues inevitably
entangled in the conduct of our international relations.'") (quoting *Romero v. Int'l Terminal
Operating Co.*, 358 U.S. 354, 383 (1959))

release the petitioners from United States custody . . . they will have obtained the result requested and at that point there will be no further need for this [c]ourt to maintain jurisdiction.").  In contrast, "the political branches are well situated to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally, and what to do about it if there is."  *Id.*  There is no meaningful difference between a notice of transfer sought here and the inquiry rejected by the Supreme Court in *Munaf*, as notice of transfer would serve no purpose other than to allow petitioner to challenge that transfer.  Thus, no such notice-of-transfer order should be entered.

## IV.    For Practical Reasons, This Court Should Prioritize Habeas Cases Brought By Detainees Not Approved for Release or Transfer.

Practical reasons militate strongly in favor of prioritizing cases where petitioners have not been approved for release or transfer, and the court has broad discretion in managing its docket that would allow such a prioritization.  *Cf. Clinton* v. *Jones*, 520 U.S. 681, 706 (1997) (a court "has broad discretion to stay proceedings as an incident to its power to control its own docket").  Moreover, because habeas is a flexible remedy that at its core rests on the "'equitable discretion' of habeas courts," *Herrera v. Collins*, 506 U.S. 390, 404 (1993), this Court has the authority to order cases so as to address those first where court review is likely to provide the most significant benefit.  *Cf. Brecht v. Abrahamson*, 507 U.S. 619, 635-636 (1993).

First, cases where the Government has approved release or transfer of a detainee may become moot while habeas proceedings are pending.  The Government is actively seeking to release or transfer those petitioners to their home country or a third country.  In fact, the Government has transferred or released over 500 Guantanamo detainees to date.  Hodgkinson Decl. ¶ 4.  Because there is a realistic chance that these cases will become moot, judicial

- 48 -

resources, as well as the resources of the parties, could be saved by prioritizing the other habeas

cases, where the Government is not attempting to transfer or release the petitioner.

Second, for petitioners who are approved for release or transfer, habeas proceedings,

even if successful, may be of limited practical significance. Win or lose, the Government will be

actively trying to effectuate transfer of those petitioners out of United States custody. As another

judge on this Court explained, "[w]ere the Court to preserve its jurisdiction over the habeas

petitions, and ultimately determine that the United States may no longer detain the petitioners,

the parties and the [court] would find themselves in precisely the same position in which they

find themselves now – with the respondents taking steps to transfer those individuals out of

United States control." *Al-Anazi*, 370 F. Supp. 2d at 196. When the DoD transfers GTMO

detainees to the control of other governments, the DoD does so after dialogue with the receiving

government. Such dialogue may be initiated by the receiving government or may be initiated by

the United States. In all cases of transfer, the detainee is transferred entirely to the custody and

control of the other government, and once transferred, is no longer in the custody and control of

the United States; the individual is detained, if at all, by the foreign government pursuant to its

own laws and not on behalf of the United States. Hodgkinson Decl. ¶ 5. Whatever their specific

situation, petitioners who are approved for release or transfer are in a different position from

those who are *not* approved for release or transfer – in the latter cases, were the petitioner to

prevail in habeas, it would lead to an effort by the Government to find a home abroad for that

petitioner, if one were not readily available, where there currently is no such an effort.

Finally, by prioritizing the other cases, the cases of petitioners approved for release or

transfer will still be before this Court, and this Court may address them promptly if those

petitioners remain at Guantanamo after other cases have been resolved.  Although these are

individuals that the Government has cleared for transfer, they have still been found to be enemy

combatants, and are no more prejudiced than other detainees by any sequencing of cases.  Thus,

at most, prioritizing the cases where release or transfer has not been approved will delay the

adjudication of the remaining cases for a period of a few months.   At the same time, this Court

would be first addressing those cases where there are no efforts underway that would potentially

moot the petitioners' cases by the Government's voluntarily giving them the relief that they

seek—release from U.S. custody.

Dated: August 12, 2008                    Respectfully submitted,

                                          GREGORY G. KATSAS
                                          Assistant Attorney General

                                          JOHN C. O'QUINN
                                          Deputy Assistant Attorney General


                                          */s/ James C. Luh*_____
                                          JOSEPH H. HUNT (D.C. Bar No. 431134)
                                          VINCENT M. GARVEY (D.C. Bar No. 127191)
                                          JUDRY L. SUBAR (D.C. Bar No. 347518)
                                          TERRY M. HENRY
                                          AUGUST E. FLENTJE
                                          JAMES C. LUH
                                          Attorneys
                                          United States Department of Justice
                                          Civil Division, Federal Programs Branch
                                          20 Massachusetts Ave., N.W.
                                          Washington, DC  20530
                                          Tel:  (202) 514-1278
                                          Fax:  (202) 514-7964
                                          Attorneys for Respondents