Steven T. Wax
Federal Public Defender
Steve_Wax@fd.org
Stephen R. Sady
Chief Deputy Federal Public Defender
Steve_Sady@fd.org
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204
503-326-2123 Telephone
503-326-5524 Facsimile

Attorneys for Petitioner



FILED WITH THE
COURT SECURITY OFFICER
CSO:
DATE: 3/16/09

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

ABDULRAHIM ABDUL RAZAK AL GINCO,

          Petitioner,

   v.

BARACK OBAMA, et al.,

          Respondents.

Civil No. 05-CV-1310 (RJL)

TRAVERSE

# TABLE OF CONTENTS

Page

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

I.  Succinct Statement Of Reasons To Grant The Writ . . . . . . . . . . . . . . . . . . 1

II. Mr. Janko Moves For Judgment Granting The Writ Because The
    Government's Return On Its Face Is Factually Insufficient To Establish
    A Lawful Basis For Detention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.  The Return Fails To Establish A Lawful Basis For Detention
        Because The Government Relies On Evidence And Decision-
        Making That Are The Products of Torture, Both By Al Qaeda
        And By United States Personnel . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.  Al Qaeda And The Taliban Extracted Involuntary
            Statements From Mr. Janko By Applying Torture Including
            Beating, Electric Shock, The Falaka, Water Torture,
            Threats, Sleep Deprivation, Extreme Cold, And Stress
            Positions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        2.  American Interrogators At The Kandahar Air Base Coerced
            Involuntary Statements From Mr. Janko By Means Of
            Threats, Assault, Sleep Deprivation, Use Of Dogs, Exercise
            To Exhaustion, And Stress Positions . . . . . . . . . . . . . . . . . . . 15

        3.  The Products Of Al Qaeda Torture And American
            Coercion Pervade Subsequent Interrogations And
            Decision-Making, Requiring A Finding That The Return Is
            Insufficient To Establish A Lawful Basis For
            Imprisonment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            a.  The Narrative And Attached Exhibits Include The
                Direct Products Of Torture . . . . . . . . . . . . . . . . . . . . . 18

i

b.  The Government Cannot Demonstrate That Guantanamo Interrogation Reports Are Not The Products Of Al Qaeda Torture And American Torture ................................. 20

c.  The Government Cannot Demonstrate That Decision-Making Regarding Mr. Janko Is Independent Of The Products Of Torture .......... 23

d.  The Government's Citation To Private Letters Home And Comparisons Between Guantanamo And The Sarpusa Prison Do Not Establish An Independent Basis For Guantanamo Interrogations And Detention Decisions ................................. 26

B.  Because The Government Relies Solely On Mr. Janko's Statements And Denounces Him As A ███████ Liar, The Statements Cannot Suffice To Establish Enemy Combatant Status ....................................... 29

C.  The Government's Return Is Insufficient To Provide A Credible Basis For Indefinite Detention Because The Reports Are Not Reliable, The Government's Interpretation Of The Reports Is Flawed, And No Sufficient Corroboration Is Provided .......... 30

1.  The Reports Attached To The Return Are Categorically Of Low Reliability And Are Specifically Unreliable Because Of The Effects Of Torture And Interrogator Bias ......... 30

2.  The Government's Skewed Interpretation Of Its Exhibits Demonstrates The Absence Of Credible Evidence To Support Detention ................................. 35

a.  Return Paragraphs 22-26: The Government's Account Of Mr. Janko's Travel To Afghanistan Is Unreliable And Based On Speculation ........... 36

b.   Return Paragraphs 27-30: The Government Provides No Credible Evidence That Mr. Janko "Sought Out And Joined" The Taliban And Admits That The Civil War Involved "Eventual," Not Current, Allies Of The United States . . . . . . . . . . . . . . . . . . . . . . . . . 40

c.   Return Paragraphs 31-34: The Government's Claims Regarding The Guesthouse Are Unreliable, Especially Given The Second CSRT's Finding Of Insufficiency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

d.   Return Paragraphs 35-42: The Government's Claims Regarding The Training Camp Are Exaggerated And Unsubstantiated . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

e.   Return Paragraphs 43-46: The Government Provides Insufficient Evidence That Mr. Janko Is A Threat To The United States. . . . . . . . . . . . . . . . . . . . . . . . . . . 52

f.   Return Paragraphs 17-21: The General Background Regarding Mr. Janko Is Incorrect And Unreliable  . . . 58

3.   The Return Lacks Credible Evidence Because Mr. Janko's Uncorroborated Purported Statements Are Tainted By The Results Of Torture And Ensuing Mental Illness. . . . . . . . . . 61

III.   Mr. Janko Moves For Judgment Granting The Writ Because, As A Matter Of Law, The Government's Statement Regarding The Legal Basis For Detention Does Not Establish The Temporal Nexus Or Otherwise Meet The Definition Of Enemy Combatant . . . . . . . . . . . . . . 63

