

- Return Ex. 49: Coerced Kandahar Air Base interrogation ⬛ and Mr. Janko renounced his statements made under torture.

- Return Ex. 26: Summary report ⬛

- Return Ex. 57: ⬛

- Return Ex. 22: The government finds it "notable" in footnote 15 of its Return that Mr. Janko ⬛ described the details of his torture and imprisonment in a manner consistent to the detail with his statements to the Court and to the CSRTs and ARB.

The following paragraph of the Return continues with a purported admission that is not an admission by taking a fragment of a sentence out of context from a sentence taken out of context. Return ¶ 45. The government finds it notable that ⬛ citing to Return Exhibit 29. But even

worse, the government left out 

*Id.* The statement in full has the opposite meaning of what the government asserted.

Similarly, Mr. Janko's 2004 CSRT statement is the opposite of what the government

asserts. Rather than indicating that his imprisonment prevented him from killing, he

stated that he requested to leave the camp because he was there involuntarily and did

not want to fight. Return Ex. 64 at 6.

The government cites unreliable inferences based on unreliable data to suggest,

Return ¶ 44. In support, the government refers to detailed and entirely

exculpatory 2004 CSRT testimony. The "apparent admission that he was fighting in

Bagram with the Taliban and al-Qaida" comes from the following word salad: "In

Bagram, fighting, because I went to administer, I just turn and ran away from my

father. But they caught me in a border city and they put me in prison." Return Ex.

64 at 3.[25] Moments later, the transcript reads:

> [T]hey forced me, tortured me to say I'm an American spy, or spy for
> any intelligence service. So, if the interrogation people said that, that's
> proof of a lie. The testimony is that I'm not al Qaida, that I'm not a
> murderer, or Jihad for others. I must be a coward. I must pray for those
> people in this world. (Very inaudible and broken.) I'm not al Qaida.

*Id.* The Alice-in-Wonderland interpretation continues with the ARB, from which the

government finds menace in the consistently exculpatory testimony that, in response

to a question, Mr. Janko does not consider himself a soldier and will never again in

his life be a soldier. Return Ex. 65 at 15.

The government also relies on a report that documents the following story to



Return Ex. 28 at 1

his damaged mind produced the following that the government suggests the Court

should rely on:

---

[25] The government has refused to produce the audio recording of the
proceeding.



Return Ex. 28 at 4.  This quality of evidence is simply worthless.[26]

Lastly, the government's claim that █████████████████████████ █████████████████ is false.  Return ¶ 46.  Mr. Janko has had excellent relations with many American guards, mental health personnel, interrogators, and legal workers.  He is also mentally ill, in a nightmarish crossfire between Al Qaeda torturers and Americans, some of whom tortured him.  In that context, as Dr. Kinzie's declaration bears out, statements during bursts of anger are understandable manifestations of torture-induced mental illness.  Traverse Ex. 11.[27]  There is also natural tension between some guards and their prisoners.  As reported by the Behavioral Sciences Consultation Team, the mental illness is treatable and, even if

---

[26] The government also ███████████████████████████████████████ ████████████████████████████████████████████ which provides no basis for any suggestion to this Court.  Return Ex. 54 at 1.



[27] ██████████████████████████████████████████████

untreated, does not create the type of risk contemplated by indefinite detention in

Guantanamo. Traverse Ex. 68 at 2.

### f. Return Paragraphs 17-21: The General Background Regarding Mr. Janko Is Incorrect And Unreliable.

Mr. Janko, given the months of Al Qaeda torture, and the inhuman brutality of

that torture, would have symptoms associated with Post Traumatic Stress Disorder.

Traverse Ex. 11. Add to that over a year in a horrendous Taliban prison, then torture

for several months by Americans, and the ███████████████████████ becomes

absurd. Return ¶ 20. As internationally recognized psychiatric expert on torture

victims Dr. J. David Kinzie stated in his declaration:

- PTSD and Major Depression are major mental illnesses that are the virtually inevitable psychological damage caused by torture;

- Such conditions are exacerbated by continued incarceration, especially the application of behavior modification by custodians;

- ███████████████████████████████████████ where there is a major mental illness and absence of other diagnostic criteria;

- The prescribing of psychotropic drugs indicates ██████████ ██████████ because medications are generally not the appropriate treatment for ██████████ beyond brief emergency intervention.

