**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ABDULRAHIM ABDUL RAZAK AL GINCO,** | ) ) ) | |
| **Petitioner,** | ) ) | |
| v. | ) ) | **Civil Case No. 05-1310 (RJL)** |
| **BARACK H. OBAMA, et al.,**[1] | ) ) ) | |
| **Respondents.** | ) | |

**MEMORANDUM ORDER** and
(June 22, 2009)

Petitioner Abdulrahim Abdul Razak Al Ginco (who now prefers the surname Janko) ("petitioner" or "Janko") is a detainee being held at the U.S. Naval Base at Guantanamo Bay, Cuba.  He alleges that he is being unlawfully detained by Respondents President Barack H. Obama, Secretary of Defense Robert M. Gates, Rear Admiral David M. Thomas, Jr., and Army Colonel Bruce Vargo (collectively, "respondents" or the "Government").  On May 28, 2009, this Court commenced habeas corpus proceedings for petitioner Janko.  That morning, counsel for both parties made unclassified opening statements in a public hearing.  Petitioner Janko listened to a live translation of these opening statements via a telephone transmission to Guantanamo Bay, Cuba.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a party to an action in his official capacity ceases to hold office, the Court will automatically substitute that officer's successor.  Accordingly, the Court substitutes Barack H. Obama for George W. Bush, Robert M. Gates for Donald H. Rumsfeld, David M. Thomas, Jr., for Jay Hood, and Bruce Vargo for Michael I. Bumgarner.

Thereafter, the Court went into a closed-door session to hear each side present an opening statement that included relevant classified information.  Upon completion of those statements, each side presented its evidence, most of which included classified material, and arguments regarding various material issues of fact in dispute by the parties. Because those presentations were not completed by the early evening of May 28, 2009, the Court reconvened the following day to hear final arguments from both sides.  In the interim, petitioner Janko decided not to testify on his own behalf.  After the Court heard each side's closing arguments, the Court informed the parties that it would hold a public hearing in the near future to announce its decision.  A classified version of this opinion setting forth in greater detail the factual basis of the Court's ruling will be distributed in the near future through the Court Security Office, together with the final judgment.

Before stating the Court's ruling, a brief statement of the relevant factual and procedural background of this case is appropriate.

## BACKGROUND

Petitioner Janko, a Syrian citizen who spent his teen years in the United Arab Emirates, was taken into custody by U.S. forces in January 2002 in Kandahar, Afghanistan.  (Unclassified Return ¶¶ 1-2, 19 [Dkt. #117]; Unclassified Traverse at 81-82, 92 [Dkt. #151].)  Initially he was held and questioned at Kandahar Air Base, until he was ultimately taken to Guantanamo Bay, Cuba, after approximately 100 days. (Unclassified Return ¶ 42, n.12; Unclassified Traverse at 2.)

2

In the aftermath of the Supreme Court's decision in *Rasul v. Bush*, 542 U.S. 466, 473 (2004) (holding that 28 U.S.C. § 2241 extended statutory habeas corpus jurisdiction to Guantanamo), petitioner Janko filed his habeas corpus petition with this Court on June 30, 2005.  (Pet. for Writ of Habeas Corpus [Dkt. #1]; *see also* Suppl. Pet. for Writ of Habeas Corpus [Dkt. #3].)  As with hundreds of other petitions filed around that time, no action was taken by this Court on the petition until the Supreme Court ruled on June 12, 2008 in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), that Guantanamo detainees are "entitled to the privilege of habeas corpus to challenge the legality of their detention." *Id.* at 2262.

In the month following the *Boumediene* decision, I met with counsel in petitioner Janko's case on a number of occasions to discuss issues unique to his case and procedural issues attendant to the habeas process.  On July 30, 2008, I ordered respondents to file their Factual Return by October 24, 2008.  (Briefing and Scheduling Order, July 30, 2008 [Dkt. #84].)  On September 9, 2008, the Government sought a thirty-day extension for the production of the Janko Factual Return.  (Mot. for Partial Relief, Sept. 9, 2008 [Dkt. #102].)  The Government's motion was granted on September 23, 2008, and respondents were ordered to file their Factual Return by November 21, 2008, (Order, Sept. 23, 2008 [Dkt. #104]), which they did.

On November 28, 2008, the Court issued its Case Management Order ("CMO") for the case.  (Case Management Order, Nov. 28, 2008 [Dkt. #111].)  That order was

essentially a duplicate of the earlier CMO I had issued on August 27, 2008 in the *Boumediene v. Bush* case, No. 04-cv-1166.