A.   Mr. Janko's Indefinite Detention Is Unlawful Because The Government's Statement Of Legal Basis For Detention Alleges No Acts During The Statutory Authority For Military Action . . . . 64

B.   A Taliban Torture Victim And Political Prisoner Who Came To The Military's Attention When He Offered To Provide Testimony To Al Qaeda and Taliban Human Rights Violations Does Not Meet Any Plausible Definition of Enemy Combatant. . . . . . . . . . . 67

C.   Because The Government Does Not Allege That Mr. Janko "Engaged In Hostilities Against The United States Or Its Coalition Partners," The Return Does Not Adequately Allege The Elements For Enemy Combatant Status . . . . . . . . . . . . . . . . . . . . . 73

IV.   Even If The Return Were Sufficient, The Petitioner's Affirmative Evidence Establishes That His Detention As An Enemy Combatant Is Unlawful And That He Is Innocent Of That Designation. . . . . . . . . . . . . 74

A.   Mr. Janko's Initial Petitions To This Court And Sworn Statement Of January 7, 2009, Provide A Detailed Account Of Mr. Janko's Activity And Conduct That Establishes He Is Not An Enemy Combatant And That He Should Be Treated As A Protected Civilian . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

B.   Mr. Janko Has Corroborated His Statements To The Court With Declarations Of Percipient Witnesses, Expert Testimony, Photographs, Contemporaneous News Reports, And Video Recordings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

1.   In January 2000, Mr. Janko Was A 22-Year-Old Syrian Kurd Student, With No History Of Political Or Religious Extremism, Who Left Home Over A Family Squabble . . . . . 81

2.   Shortly After Arriving In Afghanistan, Al Qaeda And Taliban Personnel Took Mr. Janko Into Custody, Accused Him Of Being An American And Israeli Spy, And Tortured Him Into Making False Video-Recorded Confessions . . . . . 84

3.      American Bombing In Kandahar Led To The Liberation Of
        The Taliban Prison, After Which Mr. Janko And Other
        Former Prisoners Sought Aid From The Red Cross And
        The United Nations And Offered Americans Testimony
        Regarding Human Rights Violations . . . . . . . . . . . . . . . . . . 86

4.      The American Military Took Mr. Janko And Other
        Political Prisoners Of The Taliban Into Custody,
        Transported Them To The Kandahar Air Base, Then –
        When Interrogators Mistook Mr. Janko For A Terrorist
        Based On An Al Qaeda Torture Tape – Tortured Him Into
        Falsely Confessing To Al Qaeda Affiliations . . . . . . . . . . . 92

C.    Mr. Janko's Statements To The Court Are Consistent With The
      Detailed Accounts He Provided To The First CSRT In 2004, The
      ARB In 2005, And The Second CSRT In 2008 . . . . . . . . . . . . . . 94

D.    The Statements Attributed To Mr. Janko By Guantanamo Mental
      Health Personnel In 2004 Are Virtually Identical To His
      Statements To This Court And To The Formal Military
      Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

E.    Mr. Janko's Interrogation Reports Provide a Generally Consistent
      Account Of His History And Affiliations Except When Coerced
      By Interrogators And, After Years Of Detention At Guantanamo,
      Embellished As A Result Of Increasing Mental Illness,
      Desperation, And Incentives By Interrogators . . . . . . . . . . . . . . . 96

F.    Mr. Janko's Affirmative Evidence Negates Enemy Combatant
      Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

V.    The Second CSRT Violated The Constitution, Statutes, And Its Own
      Rules, Thereby Rendering Mr. Janko's Detention Unlawful . . . . . . . . . . 106

VI.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Acheson v. Hisao Murata,*
   342 U.S. 900 (1952) ................................................................. 71

*Acheson v. Kiyokuro Okimura,*
   342 U.S. 899 (1952) ................................................................. 71

*Acheson v. Maenza,*
   202 F.2d 453 (D.C. Cir. 1953) ................................................ 71

*Arizona v. Fulminante,*
   499 U.S. 279 (1991) ................................................................. 11

*Ashe v. Swenson,*
   397 U.S. 436 (1970) ................................................................. 42

*Bannon v. United States,*
   156 U.S. 464 (1895) ................................................................. 73

*Bismullah v. Gates,*
   551 F.3d 1068 (D.C. Cir. 2009) ............................................ 106

*Blackburn v. Alabama,*
   361 U.S. 199 (1960) ................................................................... 9

*Bong Youn Choy v. Barber,*
   279 F.2d 642 (9th Cir. 1960) ................................................... 9

*Boumediene v. Bush,*
   128 S. Ct. 2229 (2008) ............................................ 7, 30, 64, 106

*Breyer v. Ashcroft,*
   350 F.3d 327 (3d Cir. 2003) .................................................... 72

*Brown v. Mississippi,*
   297 U.S. 278 (1936) ................................................................... 8

*Colorado v. Connelly*,
    479 U.S. 157 (1986) ................................................................ 12