Traverse Ex. 11 at 5-7. The Court has ordered production of mental health records

and the petitioner has a request for authorization of access for a security-cleared

psychiatrist who will be able to provide further assistance regarding the mental health issues.

The government further exploits its torture of Mr. Janko by citing reports made under physical and psychological duress as evidence that he is ▓S1 S5▓ liar. Return ¶¶ 20, 21. As previously briefed, most of the reports relied on in ¶ 21 refer to statements that are the immediate products of admitted coercion by interrogators at the Kandahar Air Base. To coerce false statements, then use them to call a man a liar when he explains he was forced to make those statements, is profoundly unfair.

The government also uses Mr. Janko's products of mental illness to claim he is ▓S1 S5▓ Mr. Janko has cut himself, banged his head until he bleeds, attempted to hang himself, and otherwise manifested mental illness in an environment that, according to Dr. Kinzie, is the exact opposite of the appropriate treatment for a torture survivor. Traverse Ex. 11 at 8-9. Counsel observed Mr. Janko during the period when some of the statements relied on by the government were made. Traverse Exs. 40, 41. The use of mental illness in Return ¶ 21 to insult Mr. Janko's character is wrong.

The government's reliance on an expert on counter-interrogation demonstrates the government's hopelessly unreliable showing. Return ¶ 21. The government cites to an expert who describes counter-interrogation techniques, none of which Mr. Janko

had knowledge of or practiced. Return Ex. 5.



Return Ex. 5 at 2. In contrast, Mr. Janko initiated contact with Americans, provided detailed and corroborated accounts of his and others' activities, ▌▌▌▌▌▌▌ and claimed torture only when he truly had been tortured.[33]

The government also denounces Mr. Janko for drug use, including in the publicly released documents the claim he frequently used hashish and heroin. Return ¶ 20. The claim of frequent use is based on a statement attributed to ▌▌▌▌▌▌ a Saudi who came to Afghanistan after 9/11, then was tortured and imprisoned by the Taliban as a spy. Return Ex. 18 at 2. ▌▌▌▌▌▌ arrived at Sarpusa prison just a week before the American bombing started and could have little first-hand knowledge regarding Mr. Janko, who had been in custody the previous two years, especially regarding frequent drug use. Return Ex. 18 at 5. The credibility of

---

[33] The government's claim that Mr. Janko provided an evolving account is addressed in a later section. The government never provides the Court with the chronological sequence that is necessary to see the consistency of his statements in the context of the acknowledged coercion by force, mental illness, and ▌▌▌▌▌▌ , which contradicts the claim that the government provided a "representative sample" of documents. Return ¶ 21 n.1. Further, in the absence of mental health records, the statements, especially the relatively recent more bizarre ones, should be correlated to Mr. Janko's medications and acute psychological distress.

these statements is further eroded based on inconsistent statements made at other times.[34] His relevant statements are that Mr. Janko was tortured based on spy allegations by the Taliban, that Mr. Janko had been tortured to the extent he had little use of his arm and, as a consequence, "spoke very badly of the Taliban," and that he believed Mr. Janko had been in prison for two or three years prior to Mr. Bukhary's arrival. Return Ex. 18 at 2.[35]

3. **The Return Lacks Credible Evidence Because Mr. Janko's Uncorroborated Purported Statements Are Tainted By The Results Of Torture And Ensuing Mental Illness.**

The government's Return is insufficient because the unreliable accounts of purported statements of Mr. Janko do not establish a sufficient basis for detention. The unreliability is especially apparent given the statements in the reports themselves, for example:



(Return Ex. 26.)

_____

[34] ███████████████████████████████████ in *Gharami v. Bush*, Civil No. 05-CV-429 (RJL), Classified Memorandum Opinion at 3-4 (January 30, 2009).

[35] Mr. Bukhary's recorded CSRT statements, from the context, include mistranslation of "tortured" as "bothered" ("Translator: He asked what is the word for 'bothered'") and describe brutal Taliban torture consistent with Mr. Janko's reports. Traverse Ex. 39 at 2-3 ("I like to talk because I found that nobody bothers me. Nobody beats me. Nobody hits me. They have an art in interrogation."), 5, and 7.



Traverse Ex. 45 at 2.

Traverse Ex. 47.

Traverse Ex. 51 at 3.

Traverse Ex. 44 at 1.

Traverse Ex. 77.

Return Ex. 39.