On December 4, 2008, the Court met with counsel to discuss any issues raised after reviewing respondents' Factual Return.  On December 5, 2008, the Government filed an unclassified version of the Factual Return.  (Notice of Filing of Unclassified Factual Return, Dec. 5, 2008 [Dkt. #117].)  Between October 22, 2008 and April 3, 2009, petitioner's counsel filed a series of motions seeking, or related to, discovery.  Four hearings were held to address those motions between December 10, 2008 and April 1, 2009.

On December 22, 2008, a possible conflict of interest issue arose as to petitioner's counsel's continued representation of Janko.  As a result, the schedule in the case was indefinitely continued until that issue was resolved.  Ultimately it was resolved on February 27, 2009, and the Court ordered petitioner's counsel to file petitioner's Initial Traverse by March 16, 2009.  (Order, Feb. 27, 2009 [Dkt. #127].)  Petitioner's counsel complied.  Indeed, petitioner's counsel subsequently sought to supplement petitioner's Traverse on three occasions, and the Court granted each request.  The Government also sought leave to supplement its Factual Return on May 18, 2009, which the Court permitted.  On May 26, 2009, a prehearing conference was held with counsel in an effort to narrow the factual issues to be covered at the merits hearing.

4

Based on a careful review of the Factual Return and Traverse and after a day and a half of hearings on the factual issues in dispute and the arguments of counsel, the following is the Court's ruling on Janko's petition.

## LEGAL STANDARD

Under the CMO, the Government bears the burden of proving the lawfulness of the petitioner's detention by a preponderance of the evidence. (CMO ¶ II.A.) The Government contends that petitioner Janko is being lawfully detained pursuant to the Authorization for Use of Military Force ("AUMF").[2] In specific, the Government initially argued that petitioner Janko was being lawfully detained because he is an "enemy combatant" who can be held pursuant to the AUMF. (Notice of Filing of Statement of the Legal Bases for Petitioner's Lawful Detention as an Enemy Combatant, Dec. 9, 2008 [Dkt. #118].) In that regard, the following definition of "enemy combatant" was previously adopted by this Court in the *Boumediene* cases to delineate those who could be lawfully detained:

> An "enemy combatant" is an individual who was part of or
> supporting Taliban or al Qaeda forces, or associated forces
> that are engaged in hostilities against the United States or its

---

[2]      In response to the September 11th terrorist attacks, Congress passed a joint resolution authorizing the President to:

> [U]se all necessary and appropriate force against those nations, organizations, or
> persons he determines planned, authorized, committed, or aided the terrorist
> attacks that occurred on September 11, 2001, or harbored such organizations or
> persons, in order to prevent any future acts of international terrorism against the
> United States by such nations, organizations or persons.

Authorization for Use of Military Force, Pub. L. No. 107-40, §§ 1-2, 115 Stat. 224 (Sept. 18, 2001).

> coalition partners. This includes any person who has
> committed a belligerent act or has directly supported
> hostilities in aid of enemy armed forces.

*Boumediene v. Bush*, 583 F. Supp. 2d 133, 133 (D.D.C. 2008). In the aftermath of the

change in administrations in January 2009, however, the Government, for reasons not

known to this Court, now eschews the use of the phrase "enemy combatant" and simply

argues instead that petitioner Janko is the type of individual that is detainable under the

AUMF. (Notice of Refinement of Position with Regard to Authority to Detain, May 4,

2009 [Dkt. #143].) In fact, they go so far as to advocate that the Court adopt an even

higher standard regarding the "supporting Taliban or al Qaeda forces" portion of this

Court's definition of enemy combatant, by requiring a showing of "substantial support"

to the Taliban or al Qaeda. (*Id.* at 1-2.)

Fortunately, however, the Court need not decide whether to adopt the

Government's new definition in this case. The Government's theory of lawful detention

here is not based on "support" to either the Taliban or al Qaeda, but rather petitioner's

being "part of" the Taliban or al Qaeda when he was taken into custody. (Unclassified

Oral Arg. Tr. 31, May 28, 2009.) Accordingly, the question before this Court is simply

whether the Government has shown by a preponderance of the evidence that petitioner

Janko is being lawfully detained – i.e., is an enemy combatant – because he was "part of"

the Taliban or al Qaeda at the time he was taken into custody by U.S. forces. Because the

Government's evidence principally consists of classified intelligence reports from various

government law enforcement and intelligence services, the Court is limited to the

following discussion of unclassified information relied upon in the Government's case.