*Crawford v. Jackson*,
    323 F.3d 123 (D.C. Cir. 2003) ..................................... 31

*Farrish v. Mississippi State Parole Board*,
    836 F.2d 969 (5th Cir. 1988) ..................................... 31

*Fikes v. Alabama*,
    352 U.S. 191 (1957) ................................................................ 11

*Foucha v. Louisiana*,
    504 U.S. 71 (1992) ................................................................ 107

*Gagnon v. Scarpelli*,
    411 U.S. 778 (1973) ................................................................ 107

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006) ................................................. 4, 63, 64, 65, 67

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) ................................................. 7, 65, 66, 67, 70

*Haynes v. Washington*,
    373 U.S. 503 (1963) ................................................................ 11, 35

*Jackson v. Denno*,
    378 U.S. 368 (1964) ................................................................ 9

*Kastigar v. United States*,
    406 U.S. 441 (1972) ................................................................ 10

*Killough v. United States*,
    315 F.2d 241 (D.C. Cir. 1962) ..................................... 12

*Lam v. Kelchner,*
    304 F.3d 258 (3d Cir. 2002) ........................................................ 9

*Lee v. Illinois,*
    476 U.S. 530 (1986) ................................................................... 45

*Leyra v. Denno,*
    347 U.S. 556 (1954) ................................................................... 11

*Lilly v. Virginia,*
    527 U.S. 116 (1999) ................................................................... 45

*Linkletter v. Walker,*
    381 U.S. 618 (1965) ..................................................................... 8

*Lisenba v. California,*
    314 U.S. 219 (1941) ................................................................... 11

*Little v. Barreme,*
    6 U.S. 170 (1804) ....................................................................... 67

*Lyons v. Oklahoma,*
    322 U.S. 596 (1944) ................................................................... 11

*Mandoli v. Acheson,*
    344 U.S. 133 (1952) ................................................................... 71

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ................................................................. 107

*Murray v. United States,*
    487 U.S. 533 (1988) ................................................................... 10

*Navia-Duran v. INS,*
    568 F.3d 803 (1st Cir. 1977) ........................................................ 9

*Nishikawa v. Dulles,*
    356 U.S. 129 (1958) ................................................................... 71

*Parhat v. Gates*,
   532 F.3d 834 (D.C. Cir. 2008) ........................................................ 4, 30, 34

*Purcell v. Miner*,
   71 U.S. 513 (1866) .................................................................... 73

*In re Quarles*,
   158 U.S. 532 (1895) ................................................................... 70

*Rasul v. Bush*,
   542 U.S. 466 (2004) ................................................................. 106

*Siderman de Blake v. Argentina*,
   965 F.2d 699 (9th Cir. 1992) ......................................................... 9

*Smith v. Groose*,
   205 F.3d 1045 (8th Cir. 2000) ...................................................... 29

*Tomasicchio v. Acheson*,
   98 F. Supp. 166 (D.D.C. 1951) ...................................................... 71

*United States v. Bell*,
   785 F.2d 640 (8th Cir. 1986) ....................................................... 31

*United States v. Borelli*,
   336 F.2d 376 (2d Cir. 1964) ........................................................ 72

*United States v. Britton*,
   108 U.S. 199 (1883) .................................................................. 73

*United States v. Comito*,
   177 F.3d 1166 (9th Cir. 1999) ...................................................... 31

*United States v. Fox*,
   189 F.3d 1115 (9th Cir. 1999) ...................................................... 73

*United States v. Huckins*,
   53 F.3d 276 (9th Cir. 1995) ........................................................ 31

*United States v. Karake*,
    443 F. Supp. 2d 8 (D.D.C. 2006) ...................................................... 8

*United States v. Kilroy*,
    27 F.3d 679 (D.C. Cir. 1994) ....................................................... 10

*United States v. Mardian*,
    546 F.2d 973 (D.C. Cir. 1976) ..................................................... 72

*United States v. Mezas de Jesus*,
    217 F.3d 638 (9th Cir. 2000) ...................................................... 31

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) ............................................................... 70

*United States v. Walls*,
    70 F.3d 1323 (D.C. Cir. 1995) .................................................... 72

*United States v. Weisz*,
    718 F.2d 413 (D.C. Cir. 1983) .................................................... 72

*Watkins v. Sowders*,
    449 U.S. 341 (1981) ............................................................ 8, 9

*Wolff v. McDonnell*,
    418 U.S. 539 (1974) ............................................................. 107

*Wong Sun v. United States*,
    371 U.S. 471 (1963) ............................................................... 9

## FEDERAL STATUTES

8 U.S.C. § 1101(a)(15) ............................................................... 70

18 U.S.C. § 3144 ................................................................... 70

18 U.S.C. § 3500(e)(2) ............................................................. 31

Fed. R. Evid. 803(4) ....................................................... 96, 100, 101

x

## MISCELLANEOUS

*Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terror*, 66 Fed. Reg. 57833 (Nov. 13, 2001) ............................................... 65

Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 ................................ 68

Theodor Meron, *The Geneva Conventions as Customary Law*, 81 Am. J. Int'l L. 348 (1987) ...................................................................................... 69

United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 15, adopted Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85 ................................... 9

William Winthrop, *Military Law and Precedents* (rev. 2d ed. 1920) ........ 64, 66, 68

The petitioner, through his attorneys, Federal Public Defender Steven T. Wax and Chief Deputy Federal Public Defender Stephen R. Sady, respectfully submits this Traverse to the government's Return, requesting that the Court grant the writ of habeas corpus because the statements asserted by the government are insufficient to carry the initial burden of proof, because the legal bases asserted by the government are foreclosed as a matter of law, and, in the alternative, because Mr. Janko's affirmative case establishes that he is not an enemy combatant.[1]

## I.   Succinct Statement Of Reasons To Grant The Writ

At the time of the Authorization for the Use of Military Force, the Taliban held Mr. Janko in a political prison in Kandahar for being an American spy based on a false confession coerced 20 months earlier by brutal torture committed by top Al Qaeda operatives.  Upon the liberation of Kandahar in December 2001, Mr. Janko remained at the prison with four other non-Afghans as guests of the warden, seeking help from non-governmental organizations and speaking to journalists.  Mr. Janko asked journalists to contact the Americans at the nearby Kandahar Air Base to offer his testimony to human rights violations by Al Qaeda and the Taliban, including crimes against persons believed to be Americans.

---

[1] Despite the caption, Mr. Janko prefers this spelling, which the government also uses in its Return.

On or about January 22, 2002, Americans came to the prison to speak to the former prisoners. Two days later, a military team transported Mr. Janko and the others to the air base where, at first, they were treated relatively well and separated from other detainees. Then, after a press conference by Attorney General Ashcroft, Time Magazine reported that Mr. Janko had been identified as an internationally wanted terrorist, a mistake based on the erroneous belief that an Al Qaeda torture tape of Mr. Janko was a suicide martyr tape.

When Mr. Janko's interrogator saw the magazine article, she concluded, erroneously, that Mr. Janko had tricked her and others. The interrogation team proceeded to apply aggressive and brutal techniques, including sleep deprivation, stress positions, assault, exercise to exhaustion, menacing with dogs, and threats. As a consequence, Mr. Janko made false statements that he was an Al Qaeda member and had knowledge of Al Qaeda plans and personnel. After about 100 days at the Kandahar Air Base, Mr. Janko was sent to Guantanamo S1 ███████████ S1 ██████ as a terrorist on the international most-wanted list. The government later recognized that the most-wanted listing as an international terrorist was based on a mistake regarding Al Qaeda's torture tape.

In this context, the government's Return fails to establish a sufficient factual basis for detention for six separate and interrelated reasons that require entry of

judgment for Mr. Janko before the burden shifts to Mr. Janko to rebut the government's case. First, the Return is infected with reliance on the products of both Al Qaeda torture and the coercive American interrogation in Kandahar. Under the Due Process Clause, the Convention Against Torture, and international humanitarian law, the products of torture cannot be used – including derivative evidence and decision-making – against Mr. Janko. Because the Return is tainted with the products of torture and coercion, the government has failed to carry its initial burden of proof.

Second, because the government relies solely on statements attributed to Mr. Janko, at the same time characterizing the statements in the Return as being made by a ▓▓▓▓▓▓ liar, the evidence is not credible and is insufficient to carry the initial burden of proof. The government's selective and out-of-context attribution of statements in the narrative is too unreliable to support the decision to detain. Further, the government is foreclosed by the Due Process Clause from taking opposing positions regarding the reliability of Mr. Janko in general while at the same time basing seven years of incarceration on selected uncorroborated statements.

Third, under the basic rules for assessing intelligence, the purportedly inculpatory information is too unreliable to carry the government's burden. The original products of torture and products of the erroneous most-wanted designation infected the intelligence-gathering process, creating a bias that pervades the Return.

The government's evidence falls far short of the reliability standard outlined in *Parhat v. Gates*, 532 F.3d 834, 849 (D.C. Cir. 2008). Further, the government's narrative adds a level of distortion and unreliability by mischaracterizing reports and taking statements out of context. From the government's own declaration regarding proper intelligence collection and analysis, the evidence does not carry an initial burden of proof.

Even if the evidence were sufficient, the legal basis for detention is insufficient as a matter of law because no relevant act occurred during the time of war. First, even assuming that Mr. Janko went to Afghanistan to fight – which he did not – the temporal nexus required by the Supreme Court is missing. The government's statement of the basis for detention alleges actions only during ███████ January 2000. The government has provided no evidence that, for the next 20 months, Mr. Janko did anything but suffer torture and imprisonment at the hands of Al Qaeda and the Taliban. The Authorization for the Use of Military Force, which provides the statutory basis for detention of enemy combatants, did not occur until September 18, 2001. The military's authority must be based on an act "*during*, not before, the relevant conflict." *Hamdan v. Rumsfeld*, 548 U.S. 557, 600 (2006) (emphasis in original).