Return Ex. 41.

The torture and mental health issues alone would establish unreliability. As a whole, with no corroboration, the massive reliance on Mr. Janko's statements does not support a prima facie case.

**III.   Mr. Janko Moves For Judgment Granting The Writ Because, As A Matter Of Law, The Government's Statement Regarding The Legal Basis For Detention Does Not Establish The Temporal Nexus Or Otherwise Meet The Definition Of Enemy Combatant.**

Mr. Janko never participated in belligerent acts against the United States. As a result of his imprisonment, Mr. Janko could not have participated in hostilities against the United States and coalition forces. Because the government asserts no act after January 2000 as a basis for enemy combatant status, Supreme Court authority bars designation as an enemy combatant because lawful military detention must occur during, not before, the time of the statutorily authorized hostilities. *Hamdan,* 548 U.S. at 600. The Return also fails to establish conduct that meets any plausible definition of enemy combatant. In fact, the government never claims Mr. Janko was part of or supporting forces "engaged in hostilities against the United States or its coalition partners," as required by this Court's definition of enemy combatant.[36] Each of these failings provides an independent basis for issuance of the writ as a matter of law.

---

[36] Mr. Janko respectfully notes his continuing objection to this definition and submits that, under the individualized facts of this case involving a civilian reporting to American authorities human rights violations including crimes against Americans, the only basis for detention should be proof of a violation of the law of war by a higher standard than a preponderance, including beyond a reasonable doubt.

**Page 63   TRAVERSE**

A.   **Mr. Janko's Indefinite Detention Is Unlawful Because The Government's Statement Of Legal Basis For Detention Alleges No Acts During The Statutory Authority For Military Action.**

Because Mr. Janko was a non-combatant prisoner of the Taliban well before and after 9/11, and because there is no allegation of belligerent conduct after early 2000, the government's statement of legal basis for the detention fails to establish initial military jurisdiction over Mr. Janko and fails to provide a basis for the enemy combatant designation. The Supreme Court in *Boumediene* focused this Court's inquiry as "whether the AUMF authorizes" indefinite detention as an enemy combatant. 128 S. Ct. at 2271-72. Consistent with that approach, the Supreme Court in *Hamdan* firmly limited the Department of Defense's lawful actions to those authorized by statute, including prominently the limitation to the temporal period of the authorization for war. *Hamdan*, 548 U.S. at 597-99 (any offense "must have been committed within the period of the war'") (citing William Winthrop, *Military Law and Precedents* at 837 (rev. 2d ed. 1920) (hereinafter Winthrop)). The earliest time for Department of Defense jurisdiction would be September 11, 2001. *Hamdan*, 548 U.S. at 599 n.31.

Based on *Boumediene*, the same temporal qualification outlined in *Hamdan* applies to Mr. Janko because the same statutory authorization is the predicate for detention of enemy combatants as for prosecution by military tribunals. Jurisdiction

must be based on acts *"during*, not before, the relevant conflict." *Hamdan*, 548 U.S. at 600 (emphasis in original); *see also Hamdi*, 542 U.S. at 518 (detention applies to individuals who fought against the United States "for the duration of the particular conflict in which they were captured"). In *Hamdan*, the Supreme Court expressly disregarded any government claims regarding acts prior to September 11, 2001. 548 U.S. at 599-600. The Executive Order authorizing detention includes the temporal limitation to individuals who, "at the relevant times," are aliens determined to be members of Al Qaeda or engaged in acts of terrorism. *Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terror*, 66 Fed. Reg. 57833 (Nov. 13, 2001). Under the laws of war, the military cannot legally assume jurisdiction based on conduct *before* the war or other exigency authorizing the exercise of military power. Traverse Ex. 9 (Declaration of Gary D. Solis) ¶ 29 ("Just as a baseball pitcher cannot strike out a batter before a game starts, a military tribunal cannot have jurisdiction over acts alleged to have occurred before an armed conflict began.").

For almost two years before his liberation from the Taliban prison, Mr. Janko was nothing more than a non-combatant victim of torture and illegal incarceration by the Taliban. He was despised by the Taliban for being a spy for the United States and Israel, an offense for which he barely escaped with his life. Unless he committed a

violation of the laws of war during the war, he is, like other non-combatants, "in general exempt from military arrest or restraint of the person." Winthrop at 816. All statements and actions attributed to Mr. Janko so far predated 9/11 that no conceivable basis exists for his being held as an enemy combatant during the later war and statutory authorization for detention.