## ANALYSIS

The Government contends, in essence, that petitioner Janko is an enemy

combatant because he was "part of . . . Taliban or al Qaeda forces" at the time he was

taken into custody by U.S. forces in 2002.  In particular, the Government argues that

petitioner Janko: (1) traveled to Afghanistan to participate in jihad on behalf of the

Taliban; (2) stayed for several days at a guesthouse used by Taliban and al Qaeda fighters

and operatives in early 2000, where he helped clean some weapons; and (3) thereafter

attended the al Farouq training camp for a brief period of time.  (Unclassified Return ¶¶

27-30, 32-40; Unclassified Oral Arg. Tr. 21-27.)  The Government effectively concedes,

however, that petitioner Janko was not only imprisoned, but tortured by al Qaeda into

making a false "confession" that he was a U.S. spy, and imprisoned thereafter by the

Taliban for over eighteen months at the infamous Sarpusa prison in Kandahar.[3]

(Unclassified Return ¶ 42; Unclassified Traverse at 13-15, 84-86.)  Notwithstanding these

extraordinary intervening events, the Government contends that Janko was still "part of"

the Taliban and/or al Qaeda when he was taken into custody after U.S. forces learned

---

[3]     Petitioner Janko contends, and the Government does not dispute, that the conditions in the Sarpusa prison were so terrible – if not horrific – that many prisoners died while incarcerated. Prisoners were fed next to nothing, and the prison was overcrowded, unsanitary, and lacked sufficient medical care.  (Unclassified Traverse at 86; Unclassified Traverse Ex. 4, ¶ 37; Unclassified Traverse Ex. 12, ¶ 3.)

from a reporter of petitioner's presence at the abandoned prison in January 2002.[4] (Unclassified Oral Arg. Tr. 9, 31; Unclassified Traverse at 86-92.)

Petitioner, not surprisingly, disagrees. He denies going to Afghanistan to participate in jihad and, while he admits to staying briefly at a Taliban guesthouse, he claims he did so against his will. (Unclassified Oral Arg. Tr. 6, 18; Unclassified Traverse at 44.) Moreover, he contends that he was later taken "involuntarily" to the al Farouq training camp, fearing that he would be killed if he did not comply. (Unclassified Oral Arg. Tr. 6, 18; Unclassified Traverse at 46-48.) While there he claims he received no more than small arms training and asked to leave on his eighteenth day in residence. (Unclassified Oral Arg. Tr. 18; Unclassified Traverse at 49.) Finally, he claims that he was accused by al Qaeda leaders of being a spy and was tortured[5] repeatedly by al Qaeda for three months until he gave a false "confession" to being a U.S. spy. (Unclassified Oral Arg. Tr. 7, 18; Unclassified Traverse at 84-86.) In addition, petitioner stresses, and the Government does not dispute, that by the point in time he was taken into U.S. custody in 2002 he was a free man that had been left behind in late 2001 at the Sarpusa prison with thousands of Northern Alliance prisoners. (Unclassified Oral Arg. Tr. 5-8, 20;

---

[4]     Originally, the Government and the U.S. media mistook Janko as one of a number of suicide martyrs based on videotapes captured at an al Qaeda safehouse. (Unclassified Oral Arg. Tr. 12-13; Unclassified Traverse at 92-93.) The tape involving Janko, however, was actually an al Qaeda torture tape. (Unclassified Oral Arg. Tr. 12-13; Unclassified Traverse at 2.) Nevertheless, upon debriefing and interrogating Janko, the Government came to realize he had had a preexisting relationship with al Qaeda prior his incarceration by the Taliban. (Unclassified Return ¶¶ 1, 42 n.12.)

[5]     Although a detailed description of the various torture methods the petitioner was subjected to by al Qaeda is beyond the scope of this opinion, it would be fair to say that if his

8

Unclassified Traverse at 86-92.) Thus, petitioner contends, in essence, that even if he had

had a prior relationship with al Qaeda or the Taliban in 2000, his subsequent torture and

imprisonment for eighteen months vitiates that relationship to such a degree that he no

longer was "part of" al Qaeda or the Taliban when he was taken in custody in 2002. The

Government disagrees.

By taking a position that defies common sense, the Government forces this Court

to address an issue novel to these habeas proceedings: whether a prior relationship

between a detainee and al Qaeda (or the Taliban) can be sufficiently vitiated by the

passage of time, intervening events, or both, such that the detainee could no longer be

considered to be "part of" either organization at the time he was taken into custody.[6] The

answer, of course, is yes. Accordingly, the question before the Court today is whether

that is exactly what happened in this case. For the following reasons, I believe it is.

Whether someone is "part of" the Taliban or al Qaeda is a factual question that the

Government has the burden of proving by a preponderance of the evidence. Although

neither Congress, nor the Executive, have ever defined the minimum evidentiary showing

necessary to warrant being adjudged "part of" either organization, a showing of some

relationship between the detainee and al Qaeda (or the Taliban) is – at a minimum –

necessary. Obviously, the more ephemeral, or undefined, the relationship, the less likely

---

account is true even in part, al Qaeda's conduct would be fairly characterized as barbaric.