Second, no precedent has ever found detention authorized under circumstances approaching this case. Mr. Janko, as a freed political prisoner, cannot be detained as an enemy combatant absent an allegation that he violated the laws of war. The protection of civilians in wartime applies with special force to a person approaching the United States to provide testimony to human rights violations, including crimes against Americans.

Third, the government's legal basis statement omits an essential element of the enemy combatant definition: "engaged in hostilities against the United States and its coalition partners." The government's statement of the legal basis for detention, on its face, fails to allege a required element for detention, which is understandable because no legitimate basis for such a claim exists.

If the factual and legal insufficiency of the government's Return do not resolve this case, Mr. Janko will establish an affirmative case that he is innocent of being an enemy combatant. The external evidence strongly corroborates Mr. Janko's account of being a moderate, apolitical student who ran away from home in the United Arab Emirates, seeking to become a refugee in the West, who then was conscripted by the Taliban and tortured and imprisoned as a spy when he tried to leave. When liberated from his prison, rather than escaping, he approached the United States through

journalists to provide testimony regarding Al Qaeda and Taliban human rights violations against him and others, including persons believed to be Americans.

In addition to consistent accounts to the Court in a sworn declaration, and to both CSRTs and the ARB, extensive extrinsic evidence supports Mr. Janko's factual assertions, including:

- His family has submitted detailed declarations regarding Mr. Janko's moderate and well-behaved background and the circumstances surrounding his departure from home around January 2000;

- Taliban officials provided contemporaneous press statements in 2000 announcing Mr. Janko's capture and supposed confession to being an American and Israeli spy;

- The description of Al Qaeda's physical torture applied against Mr. Janko is confirmed by expert testimony and the statements of other detainees;

- Other Taliban prisoners state Mr. Janko was held in the Sarpusa prison in Kandahar up to the time when, following 9/11, the Taliban fled Kandahar in December 2001;

- Western journalists confirm that Mr. Janko was freed from the Taliban political prison in December 2001, sought assistance from the United Nations and the Red Cross, and asked the journalists to tell the Americans at the Kandahar Air Base he would provide testimony regarding Al Qaeda and Taliban human rights violations;

- The American mistaken belief that Mr. Janko was a terrorist is confirmed by the sequence of Attorney General Ashcroft's press conference, the Time Magazine article, and the references to Time as the trigger for American torture of Mr. Janko;

- The description of physical torture by Americans is confirmed by ▮S1▮▮▮▮▮▮▮▮▮▮▮▮▮▮, expert testimony, and other detainees;

- Mr. Janko's torture-induced mental condition, exacerbated by years of stressful incarceration and inappropriate behavior modification in Guantanamo, is corroborated by expert testimony and his personal background.

Especially given the weakness and unreliability of evidence asserted by the government, the documented history that Mr. Janko never acted as a belligerent against America and its allies forecloses a finding that he is an enemy combatant under any reasonable definition of the term. Given the statutory and constitutional protections for civilian witnesses, Mr. Janko should be found to be not an enemy combatant under a higher standard for procedural protections than would otherwise apply.

## II. Mr. Janko Moves For Judgment Granting The Writ Because The Government's Return On Its Face Is Factually Insufficient To Establish A Lawful Basis For Detention.

Under governing habeas corpus law and this Court's management order, the government has the initial burden of establishing a sufficient basis for the lawful detention of a prisoner who seeks a writ of habeas corpus. *Boumediene v. Bush*, 128 S. Ct. 2229, 2270 (2008); *Hamdi v. Rumsfeld*, 542 U.S. 507, 533-34 (2004).[2] The

---

[2] *See Boumediene v. Bush,* Civil No. 04-1166 (RJL) (Government's Response to Court Order of July 30, 2008, Regarding Habeas Procedures, filed Aug. 12, 2008) at 15 & n.3 (recognizing that the government must put "forth credible evidence that the habeas petitioner meets the enemy-combatant criteria" and that the petitioner may

government relies extensively and pervasively on statements and reports that are the products of torture, on statements by Mr. Janko that the face of the Return itself contends are unreliable, and on exhibits that lack the level of corroboration needed to support indefinite detention as an enemy combatant. The Court should issue the writ based on the failure of the government to establish sufficient evidence that Mr. Janko's detention is lawful.