The limitation of detention authority to persons involved in belligerent acts *during* the conflict is necessary to the rationale for designating and incapacitating enemy combatants. "The purpose of detention is to prevent captured individuals from returning to the field of battle and taking up arms once again." *Hamdi*, 542 U.S. at 518. This rationale has no application in the present case where, for 20 months before the 9/11 attacks on America, Mr. Janko was a torture victim and prisoner of Al Qaeda and the Taliban. Mr. Janko was not fighting on the field of battle when detained, he was voluntarily coming forward to help the United States against Al Qaeda and the Taliban by testifying to their human rights violations.

The government's asserted legal basis for detention is fatally flawed by its failure to allege a temporal nexus with the AUMF. The government's statement of the legal basis for detention asserts only conduct in early 2000 – 20 months before the AUMF. This failing alone requires issuance of the writ.

**B.    A Taliban Torture Victim And Political Prisoner Who Came To The Military's Attention When He Offered To Provide Testimony To Al Qaeda and Taliban Human Rights Violations Does Not Meet Any Plausible Definition of Enemy Combatant.**

An enemy combatant is "part of or supporting forces hostile to the United States or coalition partners and 'engaged in an armed conflict against the United States' to justify his detention." *Hamdi*, 542 U.S. at 526; *accord Hamdan*, 548 U.S. at 570 n.1. The AUMF authorized "necessary and appropriate" force against persons the President "determines planned, authorized, committed or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons." AUMF §2(a); *see Little v. Barreme*, 6 U.S. 170 (1804) (military constitutionally limited to seizure of ships as specified in authorizing legislation). Under any permissible reading, Mr. Janko is not an enemy combatant.

The paradigmatic person to be held as an "enemy combatant" is a member of Al Qaeda or the Taliban captured fighting on the battlefield against the United States and its allies. *Hamdi*, 542 U.S. at 521, 531. No conceivable definition of enemy combatant would include a freed political prisoner who had been subjected to brutal torture and confinement by the enemy prior to the war. In the present case, there is no allegation that Mr. Janko engaged the United Stated on the battlefield in support of our enemies. On the contrary, the Taliban considered him an enemy to be tortured,

humiliated, and condemned, and as he stated to the CSRT – with no contradiction in the Return – "We said we would be witnesses against the Taliban and al Qaida." Return Ex. 64 at 6.

The government presents no evidence controverting the fact that Mr. Janko was a freed political prisoner after about 20 months of torture and imprisonment by the Al Qaeda and the Taliban. "Political prisoners of the enemy would generally be civilians, as would persons volunteering to provide evidence against the enemy." Traverse Ex. 9 ¶ 20 (Declaration of Gary D. Solis). As a civilian, the military has no authority over Mr. Janko unless he directly participated in hostilities: "[A] civilian may be treated as a combatant (albeit an unlawful combatant) whenever he/she takes a direct part in hostilities . . . . Absent direct participation in hostilities a civilian is not a combatant, and not a lawful object of either military armed force or detention as a combatant, and he is not subject to prosecution in a military forum." *Id*. at ¶ 22.[37]

Upon his liberation from the Taliban prison, Mr. Janko properly sought refuge through the intervention of non-governmental humanitarian organizations, such as the

---

[37] Persons not engaged in armed conflict are entitled to be free of restraint in the absence of a violation of the laws of war. Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287; Winthrop at 816.

International Committee of the Red Cross and the United Nations.[38]  The exhibits

filed by the government include corroboration from many witnesses that Mr. Janko

had been tortured and imprisoned in Sarpusa until the Taliban fled Kandahar.  The

government never contradicts the assertion in Mr. Janko's testimony that, through

journalists, he contacted Americans to provide testimony and to seek help.

Professor Solis, a military expert on law of war, found no case that even

approached the hypothetical matching the facts of this case:

> Under the law of war, the individual in the hypothetical is not an enemy
> combatant because he took no part, direct or otherwise, in on-going
> hostilities – the predicate for either unlawful combatancy or enemy
> combatancy.  I know of no precedent for an individual being detained
> as an enemy combatant under circumstances approaching those of the
> hypothetical.