[6]    Happily, the Government, to its credit, does not go so far as to contend that any prior
relationship with al Qaeda or the Taliban, however distant in the past and regardless of
intervening circumstances, is a sufficient basis to hold an individual under the AUMF
indefinitely. (Classified Oral Arg. Tr. 39, May 29, 2009 ("[W]e are not saying once a Taliban,

it will satisfy the "part of" requirement.  Conversely, the more explicit, in word and deed,

the conduct of the detainee vis-à-vis the organization, the more likely it is that it will

constitute evidence of a sufficient relationship.[7]

Here, the Government contends that petitioner Janko was "part of" al Qaeda

and/or the Taliban prior to his being imprisoned and tortured, as evidenced by his travel

to Afghanistan, stay at a certain Taliban guesthouse for approximately five days, and his

attendance at the notorious al Farouq training camp for two-plus weeks.  (Unclassified

Oral Arg. Tr. 31.)  The Government also contends, in essence, that the extreme treatment

Janko was subjected to over a substantial period of time thereafter was *not* sufficient to

vitiate that relationship.  As such, the Government contends he was still "part of" those

organizations when he was ultimately taken into custody by the U.S. forces some two

years later.  I disagree!

To determine whether a pre-existing relationship sufficiently eroded over a

sustained period of time, the Court must, at a minimum, look to the following factors:  (1)

the nature of the relationship in the first instance; (2) the nature of the intervening events

or conduct; and (3) the amount of time that has passed between the time of the pre-

existing relationship and the point in time at which the detainee is taken into custody.  A

fair application of these factors to the circumstances here overwhelmingly leads this

---

always a Taliban.").)

[7]    Indeed, as Judge Bates of this Court recently noted, "[w]ith respect to the criteria to be
used in determining whether someone [i]s 'part of' the 'Taliban or al Qaeda,'" the Court must,
"by necessity, employ an approach that is more functional than formal, as there are no settled
criteria for determining who is a 'part of' an organization such as al Qaeda." *Hamlily v. Obama*,

Court to conclude that the relationship that existed in 2000 – such as it was – no longer existed *whatsoever* in 2002 when Janko was taken into custody.  How so?

First, the nature of the relationship, as portrayed by the Government's evidence, was – at best – in its formative stage.  In that regard, the Government relies almost exclusively on the detainee's own statements during interviews at Guantanamo to establish that he had spent a brief period of time in the company of al Qaeda.  To say the least, five days at a guesthouse in Kabul combined with eighteen days at a training camp does not add up to a longstanding bond of brotherhood.  Assuming arguendo that these allegations were established by a preponderance of the evidence,[8] the Government has demonstrated, at most, that Janko was trusted enough to be inducted into al Qaeda's military training program.  And while there is *no* evidence – from either side – as to why he suddenly was suspected by al Qaeda leaders of spying and was tortured for months into giving a false confession, it is highly unlikely that by that point in time al Qaeda (or the Taliban) had any trust or confidence in him.  Surely extreme treatment of that nature evinces a total evisceration of whatever relationship might have existed!  Stated simply, absent proof to the contrary – which is totally lacking here – no remnant of that preexisting relationship appears to have survived.  And if that were not enough, then the combination of Janko's incarceration thereafter for a substantial eighteen-plus month

No. 05-763, 2009 WL 1393113, at *8 (D.D.C. May 19, 2009).

[8]    The Court need not directly address whether the Government met its burden under the CMO to prove by a preponderance of the evidence that petitioner was a jihadist who had a preexisting relationship with al Qaeda because even if the Government had, such a showing would have been to no avail based on the subsequent events established in this case for the

period by the Taliban and subsequent abandonment by his captors when U.S. forces ultimately liberated Kandahar, is even more definitive proof that any preexisting relationship had been utterly destroyed.

Thus, combining the limited and brief nature of Janko's relationship with al Qaeda (and/or the Taliban), with the extreme conduct by his captors over a prolonged period of time, the conclusion is inescapable that his preexisting relationship, such as it was, was sufficiently vitiated that he was no longer "part of" al Qaeda (or the Taliban) at the time he was taken into custody by U.S. forces in 2002.  Accordingly, the Government has failed to establish by a preponderance of the evidence that Janko was lawfully detainable as an enemy combatant under the AUMF at the time he was taken into custody, and the Court must, and will, GRANT his petition for a writ of habeas corpus and order the Government to take all necessary and appropriate diplomatic steps to facilitate his release forthwith.

## CONCLUSION

For all the foregoing reasons, and for the reasons in the forthcoming classified version of this opinion, it is hereby

**ORDERED** that petitioner Abdulrahim Abdul Razak Al Ginco's petition for writ of habeas corpus is GRANTED; and it is further

---

reasons set forth in this opinion.

**ORDERED** that respondents are directed to take all necessary and appropriate diplomatic steps to facilitate the release of petitioner Janko forthwith.

**SO ORDERED**.

RICHARD J. LEON
United States District Judge