    A.    **The Return Fails To Establish A Lawful Basis For Detention Because The Government Relies On Evidence And Decision-Making That Are The Products of Torture, Both By Al Qaeda And By United States Personnel.**

Statements that are the products of torture should be excluded on due process grounds as "[in]consistent with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions" and also because of "'the likelihood that the confession is untrue.'" *United States v. Karake*, 443 F. Supp.2d 8, 51 (D.D.C. 2006) (quoting *Brown v. Mississippi*, 297 U.S. 278, 286 (1936), and *Linkletter v. Walker*, 381 U.S. 618, 638 (1965)); *see Watkins v. Sowders*, 449 U.S. 341, 347 (1981).[3] Similarly, under Article 15 of the Convention Against

---

file a motion for judgment at this stage); *Boumediene v. Bush*, Civil No. 04-1166 (RJL) (Petitioner's Joint Reply to Court Order of July 30, 2008, Regarding Habeas Procedures, filed Aug. 19, 2008) at 7-8.

    [3] Involuntary confessions are not only unreliable but, even if true, the evidence must be excluded "because of the 'strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of

Torture, the United States "shall ensure that any statement which is established to have been made as a result of torture shall not be invoked as evidence in any proceedings except against a person accused of torture as evidence that the statement was made."[4] The repugnance for the use of products of torture is so profound as to have become part of international humanitarian law. *Siderman de Blake v. Argentina*, 965 F.2d 699, 717 (9th Cir. 1992) (the prohibition against official torture has attained the force of a *jus cogens* norm).

The prohibition on the use of the products of torture applies to derivatives as well as the statements themselves. *Wong Sun v. United States*, 371 U.S. 471, 491-92 (1963); *Lam v. Kelchner*, 304 F.3d 258, 268 (3d Cir. 2002). "[T]he rule against involuntary confessions is an essential element of due process." *Navia-Duran v. INS*, 568 F.3d 803, 811 (1st Cir. 1977); *accord Bong Youn Choy v. Barber*, 279 F.2d 642, 647 (9th Cir. 1960) (alien's involuntary statement used in civil deportation proceeding violates due process). Further, the derivatives include not only the

---

securing a conviction, wrings a confession out of an accused against his will.'" *Watkins*, 449 U.S. at 347 (quoting *Jackson v. Denno*, 378 U.S. 368, 385 (1964) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206-07 (1960)).

[4] United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 15, adopted Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85, implemented in the United States by Foreign Affairs Reform and Restructuring Act of 1998, 8 U.S.C. § 1231.

evidentiary results of the torture but the discretionary decisions made in reliance on the products of torture. *Murray v. United States*, 487 U.S. 533, 543 (1988).

In *Murray*, Justice Scalia addressed the Fourth Amendment's exclusionary rule in the context of an illegal search that was followed by a search with a warrant. In remanding the case, the Court instructed that the lower court needed to determine the taint from both inclusion of evidence in the search warrant affidavit and the effect of the illegal search on the decision to seek the warrant:

> The ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case *if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry*, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.

*Murray*, 487 U.S. at 543 (emphasis added).

In the context of involuntary statements, the government bears a heavy burden of establishing that the subsequent statements were not coerced or tainted by the torture and the prisoner's consequent vulnerability. *See Kastigar v. United States*, 406 U.S. 441, 461 (1972) (government bears the "heavy burden of proving that all evidence it proposes to use was derived from legitimate independent sources"); *United States v. Kilroy*, 27 F.3d 679, 683 (D.C. Cir. 1994) (same). The government cannot meet this burden because the government continued to exploit Mr. Janko's

vulnerabilities through coercive tactics such as environmental domination, sophisticated interrogation strategies, behavior modification, and inducements.[5]

The voluntary or involuntary character of a confession is determined according to the totality of the surrounding facts, including prior coercion. *Lyons v. Oklahoma*, 322 U.S. 596, 603 (1944) ("[T]he fact that the earlier statement was obtained from the prisoner by coercion is to be considered in appraising the character of the later confession. The effect of the earlier abuse may be so clear as to forbid any other inference than that it dominated the mind of the accused to such an extent that the later confession in involuntary."); *Lisenba v. California*, 314 U.S. 219, 240 (1941) ("The question of whether those confessions subsequently given are themselves voluntary depends on the inferences as to the continuing effect of the coercive practices which may fairly be drawn from the surrounding circumstances."). Here, the interrogators at Guantanamo knew or should have known that Mr. Janko was

---

[5] Promises of leniency or privileges, especially to a vulnerable person, to overpower the person's resistance, undermines voluntariness. *Haynes v. Washington*, 373 U.S. 503, 512-13 (1963) (promise that defendant could call his wife if he confessed involuntarily induced confession after defendant was held incommunicado for seven days); *Leyra v. Denno*, 347 U.S. 556, 559-60 (1954) (promise of medical treatment improperly induced defendant to confess); *Fikes v. Alabama*, 352 U.S. 191, 196-98 (1957) (repeated questioning and "pressure applied against the power of resistance of this [isolated] petitioner, who cannot be deemed other than weak of will or mind, deprived him of due process of law"); *see Arizona v. Fulminante*, 499 U.S. 279, 286-87 (1991) (statement involuntary where incarcerated informant was promised protection from fellow inmates).

especially vulnerable from the Al Qaeda torture, the Taliban imprisonment, and the

Kandahar Air Base coercion.