Traverse Ex. 9 ¶ 30.  Rather than authorizing detention,  Mr. Janko's initiation of

contact with United States authorities to report and to provide testimony against his

Taliban torturers should provide a high level of protection compared to battlefield

seizures.   The former political prisoners reported that two persons abused by the

Taliban were believed to be Americans, which should implicate the protections for

---

[38]   Those who have been mistreated by the adversary power, such as
concentration camp survivors, should be given special care by organizations such as
the International Committee of the Red Cross.  This Country signed the Fourth
Geneva Convention protecting noncombatants largely in response to the inhumane
manner in which displaced persons were treated in the wake of World War II.
Theodor Meron, *The Geneva Conventions as Customary Law*, 81 Am. J. Int'l L. 348,
364 (1987).

**Page 69   TRAVERSE**

witnesses to crimes in violation of the laws of the United States. Traverse Ex. 4, ¶ 45; Traverse Ex. 61 at 4.[39]

Whatever the full extent of protection due to a witness coming forward to assist the United States, the Supreme Court has foreclosed the possibility that such a person could be indefinitely detained. *Hamdi*, 542 U.S. at 521 ("Certainly, we agree that indefinite detention for the purpose of interrogation is not authorized."). Under the laws of war, witnesses do not fall within the scope of military authority for indefinite detention. Given the sliding scale of protections due aliens, Mr. Janko took steps placing him on a higher level of the "ascending scale of rights as he increases his identity with our society." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 275 (1990) (Kennedy, J., concurring) (citing *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950)). As a friendly alien who has offered America assistance, as opposed to an enemy taken on the battlefield, his status as a witness alone should foreclose his indefinite detention.

The government's legal burden is especially insurmountable in light of two principles raised by Mr. Janko's involuntary conscription, attempt to leave, and offer to testify against Al Qaeda and the Taliban. First, to have legal significance,

---

[39] *In re Quarles*, 158 U.S. 532, 536 (1895) (recognizing the constitutionally protected right to be a witness in federal court); *see* 18 U.S.C. § 3144 (protections under the federal material witness statute); 8 U.S.C. § 1101(a)(15)(s) (provisions for immigration protection of alien witnesses).

participation in a hostile force must be voluntary. In the context of American citizens

in an enemy army during wartime, the Supreme Court has held that expatriation could

not occur "unless the conduct is engaged in voluntarily." *Nishikawa v. Dulles*, 356

U.S. 129, 133 (1958) (citing *Mandoli v. Acheson*, 344 U.S. 133 (1952); *Acheson v.*

*Hisao Murata*, 342 U.S. 900 (1952); *Acheson v. Kiyokuro Okimura*, 342 U.S. 899

(1952)).

> [H]ere petitioner showed that he was conscripted in a totalitarian
> country to whose conscription law, with its penal sanctions, he was
> subject. . . . The Government's only affirmative evidence was that
> petitioner went to Japan at a time when he was subject to conscription.

*Nishikawa*, 356 U.S. at 136-137. The Court must consider the factors – such as

Mr. Janko's fear of being killed if he refused – depriving the person of full exercise

of free will:

> We think this type of case cannot simply be decided either by proof that
> the citizen voluntarily entered the foreign state (even the one of which
> he is a national) which subsequently drafted him, or by evidence that his
> foreign army service occurred pursuant to a draft law. The additional
> factors of actual, in fact, duress and coercion at the time of the
> conscription, on the other hand and of a free exercise of the will and of
> the mind, on the other, must bear heavily on the eventual answer. In
> other words, there must be consideration of the circumstances attending
> the service in the foreign army, and the reasonable inferences to be
> drawn therefrom.

*Acheson v. Maenza*, 202 F.2d 453, 458 (D.C. Cir. 1953); *see also Tomasicchio v.*

*Acheson*, 98 F. Supp 166, 173-174 (D.D.C. 1951) ("The plaintiff might well have

feared severe reprisals if he either protested or contested the order to the draft."); *see also Breyer v. Ashcroft*, 350 F.3d 327, 337 (3d Cir. 2003) ("We think that Breyer's demonstrated inability to secure release from the Waffen SS and his subsequent desertion can be, for the reasons discussed, sufficient to defeat the presumption of his continued military service was voluntary . . . Furthermore, his repeated attempts to secure both temporary and permanent release, followed by desertion of his unit demonstrate Breyer's lack of commitment to service in the Waffen SS."). Here, Mr. Janko's short-lived connection with al Queda and the Taliban – five days in a guesthouse and eighteen days at a training camp – was involuntary to begin with, and by trying to leave, resulted in his torture and imprisonment, demonstrating no voluntary participation.