In *Killough v. United States*, Judge Wright, in his concurring opinion, stated:

"The 'broken' man, who has already yielded to coercion, is not so easily revived."

315 F.2d 241, 250 (D.C. Cir. 1962) (*en banc*) (citing *Malinski v. New York*, 324 U.S.

401, 428-29 (1945)). Judge Wright went on to state:

> Admittedly, it is difficult to determine whether there is a connection
> between two confessions. But, human nature being what it is, we must
> recognize a presumption that one is the fruit of the other . . . .

> [T]he burden should be on the Government to show that a second
> confession did not spring from a mind in which all the mechanisms of
> resistence are still subdued by defeat and the apparent futility of further
> combat.

*Killough*, 315 F.2d at 249-50.  *Cf. Colorado v. Connelly*, 479 U.S. 157 (1986)

(interrogator must know of a special vulnerability for the factor to be considered in

assessing voluntariness). Mr. Janko is the "broken man" described by Judge Wright.

He was broken by two years of torture and abusive imprisonment by the Taliban and

Al Qaeda and by American interrogators in Kandahar. The interrogation techniques

that dominated Mr. Janko's will continued after he was transferred to Guantanamo.

1.   **Al Qaeda And The Taliban Extracted Involuntary Statements From Mr. Janko By Applying Torture Including Beating, Electric Shock, The Falaka, Water Torture, Threats, Sleep Deprivation, Extreme Cold, And Stress Positions.**

The proof that Mr. Janko made video-recorded statements that resulted from torture is incontrovertible: after brutal torture at the hands of Al Qaeda leaders, they made a video recording of Mr. Janko falsely confessing to being an American spy. The account of torture is confirmed by the expert testimony of Professor Darius Rejali, an internationally recognized expert in the sociology of torture, the statements of other Sarpusa prisoners, and the content and images of the torture tapes themselves.

Through cleared notes, counsel provided Professor Rejali with descriptions of the brutal torture inflicted upon him by Al Qaeda between the time he was arrested as a spy in late January 2000 and when he was transferred to Taliban custody. Professor Rejali analyzed several of the torture techniques distinct to Afghanistan and described how a person from Syria and the United Arab Emirates would not be familiar with them. Traverse Ex. 10 at 5-7. For example, Mr. Janko described the Afghan type of electric torture using a magneto and attaching wires to toes and ears, as well as the falaka, which involved holding the feet in a particular way while the

soles were beaten.   Traverse Ex. 10 at 5.   Further, the taped confession had characteristics typical of the products of torture.  Traverse Ex. 10 at 8-9.

The statements of other detainees confirmed the testimony provided by Mr. Janko regarding his torture.  Al Qaeda denounced as spies and horribly tortured Ayrat Vakhitov, Sadeeq Turkistani, and Jamal al Harith.  Traverse Exs. 12, 13.  Most obviously, the Abu Dhabi tape is the product of torture because, in this context, no one would falsely confess to being an American and Israeli spy – not to mention engaging in homosexual and decadent acts – unless forced to so.  Traverse Exs. 22, 23.  As family members point out, Mr. Janko appears to be under extreme stress, underweight, and speaking in a stilted manner regarding content that is patently false. Traverse Ex. 15 at 4; Traverse Ex. 16 at 4; Traverse Ex. 17 at 3.



████████████████ From the first encounters with Americans, Mr. Janko

consistently described the torture he suffered and provided information regarding the

persons responsible for the human rights violations he suffered. Traverse Ex. 62.

    2.    **American Interrogators At The Kandahar Air Base Coerced Involuntary Statements From Mr. Janko By Means Of Threats, Assault, Sleep Deprivation, Use Of Dogs, Exercise To Exhaustion, And Stress Positions.**

Once the Time Magazine article identified Mr. Janko as a terrorist, the

Kandahar Air Base interrogators began using brutal torture. The descriptions

provided by Mr. Janko match closely the following from Mr. Vakhitov, who was

housed near Mr. Janko. Mr. Vakhitov provided the following detailed account:

> About a month after our arrival at the Kandahar air base, things became much worse. Our chief interrogator was a woman who called herself ██ , who worked with another interrogator who had ██ tattooed on his arm. The military police were from an ██ ; the soldiers said they had previously been deployed in Kosovo. We were transferred to a large hangar divided with wire into separate areas. Without warning, the interrogators began treating Abdul Rahim and me very badly. The first day we spent together in the same area, and I saw Abdul Rahim brought back from interrogation with red patches on his face and with his clothing ripped. Abdul Rahim was very intimated and told me that he had been shown an article in a magazine and that statements he made on Abu Dhabi television were being twisted into meaning he was a terrorist.
>
> From that time, Abdul Rahim received very bad treatment. From my area, I saw and heard interrogations of Abdul Rahim using sleep deprivation, exercise like push-ups and sit-ups to the point of exhaustion, police dogs set on Abdul Rahim, and forcing him to stay in uncomfortable positions for long times, such as kneeling on gravel with