Second, Mr. Janko's attempt to leave the camp and offer to provide testimony cleansed him of any association with Al Qaeda and the Taliban by analogy to common law principles of withdrawal. *See United States v. Walls*, 70 F.3d 1323, 1327 (D.C. Cir. 1995) (one can withdraw from a conspiracy by "the making of a clean breast to the authorities or communication of the abandonment in a manner reasonable calculated to reach co-conspirators"); *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir. 1964); *United States v. Weisz*, 718 F.2d 413, 435 n.132 (D.C. Cir. 1983); *United States v. Mardian*, 546 F.2d 973, 978 n.5 (D.C. Cir. 1976); *see also*

*United States v. Fox*, 189 F.3d 1115, 1118 (9th Cir. 1999) (conspirator can withdraw from a conspiracy by: (1) disavowing the unlawful goal of the conspiracy; (2) affirmatively acting to defeat the purpose of the conspiracy; or (3) taking "definite, decisive, and positive" steps to disassociate himself from the conspiracy). This principle applies in both civil and criminal contexts, in which a party may abandon the intention of committing a crime or illegal contract before it has been completed and thereby avoid penalty. *Bannon v. United States*, 156 U.S. 464, 469 (1895); *United States v. Britton*, 108 U.S. 199, 205 (1883); *Purcell v. Miner*, 71 U.S. 513, 518 (1866). Although Mr. Janko never engaged in voluntary conduct nor belligerent acts, his role as a person who attempted to leave, then became a voluntary witness, forecloses enemy combatant status.

   **C.   Because The Government Does Not Allege That Mr. Janko "Engaged In Hostilities Against The United States Or Its Coalition Partners," The Return Does Not Adequately Allege The Elements For Enemy Combatant Status.**

The government's statement of the legal basis for detention filed on December 9, 2008, cites this Court's definition of enemy combatant, but then only alleges two of the three elements, omitting an allegation that Mr. Janko "engaged in hostilities against the United States or its coalition partners." The government's legal justification for detention repeats reference to the same five days in a guesthouse and 18 days at a training camp in January 2000 in support of two elements of the

definition, but omits entirely the third element. In subsection A, the government claims Mr. Janko was part of or supporting Al Qaeda and the Taliban; and in subsection B, the government asserts that Mr. Janko committed belligerent acts and directly supported hostilities in aid of enemy forces. Nowhere does the government allude to any engagement "in hostilities against the United States or its coalition partners."[40] The missing element alone forecloses an enemy combatant finding.

## IV. Even If The Return Were Sufficient, The Petitioner's Affirmative Evidence Establishes That His Detention As An Enemy Combatant Is Unlawful And That He Is Innocent Of That Designation.

In his formal statements to the Court, Mr. Janko has established that he is not an enemy combatant. These statements are completely consistent with his statements to both CSRTs and to the ARB. Mr. Janko presents incontrovertible extrinsic evidence corroborating the essentials of his innocence: at the time of his contact with Americans in January 2002, he was a free man in Kandahar who had recently been liberated from a Taliban political prison; he was seeking refugee assistance from non-governmental organizations in Kandahar; and he initiated contact with Americans through journalists to offer testimony regarding Al Qaeda and Taliban human rights violations. He also provides corroboration of his torture and imprisonment by Al

---

[40] The failure to allege hostilities against the United States and its partners is not surprising given its assertion that, in early 2000, "the Taliban was mired in a civil war with the United States' *eventual* allies, the Northern Alliance, in Afghanistan." Return ¶ 27 (emphasis added).

Page 74   TRAVERSE

Qaeda and the Taliban for the previous 20 months, as well as details regarding his departure from home to seek refugee status in the West and involuntary conscription by the Taliban for less than a month before they arrested him.

**A.**     **Mr. Janko's Initial Petitions To This Court And Declaration Of January 7, 2009, Provide A Detailed Account Of Mr. Janko's Activity And Conduct That Establishes He Is Not An Enemy Combatant And That He Should Be Treated As A Protected Civilian.**

Mr. Janko's formal statements relate a single account that establishes that he is not an enemy combatant because he did not voluntarily affiliate himself with the Taliban and Al Qaeda and because – in any event – he became their victim for 20 months before the AUMF, then allied himself with the United States by approaching the Americans and offering to be a witness against the Taliban and Al Qaeda.