his hands on his head for hours at a time. I suffered the same treatment. The mistreatment was not only painful but humiliating because it was in front of other prisoners. Although Abdul Rahim never resisted or used violence, when Abdul Rahim was taken to interrogation, a group of soldiers would jump on him, forcibly immobilize him, and rough him up. Abdul Rahim sometimes came back from interrogation with his clothing ripped. Abdul Rahim was treated worse than other prisoners, and the prisoners used their treatment of Abdul Rahim to try to make me confess to being a Russian spy. The interrogator with the ██ tattoo said words to the effect: See how we're treating your friend Abdul Rahim; we can do the same to you.

I could not hear what was said during Abul Rahim's interrogations, but he told me they wanted him to admit he was a terrorist involved in bombings. Abdul Rahim told me that he had told the interrogators everything they wanted him to say, just as he had done when the Taliban tortured him and then had him interviewed on videotape for Abu Dhabi television admitting he was an American spy. Abdul Rahim told me that he told the interrogators what they wanted to hear to make the torture stop.

Traverse Ex. 12 ¶¶ 14-16. The detail is thorough: the interrogator named ██ ████ ; the magazine article that set off the torture; the tattoo of the other interrogator; the assaults, sleep deprivation, exercise to exhaustion, and use of dogs.

As reflected in the expert testimony of Professor Rejali, the techniques described are typical of coercive interrogation used by Americans at that place and time. Traverse Ex. 10 at 25. The tactics of torture that leave no marks violated the Army Field Manual then in effect and constitute torture within the practical and legal

meaning of the term. Traverse Ex. 10 at 34-36. The torture of a vulnerable previous victim of torture affects subsequent interrogations. Traverse Ex. 10 at 46-47.

The government admits the use of coercion: in Return Exhibit 75, the Executive Note states that American military personnel **S1** ███████████ **S1** ██████████████████ implemented tactics in **S1** ██████████████████████████████ **S1** ███████████████ in interrogation of Mr. Janko, and used the **S1** ███████████████████ **S1** ███████████████████ (emphasis added). In this context, the ordinary and reasonable meaning of **S1** ████████ – used twice in the Executive Note – means the physical torture described by Mr. Janko and Mr. Vakhitov.

   3.   **The Products Of Al Qaeda Torture And American Coercion Pervade Subsequent Interrogations And Decision-Making, Requiring A Finding That The Return Is Insufficient To Establish A Lawful Basis For Imprisonment.**

Mr. Janko is imprisoned in Guantanamo because Al Qaeda torture videos led Mr. Janko's American rescuers to torture him into making more false inculpatory statements. The premise of the Return – sometimes hidden, sometimes overt – lies in the false and unreliable products of despicable acts committed against Mr. Janko's

body and mind. Both the evidentiary and the decision-making products of torture require a finding that the government failed to carry its initial burden of proof.

### a. The Narrative And Attached Exhibits Include The Direct Products Of Torture.

The text of the Return explicitly relies on the products of torture. The government's narrative cites to █████████████████████████ generated by coercive American interrogation in support of its assertion that Mr. Janko has been █████████████with interrogators. Return ¶ 21. In two places, the narrative explicitly relies on Kandahar reports as substantive evidence of Mr. Janko's supposed terrorist affiliation. Return ¶¶ 37, 44. The narrative relies on two of the coerced Kandahar interrogations for the proposition that Mr. Janko has significant involvement with Al Qaeda and incorporates by reference the products of the █████████████in ¶ 21 to argue that Mr. Janko is a threat. Return ¶ 44.

The exhibits to the Return are replete with products of the Kandahar coercion and documents derived from them. The government included in the Factual Return ████████████████████████████resulting from interrogations of Mr. Janko at Kandahar after the date that coercive tactics began to be used on him. Return Exs. ████████████████████████████████████████████████ ████████████████████████████The government's Return also includes the █████████████████for Mr. Janko, which summarizes

fourteen other interrogation reports that – judging by their ▮▮ numbers – also occurred during this period. Return Ex. 69 at 3-4. Every ▮▮▮▮▮▮ summarized in the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ appears to come from the time of the ▮▮▮ detention.

The Al Qaeda torture tapes also pervade the Return, both overtly and covertly. The narrative includes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ Return ¶ 42. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which is readily seen as false by comparing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮. *Compare* Traverse Ex. 23 *with* Traverse Ex. 37. The government also asserted the content of the Al Qaeda-sponsored Abu Dhabi TV video as corroborating that Mr. Janko is a threat to the United States. Return ¶ 45 & n.16. The government included an exhibit that mischaracterized the videotape recovered on March 22, 2003, as a ▮▮▮▮▮▮ involving exchanges that were ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Return Ex. 63 at 1.