On June 30, 2005, Mr. Janko submitted a pro se document to this Court stating that there was no basis for him to be held in Guantanamo as an enemy combatant. Traverse Ex. 2. Mr. Janko stated that he was jailed by Al Qaeda and Taliban forces for two years before the events of September 11, as the Red Cross could corroborate, and he had been "accused of being a spy working for the United States of America." Traverse Ex. 2. Mr. Janko further alleged that he did not "pose any threat to the United States and its allies and the proof is the accusation of Al Qaeda and Taliban to me stating I was an American spy and not only that but also that I cooperated with

the interrogators for the past three years up to the present time, and I am requesting

from the interrogators to make a statement of that." Traverse Ex. 2.

On August 2, 2005, Mr. Janko filed a supplemental petition for writ of habeas

corpus stating the following:

> . . . I am and was a victim of Al-Qaida and the Taliban in the past. I
> have spent two years in their prison that so-called SAREEZAH prison
> in QANDAHAR, AFGHANISTAN. Then the America[n] forces
> appeared and apprehended me; from prison they brought me to here,
> hence the ICRC requested from the American forces to release us. The
> American forces made promises that they were going to release us three
> days later. However, they've gone back on their promise and since
> those three days, here we are approaching the fourth year. How can that
> be? I was informed that it's my right to object in the America[n] courts.
> Therefore, I would say with all pride that I'm not a threat to the U.S.A.
> or to any of its allies. I was a university student and I am wholly
> prepared to cooperate with the American government[.] [T]his is in
> addition that I was cooperative and I have been for a period of more than
> three years. Thus, what do the American forces want with me?

Traverse Ex. 3. He asked the Court how he could be an enemy combatant when the

Americans freed him from the Taliban jail and he considers himself "a friend to the

Americans and I want you to know that I am not a threat at all." *Id.*

In Traverse Exhibit 4, Mr. Janko submits his declaration detailing the facts

leading to his incarceration. The statement tracks the statement of material facts

submitted in support of his summary judgment motion on September 21, 2006. He

described his departure from home to seek refugee status in the West:

Because I wanted to go Europe or North America, I contacted several embassies and a United Nations office in Abu Dhabi seeking assistance. After my efforts to produce a way out of the country failed, I heard from a college friend connected to the Afghan embassy that, without a passport, I could be deported to Afghanistan and, as a refugee there, travel to Europe through humanitarian organizations. I followed his suggestions and was eventually deported to Pakistan and, with help from Afghan deportees, arrived at the border with Afghanistan in January 2000, still planning to seek passage to Europe as a refugee.

*Id.* at ¶¶ 17-19. When his Afghan companions could no longer assist, he consulted

with local officials who insisted that he accompany them:

The Afghans with whom I traveled could no longer assist me and suggested I seek help from Afghan government personnel in traveling on to the addresses my friend had given me. When I explained I needed help, the Afghans wanted me to talk through an interpreter. The interpreter asked why I was in Afghanistan. When I told him, he refused to help. He told me to go back where I came from but I had no money and I could not get out of the mountains where I was. My friends had already left and I had only thin clothing and light shoes in the snow and cold of the border area. The interpreter told me I could either come with Afghans or he would leave me. He told the Afghans to take me to a guest house in Kabul. I only went with them because otherwise I would have died in the mountains.

Traverse Ex. 4, ¶¶ 20-21.

Mr. Janko explained that he did not voluntarily involve himself with the guest

house or the training camp:

Although I repeatedly told the Afghan government personnel that I did not want to go to the guest house, they insisted that I go with them to the guest house for five days. After those five days, a truck arrived to take me to a camp near Kabul. I did not go voluntarily to the guest house or

> to the camp; I accompanied them because I was afraid they were going
> to kill me.

*Id.* at ¶¶ 22-23. At both the guest house and the camp, he performed only low-level

tasks:

> While I was at the guest house, I only cleaned weapons upon
> instructions that I had to perform the task; I did not repair or maintain
> weapons or receive training. While I was at the training facility, I was
> treated with suspicion and given low level jobs such as hauling water,
> cutting wood, and cleaning small arms.

*Id.* at ¶¶ 24-25. When he attempted to leave the camp after two and a half weeks, he

was taken into custody and accused of spying for the United States:

> After seventeen days during which the only training I received was on
> small arms, I attempted to leave the camp, advising the camp leader that
> I wanted to return home. When I stated I wanted to leave, the camp
> leaders took me into custody the 18th day and accused me of spying for
> the United States and Israel. The accusation only came after I told them
> I wanted to leave.

*Id.* at ¶¶ 26-28.

> Mr. Janko was then tortured into making video-recorded false confessions:

> First in Kabul, and later in Kandahar, the Taliban, as well as Al Qaeda
> officials, subjected me to severe torture and threats of death during long
> interrogation sessions. The torture inflicted upon me included severe
> beatings, electric shock, being hung from the ceiling, water torture,
> striking the bottom of my feet with clubs, striking my hand with the butt
> of a gun, and sleep deprivation. They also extinguished cigarettes into
> my legs. As a result of the torture and threats starting in January 2000,
> I falsely confessed to being a spy for the United States and Israel, which
> was videotaped by my captors.

*Id.* at ¶¶ 29-31. After three months of torture, the Taliban placed him in a political

prison where he survived through terrible living conditions:

> After three months of torture, I was transferred to a political prison in
> Kandahar called Sarpusa after the neighborhood where it was located.
> I believe the Taliban Islamic Court in Kandahar sentenced me in May
> 2001, to a 25-year prison sentence on the false accusation of being a spy.
> The prison where I was confined also housed about 1,200 political
> prisoners, mostly Afghans from the Northern Alliance. The conditions
> in the Taliban prison were terrible: one piece of bread to eat all day,
> overcrowding, filthy living conditions, an abundance of rats and insects,
> poor medical care, and rampant disease. The International Committee
> of the Red Cross visited me while I was in the Sarpusa prison. I
> remained in the prison, after the initial three months of torture, between
> approximately May 2000 to January 2002.

*Id.* at ¶¶ 34-39. As a result of American bombing of Kandahar, Mr. Janko was freed

from imprisonment, continuing to live in a wing of the prison while seeking

assistance from non-governmental agencies:

> On or about December 18, 2001, the Taliban abandoned the prison in
> Kandahar due to American bombing, and the new Afghan government
> took over. Almost all the political prisoners left the prison, eventually
> leaving behind myself, Jamal Al-Harith from Great Britain, Sadeeq
> Turkestani, a Uighur from Saudi Arabia, Abdul Hakeem Al-Bukhary
> from Saudi Arabia, and Ayrat Vakhitov from Russia. We remained as
> guests in the juvenile wing of the prison because the new warden
> warned us that local Afghans might be hostile to us. Between mid-
> December 2001, and January 24, 2002, I and the others visited offices
> of the Red Cross and the United Nations, seeking assistance in returning
> to our home countries.

*Id.* at ¶¶ 40-43. During this time of freedom, Mr. Janko spoke with journalists and

expressed his willingness to be a witness to the human rights violations he suffered,

Page 79   TRAVERSE

which resulted in a visit from persons who identified themselves as military intelligence:

> Between mid-December 2001, and January 24, 2002, I and the others spoke to numerous journalists regarding our treatment as prisoners of the Taliban. I stated that I had been tortured and asked the journalists to contact the American military so I could testify regarding the human rights violations committed against me and others, including two prisoners I believed to have been Americans who were killed at the prison. On January 22, 2002, Americans visited the prison, advised they were from military intelligence, took photographs of us, and said they wanted information and we would be transferred home in about two weeks.

*Id.* at ¶¶ 44-46.

Two days later, a military detachment took the former prisoners to the Kandahar Air Base where he was treated relatively well until "the interrogators began treating me very badly after showing me a Time magazine article claiming I was a terrorist." Traverse Ex. 4 ¶¶ 47-49. "My bad treatment by the Kandahar air base interrogators, after they confronted me with the magazine article, included striking me on the forehead; threatening to remove my fingernail; sleep deprivation; exposure to very cold temperatures; exercise to exhaustion doing sit-ups, push-ups, and running in chains; stress positions for hours at a time; use of police dogs; and rough treatment to take me to interrogation, although I did not resist or use violence." Traverse Ex. 4 ¶ 50. In late April or early May 2002, Mr. Janko was taken to Guantanamo. Traverse Ex. 4 ¶ 51.

**Page 80    TRAVERSE**